# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

THOMAS BAUER, KENNETH JOHNSON, )
CHARLES LEONARD, JAMES P. MANNA, )
REGINALD NELSON, ANTHONY PIERCE, )
JAMES PREVAIL, DAVID RANSFORD, )
JAMES SANDMAN, CRAIG WALSH and )
UNITED TRANSPORTATION UNION )
LOCAL 418 )
                                    )
                          **Plaintiffs,** )
                                    )
**v.**                                      )       **Civil Action No. C03-410 MWB**
                                      )
**BURLINGTON NORTHERN AND** )
**SANTA FE RAILWAY COMPANY,** )
                                      )
                         **Defendant.** )

## AFFIDAVIT OF DAVID F. ISOM

STATE OF TEXAS       )
                         ) SS.
COUNTY OF TARRANT    )

       Being duly sworn states as follows:

       1.      My name is David F. Isom. I am Director Labor Relations for The Burlington Northern and Santa Fe Railway Company ("BNSF"). My office address is 2650 Lou Menk Drive, Fort Worth, Texas 76161. I have been in the Labor Relations Department for the BNSF since 1999. Prior to 1999, I worked for the Union Pacific Railroad or its predecessors at various locations, including Omaha, Nebraska, and Clinton, Iowa. I make this affidavit based on personal knowledge, review of corporate documents or other business records and correspondence which are kept in the regular course of business.

EXHIBIT 1

2.      As Director Labor Relations, I have primary responsibility for the so-called operating crafts and the representatives for employees who are actually involved in the movement of freight trains. Among other organizations, I conduct labor relations with the United Transportation Union (UTU). The UTU represents among others, conductors, trainmen, brakemen and locomotive firemen. I am also familiar with the Brotherhood of Locomotive Engineers and Trainmen (BLET). The BLET also represents operating craft employees, namely locomotive engineers.

3.      There are collective bargaining agreements in place between BNSF and its employees represented by UTU which specifically address the process for investigating allegations of employee wrongdoing and for assessing discipline. A true and correct copy of the applicable agreement governing operations in Sioux City, Iowa, dated October 24, 1984 is attached as Exhibit A. Under this agreement, any discipline from a formal reprimand or warning up to and including termination are governed by a specified process.

4.      Under the October 24, 1984 Agreement, employees cannot be disciplined by BNSF without first complying with the provisions of the Agreement. Specifically, the Agreement provides:

**SECTION A.  General Requirements**

1.      An employee shall not be discharged, suspended or otherwise discipline without just cause and without a fair and impartial hearing, except that an employee may waive a hearing in accordance with Section B(2) of this Article....

2.      An employee shall not be held from service pending hearing except in serious cases, such as theft, altercation, Rule "G" violation, insubordination, major accidents, serious misconduct and major offenses whereby the employee's retention in service could be hazardous.

5.     Thus, under the Agreement, BNSF is contractually restricted from issuing discipline to its UTU represented employees unless it complies with the terms of the applicable collective bargaining agreement. The requirements contained in the Agreement include written notice of a formal hearing prior to assessment of any discipline. By agreement rule, "The notice shall contain a clear and specific statement of the date, time, place and nature of the occurrence or incident that is to be subject of the hearing." Other procedural requirements contained in the Agreement include specifics on the conduct of the hearing and a requirement that the hearing be transcribed.

6.     There are similar agreements in place with the BLET. A true and correct copy of the BLET agreement covering Sioux City, Iowa, is attached as Exhibit B.

7.     Under the UTU and BLET agreements, if any discipline is assessed, the employee may challenge or grieve such discipline through various levels of BNSF management. If these grievances are unresolved, they may be presented to arbitration at the National Railroad Adjustment Board (NRAB), which is an agency of the federal government. Such unresolved claims and grievances may also be submitted to private arbitration boards, known as public law boards.

8.     Either at the NRAB or a Public Law Board (PLB), a neutral arbitrator will examine the facts, the record or transcript and the history of the dispute to determine whether the discipline is warranted. Arbitrators have authority to sustain an employee's claim, in whole or in part, which can amount to a reversal or modification of discipline assessed by BNSF. An example of a case where discipline was overturned and the claim sustained is Award No. 7, before Arbitrator Robert O'Brien *UTU-Burlington Northern R.R. Co.*, which is attached as Exhibit C. In that case, the employees were assessed a ten (10) day dismissal for their alleged

failure to perform a walking inspection of a train. The employees alleged that they believed they could finish their lunch and still have time to complete the inspection. The Arbitrator agreed and reversed the discipline:

> [T]he Claimants concluded that they had sufficient time to complete the walking inspection before departing Bingham. In our view, this was a reasonable assumption on their part. In fact, Brakeman Kampbell did complete the walking inspection before Train No. 37K11 left Bingham. Consequently, the discipline assessed the Claimants must be set aside and they must be made whole for lost wages they sustained during their ten (10) day suspensions.

PLB No. 3304 Award 76 (O'Brien 1987).

9.      Another example is Award No. 335 from Arbitrator O'Brien also before PLB 3304. In that case the Claimant was dismissed for his alleged improper actions in the context of a train accident. The Arbitrator disagreed and reversed the thirty (30) day suspension. PLB 3304, Award 335 (O'Brien 1995). A coy of that Award is attached as Exhibit D.

10.     RLA Arbitrators can also modify discipline that has been assessed by the railroad. In Award No. 23 from PLB 3304, the Arbitrator believed that the employee-claimant had committed the offense, but found that discharge from employment was excessive discipline. Instead, the Arbitrator ordered the employee reinstated without back pay for the time he was out of service. A copy of PLB 3304 Award 23 (O'Brien 1985) is attached as Exhibit E.

11.     Additionally, under the applicable agreements employees can waive their right to a hearing and accept formal discipline. An example of such a situation is the Waiver signed by J. B. Linneman, attached as Exhibit F.

AFFIANT SAYETH NOT.

David F. Isom

SUBSCRIBED AND SWORN TO BEFORE ME by the said David F. Isom, on this the 26th day of April, 2004.



Notary Public, State of Texas

VICKIE POPEJOY
Notary Public, State of Texas
My Commission Expires
Sept. 8, 2006

# MEMORANDUM OF AGREEMENT
## Between
## BURLINGTON NORTHERN RAILROAD COMPANY
### (Former CB&Q)
## And
## UNITED TRANSPORTATION UNION (C,T&Y)

IT IS AGREED:

The following portion of the "National Investigation Rule" is adopted in lieu of existing agreements, understandings and practices in regard to discipline investigations (hearings) and the assessment of discipline.

## SECTION A.  General Requirements

1. An employee shall not be discharged, suspended or other-wise discipline without just cause and without a fair and impartial hearing, except that an employee may waive a hearing in accordance with Section B(2) of this Article .....

2. An employee shall not be held from service pending hearing except in serious cases, such as theft, altercation, Rule 'G' violation, insubordination, major accidents, serious misconduct and major offenses whereby the employee's retention in service could be hazardous.

## SECTION B.  Formal Hearing

1. Notice of Hearing

    (a) An employee directed to attend a formal hearing to determine the employee's responsibility, if any, in connection with an occurrence or incident shall be notified in writing by certified mail, return receipt requested, to the last known address within a reasonable period of time but not to exceed ten (10) days from the date of occurrence, or where the occurrence is of a nature not immediately known to the employee's super-visor(s), from the time they first have knowledge there-of.  The notice shall contain a clear and specific statement of the date, time, place and nature of the occurrence or incident that is to be the subject of the hearing.  The notice shall be sent in duplicate in order that the employee may transmit a copy to the employee's representative if the employee desires.

    NOTE:  This rule does not preclude delivery of the notice at reasonable times by a carrier representative. Such delivery at the employee's home shall be made

jjr.3

-1-

only when other means of delivery are not practicable.

(b)  The notice shall state the date, time and place the hearing is to be held which shall not be less than five (5) days after the date of notification or more than ten (10) days after the date of notification unless otherwise agreed to.

(c)  The Carrier will have the responsibility of producing sufficient witnesses to develop the facts concerning the incident or occurrence being investigated and the notice of hearing shall include the name of each person receiving the notice and the names of all witnesses known at the time of the notice that the carrier intends to have in attendance at the hearing.  The employee or the employee's representative may bring to the attention of the responsible carrier official the name or names of other witnesses who may provide material facts.

(d)  The notice shall inform each employee so notified of the right to representation and to bring in witnesses.

(e)  If an employee who is to receive a notice of hearing will not be permitted to exercise the option under Section B(2) of this Article, the notice of hearing shall so specify.

2.  Waiver of Hearing

(a)  An employee who has been notified to appear for a hearing shall have the option, prior to the hearing, to discuss with the appropriate carrier official, either personally, through or with the employee's representative, the act or occurrence and the employee's responsibility, if any.

If disposition of the charges is made on the basis of the employee's acknowledgement of responsibility, the disposition shall be reduced to writing and signed by the employee and the official involved and shall incorporate a waiver of hearing and shall specify the maximum discipline which may be imposed for employee's acceptance of responsibility.

Disposition of cases under this paragraph (a) shall not establish precedents in the handling of any other cases.

(b)  No minutes or other record will be made of the discussions and, if the parties are unable to reach an agreed upon disposition on this basis, no reference shall

be made to these discussions by either of the parties in any subsequent handling of the charges under the discipline procedure.

3. Postponements of Hearing

Consistent with the provisions of Section A. 1 for a fair and impartial hearing, postponements of the formal hearing may be requested by either party on reasonable grounds and consent shall not be unreasonably withheld.

4. Conduct of Hearing

(a) The hearing shall be conducted by an officer of the employing carrier who may be assisted by other officers. If practicable to do so, the hearing shall be held at the home terminal of the employee involved or in the case where more than one employee is involved at the home terminal of the majority of the employees.

NOTE: When another carrier is involved, this will not preclude an officer of that carrier from conducting the hearing or assisting in the hearing recognizing, in any case, that there shall be only one presiding (hearing) officer.

(b) The employee shall have the right to be represented at the hearing by an employee or an organization representative of the employee's own choosing. The employee and/or the employee's representative shall have the right to introduce witnesses in the employee's behalf, to hear all testimony introduced, and to question all witnesses.

(c) An employee's personal service record will not be included in or referred to in the hearing or in the transcript of the proceedings of the hearing. The employee's personal record may be taken into consideraion in assessing the amount of discipline imposed, if any.

(d) If the formal hearing is not held within the time limits specified in Section B. 1(b), the employee will not be disciplined, will be paid for all time lost, and no disciplinary entry will be made in the employee's personal service record.

(é) The employee and witnesses will be permitted time off if requested in order to have sufficient rest prior to and following the hearing.

SECTION C.  Transcript of Hearing

It is recognized that the Carrier is responsible for ensuring
that an accurate transcript of the hearing proceedings is
made.  However, this will not preclude the employee or employ-
ee's representative from making a record of the proceedings
for their own use.

If, during the hearing, a partial transcript is made prior to
conclusion of the hearing such partial transcript will be made
available to the employee and employee's representative upon
request.  If electronic recording devices are used and
recordings are available for review by carrier officials, they
also shall be made available upon request for review by the
employee and employee's representative at the appropriate
carrier facility.

In any cases where discipline is assessed, or in cases where
discipline is not assessed but nevertheless there is a
transcript, copy of the transcript will be furnished to the
employee and the employee's representative promptly upon
request.

SECTION D.  Hearing Decision

1.   If the formal hearing results in assessment of disci-
     pline, such decision shall be rendered within fifteen
     (15) calendar days from the date the hearing is conclud-
     ed, and the employee will be notified in writing of the
     reason therefore by certified or registered U. S. mail
     with additional copy provided for the employee represen-
     tative.

     NOTE:  This rule does not preclude delivery of the
            decision at reasonable times by a carrier rep-
            resentative.  Such delivery at the employee's home
            shall be made only when other means of delivery
            are not practicable.

2.   If the hearing does not result in discipline being
     assessed, any charges related thereto entered in the
     employee's personal service record shall be voided.

SECTION E.  Compensation for Attending Hearings

1.   Witnesses, as referred to in Section B. 1. (c), who are
     directed by the carrier to attend a hearing, shall be
     compensated for all time lost and, in addition, will be
     reimbursed for actual, reasonable and necessary expenses
     incurred for each day of the hearing.  Where no time is
     lost they will be paid for actual time attending the

jjr.3

-4-

hearing, with a minimum of four (4) hours, to be paid for at the rate of pay applicable to the last service performed.

2. When an employee involved in a formal hearing is not assessed discipline, the employee shall be compensated for all time lost. In addition, the employee will be reimbursed for actual, reasonable and necessary expenses incurred for each day of the hearing. Where no time is lost the employee shall be paid for actual time attending the hearing with a minimum of four (4) hours for each day of the hearing, to be paid for at the rate of pay applicable to the last service performed.

## SECTION F.  Time Limit on Appeals

The current Time Limit on Claims Rule (BN Agreement 3/14/84 OPS. 19-84) between the parties hereto, insofar as it applies to the presentation and appellant handling of discipline, shall continue to apply.

This agreement signed at _Omaha, Neb._, this _24th_ day of _October_, 1984, and effective _November 1_, 1984.

For the
UNITED TRANSPORTATION
UNION (C,T&Y)

By _R.W. Mez_
General Chairman

By _Bur Long_
Associate Chairman

For the
BURLINGTON NORTHERN RAILROAD
COMPANY (former CB&Q)

By _S.D. Vancamp_
Asst. Vice President
Labor Relations

By _C.A Brryan_
Senior Vice President-
Regional Operations

jjr.3

MEMORANDUM OF AGREEMENT
Between
BURLINGTON NORTHERN INC.
And
BROTHERHOOD OF LOCOMOTIVE ENGINEERS

Pending the conclusion of our negotiations for a single engineers' schedule agreement to apply throughout Burlington Northern Inc., the following provisions are agreed to in order to establish a uniform time limits rule:

(a) This rule does not apply to requests for reinstatement without pay in discipline cases.

(b) Failure to comply with the time limits specified in this rule will not set a precedent or waiver of the contentions of either party as to future application of rules regarding similar or identical claims. When U.S. mail is used the postmark date will apply.

(c) All claims must be filed in writing by or on behalf of the engineer or engineers with the officer of the Carrier authorized to receive same within sixty days from the date of the occurrence on which the claim is based. The date of occurrence in discipline cases is the date the notification of discipline is received. Claims not allowed must be declined by Carrier to the individual engineer or his representative, whoever presented the claim, by notice in writing within sixty days from date same is filed, giving the reason for such disallowance. If not so notified the claim shall be allowed.

(d) If claim is to be appealed, such appeal must be submitted in writing by the Local Chairman to the Superintendent within sixty days from the date of receipt of notice of disallowance from the Carrier. Failing to comply with this provision the claim will be barred. If such appeal if to be declined the Superintendent will have sixty days from date of receipt of such appeal to do so and if not declined to the appellant in writing within that period the claim shall be allowed. Claims initiated by a Local Chairman will not be appealed under this paragraph (d) but may be progressed by the General Chairman under paragraphs (g), (h) and (i) of this rule, whichever is appropriate.

(e) This rule recognizes the right of representatives of the organization signatory hereto, to file and pursue claims for and on behalf of employees they represent.

(f) It is further recognized that both the General Chairman and the Carrier's highest appeal officer are free to amend the respective positions taken by their local representatives in respect to the basis on which a claim is initially premised or declined during its handling on the local level so as to be consistent with their respective positions concerning the meaning and application of the involved rules of the contract.

(g) If a claim involving discipline is to be appealed, it will be submitted to the highest designated officer of the Region involved, within sixty days from date of receipt of Superintendent's declination, or the claim will be barred. If such appeal is to be declined, the highest designated officer of the Region involved will have sixty days from date of receipt of such appeal to do so, and if not declined to the appellant in writing within that period the claim shall be allowed.

(h) If a claim involving discipline is to be further appealed, it will be submitted by the General Chairman to the highest designated officer of the Carrier within ninety days from date of receipt of highest designated officer of the Region's declination, or the claim will be barred. If such appeal is to be declined, the highest designated officer will have ninety days from date of receipt of such appeal to do so, and if not declined to the appellant in writing within that period the claim shall be allowed.

(i) If claim involving other than discipline is to be appealed, it will be submitted to the highest designated officer of the Carrier by the General Chairman within ninety days from date of receipt of Superintendent's declination as outlined in paragraph (d) of this rule or the claim will be barred. If such appeal is to be declined, the highest designated officer will have ninety days from date of receipt of such appeal to do so, and if not declined to the appellant in writing within that period the claim will be allowed.

(j) The decision of the highest designated officer will be binding unless within one year from date of said officer's written decision proceedings are instituted by the employe or his representative before a tribunal having jurisdiction to dispose of said claim. Under these circumstances failure to institute such proceedings will not set a precedent in any way for disposition of other similar claims.

- 2 -

(k) Time limits as stated in this agreement may be extended for any case by mutual agreement between the parties.

This agreement cancels Labor Agreement BN 8/14/78, will become effective _June 1, 1979_, and will apply to all claims arising out of incidents, trips or tours of duty on or after that date, and will remain in effect until superseded by the new BLE-BN schedule.

Signed at St. Paul, Minnesota, this _20th_ day of _April_, 1979.

For
BROTHERHOOD OF LOCOMOTIVE

For
BURLINGTON NORTHERN INC.

_W. M. Dunegan_
General Chairman

_A E Egbes_
Vice President-Labor Relations

EJC:dsagmts,69

## MEMORANDUM OF AGREEMENT

Paragraph (d) of the Memorandum of Agreement signed April 20, 1979, establishing a uniform time limit rule, is revised as follows:

(d)  If claim is to be appealed, such appeal must be submitted in writing by the Local Chairman to the Superintendent within sixty days from the date of receipt of notice of disallowance from the Carrier. Failing to comply with this provision the claim will be barred.  If such appeal is to be declined the Superintendent will have sixty days from date of receipt of such appeal to do so and if not declined to the appellant in writing within that period the claim shall be allowed.  Claims initiated by a Local Chairman will not be appealed under this paragraph (d) but may be progressed by the Local Chairman or the General Chairman under paragraph (g), and by the General Chairman under paragraphs (h) and (i) of this rule, whichever is appropriate.

Signed at St. Paul, Minnesota, this 4th day of December 1981.

FOR THE BROTHERHOODD OF
LOCOMOTIVE ENGINEERS:

FOR BURLINGTON NORTHERN
RAILROAD COMPANY:

*W. M. Dunegan*
General Chairman

*A E Egbers*
Vice President-Labor Relations

DRCABLE3,20

**BURLINGTON NORTHERN**

176 East Fifth Street
St. Paul, Minnesota 55101

January 17, 1979

Mr. W. M. Dunegan
General Chairman
Brotherhood of Locomotive Engineers
1003 Pioneer Building
St. Paul, Minnesota   55101

Dear Mr. Dunegan:

This will confirm our discussions regarding engineers'
discipline investigations and our mutual endeavor to
minimize the number of investigations.

We have agreed that for a four-month trial period,
February 1 through May 31, 1979, the following will be
effective:

> An engineer may formally waive his rights to
> an investigation, provided that such waiver
> specifies the discipline to be assessed and
> is confirmed in writing in the presence of
> his duly authorized representative and proper
> officer of the Carrier.

The above will remain in effect after May 31, 1979,
unless terminated by a 30-day notice, one party on the
other party.

Very truly yours,                        ACCEPTED:

*A E Egbers*                             *W. M. Dunegan*
                                         General Chairman, BLE

A. E. Egbers
Vice President

EJC/cw13

VICE CHAIRMEN
MACK L. GLOVER
JIM D. SHELL
WILLIAM C. KEPPEN

ROBERT E. PELAVA
GENERAL CHAIRMAN

SECRETARY-TREASURER
MAELYN E. HANSEN
P.O. BOX 21291
COLUMBIA HTS., MN 55421



# BROTHERHOOD OF LOCOMOTIVE ENGINEERS

### GENERAL COMMITTEE OF ADJUSTMENT

BURLINGTON NORTHERN RAILROAD COMPANY
333-ON-SIBLEY STREET, SUITE 410
ST. PAUL, MINNESOTA 55101
Phone (612) 224-5441

June 1, 1984
BLE File: Investigations
BNRC File: EF-20(i)

Mr. J. L. Russell
Director of Labor Relations
Burlington Northern Railroad Co.
176 East Fifth Street
St. Paul, Minnesota 55101

Dear Mr. Russell:

Referring to our letters of agreement identified as BLE/BN 1/17/79, carrier file EF 20(i), it is our position that this agreement is subject to the following interpretation:

> An engineer waiving his rights to an investigation does so solely of his own volition. However, the signing of the waiver must be witnessed by the representative and the proper carrier officer.

If you concur with this interpretation, sign and return one (1) copy of this letter.

Very truly yours,

*R. E. Pelava*

R. E. Pelava
General Chairman

*J. L. Russell*

J. L. Russell
Director of Labor Relations

Dated: 6/28/84

REP:mcp

BURLINGTON NORTHERN R.R. CC

JUL 1 1984

VICE PRESIDENT
LABOR RELATIONS

$CTB-82-2-1H$

Case No.   79
Award No. $76$

PARTIES TO DISPUTE:       UNITED TRANSPORTATION UNION

-and-

BURLINGTON NORTHERN RAILROAD COMPANY

STATEMENT OF CLAIM:

Request of Wyoming District (Alliance) Conductor
M. J. Snelson and Brakeman J. J. Kampbell for removal
of the censures from their personal records and pay
for time lost as the result of their ten (10) day
suspension from June 6 through June 15, 1980.

FINDINGS:

This Board, upon the whole record and all the evidence,
finds as follows:

That the parties were given due notice of the hearing;

That the Carrier and Employees involved in this dispute
are respectively Carrier and Employees within the meaning of
the Railway Labor Act as approved June 21, 1934;

That this Board has jurisdiction over the dispute
involved herein.

On April 30, 1980, the Claimants were assigned to Train
No. 37K11, Extra MP-3023 Westbound. At approximately 3:35
a.m., Train No. 37K11 stopped at an absolute red signal in
Bingham, Nebraska. The Carrier contends that the Claimants
failed to make a walking inspection of their train while it
was stopped at Bingham and it therefore conducted an
investigation on May 8, 1980.

The facts adduced at the May 8, 1980, investigation
reveal that approximately fifteen (15) minutes after Train
No. 37K11 stopped at Bingham, Trainmaster Langston and Road
Foreman Gorsage entered the caboose. Trainmaster Langston
testified that he asked the Claimants if their train had been
inspected whereupon Conductor Snelson responded that they
were getting ready to make the inspection. According to
Conductor Snelson, Train No. 37K11 was stopped at Bingham
waiting for an eastbound train to pass. Mr. Snelson stated

EXHIBIT C

that he attempted to contact the eastbound train by radio but did not receive a response. He therefore concluded that the train was some distance away and that the crew would have sufficient time to inspect the train before it left Bingham. Mr. Snelson explained that he thus allowed Brakeman Kampbell to finish a sandwich he was eating before commencing the walking inspection.

The evidence also revealed that Train No. 37K11 was stopped at Bingham for approximately forty (40) minutes. According to Brakeman Kampbell, he completed the walking inspection of the train before it departed. However, the Carrier determined that the Claimants had violated General Rule A and Rule 713 (E) of the Consolidated Code of Operating Rules when they failed to make a walking inspection of their train between 3:35 a.m. and 3:49 a.m. The Carrier entered censures on their personal records and suspended the Claimants for ten (10) days as a result.

Rule 713 (E) requires crews on freight trains to make a walking inspection of their train at all stops as time will permit. Based on the evidence adduced at the May 8, 1980, investigation, it is the considered opinion of this Board that the Claimants complied with Rule 713 (E). Inasmuch as the eastbound train they were waiting for to pass could not be contacted by radio, the Claimants concluded that they had sufficient time to complete the walking inspection before departing Bingham. In our view, this was a reasonable assumption on their part. In fact, Brakeman Kampbell did complete the walking inspection before Train No. 37K11 left Bingham. Consequently, the discipline assessed the Claimants must be set aside and they must be made whole for lost wages they sustained during their ten (10) day suspensions.

AWARD:    Claim sustained.

Carrier is directed to make the within Award effective on or before thirty (30) days from the date hereof.

_____
Robert M. O'Brien, Neutral Member

_____
W. T. Pearl, Employee Member

_____
J. M. Waldron, Carrier Member

Dated: November 5, 1987

2

PUBLIC LAW BOARD NO. 3304

Case No.  370
Award No. 335

PARTIES TO DISPUTE:          UNITED TRANSPORTATION UNION

-and-

BURLINGTON NORTHERN RAILROAD

STATEMENT OF CLAIM:

Claim of Illinois-Wisconsin Seniority District (Galesburg)
Yardman P.L. Johnson for removal of the censure from his personal
file and payment for all time lost as a result of an
investigation held on October 5, 1993.

FINDINGS:

This Board upon the whole record and all the evidence, finds
as follows:

That the parties were given due notice of the hearing;

That the Carrier and Employees involved in this dispute are
respectively Carrier & Employees within the meaning of the
Railway Labor Act as approved June 21, 1934;

That this Board has jurisdiction over the dispute involved
herein.

On September 26, 1993, the Claimant was assigned as Switch
Foreman on Job No. 101H (first Hump Engine) in Galesburg Yard
with an on-duty time of 7:00 A.M. At approximately 12:10 P.M.,
the Claimant and his crew proceeded to the hump tower to go to
lunch. They had a two-engine consist. The Claimant was riding on
the engineer's side of the lead unit and Engineer Milan was on
the same side in the trailing unit.

As the first Hump Engine proceeded to the hump tower on
Track No. X-2, the two-engine consist of the second Hump Engine
assignment sat idle on Track No. X-2 in front of the hump tower
while that crew was on a lunch break. The first Hump Engine
struck these engines on Track No. X-2 causing damage to both
locomotive consists. Engineer Milan also sustained a personal
injury as a result of this collision.

1

The crew of the first Hump Engine was instructed to attend an investigation on October 5, 1993, to determine their responsibility, if any, for the collision on Track No. X-2. At that investigation, the Claimant insisted that he gave Engineer Milan an "easy" sign as they approached the engines of the second Hump Engine assignment. When there was no response, the Claimant made an emergency application of the brakes but the movement did not stop in time to avoid colliding with the consist of the second Hump Engine assignment. Engineer Milan stated that he never saw the Claimant give him a hand signal. The Claimant and Engineer Milan were both censured and assessed a thirty (30) day suspension due to their reputed responsibility for the collision.

Based on the evidence adduced at the October 5, 1993 investigation, this Board is not convinced that the Claimant was derelict in the performances of his duties on September 26, 1993. We are inclined to credit his testimony that he gave the Engineer an "easy " hand sign as they approached the idle consist of the second Hump Engine assignment. Since the Claimant was sitting directly in front of Engineer Milan; it was daylight; and visibility was clear, there was no excuse for Engineer Milan not to observe the Claimant's hand sign. And in any event, the idle engines outside the hump tower on Track No. X-2 were clearly visible to Engineer Milan and he should have stopped short of them even if the Claimant did not pass him an "easy" sign.

It is the considered opinion of this Board that the Claimant was not responsible for the collision even though he was controlling the movement of the engine consist at the time. He gave the Engineer an "easy" signal and when the movement did not slow he immediately made an emergency application of the brakes. In our view, he should not have been disciplined since he was not derelict in the performance of his duties as Switch Foreman on the first Hump Engine assignment. The discipline assessed the Claimant must therefore be set aside and he is entitled to the wages he lost as a result of his improper discipline.

2

AWARD:    Claim sustained.

Carrier is directed to make the
within Award effective on or before
thirty (30) days from the date hereof.

_Robert M. O'Brien_
Robert M. O'Brien, Neutral Member

_W. T. Pearl_
W.T. Pearl, Employee Member

_R.L. Luther_
R.L. Luther, Carrier Member

Dated: March 2, 1995

3

CTB-82-9-22H

Case No.: 68
Award No.: 23

PARTIES TO DISPUTE:
* United Transportation Union
*
* -and-
*
* Burlington Northern Railroad Company
*
*
*

STATEMENT OF CLAIM:

Request of Wyoming District (Gillette) Conductor A.L. Alderman for reinstatement to service with seniority unimpaired and pay for all time lost since being dismissed from service on August 17, 1981.

FINDINGS:

This Board, upon the whole record and all the evidence, finds as follows:

That the parties were given due notice of the hearing;

That the Carrier and Employees involved in this dispute are respectively Carrier and Employees within the meaning of the Railway Labor Act as approved June 21, 1934;

That this Board has jurisdiction over the dispute involved herein.

Conductor A.L. Alderman began his employment with the Burlington Northern Railroad Company on May 20, 1979. On Friday, June 19, 1981, the Claimant was given an 8:45 a.m. assignment as Conductor in the loading pool at Gillette, Wyoming. The Claimant's assignment consisted of pulling empty cars to a coal mine called Black Thunder; loading the empty cars with coal at that location; and hauling the loaded cars out of Black Thunder. The Carrier alleged that on that date, Claimant quarrelled with a dispatcher over the procedure being used to load

the empty cars; then falsely marked off sick after being in-
structed by the dispatcher to continue his tour of duty at
Black Thunder.

On July 21, 1981, the Carrier conducted an investigation
to ascertain the facts and to determine the Claimant's respon-
sibility for allegedly quarrelling with the dispatcher; and for
allegedly falsifying his physical condition after being instruc-
ted by the dispatcher to continue his tour of duty. At the in-
vestigation, evidence was presented which revealed that on June
19, 1981, Claimant was waiting at the yard in Reno, Nevada to
proceed to Black Thunder. Apparently Black Thunder had been
closed for approximately 48 hours prior to June 19, 1981, and
as a result, trains with empty cars and loading crews remained
backed up and idle at Reno. Mr. Roby, the dispatcher involved
in this incident, testified that one (1) loading crew was load-
ing coal into a train at Black Thunder; four (4) trains with
empty cars were at Reno waiting to proceed to Black Thunder;
and three (3) more trains with empty cars were heading toward
Reno also destined for Black Thunder.

The conversation that transpired between Claimant and Mr.
Roby is in dispute. Mr. Roby testified that Claimant requested
that he and his loading crew be allowed to proceed to Gillette
to tie up since there already were crew loading cars at Black
Thunder. Mr. Roby denied this request in the light of the back
up at Reno and the need to move trains to Black Thunder for
loading. Mr. Roby claimed that he instructed Claimant to operate
the first train at Reno to Black Thunder and load it but that
the Claimant became quarrelsome and refused to do so. The Claim-
ant also stated that he was going to call the trainmaster at
Gillette. After advising Claimant that he did not care who he
called, Mr. Roby testified that Claimant hung up the telephone
on him. Mr. Roby testified that he then called the operator at
Reno and instructed the operator to direct Claimant to proceed
to Black Thunder. Approximately fifteen or twenty minutes later,
the operator called Mr. Roby and informed him that Claimant had
marked off sick.

Claimant admitted that Mr. Roby instructed him to move a
train to Black Thunder for loading. But he denied quarrelling
with Mr. Roby. Rather, he merely asked for an explanation of
his instructions since he did not believe that two loading crews
were needed at Black Thunder. Claimant testified that since one
loading crew had recently arrived at Black Thunder, he and his
loading crew would be sitting idle at Black Thunder waiting for
them to finish loading their train of empty cars. Moreover,
given the frequency of mechanical failures at Black Thunder,

Claimant opined that he and his loading crew would not commence loading until they were already on overtime.

Evidence presented at the investigation demonstrated that Claimant operated the train to Black Thunder, arriving at approximately 2:05 p.m. on June 19, 1981. However, he did not participate in loading the train for at approximately 2:25 p.m. on June 19, 1981, he marked off sick complaining of a headache and a stomachache. Mr. Brieske, the Engineer on the loading crew testified that loading began at approximately 4:20 p.m. on June 19, 1981, but was still not completed when the loading crew's tour of duty ended at 8:45 p.m.

The Claimant also asserted that he did not request to tie up at Gillette. His testimony was corroborated by Mr. Brieske, and Mr. Calene, a van operator unaffiliated with the Carrier. They claimed that they heard the Claimant's conversation with Mr. Roby, and that Claimant was not quarrelsome, nor did he refuse to take the train to Black Thunder to load it. They further testified that Claimant was telephoning Mr. Roby on behalf of his loading crew to find out why two loading crews were needed at Black Thunder.

At 2:25 p.m. on June 19, 1981, Claimant was relieved from duty. Upon his arrival in Gillette, he was met by Trainmaster Stulac who transported him to the emergency room of a hospital located in Gillette for diagnosis. However, because of the number of patients in the emergency room; and since Claimant did not believe that he needed to be examined by a physician for his illness, he and Mr. Stulac left the hospital without seeing a doctor. Finally, the evidence further revealed that Claimant's approved vacation began on June 22, 1981. However, Claimant had also been granted an approved lay off from duty for Saturday, June 20, 1980; and for Sunday, June 21, 1981. As a result, Claimant testified that he left for his vacation the evening of Friday, June 19, 1981.

By letter dated August 17, 1981, Claimant was notified that he was dismissed from service for his violation of Rule 700 of the Consolidated Code of Operating Rules due to his quarrelsome conduct with Dispatcher Roby; and for his refusal to comply with the Dispatcher's instructions to continue his tour of duty at Black Thunder. The Organization maintains that the evidence clearly demonstrates that Claimant was not quarrelsome with Carrier's dispatcher; and that he did not fail to perform his tour of duty as instructed by the dispatcher. Accordingly, it insists that Claimant's dismissal from service was not warranted.

The Carrier, of course, has the burden of proving the
charges against Claimant. To meet this burden, it must demon-
strate by substantial evidence that Claimant was quarrelsome
with Dispatcher Roby; and that he refused to obey the instruc-
tions of the dispatcher to continue his tour of duty at Black
Thunder. Based on the evidence adduced at his investigation,
it is uncertain whether Claimant was quarrelsome during his
conversation with Dispatcher Roby. Accordingly, we find that
Carrier has not sustained its burden of proving this charge.

However, it is undisputed that Dispatcher Roby had instruc-
ted Claimant to complete his tour of duty at Black Thunder. That
Claimant did not load the empty cars in his train at Black Thunder
is equally clear. Therefore, unless Claimant had a compelling
reason for not loading the empty cars at Black Thunder, we must
find that he did not comply with the dispatcher's instructions
to continue his tour of duty.

Claimant testified that he marked off sick at Black Thunder
because he was experiencing a headache and a stomachache. While
no evidence has been presented which directly refutes this con-
tention, nevertheless we find his claim highly questionable. It
must be noted that the loading process at Black Thunder is in-
herently slow. In addition, Claimant testified that given the
propensity for mechanical failures at Black Thunder, he antici-
pated that his loading crew would not commence loading coal un-
til late afternoon on June 19, 1981. In fact, the loading crew
did not begin to load the empty cars until approximately 4:20
p.m. on June 19, 1981. At 8:45 p.m. when the crew outlawed
under the Hours of Service Act, the task of loading all the
empty cars had not been completed. The loading crew did not ar-
rive back in Gillette until approximately 9:45 p.m. The evidence
also revealed that Claimant commenced his vacation the evening of
June 19, 1981, the date on which the incident giving rise to his
discipline occurred. Obviously, his vacation would have been de-
layed had he completed his assignment at Black Thunder.

Taking all these facts into consideration leads this Board
to conclude that Claimant did indeed falsely mark off sick after
he was instructed to complete his assignment at Black Thunder.
It must be noted that despite his claimed illness, Claimant com-
menced his scheduled vacation after he marked off on June 19,
1981. His conduct was questionable to say the least.

Notwithstanding the foregoing, this Board does not be-
lieve that Claimant committed a dismissable offense.  We there-
fore order him restored to service with his seniority unimpaired
but without any compensation for lost wages or benefits.

AWARD:  Claim sustained to the extent indicated in the Findings.
        Carrier is directed to make the within Award effective
on or before thirty (30) days from the date hereof.

_Robert M. O'Brien_
Robert M. O'Brien, Chairman and Neutral Member

_K. Levin_
K. Levin, Employee Member

_R.A. Bakken_
Ronald Bakken, Carrier Member

DATED:  APRIL 24, 1985

 

**BNSF**

G. D. WRIGHT

DIRECTOR ADMINISTRATION

The Burlington Northern
and Santa Fe Railway Company

201 North 7th Street
Lincoln, NE 68508

402-458-7596
Fax 402-458-7503
E-mail

RECEIVED BNSF
KANSAS CITY, KS
SEP 15 2000
CORPORATE SUPPORT

September 8, 2000

J. B. Linneman - Conductor
Employee No. 716475-9
SSN: 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
5435 N.W. Fairway Drive
Lincoln, NE 68521

This letter will confirm that as a result of our conference in connection with your alleged failure to comply with instructions from the proper authority, your alleged delay to various BNSF Trains and your alleged insubordinate, quarrelsome and discourteous conduct at or near Ferry, Nebraska, on or about 1500 Hours, Friday, September 1, 2000, while assigned as Conductor on Train G-RUTEMP1-31A, on duty at 0730 Hours, Friday, September 1, 2000, at Sioux City, IA, you are being issued a Level S – thirty (30) day suspension for violation of Burlington Northern Santa Fe General Code of Operating Rules – Rule 1.6 (Conduct); Rule 1.6.3 (Insubordinate); Rule 1.6.6 (Quarrelsome); Rule 1.6.7 (Discourteous); Rule 1.13 ( Reporting and Complying With Instructions) and Rule 1.29 (Avoiding Delays). Additionally, you are being assigned a probationary period of three (3) years beginning September 2, 2000. If you commit another serious rule violation during the tenure of this probation period, you will be subject to dismissal.

Your suspension will commence at 0001 Hours, Saturday, September 2, 2000. Any scheduled vacation, leave of absence or furlough during this time will extend your suspension by the corresponding number of days that fall within the suspension period. You will be reinstated to service at 0001 Hours, Monday, October 2, 2000.

In accessing discipline consideration was given to your personal record.

This letter will be placed in your personal file. Your signing below serves as acceptance of this suspension and agreement to waive your right to formal investigation and appeal in this matter.

G. D. Wright
Director Administration

CC:     M. G. Heyns
        S. S. Nettleton
        A. V. Wetsch
        B. Investigation File (164-00)
        Personal Records

**ACKNOWLEDGE:**

Signature: _____        Date: 9-12-00

BNSFh1.dot

1010
0510
9-18-00
JB

EXHIBIT F

# NYEMASTER, GOODE, VOIGTS, WEST, HANSELL & O'BRIEN

700 Walnut Street
Des Moines, Iowa 50309
(515) 283-8029
FAX: (515) 283-3108

June 11, 2004

TO:               Don Munro

FAX NUMBER:        202-828-2195

FROM:             Mary Funk

RE:               Bauer v. BNSF

COMMENTS:          See attached

NUMBER OF PAGES BEING TRANSMITTED, <u>INCLUDING COVER SHEET</u>: ___

ORIGINAL:     (x) WILL NOT BE SENT

If you have trouble with this transmission or do not receive all of the pages, please contact: Nancy Weiler at 515-283-3182.

<u>THIS COMMUNICATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.</u>

If the reader of this communication is not the intended recipient or the employee or agent responsible for delivering the communication to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original communication to us at the above address via the U.S. Postal Service at our expense. Thank you.

**Motions** Notice - Documents Filed Under Seal or Ex Parte
The court has made the decision pursuant to LR 5.3.e.1, to not allow the filing of sealed pleadings,
motions or other documents or any ex parte filings to be made electronically. If any part of the pleading,
motion or other document, which you are trying to file at this time is either sealed or exparte,
you must file a hard copy with the office of the Clerk of Court. You may not file it electronically
5:03-cv-04110-MWB Bauer et al v. Burlington Northern Sante Fe Railroad Company

### U.S. District Court

### Northern District of Iowa

Notice of Electronic Filing

The following transaction was received from Funk, Mary E entered on 4/28/2004 at 1:22 PM CDT and
filed on 4/28/2004
**Case Name:**       Bauer et al v. Burlington Northern Sante Fe Railroad Company
**Case Number:**     5:03-cv-4110
**Filer:**           Burlington Northern Sante Fe Railroad Company
**Document Number:** 8

**Docket Text:**
MOTION to Dismiss by Defendant Burlington Northern Sante Fe Railroad Company. Responses due by
5/17/2004 (Attachments: # (1) Brief # (2) Affidavit)(Funk, Mary)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1025896836 [Date=4/28/2004] [FileNumber=105481-0]
[58756b7aa52365fba8671e41583fdb2f433e598ac8749a1133c88489aff90a0d8aca
dc25d6206f7b65647ad73bfbc7917efccd8570601cd039ee764cae0b5ce8]]
**Document description:**Brief
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1025896836 [Date=4/28/2004] [FileNumber=105481-1]
[039699ad52dbe46ed99f0e29965666d3e0b5b888045cace12dec2c97ca23c7c4877a
ca8d9af121d295b5ac6c28357dac44e50f76340f8cfeb11e5d8e1421810b]]
**Document description:**Affidavit
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1025896836 [Date=4/28/2004] [FileNumber=105481-2]
[4f065314e84d1074af0d695fc366985426b165b2084d26c2406b733a2f07a15b7ed9
07fc8b3dd17d830c505e54f7579fe33d27564ca6634d1ed9043a2da54788]]

**5:03-cv-4110 Notice will be electronically mailed to:**

Mary E Funk    mef@nyemaster.com,

**5:03-cv-4110 Notice will not be electronically mailed to:**

Charles A Collins
Labor & Professional Centre
411 Main Street
Suite 410
\*\*FAX ATTORNEY
St Paul, MN 55101

Scott H Peters
Peters Law Firm PC
233 Pearl Street
PO Box 1078
Council Bluffs, IA 51502-1078

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| THOMAS BAUER, KENNETH JOHNSON, | ) | |
| CHARLES LEONARD, JAMES P. MANNA, | ) | |
| REGINALD NELSON, ANTHONY PIERCE, | ) | |
| JAMES PREVAIL, DAVID RANSFORD, | ) | |
| JAMES SANDMAN, CRAIG WALSH and | ) | |
| UNITED TRANSPORTATION UNION | ) | |
| LOCAL 418 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. C03-410 MWB |
| | ) | |
| BURLINGTON NORTHERN AND | ) | |
| SANTA FE RAILWAY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF WILLIAM L. YECK

| | |
|---|---|
| STATE OF TEXAS | ) |
| | ) SS. |
| COUNTY OF TARRANT | ) |

Being duly sworn states as follows:

1.     My name is William L. Yeck. I am Director Labor Relations for The Burlington Northern and Santa Fe Railway Company ("BNSF"). My office address is 2650 Lou Menk Drive, Fort Worth, Texas 76161. I have been in the Labor Relations Department for the BNSF since 1998. I started working for BNSF's predecessors in 1994 as a train dispatcher in Schaumburg, Illinois, and a trainmaster in Belen, New Mexico. I make this affidavit based on personal knowledge, review of corporate documents or other business records and correspondence which are kept in the regular course of business.

EXHIBIT 2

2.    As Director Labor Relations, I have primary responsibility for the so-called non-operating crafts and the representatives for employees who are actually involved in maintaining the right-of-way. The organization I conduct labor relations with is the Brotherhood of Maintenance of Way Employees.

3.    There are collective bargaining agreements in place between BNSF and its employees represented by BMWE which specifically address the process for investigating allegations of employee wrongdoing and for assessing discipline. A true and correct copy of excerpts from the applicable agreement governing operations in Sioux City, Iowa, effective September 1, 1982 and updated December 2002, is attached as Exhibit A. Under this agreement, any discipline from a formal reprimand or warning up to and including termination are governed by a specified process.

4.    Under the September 1, 1982 Agreement, employees cannot be disciplined by BNSF without first complying with the provisions of the Agreement. Specifically, the Agreement provides:

**RULE 40. INVESTIGATIONS AND APPEALS**

A. An employe in service sixty (60) days or more will not be disciplined or dismissed until after a fair and impartial investigation has been held. Such investigation shall be set promptly to be held not later than fifteen (15) days from the date of the occurrence, except that personal conduct cases will be subject to the fifteen (15) day limit from the date information is obtained by an officer of the Company (excluding employes of the Security Department) and except as provided in Section B of this rule.

B. In the case of an employe who may be held out of service pending investigation in cases involving serious infraction of rules the investigation shall be held within ten (10) days after the date withheld from service. He will be notified at the time removed from service of the reason therefore.

C. At least five (5) days advance written notice of the investigation shall be given the employe and the appropriate local organization representative, in order that the employe may arrange for representation by a duly authorized

representative or an employe of his choice, and for presence of necessary witnesses he may desire. The notice must specify the charges for which investigation is being held. Investigation shall be held, as far as practicable, at the headquarters of the employe involved.

5.     Thus, under the Agreement, BNSF is contractually restricted from issuing discipline to its BMWE represented employees unless it complies with the terms of the applicable collective bargaining agreement. The requirements contained in the Agreement include written notice of a formal hearing prior to assessment of any discipline. By agreement rule, "The notice must specify the charges for which investigation is being held." Other procedural requirements contained in the Agreement include specifics on the conduct of the hearing and a requirement that the hearing be transcribed.

6.     Under the BMWE Agreement, if any discipline is assessed, the employee may challenge or grieve such discipline through various levels of BNSF management. If these grievances are unresolved, they may be presented to arbitration at the National Railroad Adjustment Board (NRAB), which is an agency of the federal government. Such unresolved claims and grievances may also be submitted to private arbitration boards, known as public law boards.

7.     Either at the NRAB or a Public Law Board (PLB), a neutral arbitrator will examine the facts, the record or transcript and the history of the dispute to determine whether the discipline is warranted. Arbitrators have authority to sustain an employee's claim, in whole or in part, which can amount to a reversal or modification of discipline assessed by BNSF.

8.     In addition to the written terms of the agreement, Railway Labor Act agreements also will often include implied terms or incorporate the past practice of the parties. These unwritten rules are often considered by arbitrators when reviewing discipline. For example, Rule 40 does not specify that long tenure or many years of service without a disciplinary incident is a

3

mitigating factor in a discipline case. However, in *BMWE-BNSF*, Pub.L.Bd. No. 5850 Award 176 (Hicks 2001), Arbitrator Hicks considered the employees 29 years of employment without disciplinary problems when it reduced the thirty days of suspension to a written reprimand. (Award 176 at p. 4). A copy of that award is attached as Exhibit B.

9.     Similarly, in NRAB Third Division Award No. 36,798, Arbitrator Goldstein found that the disciplinary hearing for a certain employee was fair and impartial and that the evidence supported the charges that lead to the employee's dismissal. However, the arbitrator considered other factors such as the employee's candor during the investigation and his long service when deciding that the employee should be reinstated, but without payment of any lost wages from the period he was out of service. *BMWE-BNSF*, NRAB 3rd Div. Award No. 36,798 (Goldstein 2003). A copy of that award is attached as Exhibit C.

FURTHER AFFIANT SAYETH NOT.

William L. Yeck

SUBSCRIBED AND SWORN TO BEFORE ME by the said William L. Yeck, on this the _11th_ day of June, 2004.

Notary Public, State of Texas

VICKIE POPEJOY
Notary Public, State of Texas
My Commission Expires
Sept. 8, 2006

4

# BNSF



# AGREEMENT

### BETWEEN

# THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY

### AND ITS EMPLOYEES
### REPRESENTED BY THE

# BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES



**Effective September 1, 1982**
**Updated December, 2002**

EXHIBIT A

Form 12619

(6) working days' notice in advance.

> NOTE: The employe will either pay in advance or sign order for payroll deduction to protect board bill.

C.     Employes assigned in cooperative boarding cars under this rule will be allowed a meal allowance of $7.50 per day as provided in Rule 38 Section I, D and G, and they will also be subject to the provisions of Rule 38 Section I, A (2). However, if employes are sent away from their outfit cars by direction of the Company and remain away overnight, Rule 36 Section I, A meal and lodging expense reimbursement instead of the meal allowance provided for in this rule will be applicable on such days. [5/31/01 National Agreement]

## RULE 40.     INVESTIGATIONS AND APPEALS

A.     An employe in service sixty (60) days or more will not be disciplined or dismissed until after a fair and impartial investigation has been held. Such investigation shall be set promptly to be held not later than fifteen (15) days from the date of the occurrence, except that personal conduct cases will be subject to the fifteen (15) day limit from the date information is obtained by an officer of the Company (excluding employes of the Security Department) and except as provided in Section B of this rule.

B.     In the case of an employe who may be held out of service pending investigation in cases involving serious infraction of rules the investigation shall be held within ten (10) days after the date withheld from service. He will be notified at the time removed from service of the reason therefor.

C.     At least five (5) days advance written notice of the investigation shall be given the employe and the appropriate local organization representative, in order that the employe may arrange for representation by a duly authorized representative or an employe of his choice, and for presence of necessary witnesses he may desire. The notice must specify the charges for which investigation is being held. Investigation shall be held, as far as practicable, at the headquarters of the employe involved.

D.     A decision shall be rendered within thirty (30) days following the investigation, and written notice thereof will be given the employe, with copy to local organization's representative. If decision results in suspension or dismissal, it shall become effective as promptly as necessary relief can be furnished, but in no case more than five (5) calendar days after notice of such decision to the employe. If not effected within five (5) calendar days, or if employe is called back to service prior to completion of suspension period, any unserved portion of the suspension period shall be canceled.

E.     The employe and the duly authorized representative shall be furnished a copy of the transcript of investigation, including all statements, reports, and information made a matter of record.

F.     The investigation provided for herein may be waived by the employe provided that any discipline assessed is confirmed in writing in the presence of his duly authorized representative and agreed to by the proper officer of the Carrier.

G.     If it is found that an employe has been unjustly disciplined or dismissed, such discipline shall be set aside and removed from record. He shall be reinstated with his seniority rights unimpaired, and be compensated for wage loss, if any, suffered by him, resulting from such discipline or suspension.

H.     The provisions of Rule 42 shall be applicable to the filing of claims and to appeals in discipline cases. [See Appendix JJ for alternative expedited arbitration procedures]

I.    The date for holding an investigation may be postponed if mutually agreed to by the Company and the employe or his duly authorized representative. If there is a change in the location of the investigation, the employe and his duly authorized representative will be notified.

J.    If investigation is not held or decision rendered within the time limits herein specified, or as extended by agreed-to postponement, the charges against the employe shall be considered as having been dismissed.

K.    If an employe who has been discharged for cause is later reinstated, without having been found blameless, and his former position has been bid in by another employe on regular bulletin, the reinstated employe will displace the youngest assigned man in his own rank, unless otherwise agreed between the General Chairman and the Company.

## RULE 41.    PHYSICAL DISQUALIFICATION

A.    When an employe is withheld from duty because of his physical condition, the employe or his duly accredited representative may, upon presentation of a dissenting opinion as to the employe's physical condition by a competent physician, make written request upon his employing officer for a Medical Board.

B.    The Company and the employe shall each select a physician to represent them, each notifying the other of the name and address of the physician selected. These two physicians shall appoint a third neutral physician, who shall be an expert on the disability from which the employe is alleged to be suffering.

C.    The Medical Board thus constituted will make an examination of the employe. After completion they shall make a full report in duplicate, one copy to the Company and one copy to the employe. The decision of the Medical Board on the physical condition of the employe shall be final.

D.    The Company and the employe shall each defray the expenses of their appointee, and shall each pay one-half of the fee and expenses of the third neutral physician.

E.    If there is any question as to whether there was any justification for restricting the employe's service or removing him from service at the time of his disqualification by the company doctors, the original medical findings which disclose his condition at the time disqualified shall be furnished to the neutral doctor for his consideration and he shall specify whether or not, in his opinion, there was justification for the original disqualification. The opinion of the neutral doctor shall be accepted by both parties in settlement of this particular feature. If it is concluded that the disqualification was improper, the employe will be compensated for actual loss of earnings, if any, resulting from such restrictions or removal from service incident to his disqualification, but not retroactive beyond the date of the request made under Section A of this rule.

## RULE 42.    TIME LIMIT ON CLAIMS

A.    All claims or grievances must be presented in writing by or on behalf of the employe involved, to the officer of the Company authorized to receive same, within sixty (60) days from the date of the occurrence on which the claim or grievance is based. Should any such claim or grievance be disallowed, the Company shall, within sixty (60) days from the date same is filed, notify whoever filed the claim or grievance (the employe or his representative) in writing of the reasons for such disallowance. If not so notified, the claim or grievance shall be allowed as presented, but this shall not be considered as a precedent or waiver of the contentions of the Company as to other similar claims or grievances.

B.    If a disallowed claim or grievance is to be appealed, such appeal must be in writing and must be

PUBLIC LAW BOARD NO. 5850

(Brotherhood of Maintenance of Way Employes

**PARTIES TO DISPUTE:**

(The Burlington Northern Santa Fe Railroad

**STATEMENT OF CLAIM:**

1.    The Carrier violated the Agreement when on February 7, 2001, the Carrier issued a Level-S, 30-day record suspension to Mr. M. H. Tovar for his alleged insubordination following his allegedly failing to comply with written instructions issued to him on August 9, 2000.

2.    As a consequence of the Carrier's violation referred to above the discipline shall be removed from Mr. M. H. Tovar's personal record and he shall be compensated for all wages lost, if any, in accordance with the Agreement.

**FINDINGS**

Upon the whole record and all the evidence, the Board finds that the parties herein are carrier and employee within the meaning of the Railway Labor Act, as amended. Further, the Board is duly constituted by Agreement, has jurisdiction of the Parties and of the subject matter, and the Parties to this dispute were given due notice of the hearing thereon.

On August 11, 2000, the Carrier notified Claimant of an investigation as follows:

"...for the purpose of ascertaining the facts and determining your responsibility, if any, in connection with alleged failure to report injury as per conversation with Dave Kitchen, August 9, 2000 or furnish information relative to injury and failure to comply with written instructions from Roadmaster R.L. Ramsey and Assistant Roadmaster M. Sheets dated August 9, 2000 to provide reports as required, possible violation of Rules 1.2.5, 1.2.7, 1.6 NO. 3, and 1.13 of the Maintenance of Way Operating Rules, effective January 31, 1999, as revised."

The investigation was finally held January 10, 2001, following which Claimant was assessed a record suspension of 30 days.

The basics are that on August 8, 2000, Claimant apparently slipped on a loose stone in the ballast and twisted his knees. Claimant's injury was not witnessed by anyone that saw his fall, but others saw him laying on the ground. He got up with assistance, advised the Foreman he thought he was alright. He did not request to see a doctor.

That evening he contacted his Foreman and related he had seen a doctor who advised him to stay off his feet until their next appointment. The next morning, the Foreman relayed Claimant's condition to his Supervisor who in turn reported to his Supervisor.

Claimant, at this point, had not completed an "EMPLOYEE PERSONAL INJURY/OCCUPATIONAL ILLNESS REPORT" so a Roadmaster and an Assistant Roadmaster went to Claimant's home after receiving prior approval to do so, seeking Claimant's cooperation in completing the injury report and one other document. Claimant asked that the forms be left and he would fill them out as he stated he wanted to take his time to assure what he said was correct. The Roadmaster agreed, allowing Claimant a 24 hour window and instructing Claimant to complete the forms and advise either one of them who then would retrieve the documents from Claimant.

Claimant did not return the forms to either Roadmaster within 24 hours, but he did mail same to the Division Engineer. Thus, the charges as set forth earlier in this Award.

Claimant admitted he knew of the Rules requiring his filing of an injury report. He also knew that the Carrier did investigate each injury in an effort to perhaps correct the manner in which work was done, to alter policy, to perhaps even rewrite safety rules, etc.

The effort is to provide the safest place to work injury-free.

Nevertheless, Claimant was reluctant to cooperate at the outset, thwarting Carrier's efforts to determine what happened.

The second form requested of Claimant was apparently a medical release that according to the Organization was too broad in application that the doctor or any doctor knowing of Claimant would be free to divulge a medical history going beyond the claimed injury.

The Organization argued that Claimant advised the visiting Roadmasters that the release of medical information as protected by the Rules of Discovery and was illegal since Claimant had advised them he was being represented by an attorney.

This Board's authority is set forth in the Railway Labor Act and it authorizes Neutrals only to interpret and apply mutually agreed to Rules and Understandings. If the information sought was improper for some legal reason, that is solely a matter for a forum other than the case before this Board.

The requirements of immediately reporting an injury and completing the prescribed form is known to Claimant. In lieu of notifying either Roadmaster that he filed the report with the Division Engineer, he kept silent. He did complete the report, but the Carrier was not aware until August 11, 2000, when the Division Engineer receipted for the report of the how, when and where Claimant sustained the injury.

There was some discussion whether Claimant had 72 hours to file his report, as that is the advice he received from the Foreman but that advice flows only to the so-called first aid report covering bruises, contusions, etc., that are not serious enough to result in lost time.

After reviewing all the written material and the transcript, it is evident that Claimant did not cooperate with the Roadmasters in determining the material facts of how the injury occurred and failed to timely file and injury report as instructed. But there is no penalty for his alleged failure to complete the so-called medical release form that was not furnished as evidence in the investigation.

Claimant had 29 years with the Carrier as of the date of injury with no disciplinary problems since October, 1981. Under the circumstances, the discipline assessed is reduced to a written reprimand eliminating therefrom any reference to a second form. If Claimant lost any time as a result of this claim, he is to be compensated as provided in the Schedule Agreement.

## AWARD

Claim sustained in accordance with the Findings.

## ORDER

This Board, after consideration of the dispute identified above, hereby orders that an award favorable to the Claimant(s) be made. The Carrier is ordered to make the award effective on or before 30 days following the date the award is adopted.

_Robert L Hicks_

Robert L. Hicks, Chairman & Neutral Member

_Rick B. Wehrli_

Rick B. Wehrli, Labor Member

_Thomas M. Rohling_

Thomas M. Rohling, Carrier Member

Dated: October 22, 2001

Form 1

NATIONAL RAILROAD ADJUSTMENT BOARD
THIRD DIVISION

Award No. 36798
Docket No. MW-36612
03-3-01-3-136

The Third Division consisted of the regular members and in addition Referee
Elliott H. Goldstein when award was rendered.

(Brotherhood of Maintenance of Way Employes
PARTIES TO DISPUTE: (
(Burlington Northern Santa Fe Railway Company
( (former Burlington Northern Railroad Company)

STATEMENT OF CLAIM:

"Claim of the System Committee of the Brotherhood that:

(1)    The dismissal of Mr. J. S. Gotchall for alleged violation of
Maintenance of Way Operating Rule 1.6 (Conduct - Employees
must not be: 1. Careless of the safety of themselves or others 2.
Negligent 3. Insubordinate 4. Dishonest 5. Immoral 6.
Quarrelsome or 7. Discourteous) in connection with expense
forms submitted during 1998, 1999 and 2000 while employed as a
section laborer, was arbitrary, capricious, unwarranted and in
violation of the Agreement [System File C-00-D070-8/10-00-0567-
D(MW) BNR].

(2)    As a consequence of the violation referred to in Part (1) above,
Mr. J. S. Gotchall shall now be returned to service, paid for all
lost time and benefits, and any mention of this incident shall be
removed from his personal record."

FINDINGS:

The Third Division of the Adjustment Board, upon the whole record and all the
evidence, finds that:

EXHIBIT C

The carrier or carriers and the employee or employees involved in this dispute are respectively carrier and employee within the meaning of the Railway Labor Act, as approved June 21, 1934.

This Division of the Adjustment Board has jurisdiction over the dispute involved herein.

Parties to said dispute were given due notice of hearing thereon.

The Claimant held the position of Laborer on the Crete, Nebraska, section gang. At the time of his dismissal, he had accumulated 26 years of service, with no prior discipline on his record. According to the record, the Laborer position held by the Claimant for most of his career was non-traditional inasmuch as he did not perform actual track work. Rather, his responsibilities included managing budgets and keeping track of maintenance materials. The Claimant worked for several Roadmasters on a territory encompassing three operating divisions and his position was carried on the seniority roster as a Sectionman on the Crete gang.

According to the Organization, the Claimant "had tacit, if not explicit authorization to sign forms and bills for various Carrier Officials and routinely did so." The Claimant's position was encumbered by paperwork, according to the Organization, and his duties became increasingly more difficult to accomplish during normal work hours. The Organization avers that in order to keep overtime expenses to a minimum, through a special arrangement with former Division Engineer Kettenring, the Claimant was allowed to convert his overtime hours worked to automobile mileage expense. The Organization states that Clerk R. E. Blank, who worked with the Claimant, had a similar arrangement with Kettenring. Specifically, Blank was permitted to trade overtime worked for uncompensated time off. The Organization acknowledges that the Claimant's arrangement with Kettenring was not provided for in the Agreement and that the Claimant's immediate supervisor, Roadmaster G. L. Swanson was unaware of this arrangement.

In approximately August 1999, the Carrier terminated Kettenring's employment and appointed W. J. Seeger to the position of Division Engineer. On February 28, 2000, Seeger received an audit of the Claimant's personal expenses for 1999 up to the audit date. The audit indicated that the Claimant had received over $24,000.00 in mileage reimbursements. The Carrier notes that, "At 31 cents a mile,

the Claimant would have had to drive over 77,500 miles that year, that is almost 350 miles every day the Claimant worked for the Carrier."

The Claimant was on vacation on the date Seeger received the audit. Seeger spoke to Roadmaster Swanson, whose name the Claimant had signed on the expense forms, and ascertained that Swanson was unaware of the situation. On March 6, 2000, the Claimant returned from vacation, and Seeger asked him to explain the mileage figures. In sum, the Claimant told Seeger that based on a previous arrangement he had with the former Division Engineer, he had been allowed to claim the mileage on an expense form instead of submitting overtime claims. The Claimant explained that because he had signed the Roadmaster's name to other correspondence, including expense forms submitted by other gang members, he believed he was authorized to approve his own expenses.

After the meeting with Seeger, the Claimant was removed from service pending the outcome of an Investigation to determine whether he had engaged in dishonest behavior by falsifying his expense forms. The Notice of Investigation was issued on March 9 and specified an Investigation date of March 16, 2000. After one postponement, at the Organization's request, the Investigation was conducted on March 24, 2000. At the conclusion of the Investigation and following the Carrier's review of the record, the Claimant was dismissed on April 4, 2000 for his violation of Maintenance of Way Operating Rule 1.6 (Conduct) which states:

> "Employees must not be: Careless of the safety of themselves or others, negligent, insubordinate, dishonest, immoral quarrelsome or discourteous."

The Organization argues that the Carrier failed to schedule or hold the Investigation within 15 days from February 28, 2000, the date of the Carrier's first knowledge of the offense, in violation of Rule 40, paragraph (A) of the Agreement. The Organization stresses that the record established that Division Engineer Seeger and Roadmaster Swanson knew something was amiss on that date, but had not scheduled an Investigation by March 14, 2000, the 15th and last day, as specified by Rule 40(A). According to the Organization, the Carrier's position that it wanted to afford the Claimant an opportunity to provide an explanation before deciding to proffer any charges was an unconvincing attempt at excusing its procedural error.

The Organization also asserts that the Claimant's Agreement due process right to a fair and impartial Investigation was abridged when the Carrier allowed written statements from Division Engineer Kettenring to be entered into the record. Kettenring did not attend the Investigation and, therefore, could not be cross-examined by the Organization and the Claimant.

Regarding the merits of the case, the Organization stresses that the Carrier failed to present any credible or substantial evidence in support of its disciplinary action against the Claimant. In the Organization's opinion, the Claimant complied with Rule 1.6 by telling Seeger the truth, which the Carrier has not disproved. Furthermore, the record demonstrates that the Claimant was a dedicated and honest career employee who had worked double shifts, as substantiated by the testimony of Clerk R. E. Blank and Seeger. Some of the mileage claims were for miles actually driven and, therefore, were legitimate. Furthermore, the Claimant candidly explained that he carefully made the mileage calculations to "swap" the overtime in an equitable manner. The discipline exacted in this case was arbitrary and without just cause inasmuch as the "arrangement" between the Claimant and Kettenring was known, and condoned until the results of the Accounting Department's audit came to light.

In sum, the Organization charges that the Carrier's assessment of discipline against the Claimant was arbitrary, capricious, unjust, unwarranted and excessive. Based on the above, the Organization requests that the Board sustain this claim and reinstate the Claimant to service, with payment for lost wages and benefits, and with his seniority unimpaired.

The Carrier asserts that this case is a simple one involving an employee's proven dishonesty. The Claimant was working in a position of trust, which he violated by signing his own expense claims, in violation of corporate policy with which the Claimant was well versed given his length of service with the Carrier. In sum, the Claimant knowingly and admittedly submitted false expense forms and forged the approval signatures, as well. According to the Carrier, even if Kettenring had told the Claimant to submit the mileage claims in lieu of overtime, the Claimant nonetheless bears responsibility because "following orders" does not excuse fraudulent conduct.

At the conclusion of the Investigation, and upon its review of the record, the Carrier determined there was sufficient, credible evidence to establish the Claimant's dishonesty, in violation of Rule 1.6. Therefore, the Carrier argued that it sustained its evidentiary burden of proof. Given the severity of the offense and prior arbitral

precedent supporting employee dismissals in cases such as this, where an employee's intent to mislead or defraud the Carrier has been proven, the Carrier stressed that the Board should uphold the Carrier's findings and level of discipline assessed in this case.

The Carrier also maintains that this case is procedurally sound. The Carrier's issuance of the charges and scheduling of the Investigation comported with Rule 40 (A) because the Carrier correctly waited to talk with the Claimant before invoking the disciplinary process. By waiting for the Claimant's return from vacation, the Carrier demonstrated a willingness to hear from the Claimant before drawing any conclusions. The Claimant had been a respected employee. Therefore, there was no reason to doubt his integrity before interviewing him, the Carrier submits. Consequently, the Carrier argues that no violation occurred when, instead of scheduling the Investigation based on a February 28, 2000 "first knowledge" date, the Carrier waited until March 6, 2000 before proceeding with an Investigation.

Regarding the various procedural arguments made by the Organization during its on-property handling of the case, the Carrier asserts that the Claimant was not prejudged during the March 6, 2000 interview and that the interview was not an Investigation. Furthermore, Rule 40 contains no provision requiring the Carrier to provide discovery before an Investigation. The Carrier further maintains that it conducted a fair and impartial Investigation in all respects. Based on the volume of evidence introduced during the Investigation, the Claimant's discharge was warranted. The Carrier urges that the Board uphold its procedural handling of this case.

The Board reviewed the evidence of record and carefully considered the arguments of both parties. For the following reasons, the Board finds that while there is substantial evidence that the Claimant bears some responsibility for claiming mileage expenses that he did not actually incur, the Claimant is not solely responsible for the situation uncovered by the audit. The Board finds that, based on its review of the record, there are factors here that mitigate the penalty of dismissal and warrant the Claimant's return to service which were not given appropriate weight by the Carrier and which, therefore, require reinstatement of the Claimant, despite his proven deviation from established procedures. The primary factor is that there is strong evidence, albeit indirect, that supervision in the person of Supervisor Kettenring had helped participate, create, approve, and condone the Claimant's conduct for a substantial number of years.

Kettenring's statement that he knew nothing of the Claimant's mileage arrangement is not convincing, given Clerk Blank's unrefuted testimony regarding his own overtime arrangement with Kettenring. The Claimant's testimony that he was allowed to convert overtime to mileage expenses is more credible than Kettenring's self-serving testimony, the majority thus finds.

However, the Board also finds that, according to the record, the Claimant knew the arrangement contravened both corporate policy and the Agreement, but continued to participate in it for three years, presumably because Kettenring had approved it as a fair trade-off for overtime worked, as opposed to overrunning the overtime budget.

It is undisputed that the Claimant signed Roadmaster Swanson's name to his own expense accounts, in clear violation of corporate policy. However, there is no evidence that the Claimant's use of Swanson's signature rose to the level of an intent to defraud the Carrier. The Claimant provided unrebutted testimony that because he had signed Swanson's name to so many other forms, including the expense accounts of other gang members, he thought he had permission to sign Swanson's name to his own expense forms. The Board notes, however, that by signing his name and Swanson's to the forms, the Claimant was attesting that the expenses he claimed complied with Carrier policy. The record is clear that those expenses, which represented a conversion of overtime to mileage, were not supported by any policy, or by the Agreement. However, given the evidence of record, any "dishonesty" on the part of the Claimant has not been proven given Kettenring's acquiescence to the arrangement and his similar arrangement with Clerk Blank.

The Board has given careful consideration to the bevy of procedural arguments raised by the Organization, in support of its contention that the discipline should be overturned outright, and that the Claimant should be returned to service with full backpay and benefits. The Board finds no evidence of any procedural violations warranting the Claimant's reinstatement without any consideration of the merits. The Board is persuaded that the date of first knowledge began on March 6, 2000 when the Carrier interviewed the Claimant. Before that, especially in light of the Claimant's good reputation, the Carrier had insufficient information on which to frame a charge and schedule an Investigation. Therefore, the notification issued on March 9, 2000 scheduling an Investigation for March 16, 2000 was timely in all respects. See on-property Award 10 of Special Board of Adjustment No. 1112, Third Division Awards 26155, 35024, 36337, and on-property Fourth Division Award 4819.

From its review of the entire record with respect to procedure, the Board concludes that the Claimant's Investigation was fair and impartial. Throughout the Investigation, both the Claimant and his representative were permitted to question the Carrier's witness, review all documentary evidence, and recess the proceedings, if necessary. Rule 40 contains no provision for advance discovery procedures, and the Carrier, therefore, was not required to provide the Organization any documentation prior to the Investigation. See Third Division Awards 32384, 34082 and 35305.

As the Carrier points out, the Board has upheld dismissals in cases where an employee's falsification of Carrier records has been proven by substantial evidence. See Second Division Award 12895, Case 231 of on-property Public Law Board No. 5850, and Third Division Awards 30429 and 32454. Here, while the Claimant bears responsibility for his actions, the Board finds that the Carrier failed to consider those mitigating factors just noted that favor the Claimant. See on-property Award 18 of Public Law Board No. 4340 involving these same parties. It is important to note and the record indicates that the Claimant consistently gave forthright information about the arrangement with Kettenring and he candidly explained the basis and method of his mileage calculations. He was neither evasive nor did he deny his participation in the arrangement. Clerk Blank's arrangement with Kettenring is evidence that "deals" had been made to avoid overtime expenses within the production gang. Finally, the Claimant's long career with the Carrier and his unblemished service record leads to a finding by the majority that the Carrier's dismissal action was overly harsh, and without "just cause."

Therefore, the Claimant shall be reinstated to service with seniority unimpaired, but with no backpay or other monetary benefits awarded. The Claimant's return to service is contingent upon his successful completion of the Carrier's applicable return-to-work procedures.


## AWARD

Claim sustained in accordance with the Findings.

## ORDER

This Board, after consideration of the dispute identified above, hereby orders that an award favorable to the Claimant(s) be made. The Carrier is ordered to make the Award effective on or before 30 days following the postmark date the Award is transmitted to the parties.

NATIONAL RAILROAD ADJUSTMENT BOARD
By Order of Third Division

Dated at Chicago, Illinois, this 29th day of December 2003.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

THOMAS BAUER, KENNETH JOHNSON,  )
CHARLES LEONARD, JAMES P. MANNA,  )
REGINALD NELSON, ANTHONY PIERCE,  )
JAMES PREVAIL, DAVID RANSFORD,  )
JAMES SANDMAN, CRAIG WALSH and  )
UNITED TRANSPORTATION UNION  )
LOCAL 418  )
                                )

             **Plaintiffs,**  )
                                )

v.                                 )       **Civil Action No. C03-410 MWB**
                                )

BURLINGTON NORTHERN AND  )
SANTA FE RAILWAY COMPANY,  )
                                )

             **Defendant.**  )

## AFFIDAVIT OF JAMES T. OBERMILLER

STATE OF TEXAS     )
                        ) SS.
COUNTY OF TARRANT  )

Being duly sworn states as follows:

1.     My name is James T. Obermiller. I am Manager, Corporate Record and Law Support for The Burlington Northern and Santa Fe Railway Company ("BNSF"). My office address is 2500 Lou Menk Drive, Fort Worth, Texas 76131. I make this affidavit based on review of corporate documents or other business records and correspondence which are kept in the regular course of business.

2.     James B. Linneman is currently an employee of BNSF.

EXHIBIT 3

FURTHER AFFIANT SAYETH NOT.

_James T. Obermiller_
James T. Obermiller

SUBSCRIBED AND SWORN TO BEFORE ME by the said James T. Obermiller, on this the _11th_ day of June, 2004.

_Vickie Popejoy_
Notary Public, State of Texas

VICKIE POPEJOY
Notary Public, State of Texas
My Commission Expires
Sept. 8, 2006

2