# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

THOMAS BAUER, RANDALL
ANDERSON, PERRY BOCHMANN,
WILLIAM DAHNA, STEVEN DERRY,
BRENT HILDAHL, ROBERT
HOGEBOOM, KENNETH JOHNSON,
CHARLES LEONARD, J.B.
LINNEMAN, JAMES P. MANNA,
REGINALD NELSON, DAVID
OHLRICH, ANTHONY PIERCE,
CAMERON POLLY, JAMES
PREVAIL, DAVID RANSFORD,
JAMES SANDMAN, JOHN TURNER,
CRAIG WALSH, JOHN DOE(S),
UNITED TRANSPORTATION UNION,
LOCAL 418, BURLINGTON SYSTEM
DIVISION OF THE BROTHERHOOD
OF MAINTENANCE OF WAY
EMPLOYEES, and THE
BURLINGTON NORTHERN SYSTEM
OF THE BROTHERHOOD OF
MAINTENANCE OF WAY
EMPLOYEES,

      Plaintiff,

vs.

BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY, a
Delaware Corporation,

      Defendant.

**No. 03-CV-4110**

**ORDER**

_____

## TABLE OF CONTENTS

I.   **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . 3
    **A. Acronyms** . . . . . . . . . . . . . . . . . . . . . . 3
    **B. Factual Background** . . . . . . . . . . . . . . . . 4
        **1. Parties** . . . . . . . . . . . . . . . . . . . 4
        **2. Plaintiff's Complaint** . . . . . . . . . . . 6

    C.  Procedural Background   . . . . . . . . . . .  11

II.  LEGAL ANALYSIS  . . . . . . . . . . . . . . . . .  13
    A.  Standards of Review  . . . . . . . . . . . .  13
        1.  The Rule 12(b)(1) Motion  . . . . . . . .  14
            a.  Arguments of the parties  . . . . . .  14
            b.  Standards for 12(b)(1) Motion  . . . .  15
            c.  Resolution  . . . . . . . . . . . . .  17
        2.  Standards for a Rule 12(b)(6) Motion  . . .  17

III.  CLAIMS ALLEGED BY PLAINTIFFS  . . . . . . . . . .  19
    A.  Declaratory Judgment Act  . . . . . . . . . .  19
        1.  Count  Three:  Declaratory  Judgment
            Permitting  Right  to  Engage  in  Safety
            and/or Political Strikes  . . . . . . . .  20
            a.  Railway Labor Act  . . . . . . . . . .  21
            b.  Conclusion  . . . . . . . . . . . . .  29
        2.  Count Four: Declaratory Judgment Stating
            BNSF's  Duties  Under  Federal  Securities
            Laws  . . . . . . . . . . . . . . . . . .  30
            a.  Applicable Law  . . . . . . . . . . .  32
            b.  Conclusion  . . . . . . . . . . . . .  37
        3.  Count Five: Workers Right to Declaratory
            Relief Under Price-Anderson Act  . . . . .  38
            a.  Applicable Law  . . . . . . . . . . .  38
            b.  Conclusion  . . . . . . . . . . . . .  41
        4.  Count Two:  Violations of the Iowa Public
            Policy Doctrine . . . . . . . . . . . . .  42
            a.  Applicable Law  . . . . . . . . . . .  43
                1.  Engagement  in  a  protected
                    activity  . . . . . . . . . . . .  49
                2.  Adverse  employment  action  and
                    causal connection Between the
                    Two  . . . . . . . . . . . . . . .  53
            b.  Conclusion  . . . . . . . . . . . . .  54
        5.  Count One:  Safety Violations?  . . . . .  55
            a.  Arguments of the parties  . . . . . .  56
            b.  Conclusion  . . . . . . . . . . . . .  62

## I. INTRODUCTION

### A. Acronyms

The following list of acronyms appear throughout this Order and are listed here for clarity.

AAR-      American Association of Railroads

BLE-      Brotherhood of Locomotive Engineers

BMWE-     Brotherhood of Maintenance of Way Employees Union (track Workers)

BNSF-     Defendant Burlington Northern Santa Fe Railroad

CBA-      Collective Bargaining Agreement

CTC-      Central Track Control

DOE-      Department of Energy

ERA-      Energy Reorganization Act

FRA-      Federal Railroad Administration

FRSA-     Federal Railroad Safety Act 49 U.S.C. § 20101

LMRA-     Labor Management Relations Act

NLGA-     Norris-La Guardia Act

NLRA-     National Labor Relations Act 29 U.S.C. § 301

NRAB-     National Railroad Adjustment Board

NWPA-     Nuclear Waste Policy Act 42 U.S.C. § 10101

PAA-      Price Anderson Act 42 U.S.C. § 2210

RLA-      Railway Labor Act 45 U.S.C. § 145

UTU-    United Transportation Union (BNSF Sioux City
        Terminal Employees)

## B.  Factual Background

### 1.  Parties

Defendant Burlington Northern and Sante Fe Railway Company ("BNSF") is a Delaware corporation, with its headquarters in Forth Worth, Texas. BNSF employs approximately 33,000 workers, and operates rail lines in 28 states. BNSF operates the second largest railroad system in the United States. BNSF has a sizeable terminal and facilities in Sioux City, Iowa. See First Amended Complaint ("Complaint"), Docket 10, ¶ 27.

The following individually-named plaintiffs are currently employed at the Sioux City terminal of BNSF: Randall Anderson, Thomas Bauer, Perry Bochman, William Dahna, Steven Derry, Brent Hildahl, Robert Hogeboom, Kenneth Johnson, Charles Leonard, James P. Manna, Reginald Nelson, David Ohlrich, Anthony Pierce, Cameron Polly, James Prevail, James Sandman and Craig Walsh. Id. ¶¶ 5-13, 15-21.

Individual plaintiff James Linneman ("Linneman") is a resident of Lincoln, Nebraska, and had over 25 years of experience in the train service industry when he was fired by BNSF in 2001. Linneman originally filed an action against

BNSF in Nebraska state court, which BNSF removed to Nebraska federal court. Linneman filed a stipulated dismissal without prejudice of the Nebraska action in order to join this action. Id. ¶ 14.

The "John Doe(s)" plaintiffs are described as follows:

> John Doe(s), are approximately 120 similarly situated train service employees working under authority of Sioux City Terminal Managers, at least 90 are Iowa residents, most live within 100 miles of Sioux City, Iowa.

Id. ¶ 22.

United Transportation Union, Local 418, ("UTU") is a labor organization that represents many of the plaintiffs. Id. ¶ 23. The Burlington System Division of the Brotherhood of Maintenance of Way Employees, collectively referred to as "BMWE Division," are two divisions of unions of railroad employees that represent thousands of BNSF employees, including many of the named plaintiffs. The terms and conditions of employment for BNSF employees represented by both UTU and BMWE Division are governed by various collective bargaining agreements ("CBAs"). Id. ¶ 24. Plaintiffs David Ransford and John Turner are train service employees residing in or near Sioux City, Iowa, and have been shareholders of BNSF stock since the fall of 1996. Id. ¶¶ 25-26. BNSF's

railroad operations are regulated by the Federal Railroad Administration ("FRA"). In addition to safety procedures required by the federal law, BNSF has officially adopted the safety procedures and practices recommended by the American Association of Railroads ("AAR").

**2. Plaintiff's Complaint**

The plaintiffs contend that BNSF carries large quantities of hazardous materials ("haz-mat") on its railway system—including, but not limited to: low level nuclear waste, high level radioactive fuel elements from nuclear reactors, high level radioisotopes, high level radioactive special solids, high level radioactive material shipping containers, uranium fluorides, oxides, thorium and uranium metal scrap and low level radioactive waste. Complaint ¶¶ 28-32. BNSF currently transports, or in the near future plans to transport, these hazardous materials through heavily populated areas such as Chicago, Denver, Des Moines, Sioux City, Council Bluffs, Minneapolis, Los Angeles, San Francisco, Portland, Las Vegas and Seattle. Through the Sioux City Terminal, specifically, substantial volumes of dangerous and hazardous materials— such as anhydrous ammonia LP gas, liquid chloride, flammable gases and liquids, ethyl alcohol, and many other

chemicals—are moved.  The tracks of the Sioux City Terminal are authorized and anticipated to carry nuclear waste.  The inherent danger from this type of cargo poses 'grave and unacceptable risks' to the plaintiffs—as well as to owners of property adjacent to all BNSF rail lines, and all levels of government in those areas.  Complaint ¶ 75.

The plaintiffs contend that magnifying these inherent risks is the Sioux City Terminal's intentional disregard for reporting and safety procedures—in the interest of turning a larger profit.  For the last 15 years, the Sioux City Terminal Management has engaged in a pattern and practice of directing employees not to comply with federal safety requirements, FRA provisions, or internal BNSF operating rules.  Sioux City Terminal managers have repeatedly ordered, or coerced, employees not to complete required testing, such as: testing of air brake systems on trains prior to departure, foregoing standard inspections of inbound and outbound trains for defective cars, not to remove or switch out defective cars, and running trains without required monitoring devices. Employees at the Sioux City Terminal, including some of the individual named plaintiffs, are and have been retaliated against in the form of abusive language, discipline, or

dismissal, (none have been dismissed in Sioux City) for engaging in the required inspections, tests and safety practices. The motive behind this behavior is simply profit—expedited train departures, as a result of fewer safety tests, results in more profit for the Sioux City Terminal management, and consequently, for BNSF. According to the plaintiffs, dual violations have occurred surrounding this managerial misconduct: (1) BNSF has failed to report this misconduct to the FRA and has failed to request that the FRA commence disqualification proceedings based on this misconduct; and (2) the FRA, despite actual notice of these violations via judicial complaints and supplemental information, has not initiated any proceedings against BNSF management at the Sioux City Terminal. Complaint ¶¶ 126-130.

The plaintiffs also contend that another safety concern is BNSF's failure to safely upgrade and maintain the padlocks on track switches. Track switches are located on the train tracks, and can be moved into different positions in order to direct trains onto the main track, or onto various sidetracks. The switches are locked to prevent tampering resulting in movement of the switches so as to cause derailment or collision. BNSF has been using the same generic padlocks on

its more than 100,000 switches for approximately 20 years.  A
common BNSF key opens all of these switch locks.  Thousands of
these keys are in the hands of current BNSF employees, ex-
employees and collectors.  Further, the locks are of such poor
construction that they are easily picked or jarred open—even
by BNSF employees.  Tampering with these locks can cause
serious damage and injury—which is significantly increased by
the highly dangerous chemical and nuclear materials a
particular train may be carrying.  BNSF has done nothing to
address this safety issue.  Complaint ¶¶ 66-78.

With the Nuclear Waste Policy Act, 42 U.S.C. § 10101, et
seq., ("NWPA") Congress declared that it was in the nations
best interest to move all high level nuclear waste produced by
the nation's nuclear facilities to a specially constructed
facility inside Yucca Mountain, Nevada, for storage.  The NWPA
charged the Department of Energy ("DOE") with the
responsibility of planning, and implementing, a system to
safely transport all high level nuclear waste from the
nation's nuclear facilities to the Yucca Mountain facility.
DOE intends to use rail carriers, including BNSF, to transport
significant amounts of this nuclear waste.  Plaintiffs allege
that BNSF has failed to disclose its actual safety practice or

the actual accident and/or injury incidents to the FRA, the DOE, other regulators, its shareholders and its prospective shareholders, and is continuing this pattern of non-disclosure today. The DOE has concluded that BNSF rail lines are safe for transporting high levels of nuclear waste because BNSF has purposefully failed to disclose material facts to the DOE, such as: (1) BNSF has a materially deficient track infrastructure; (2) BNSF has materially deficient operating practices; (3) BNSF has not disclosed prior haz-mat accidents, including some accidents involving nuclear loads; (4) BNSF only carries partial insurance and does not have the financial resources to compensate those injured in the event of a mass loss. Complaint ¶ 100. Further, BNSF's complete and purposeful disregard for safety requirements, as well as it's practice of covering up material information regarding safety and accidents, makes it incapable of safely performing any contract with the DOE to transport high level nuclear waste. BNSF's actions are purposeful, and endanger the general public, its employees, its shareholders, its customers, and governments at all levels. Complaint ¶¶ 102-03.

## C.  Procedural Background

The culmination of all of these concerns resulted in the filing of a complaint by the plaintiffs on November 14, 2003. Docket 1.  The complaint alleged causes of action under the Iowa Public Policy Tort Doctrine and under state and federal laws making illegal BNSF's demands on the plaintiffs to disregard safety requirements.  Id.  On November 28, 2003, the plaintiffs filed their First Amended Complaint and other plaintiffs were added to the cause of action, and the portions of the complaint detailing the factual allegations and jurisdiction were expanded.  Docket 3.  On April 28, 2004, BSNF filed a Motion to Dismiss and Request Oral Argument. Docket 8.  On May 3, 2004, the plaintiffs filed what was captioned as their First Amended Complaint, but which procedurally is in fact their "second amended complaint." Docket 10.  This is the complaint at issue in this motion to dismiss.  In the second amended complaint numerous plaintiffs were added, the relationship between each plaintiff and the cause of action was described, the general allegations were significantly expanded, and additional causes of action were added.  The second amended complaint requests declaratory judgment as to four matters: **<u>count one</u>** declaratory judgment

defining BNSF's duties to report safety violations to the FRA and/or commence its own proceedings for potential violations of FRA regulations, as well as determining whether the FRA has a duty to commence disqualification proceedings once it is adequately appraised of such a pattern and practice of misconduct; **count three** declaratory judgment stating that the plaintiffs are permitted to engage in safety and/or political strikes; **count four** declaratory judgment stating BNSF's duties under federal securities laws;[1] and **count five** declaratory judgment legally stating that the Price-Anderson Act ("PAA"), 41 U.S.C. § 2011, et seq. provides that rail transportation workers are eligible for benefits and damages in the event an injury resulting from the movement of high level nuclear materials.[2] The plaintiffs also assert a cause of action for violation of the Iowa Public Policy Doctrine.[3]

---

[1] The heading of this count states that declaratory judgment is requested as to BNSF's duties under federal securities laws. The Court addresses this in more detail commencing on page 29 below.

[2] BMWE Division is a plaintiff only with regard to the first, third and fifth counts. See Complaint ¶ 24.

[3] This claim is count two of the second amended complaint.

In light of the fact that the second amended complaint asserted never before mentioned causes of action, the Court filed an order which gave BNSF additional time to file a supplemental brief to its motion to dismiss in which it addressed what effect, if any, the amended complaint had on its arguments to dismiss. Docket 16. On June 15, 2004, BNSF filed a supplemental brief addressing the new issues raised in the plaintiffs' amended complaint. Docket 20. On July 12, 2004, the plaintiffs filed the plaintiffs brief opposing motion to dismiss. Docket 24. On July 23, 2004, BNSF filed it's reply brief. Telephonic oral arguments on the motion to dismiss were held. At oral arguments, the plaintiffs were represented by Harry Zanville, Charles A. Collins, and Ray L. Linewebe of United Transportation Union. BNSF was represented by Charles W. Shewmake, Senior General Attorney, of Burlington Northern Sante Fe and Thomas M. Cunningham of Nyemaster, Goode, Voigts, West, Hansell & O'Brien. The matter is now fully submitted and ready for a determination by the Court.

## II. LEGAL ANALYSIS

### A. Standards of Review

BNSF's motion to dismiss is made under Federal Rules of Civil Procedure 12(b)(1) *and* 12(b)(6). Purportedly in support

of it's Rule 12(b)(1) motion, BNSF attached a series of affidavits. There is a disagreement between the parties as to whether these affidavits can be considered—prompting an analysis of whether BNSF makes a 'facial' or 'factual' attack as to subject matter jurisdiction. As such, the Court must first resolve this issue before enumerating the standards to be applied to BNSF's motion to dismiss.

## 1. The Rule 12(b)(1) Motion

### a. Arguments of the parties

In its motion to dismiss, BSNF asserts that as it mounts a factual challenge to subject matter jurisdiction in its Rule 12(b)(1) motion, the Court is not bound by the allegations in the complaint and may consider matters outside the pleadings—including the affidavits that BNSF attached in support of its motion to dismiss. The plaintiffs take issue with BNSF's position—contending that BNSF launches only a facial attack to subject matter jurisdiction. Specifically, the plaintiffs contend that BNSF does not attack any specific jurisdictional fact, but rather repackages its broad preemption arguments in 'factual dispute' language. The plaintiffs request that the affidavits be struck, the Rule 12(b)(1) motion be denied, and that the Court proceed to a

determination under Rule 12(b)(6) standards of the plaintiffs' claims based on the FRSA and the Iowa Public Policy doctrine. This Court, prior to the hearing, informed the parties that it was not going to read or consider any affidavits in deciding the pending motions. BNSF did not respond to the plaintiffs' arguments in its reply. Neither party has requested an evidentiary hearing in regard to BNSF's subject matter jurisdiction challenge.

### b.   Standards for 12(b)(1) Motion

A motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) can be described in one of two ways: (1) factual—meaning that it attacks the existence of subject matter jurisdiction in fact; or (2) facial—meaning that it attacks the sufficiency of the allegations in the complaint to support subject matter jurisdiction. See Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980). The Eighth Circuit Court of Appeals, in Titus v. Sullivan, 4 F.3d 590 (8th Cir. 1993), pointed out the differences between these two types of challenges to subject matter jurisdiction under Rule 12(b)(1):

> In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff

15

fails to allege an element necessary for
subject matter jurisdiction. <u>Eaton v.
Dorchester Dev., Inc.</u>, 692 F.2d 727, 731-32
(11th Cir. 1982). . . . .

If the [defendant] wants to make a
factual attack on the jurisdictional
allegations of the complaint, the court may
receive competent evidence such as
affidavits, deposition testimony, and the
like in order to determine the factual
dispute. <u>Land v. Dollar</u>, 330 U.S. 731, 735
n.4 (1947) [footnote omitted]. The proper
course is for the defendant to request an
evidentiary hearing on the issue. <u>Osborn
[v. United States]</u>, 918 F.2d [724,] 730
(citing <u>Crawford v. United States</u>, 796 F.2d
924, 928 (7th Cir. 1986)).

The <u>Osborn</u> court found the distinction between facial and
factual attacks on the complaint under Rule 12(b)(1) to be
critical. <u>Id</u>. (internal citations omitted). The court stated
that:

[i]n the first instance, the court
restricts itself to the face of the
pleadings, and the non-moving party
receives the same protections as it would
defending against a motion brought under
Rule 12(b)(6). The general rule is that a
complaint should not be dismissed "'unless
it appears beyond doubt that the plaintiff
can prove no set of facts in support of his
claim which would entitle him to relief.'"
In a factual attack, the court considers
matters outside the pleadings, and the
non-moving party does not have the benefit
of 12(b)(6) safeguards.

<u>Id</u>. at 729 n.6 (citations omitted). A factual challenge to
jurisdiction under Rule 12(b)(1) is unique:

16

> [H]ere the trial court may proceed as it
> never could under 12(b)(6) or Fed.R.Civ.P.
> 56. Because at issue in a factual motion
> is the trial court's jurisdiction--its very
> power to hear the case--there is
> substantial authority that the trial court
> is free to weigh the evidence and satisfy
> itself as to the existence of its power to
> hear the case. In short, no presumptive
> truthfulness attaches to the plaintiff's
> allegations, and the existence of disputed
> material facts will not preclude the trial
> court from evaluating for itself the merits
> of jurisdictional claims. Moreover, the
> plaintiff will have the burden of proof
> that jurisdiction does in fact exist.

Id. at 730 (quoting Mortensen, 549 F.2d at 891). With these standards in mind, the Court turns to a discussion of each count to determine whether it has subject matter jurisdiction under 12(b)(1).

### c. Resolution

This must be resolved through an examination of the grounds upon which BNSF seeks dismissal for lack of subject matter jurisdiction to determine whether the challenge is factual, or facial, in nature.

### 2. Standards for a Rule 12(b)(6) Motion

The issue on a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence in support of his

or her claims. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974); <u>United States v. Aceto Agric. Chem. Corp.</u>, 872 F.2d 1373, 1376 (8th Cir. 1989). In considering a motion to dismiss under Rule 12(b)(6), the Court must assume that all facts alleged in the plaintiff's complaint are true, and must liberally construe those allegations. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Gross v. Weber</u>, 186 F.3d 1089, 1090 (8th Cir. 1999).

The Court is mindful that in treating the factual allegations of a complaint as true pursuant to Rule 12(b)(6), the Court must "reject conclusory allegations of law and unwarranted inferences." <u>Silver v. H & R Block, Inc.</u>, 105 F.3d 394, 397 (8th Cir. 1997). Conclusory allegations need not and will not be taken as true; rather, the Court will consider whether the facts alleged in the complaint, accepted as true, are sufficient to state a claim upon which relief can be granted. <u>Silver</u>, 105 F.3d at 397; <u>Westcott</u>, 901 F.2d at 1488.

The Court is granting the 12(b)(1) motion as to this count. Accordingly, the Court will not discuss the 12(b)(6) motion as to this count.

### III.  CLAIMS ALLEGED BY PLAINTIFFS

The Court will now address the arguments as to each of the claims alleged by the plaintiffs, first taking up the declaratory judgment counts numbers three, four and five. Next, the Court will discuss the Iowa Public Policy Doctrine and thereafter discuss what should be done in relation to declaratory judgment count one, concerning BNSF's duties regarding safety violations.

### A.  Declaratory Judgment Act

28 U.S.C. § 2201(a) states in relevant part, "[i]n a case of actual controversy within its jurisdiction...any court of the United States...may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  The jurisdiction of this Court must be established first before this Court will go into the merits of a case, to do otherwise would only produce a "hypothetical jurisdiction" case.  See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101, 118 S.Ct. 1003, 1016 (1998). "Hypothetical jurisdiction produces nothing more than a hypothetical judgment-- which comes to the same thing as an advisory opinion, disapproved by

this Court from the beginning." Id.  For a court to act when it has no jurisdiction is simply ultra vires.  Id.

"Jurisdictional issues, whether they involve questions of law or of fact, are for the court to decide.... [J]udicial economy demands that the issue be decided at the outset rather than deferring it until trial...."  Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990).  "[Federal courts] possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.  It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (citation omitted).

### 1. Count Three: Declaratory Judgment Permitting Right to Engage  in Safety and/or Political Strikes

Plaintiffs argue that they have a right to engage in safety and/or political strikes.  Complaint ¶ 148.  Plaintiffs contend that defendant circumvents safety tests and inspections required under Federal Railroad Administration ("FRA") regulations, Burlington Northern and Sante Fe Railway Company ("BNSF") rules, and American Association of Railroads ("AAR") recommended practices.  Id. ¶ 144.  Plaintiffs further

argue that this alleged malpractice gives plaintiffs "the unlimited right to engage in safety strikes to protest the unsafe conditions which threaten the life, livelihood, and property of all Americans." Id. ¶ 148.

Plaintiffs also contend that they have the right to engage in a "political strike for non-economic political motives." Docket 24, at 43. Plaintiffs allege complaints against the federal government, Congress, and the FRA. Id. at 45.

### a. Railway Labor Act

The Railway Labor Act, promulgated by Congress in 1934, 45 U.S.C. § 145, et seq. ("RLA"), was intended as a dispute resolution mechanism for actions "growing out of grievances or out of the interpretation and application of agreements concerning rates of pay, rules, or working conditions." Id. § 151(a). Creating a uniform body of law by which to efficiently settle disputes was a primary goal, which Congress felt would be accomplished via the establishment of a detailed administrative system to address employee grievances. See id. §§152-162.

49 U.S.C. § 20103 grants the Secretary of Transportation the authority to prescribe regulations and issue orders "for

every area of railroad safety." Nowhere in the Code of Federal Regulations does it say that employers have an obligation to report safety violations to the FRA. However, employers do have an obligation to allow an employee "to challenge in good faith whether the on-track safety procedures to be applied at the job location comply with the rules of the operating railroad." 49 C.F.R. § 214.311.

The Secretary of Transportation has an obligation to inspect railways and ensure that railways are in safe conditions. 49 U.S.C. § 20103(a); 49 C.F.R. § 149. If a railway employee is "exposed to imminent physical injury" because of the Secretary's failure to issue an order restricting or prohibiting unsafe rail carrier practices, the employee may bring a lawsuit against the Secretary himself. 49 U.S.C. § 20104(c).

Although the RLA does not use this language, the courts have carved out two categories of disputes in the RLA, i.e., "major" and "minor." Elgin, Joliet & Eastern Ry. V. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945). "Minor" disputes concern grievances or disputes over the meaning or application of an existing collective bargaining agreement or the practices of an employer or employee in a

given situation.  See <u>Brotherhood of R.R. Trainmen v. Chicago</u>
<u>river & Ind. R.R.</u>, 353 U.S. 30, 33, 77 S.Ct. 635, 637, 1
L.Ed.2d 622 (1957), 45 U.S.C. § 152, Sixth.  "Major" disputes,
on the other hand, deal with trying to change existing
agreements, contracts, rules or working conditions. 45 U.S.C.
§ 152, Seventh.  If there is a "major" dispute, both parties
must maintain the status quo until the parties exhaust the
negotiation and arbitration procedures developed by the RLA.
<u>Id</u>. § 152, Seventh, § 155, First, § 156, § 160.

The United States Supreme Court has consistently
interpreted that one of the main purposes of the Railway Labor
Act is "to provide a machinery to prevent strikes."  <u>Detroit</u>
<u>& Toledo S.L.R. Co. V. United Transp. U.</u>, 396 U.S. 142, 148
n.13 (quoting <u>Texas & N.O.R. Co. v. Brotherhood of Railway &</u>
<u>S.S. Clerks</u>, 281 U.S. 548, 565 (1930)).

45 U.S.C. § 151a states,

> the general purposes of [the Railway Labor
> Act are]: (1) To avoid any interruption to
> commerce or to the operation of any carrier
> engaged therein...(4) to provide for the
> prompt and orderly settlement of all
> disputes concerning rates of pay, rules, or
> working conditions; (5) to provide for the
> prompt and orderly settlement of all
> disputes growing out of grievances or out
> of the interpretation or application of
> agreements covering rates of pay, rules, or
> working conditions.

This Court will first go through the appropriate steps in both the minor and major dispute resolution processes. Then, this Court will determine whether or not plaintiffs attempted either process or if plaintiffs were justified in not attempting to go through the dispute resolution process set out by the RLA.

45 U.S.C. § 153, First(i) and § 152, Sixth explain the minor dispute procedure. "[Minor disputes] must be resolved only through the RLA mechanism, including the carrier's internal dispute-resolution processes and an adjustment board established by the employer and the unions." Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246 (1994). Minor disputes are subject to compulsory arbitration before the National Railroad Adjustment Board. "Courts may enjoin strikes arising out of minor disputes." Conrail, 491 U.S. at 304. Employees may not bypass the arbitration proceedings and initiate self-help proceedings by striking. This is exactly the type of activity that Congress hoped to prevent in order to maintain the flow of commerce.

Major disputes are governed by § 2, Second and § 6 of the RLA. 45 U.S.C. § 152, Second and § 156. Section 152, Seventh requires that no carrier "shall change the rates of pay,

rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements" or follow the mediation procedures set forth in § 6. Section 156 requires the parties to give each other notice of any intended change in working conditions and to participate in lengthy bargaining and mediation. Before any change in working conditions may be implemented, the parties must maintain the status quo until the exhaustive procedures are complete.

The first step in a major dispute is negotiation between the carrier and the union. See 45 U.S.C. § 152, Second. If the initial negotiations fail, then the National Mediation Board ("NMB") looks at the dispute. See 45 U.S.C. § 156. If the NMB cannot mediate the dispute and the dispute threatens to interrupt interstate commerce, the President may create an emergency board to arbitrate the dispute. See 45 U.S.C. § 160. If arbitration is also unsuccessful, there is a mandatory 30-day "cooling off" period in which both sides must maintain the status quo. Id. The major dispute area is very exhaustive and tries every possible mechanism before allowing parties to resort to self-help. These exhaustive procedures

were implemented to maintain the status quo and hopefully help the parties resolve the dispute.

Finally, if none of these mechanisms work, then a party may resort to self-help. <u>See</u> <u>Consolidated Rail Corp. V. Railway Labor Executives' Ass'n</u>, 491 U.S. 299 (1989) ("Once this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force."). "If, and only if, negotiation, mediation, arbitration, and the cooling-off period fail to produce an agreement, may the parties resort to self-help – the employer by unilaterally changing rates of pay, rules, or working conditions, the union by striking." <u>National R.R. Passenger Corp. v. Transport Workers</u>, 373 F.3d 121, 124 (D.C. Cir. 2004).

Section 20109 of the FRSA states that an employee may refuse to work if it is "made in good faith and no reasonable alternative to the refusal is available to the employee" and a reasonable individual in the employee's situation would conclude that "the hazardous condition presents an imminent danger of death or serious injury" and the urgency of the situation does not allow the employee to follow the statutory procedure. Furthermore, the employee must notify the employer

of the situation. 49 U.S.C. § 20109(b). Disputes under this section also require mandatory and binding arbitration. 49 U.S.C. § 20109(c). Again, there is no evidence here that the employees initiated any sort of formal complaint or attempted to resolve these concerns by arbitration.

Plaintiffs also try to artfully plead a "political" strike is appropriate. Docket 24, at 43. The Appeals Court in the District of Columbia faced a similar situation and stated:

> ...a politically motivated strike has the "same adverse effect on interstate commerce" as a "strike motivated by more conventional labor concerns." Call it a political protest rather than a strike; no matter: When the RLA prohibits a strike it also prohibits any union tactic "which has the consequences of a strike."

Transport Workers, 373 F.3d at 126 (quoting Air Lines Pilots Ass'n, Int'l v. United Air Lines, Inc., 802 F.2d 886, 906 (7th Cir. 1986).

This Court is not persuaded that plaintiffs are attempting a politically motivated strike. Instead, the crux of the plaintiffs' complaints are directly related to working conditions. Plaintiffs allege that the "federal government has not allocated sufficient financial and human resources" to these safety issues. Docket 24, at 45. However, this is a

working condition that plaintiffs can attempt to remedy through the "major" dispute resolution procedures by negotiating new rates, working conditions, or agreements. These are the types of labor disputes that Congress attempts to resolve without judicial interference through the RLA.

This Court has carefully considered the plaintiffs' First Amendment, Thirteenth Amendment and practical considerations arguments and is not persuaded that there is solid precedence to grant relief by using any of them.

The plaintiffs cite cases for the proposition that the RLA permits sympathy strikes and secondary boycotts. Docket 39, at 10-11. Plaintiffs mischaracterize these decisions. In Burlington Northern v. BMWE, 481 U.S. 429 (1987), the United States Supreme Court concluded that secondary boycotts are lawful if the union fully exhausts the major dispute procedures of the RLA. Id. at 447 ("[C]ourts may not enjoin secondary picketing in a railway dispute after the parties exhaust the RLA's procedures."). As for sympathy strikes, the law is clear that they are not lawful. See, e.g., S.E. Pa. Transp. Auth. v. Brotherhood of R.R. Signalmen, 882 F.2d 778 (3rd Cir. 1989); Long Island R.R. v. Intern. Ass'n of Machinists, 874 F.2d 901 (2nd Cir. 1989) ("We see no reason

why a union should be accorded greater rights to engage in a sympathy strike to apply pressure against another employer than it has to engage in a primary strike...").

Allowing plaintiffs to strike would seriously undermine defendants' bargaining position before any mediation or negotiation took place. Unless plaintiffs attempt to resolve this dispute by initiating some sort of formal complaint and an attempt at arbitration, this Court will not allow a party to disrupt Congressional intent and simply strike at-will. This Court does not have sufficient evidence to support such a ruling under the law and present state of the record.

### b. Conclusion

Regardless as to what classification this Court gives with regards to this dispute, plaintiffs have not attempted any sort of reconciliation with defendant, which this Court is persuaded that plaintiffs are required to do. Instead, plaintiffs attempt to bypass the main intent of Congress in creating the Railway Labor Act, i.e., to maintain the flow of commerce when disputes arise. Self-help in these situations should only be used as a last resort when both sides have genuinely attempted to resolve the dispute. The Court does not have enough evidence to support such a ruling allowing a

strike under the present state of the record. Based on the foregoing, this Court is persuaded that it does not have jurisdiction over this matter.

The Court is granting the 12(b)(1) motion as to this count. Accordingly, the Court will not discuss the 12(b)(6) motion as to this count.

### 2. Count Four: Declaratory Judgment Stating BNSF's Duties Under Federal Securities Laws

Plaintiffs request that the Court issue a declaratory judgment by answering "yes" to the following legal questions, the result of which then shall define their relative rights and responsibilities:

> a. has the BNSF made a "claim" under the FCA if the statements made by the BNSF to the federal government to request the creation of the Price Anderson Act based indemnity agreement are false or fraudulent?
>
> b. Do the plaintiffs have standing to file a FCA *Qui Tam* action if the BNSF made a "claim" under the FCA if the statements made by the BNSF to the federal government to request the creation of the Price Anderson Act based indemnity agreement are false or fraudulent in advance of the indemnity agreement being made or high level nuclear waste not yet having been transported?
>
> c. If an indemnity agreement was proffered, accepted, high level nuclear waste transported and there was a resulting mass

30

liability claim, would the federal government refuse to honor the indemnity agreement if it was induced by false or fraudulent claims?

d. Should the risk of claims for indemnity by BNSF being refused by the federal government because they were induced by false or fraudulent claims be disclosed to shareholders and prospective shareholders in its annual reports, 10-K, 10-Q, proxy solicitations, Management Discussion and Analysis, all as required pursuant to the 1934 Securities Act, 15 U.S.C. § 78a-78ll, the 1933 Securities Act: 15 U.S.C. 77a-77aa, 17 C.F.R. § 240.10b5; S.E.C. Reg. S-K, §229.303, SEC SAB No. 92 (6/93), SFAS #5, APB Opinion #22, and FRR #36 interpretation of 303?

E. Is BNSF subject to assessments, excise taxes, or other forms of possible acts to spread the liability risks either before or after an incident or accident or do (sic) doctrine such as illegal exactions or taking protect the corporation from such government actions?

Complaint ¶ 160. In addition to the request for declaratory judgment, the plaintiffs additionally request: (1) that the Court enjoin BNSF from entering into any agreements with the federal government to transport high level nuclear waste; (2) that the Court order BNSF to accurately report its safety record and risks of its operation to current and prospective shareholders; (3) that the Court order any equitable relief it

deems appropriate; and (4) that the plaintiffs be awarded reasonable costs and attorney fees.  Id. ¶ 164.

### a.  Applicable Law

Federal courts are limited by Article III of the Constitution to hearing only actual "Cases" and "Controversies."  U.S. CONST. art. III, § 2.  This limitation prevents federal courts from issuing "advisory opinions."  See Bender v. Educational Credit Mgmt. Corp., 368 F.3d 846, 847-48 (8th Cir. 2004).  A federal court may not give an advisory opinion "advising what the law would be upon a hypothetical state of facts."  Preiser v. Newkirk, 422 U.S. 395, 401 95 S.Ct. 2330, 45 L.Ed.2d. 272 (1975) (quoting Aetna Life Ins. Co. v. Haworth 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937).  "Federal courts are not empowered 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'"  In re Security Life Ins. Co. of America, 228 F.3d 865, 870 (8th Cir. 2000) (citations omitted).

Plaintiffs' first set of questions in which they seek a declaratory judgment are simply asking for advisory opinions.  See Complaint ¶ 160.  Plaintiffs are attempting to seek, in

essence, legal advice from this Court. This Court refuses to reach the merits on plaintiffs' first set of questions because to do so would result in this Court giving an advisory opinion, which this Court is prohibited from doing.

In plaintiffs' complaint, they ask this Court to enjoin defendant from entering into any agreements with the federal government from transporting high level nuclear waste. Complaint ¶ 164. First, plaintiffs are speculating on what factors the Department of Energy came to in concluding that transporting high level nuclear waste with defendant is safe. Furthermore, plaintiffs are seeking to affect the rights and interests of the Department of Energy without joining them as a party.

Under the doctrine of sovereign immunity, a party may not sue the United States, unless the United States consents to be sued. See United States v. Dalm, 494 U.S. 596, 608, 110 S.Ct. 1361, 1368, 108 L.Ed.2d 548 (1990). "District courts lack subject-matter jurisdiction over claims against the Government to which Congress has not consented." Miller v. Tony and Susan Alamo Foundation, 134 F.3d 910, 916 (8th Cir. 1998). Because plaintiffs are attempting to affect the rights and interests of the United States by limiting their contractual

capacity, the Department of Energy should have a say in this claim. Unless Congress consents to limiting the contractual capacity of the Department of Energy, this Court cannot determine who the Department of Energy can and cannot contract with either directly or indirectly by prohibiting entities from contracting with the Department of Energy.

Under Federal Rule of Civil Procedure 19(b), if a party is considered an "indispensable" party and is not joined, the suit should be dismissed. This Court cannot affect the contracting rights of the United States without having them consent to the lawsuit. Since the United States has not consented in any fashion to this lawsuit and they are considered an indispensable party, plaintiffs' request that this Court enjoin defendant from entering into a contract with the United States cannot be granted under the present record.

Plaintiffs next request this Court to order defendant to "accurately report to its shareholders" the truth about BNSF's safety record. Complaint ¶ 164. Federal Rule of Civil Procedure 23.1 states in relevant part, "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from

the directors...and the reasons for the plaintiff to obtain the action or for not making the effort."

Typically as a prerequisite to a shareholders suit against directors, courts require shareholders to demonstrate that the corporation has refused to perform after a suitable demand. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991). Courts look to the law of the state in which the corporation is incorporated to determine if the demand requirement has been satisfied. See id. at 98.

In determining "futility" of a demand, Delaware courts have determined that they must decide whether or not under the particularized facts alleged in the complaint that "[a] reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Spiegel v. Buntrock, 571 A.2d 767, 774 (Del. 1990). Courts require shareholders to make a "demand" on the directors in order to give the directors a chance to remedy the alleged wrong without having to go through a lawsuit and the further harm to the corporation.

Under this first prong, the Court reviews the factual allegations of the complaint to determine whether there is a

reasonable doubt as to the independence and disinterestedness of the directors. <u>Blasband v. Rales</u>, 971 F.2d 1034, 1048 (3rd Cir. 1992). If this first prong is not satisfied, there is a rebuttal presumption that the business judgement rule applies. <u>Id</u>.

The second prong involves the "business judgment rule," which Delaware courts have interpreted to mean "a presumption that in making a business decision, not involving self-interest, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." <u>Buntrock</u>, 571 A.2d at 774. The party challenging the directors conduct has the burden of establishing facts that rebut this presumption. The Delaware courts acknowledge that the board of directors have "managerial prerogatives." <u>Id</u>.

Plaintiffs assert that the fact that defendant repeatedly failed to disclose that they carry nuclear materials in their SEC 10-Q and 10-K filings raises a "reasonable doubt" that the BNSF's Board of Directors would properly remedy the situation. Docket 24, at 53.

The second explanation that plaintiffs give for not demanding remedial action is that the BNSF Board of Directors

36

is a "virtual Republican dream-team of anti-labor, anti-environmental concerns, and pro-nuclear industrial advocates." Id. at 54. Plaintiffs imply that BNSF's Board of Directors would by strongly opposed to the union and the union member's claims. Id.

This Court is not persuaded by plaintiffs reasons set out above for not making a demand on the directors before filing a lawsuit. The demand requirement ensures the directors an opportunity to remedy the situation before a lawsuit is filed. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991). Usually, only after the demand is refused by the directors can a shareholder bring a lawsuit on behalf of the shareholders. Id.

There just are not solid "particularized facts" alleged to create a reasonable doubt that a demand of the board would be futile. Brehm v. Eisner, 746 A.2d 244, 249 (Del. 2000).

**b. Conclusion**

For all the reasons set out herein, this Court will not answer the questions set out on pages 29 and 30 of this Order and the additional requests set out on pages 30 and 31 are denied because no demand has been made to the defendant's Board of Directors.

The Court is granting the 12(b)(1) motion as to this count.  Accordingly, the Court will not discuss the 12(b)(6) motion as to this count.

### 3.  Count Five: Workers Right to Declaratory Relief Under Price-Anderson Act

Plaintiffs are requesting a declaratory judgment "enunciating their rights to recover under the [Price-Anderson Act] in the event of their injury related to movement of nuclear materials."  Complaint ¶ 168.

#### a.  Applicable Law

The Price-Anderson Act was initially enacted as an amendment to the Atomic Energy Act in 1957 to try and persuade private investors to participate in the development of nuclear power by limiting the liability of private owners and operators in the unfortunate event of a "nuclear incident."

42 U.S.C. § 2210 vests district courts with original jurisdiction with respect to "any public liability action arising out of or resulting from a nuclear incident."  42 U.S.C. § 2210(n)(2).  A "nuclear incident" is defined in relevant part as:

> any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to

> property, or loss of use of property,
> arising out of or resulting from the
> radioactive, toxic, explosive or other
> hazardous properties of source, special
> nuclear, or byproduct material.

42 U.S.C. § 2014(q). "[L]iability under the Price-Anderson Act turns on the existence of a 'nuclear incident,' which does not occur when there is no unintended escape or release of nuclear energy." In re Cincinnati Radiation Litigation, 874 F.Supp. 796, 832 (S.D. Ohio 1995). Courts generally presume that Congress' legislative intent is the ordinary meaning of the words. The word "occurrence" is defined in Webster's as "the act or fact of occurring" or "something that occurs; event; incident." WEBSTER'S NEW WORLD DICTIONARY 984 (2nd coll. ed. 1982). "Nuclear incident" is any occurrence, including an "extraordinary nuclear occurrence." § 2014(q). "Extraordinary nuclear occurrence" is statutorily defined as:

> any event causing a discharge or dispersal
> of source, special nuclear, or byproduct
> material from its intended place of
> confinement in amounts offsite, or causing
> radiation levels offsite, which the Nuclear
> Regulatory Commission or the Secretary of
> Energy, as appropriate, determines to be
> substantial, and which the Nuclear
> Regulatory Commission or the Secretary of
> Energy, as appropriate, determines has
> resulted or will probably result in
> substantial damages to persons offsite or
> property offsite. Any determination by the
> Nuclear Regulatory Commission or the

> Secretary of Energy, as appropriate, that
> such an event has, or has not, occurred
> shall be final and conclusive, and no other
> official or any court shall have power or
> jurisdiction to review any such
> determination. The Nuclear Regulatory
> Commission or the Secretary of Energy, as
> appropriate, shall establish criteria in
> writing setting forth the basis upon which
> such determination shall be made. As used
> in this subsection, "offsite" means away
> from "the location" or "the contract
> location" as defined in the applicable
> Nuclear Regulatory Commission or the
> Secretary of Energy, as appropriate,
> indemnity agreement, entered into pursuant
> to section 2210 of this title.

§ 2014(j).

Plaintiffs have not alleged the existence of a "nuclear incident" or "occurrence" that complies with the legislative history of the Price-Anderson Act.

The defendant, "BNSF," has argued that plaintiffs cannot state a claim under the Price-Anderson Act ("PAA") because the act only permits a cause of action for injury "arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n)(2). Plaintiffs called the attention of the Court to Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59 (1978), for the proposition that their PAA Declaratory Judgment claim is ripe, even in the absence of a "nuclear incident." Defendants argue that the Duke decision

does not support the plaintiffs' position saying that the case does not even involve a claim under the PAA. Id. at 68-69 ("[A]ppellees' claims do not 'arise under' the Price-Anderson Act."). In Duke, there was a due process claim against the nuclear regulatory commission. Additionally, the Duke court found that the claim was ripe because the plaintiffs alleged a present injury, not just a speculative future injury that we have here. The Duke case is not helpful to plaintiffs. This Court has not been made aware of any case that holds that there does not have to be a nuclear happening to allow the Price-Anderson Act to be implemented.

### b. Conclusion

Again, under the Declaratory Judgment Act, there must be an actual case or controversy. There is no actual case or controversy here. Plaintiffs again attempt to have this Court issue an advisory opinion on a hypothetical set of facts, which this Court has previously indicated that it will not do. For this reason, this Court does not have jurisdiction and therefore plaintiffs' claim under the Price-Anderson Act is dismissed.

The Court is granting the 12(b)(1) motion as to this count.  Accordingly, the Court will not discuss the 12(b)(6) motion as to this count.

### 4.   Count Two:   Violations of the Iowa Public Policy Doctrine

Plaintiffs argue that there is a "strong public policy supporting the obedience and enforcement of required and necessary safety procedures and equipment in public transportation..." Complaint ¶ 138.  Plaintiffs also contend that defendant's alleged activities towards plaintiffs constitute "adverse employment actions."   <u>Id</u>. ¶ 139. Plaintiffs argue that defendant threatened dismissal, harassed, and disciplined plaintiffs for attempting to comply with the safety procedures, which is a violation of the Iowa Public Policy Doctrine.  <u>Id</u>. ¶¶ 138-42.

Plaintiffs acknowledge that all of the plaintiffs were employed by the defendant at the time of the filing of this lawsuit.  Docket 35, at 81 and 105.  However, they contend that one of the plaintiffs was in fact dismissed and later re-instated by defendant.  <u>Id</u>. at 105.  Plaintiffs further acknowledge that the vast majority of cases dealing with this type of public policy protection deal with actual dismissals. However, plaintiffs contend that traditionally the Iowa

Supreme Court has relied on what other jurisdictions have done in developing this public policy tort. Docket 24, at 30. Plaintiffs go on further to state that many other states "have expanded the doctrine to protect other adverse employment acts in addition to dismissal cases" and further argue that if the issue was presented to the Iowa Supreme Court they would do the same. Id.

Defendant argues that plaintiffs do not state a cause of action that is recognized in Iowa. Docket 8, at 12. Alternatively, defendant argues that plaintiffs' claim is preempted by the Federal Rail Safety Act. Docket 8, at 16.

### a.  Applicable Law

Specifically, 49 U.S.C. § 20109(a) states in relevant part, "[a] railroad carrier...may not discharge or in any way discriminate against an employee because the employee...(1) filed a complaint or brought or caused to be brought a proceeding related to the enforcement of this part..." § 20109(c) states that, "[a] dispute, grievance, or claim arising under this section is subject to resolution under Section 3 of the Railway Labor Act 45 U.S.C. 153." 45 U.S.C. § 153 is the section concerning the National Railroad Adjustment Board. § 153(i) states in pertinent part,

43

"disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions...shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes."

However, in this case there was never a complaint filed or a "proceeding" initiated that would be covered by § 20109. Plaintiffs' complaints are not a situation that provides for federal protection by the language of § 20109.  Plaintiffs allegedly made informal complaints to superiors and that is where it stopped.  There was never a formal complaint filed, the FRA was never notified, and there was never a "proceeding" initiated with regards to plaintiffs' complaints.  § 20109 does not "substantially subsume" plaintiffs' claim, but merely relates to it.  See CSX Tranp., Inc. V. Easterwood, 507 U.S. 658, 666 (1993).

This Court is aware of the recent ruling Sereda v. Burlington Northern Sante Fe Railroad Co., 2005 U.S. Dist. LEXIS 5598 (S.D. Iowa 2005).  However, this Court feels that this case is distinguishable from Sereda because there was an actual formal complaint filed and retaliation by the employer,

which is covered by § 20109.  This Court is not deciding the preemptive effect of § 20109 because this Court is not persuaded that § 20109 is applicable in this situation.

In determining whether federal law pre-empts state law, courts must look at congressional intent.  "Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving disputes."  Hawaiian Airlines, Inc. V. Finazzo, 512 U.S. 246, 252 (1994).

Defendant cites to Rayner v. Smirl, 873 F.2d 60 (4th Cir. 1989), as "especially instructive" in whether or not the FRSA preempted state causes of action for public policy protection in making safety complaints.  Docket 8, at 18.  This Court feels Rayner is not persuasive in light of the United States Supreme Court case Hawaiian Airlines, 512 U.S. at 266 (holding "respondent's claims for discharge in violation of public policy and in violation of the Hawaii Whistleblower Protection Act are not preempted by the RLA.").  As it is, the Supreme Court so holding, that case, not Rayner, must be followed.

Courts have consistently interpreted the RLA as establishing two categories of disputes, i.e., "major" and "minor."  Consolidated Rail v. Railway Labor Exec. Ass'n., 491

U.S. 299, 302 (1989).  In simple terms, the U.S. Supreme Court described major disputes as creating contractual rights and minor disputes as enforcing those contractual rights.  Id.

As previously set out herein (pages 20-24), there are specific procedures to follow depending on whether the dispute is "minor" or "major."  See supra Part Railway Labor Act.  In order for the plaintiffs to bypass the required procedures of "major" or "minor" disputes, the plaintiffs must establish that their claim is independent of any negotiated labor agreement, e.g., CBA.  "Collective-bargaining agreements ["CBA's"] often incorporate express or implied terms that are designed to give management, or the union, a degree of freedom of action within a specified area of activity."  Conrail, 491 U.S. at 308.  "[S]ubstantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA."  Norris, 512 U.S. at 257.  The premise is simple, parties may not contract under a collective bargaining agreement for what may be illegal under state law.

The Eighth Circuit has recently stated that "[t]o be preempted by the Act, a claim must be inextricably intertwined with consideration of a collective bargaining agreement."  Thomas v. Union Pacific R. Co., 308 F.3d 891, 893 (8th Cir.

46

2002). The Circuit went on further to explain that by simply referring to a collective bargaining agreement, without more, will not result in preemption. Id. If the CBA arguably governs the claim of plaintiffs, then plaintiffs' claims should be subjected to the arbitral procedures of the RLA.

The United States Supreme Court has said that collective bargaining agreements are a "generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate." Conrail, 491 U.S. at 311-12. The court also pointed out that you must take into account the "practice, usage and custom" when interpreting the agreement. Id. at 311. Simply because the alleged complaint is not specifically addressed in the collective bargaining agreement does not mean that the complaint is "independent" of the CBA. The crux of plaintiffs' complaint deals with the alleged violations of safety procedures and some sort of retaliation by the employer when an employee informally brings up the safety noncompliance to management, which plaintiffs have never attempted to resolve through the mandatory arbitration procedures.

Plaintiffs are trying to expand a long-standing public policy exception of the employment-at-will doctrine in Iowa, i.e., wrongful discharge, to include "adverse employment

actions," i.e., threatened dismissals, harassment, and discipline for attempting to comply with safety precautions. These are sometimes referred to as common law claims by the courts.

Currently, every one of the plaintiffs in this lawsuit are employed by defendant. Plaintiffs in this case acknowledge that none of them are at-will employees. Plaintiffs contend that their union membership cannot be a reason that they are not allowed the same protections as at-will employees. See Docket 39, at 40-41, see also Iowa Code 731.1 and 731.2. Plaintiffs go on to argue that even though the Iowa Supreme Court has never determined whether union members should be entitled to the same public policy protections as at-will employees, plaintiffs argue that the Iowa Supreme Court would allow union members the same public policy protections as at-will employees. Id. at 41. It is this Court's conclusion that certifying this question to the Iowa Supreme Court would result in the same conclusion. This Court is persuaded that a party's membership in a union does not preclude them from the same public policy protections as at-will employees. Therefore, this Court will proceed to determine if plaintiffs have an actionable public policy tort.

With the exception of one plaintiff, Linneman, no one has ever been discharged and it is undisputed that he is currently working for the defendant.  Plaintiffs would like this Court to extend the public policy exception of wrongful discharge to include certain retaliatory action, i.e., demotion, harassment, threatened discharge, etc., which they contend that they have been subjected to.  Docket 24, at 29.

Iowa recognizes a cause of action for violation of a "well-established public policy."  <u>Teachout v. Forest City Comm. School Dist.</u>, 584 N.W.2d 296, 299 (Iowa 1998).  To establish a "well-established public policy," a plaintiff must show "(1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two."  <u>Id</u>.  The Court will now discuss these three factors.

**1.  Engagement in a protected activity.**  In determining whether such a public policy exists, the Iowa Supreme Court has "looked only to [their] statutes and their constitution."  <u>Lloyd v. Drake Univ.</u>, 686 N.W.2d 225, 229 (Iowa 2004).  The Iowa Supreme Court went on further to explain that in determining a public policy they "proceed cautiously and will only extend such recognition to those policies that are well recognized and clearly defined."  <u>Id</u>. (quoting <u>Davis v.</u>

Horton, 661 N.W.2d 533, 536 (Iowa 2003). The Lloyd Court made it clear that there must be a discharge from employment or termination. 686 N.W.2d at 228. This does not include cases of threats or harassment, such as we have here.

The Iowa Supreme Court has also expressed a fear of a "proliferation of common-law suits in an area largely preempted, through statutes..." Below v. Skarr, 569 N.W.2d 510, 512 (Iowa 1997). The court in Skarr held that "claimed harassment of a worker, including threatened termination, does not give rise to a claim at common law." Id.

Based on this recent Iowa Supreme Court definition of what constitutes "public policy," plaintiffs do not allege a violation of a clearly defined public policy in Iowa. Plaintiffs, as mentioned, allege that defendant removed employees from service, threatened dismissal, dismissed, disciplined, harassed, and punished employees for performing safety procedures. Complaint ¶ 139. Plaintiffs do not cite to any specific statute or rule that plaintiffs have complied with and are being retaliated for their compliance with. Instead, plaintiffs are contending general allegations of violations of the RLA, FRA, FRSA, and other railroad safety practices. Furthermore, plaintiffs have never formally

brought these complaints to the attention of management through the grievance procedure outlined by the CBA, nor have plaintiffs by themselves or through the union filed any sort of formal complaint to the FRA.

Plaintiffs' general allegations are not a clearly defined public policy in Iowa. These safety statutes set up proper procedures to report safety violations in hope of remedying violations or non-compliance without ever needing a lawsuit. Simply making informal complaints or disregarding management directives about safety violations is not a clearly defined protected public policy.

"[P]ublic policy exception is narrow and courts should not lightly intervene to impair the exercise of managerial discretion." Fitzgerald v. Salsbury Chemical, Inc., 613 N.W.2d 275, 283 (Iowa 2000) (citing Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 745 A.2d 178, 182 (2000). "[W]e continue to adhere to our guiding principle to only declare public policy which is clearly articulated by a statute or other appropriate source." Fitzgerald, 613 N.W.2d at 285.

Some examples of a protected public policy in Iowa include, employee making demand for wages, see Tullis v. Merrill, 584 N.W.2d 236, 239 (Iowa 1998), see also Iowa Code

§ 91A.10(5); employee asserting a right to workers compensation benefits, see Niblo v. Parr Mfg., Inc., 445 N.W.2d 351, 353 (Iowa 1989); employee filing a claim for partial unemployment benefits, see Lara v. Thomas, 512 N.W.2d 777, 782 (Iowa 1994), see also Iowa Code § 96.15(1) (1989); employee reporting suspected child abuse, see Teachout v. Forest City Comm. School Dist., 584 N.W.2d 296, 299 (Iowa 1998), see also Iowa Code §§ 232.67-.77. Defendant contends, and this Court agrees, that the plaintiffs are trying to create a public policy in Iowa that is not clearly defined by statutes or constitution. Plaintiffs have not cited to any statutes or constitutional provisions that would create the public policy exception they are trying to advance. "The need for clarity in public policy is similarly recognized in our reluctance to search too far beyond our legislative pronouncements and constitution to find public policy to support an action." Lloyd, 686 N.W.2d at 230 (quoting Fitzgerald, 613 N.W.2d at 283)).

Plaintiffs may have had a more viable argument for a public policy if they had reported violations to the FRA or through the RLA dispute resolution procedures and failed to get any relief because those are protected activities.

However, simply making informal complaints to the defendant's officers about alleged safety violations is not considered a clearly defined protected public policy in Iowa.

**2. Adverse employment action and causal connection Between the Two.** Since this Court has determined that plaintiffs did not participate in a protected activity, this Court does not need to determine if there was an adverse employment action and a causal connection between the protected activity and the adverse employment action. See Teachout, 584 N.W.2d at 299.

Plaintiffs have now requested that we defer the Iowa "Adverse Employment Act" issue. The United States Supreme Court's and the Iowa Supreme Court's rulings heretofore mentioned for all practical purposes say that there must be a termination. See Lloyd, 686 N.W.2d at 228. This Court is persuaded that a certification of this issue to the Iowa Supreme Court would not be appropriate. Further, that Court, in its rulings, has not given this Court any reason to believe that they will, in the reasonable future, change their position. Deferment now is not an acceptable or appropriate option.

The Iowa precedence and Code sections make it clear that in order to be considered a protected activity it must be clearly defined by statute. Plaintiffs' activities here, such as informal notification, are not clearly defined by Iowa statute and are not considered a protected activity. Plaintiffs do not claim an action which the State of Iowa currently recognizes or in which this Court is persuaded that the State of Iowa would recognize.

### b.  Conclusion

Since plaintiffs do not allege a claim that is independent of any CBA, they should resort to the arbitral proceedings required by the RLA and try and resolve any dispute or grievance that they may have regarding safety violations or management actions.  Plaintiffs may also, through their union or individually, give formal notice to the FRA of any violations.  For the foregoing reasons, plaintiffs' public policy claim is dismissed.

The Court is granting the 12(b)(1) motion as to this count.  Accordingly, the Court will not discuss the 12(b)(6) motion as to this count.

**5. Count One: Safety Violations?**

The Court has covered three of the four requests for declaratory judgments that were prayed for in plaintiff's second amended complaint. It now will discuss the remaining request for declaratory judgment which the plaintiffs have set out as follows:

> 1. Declaratory judgment defining BNSF's duties to report safety violations[4] to the FRA and/or commence its own proceedings for potential violations of FRA regulations, as well as determining whether the FRA has a duty to commence disqualification proceedings once it is adequately appraised of such a pattern and practice of misconduct;

---

[4]Count One, pertaining to Safety Factors, was discussed throughout the hearing this Court held. The defendant says at the start of their argument, Tr. 6, "Plaintiffs have directed this [issue] to the wrong branch of government," "it is preempted under the Federal Railroad Safety and Railroad Safety Act." Tr. 9. Defendants further argue that "there is no opportunity for a federal court to come in and say that the Federal Railroad Administration should do something differently and do something more than what they are already doing." Tr. 11. There are very similar "arguments" set out in Tr. 12 through 21.

The plaintiffs argue as to safety issues extensively. Tr. 54-67. They also try hard to refute the preemption (to government agencies). Tr. 68-88. The defendant comes back and strongly refutes these arguments. Tr. 91, 102. Plaintiffs respond by saying if the present system worked, we wouldn't be here. Tr. 103. They also set out the serious pitfalls of arbitration. Tr. 105.

The Court has set out the above to specifically inform the parties that it has not forgotten, and fully considered their arguments as to Count One, "Safety Violations?".

This claim is much more fully set and is much broader as shown on pages 4, 5, 6 and 7 of this Order. All references that relate to Count One issues are hereby repeated in this section as though fully set out.

This matter, as the parties informed the Court, is complicated. There are issues where there is no solid precedence. This Court has operated on the theory that it is easy to rule, but that it is much harder to rule correctly. Therefore, the Court is going to outline some of the problems as to this claim that have required it to spend considerable time trying to become informed enough to get to the point where it could rule up or down.

Following the United States Supreme Court, the Eighth Circuit Court of Appeals has observed that: "A court should grant the motion and dismiss the action 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" <u>Handeen v. Lemaire</u>, 112 F.3d 1339, 1347 (8th Cir. 1997) (quoting <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984)).

### a. Arguments of the parties

The plaintiffs have contended that they are forced to choose between following their employer's illegal orders which

endanger themselves, their families, and their community or to risk termination. Their alternative to protest is not simply inaction; it is the performance of the personal services for the benefit of the perpetrator of the illegal acts. The plaintiffs further contend that the only realistic antidote to the poison pill of quitting, leading to labor suicide, is giving rise to sufficient voice to attempt to influence employer policies by making suggestions, complaining, or engaging in protest activities.

As mentioned, they contend that the choice to quit their jobs is a virtual act of labor suicide. These workers are tied into retirement and health benefit plans, seniority, personal ties with co-workers and an earned place in the community. See Jacoby, *Industrial Labor Mobility in Historical Perspectives*, 22 INDUS. REL. 261, 270-71 (1983).

The plaintiffs contend that the Department of Energy ("DOE") has concluded that BNSF rail lines are safe for transporting high levels of nuclear waste because BNSF has purposefully failed to disclose material facts to the DOE, such as: (1) BNSF has a materially deficient track infrastructure; (2) BNSF has materially deficient operating practices; (3) BNSF has not disclosed prior haz-mat (hazardous

materials) accidents, including some accidents involving nuclear loads; (4) BNSF only carries partial insurance and does not have the financial resources to compensate those injured in the event of a mass loss, all as set out in the complaint, Docket 10, at ¶ 100. There are other serious complaints, but the above is sufficient to show that there are important issues that have been urged by the plaintiff.

The plaintiffs further allege that BNSF, along with other members of the AAR, have so influenced federal rail regulators as to have made them captives to their purposes. They continue by adding: "The federal judiciary is the only protection rail workers have against this wholesale rendering of the fabric of democracy in the United States." See Plea v. National Mediation Board, 29 F.3d 655 (D.C. Cir. 1994).

The plaintiffs further contend that a secret of the railroad industry is the fact that railroad managers do order their subordinates to violate the federal safety requirements in order to expedite trains and/or for other reasons. Congress has acknowledged this fact while working on federal rail litigation. See FRA quotation of the remarks of the Nebraska Senator Exxon, 49 C.F.R. Part II., Appendix. A, at 38, 133 Congressional Record, S. 15899 (11-5-87).

The plaintiffs further point out to the Court in their brief that despite this Court's ruling on the use of affidavits during the oral arguments, the defendants submitted a letter from S. Mark Lindsey, Chief Counsel for the Federal Railroad Administration. In this letter, the Chief Counsel sets out that the plaintiffs are invited to work with the Federal Railroad Administration ("FRA") to address any safety problems that might exist on the Burlington Northern and Santa Fe Railroad rather than pursue needless litigation. He is talking about this case, <u>Bauer v. BNSF</u>.

In that lengthy letter, the Chief Counsel says that FRA is ready, willing, and able to handle any and all complaints arising in Sioux City. The plaintiffs in footnote 15, p. 26, of their supplemental post-hearing brief, Docket 41, informed the Court that this same Chief Counsel did not respond to initial complaints, to the amended complaint, when filed, did not investigate the case, did not respond to the safety sensitive issues, and ignored a response from the plaintiffs' counsel which the plaintiffs deemed as "disputing FRA's self-serving, inaccurate, and oddly timed letter."

The plaintiffs set out that the FRA is not a necessary party to the case now before this Court; but they argue that

if the Court, after hearing the evidence and considering the regulations, finds that BNSF has a duty to report itself and/or to request commencement of management safety-sensitive disqualification procedures, BNSF itself will then be self-triggering the FRA enforcement actions.  The plaintiffs go on to say in footnote 17, p. 27, of said brief, that they will not object to and would welcome FRA as an intervener on BNSF's behalf in this case.  Is this a possibility?  What do the parties think of the legality and appropriateness of such a suggestion?

It goes without saying that the defendant here, BNSF, disputes all of the above.  This Court is not drawing any conclusions from the plaintiffs' contentions set out above, except to conclude that they are issues that should not now be ignored.  Despite the Court's ruling about not using affidavits, this Court, after much thought and in attempting to rule on this portion of the declaratory judgment requested by the plaintiffs, felt that it would not be able to make any kind of a ruling without going into some, if not all, of these contentions set out in the Chief Counsel's letter and others not mentioned above only for the reason of brevity.  This FRA letter, of course, is not an affidavit.

In their original brief, Docket 24, at page 56, the plaintiffs inform the Court that this is not a case requesting the Court to write law review articles. The plaintiffs go on to say that there are a number of cutting edge legal issues, some of first impression or on which there is very little actual precedent, and others very complex. These issues involve policy and legislative interpretation and involve real and substantial public safety concerns.

This Court, when it heard the contentions as to the supposed lack of enforcement of railroad safety rules and the alleged shortcomings and omissions of the railroad in relation to improper maintenance and other serious violations as to trains going through Sioux City, was compelled to conclude that if even a part of these allegations were true, then there must be action taken by Government regulators, or if necessary, by the Courts. This Court is persuaded that none of these hotly contested issues can be ruled on without a good deal more information and more specific research by the parties and the Court.

Based on the letter filed by BNSF, this Court believes that BNSF has raised a factual challenge to Count One. However, this Court must reserve ruling on the 12(b)(1) motion

as to Count One, until it has held an additional evidentiary hearing to receive competent evidence, as discussed on page 13 above.

This Court is filing this ruling to give the parties a notification of some of the critical matters that are bothering the Court. The Court is then going to hold a hearing after receiving additional comment and/or briefs from the parties. It is contemplating the possibility of subpoenaing Chief Counsel, Mr. Lindsey, to this Court to determine if he is ready to back up the statements and promises set out in his letter of August 22, 2004. This Court is considering allowing both parties to cross-examine Mr. Lindsey as to the many contentions from both sides in relation to the matters set out in his letter and any other relevant matters.

### b. Conclusion

This Court is persuaded that the lengthy discussion in this Order as to which motion to dismiss, to use, and/or changing those motions into a summary judgment situation will not be a satisfactory course of procedure as to this count. The contentions and denials as to safety violations are too unresolvable for a summary judgment. Any of the previous

affidavits filed by the defendant that pertain to the safety violation issues will be considered by the Court as will any affidavits the plaintiffs deem relevant.  This Court wants to make it clear that this is not to indicate that this will be a battle of affidavits.  The Court is really interested in direct testimony.  This Court, subject to input by the parties, will very likely evaluate for itself the safety violations and related claims.  See <u>Osborn v. United States</u>, 918 F.2d at 730.

Recently, counsel for the defendants sent the Court copies of <u>Sereda v. Burlington Northern Sante Fe Railroad Co.</u>, 2005 U.S. Dist. LEXIS 5598 (S.D. Iowa 2005); <u>CSX Tranp. Inc., v. Williams</u>, 2005 U.S. App. LEXIS 7604 (D.C. 2005); <u>CSX Tranp. Inc., v. Williams</u>, 2005 U.S. Dist. LEXIS 6569 (D.C. Cir. 2005).  This Court has read these cases.  Counsel should include comments as to these cases in their response.

**IT IS THEREFORE HEREBY ORDERED** that the requested Declaratory Judgments: Count Three re: safety and political strikes from page 19; Count Four re: security laws from page 29; Count Five re: Price-Anderson Act from page 36; and Count Two re: Iowa Public Policy from page 40, are <u>each</u> **denied**.

**IT IS FURTHER HEREBY ORDERED** that the request for declaratory judgment Count One re: safety issues on page 52 is held in abeyance until further briefing, an additional hearing and anything else that is deemed appropriate by the Court.

**IT IS FURTHER HEREBY ORDERED** that the parties shall file updated comments and/or briefs as to all questions raised by the Court within twenty-one days of the date of this Order.

**IT IS FURTHER HEREBY ORDERED** that a hearing on these concerns of the Court and all matters related to the "Safety Violations" issues shall be held on **July 6, 2005, at 2:00 p.m.**

**IT IS SO ORDERED** this 6th day of June, 2005.

_Donald E. O'Brien_
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa