

# Federal Railroad Administration

About the FRA
Safety
Freight Railroading
Passenger Rail
Research & Development
Press Room
Legislation, Regulation, & Litigation

DOT Site Search:

[GO]

FRA-only ☑

## Operating Practices Compliance Manual

Chapter 1    Program Goal

Chapter 2    Inspection and Investigation Procedures

Chapter 3    Conducting Operating Practices Inspections

Chapter 3A    Railroad Operating Practices

Chapter 3B    Railroad Communication

Chapter 4    Enforcement Actions

Chapter 5    Field Reporting - Violation Procedures and Forms

Chapter 6    Accident Investigation

Chapter 6A    Highway-Rail Grade Crossing Accident Guide

Chapter 7    Complaint Investigations

Chapter 8    General Interpretive Guidelines

Chapter 8A    Part 40 - Procedures for Transportation Workplace

Chapter 8B    Train Employees - Hours of Service Law

Safety / Operating Practices

Last Updated: Apr. 21, 2005

About Us | Safety | Freight Railroading | Passenger Rail | Press Room | Legislatio
Regulations & Litigation | Site Index | Privacy Policy | FOIA | Jobs | Home

© Federal Railroad Administration 1120 Vermont Avenue NW, Washington, DC 205

# EXHIBIT 5

## Chapter 2

# Table of Contents

Table of Contents.................................................................................................................1
Inspection and Investigation Procedures Safety Assurance and Compliance Program:  Focused
Enforcement.........................................................................................................................3
    Summary of Enforcement Principles Under SACP.....................................................................3
        Basic Principles ...........................................................................................................4
    Enforcement Discretion ................................................................................................4
    Focused Enforcement...................................................................................................5
Failure to Implement a SACP Action Plan ................................................................................6
Small Businesses..................................................................................................................6
Integration of Safety Profiles, SACP Audits and Civil Penalty Negotiations.................................8
Guiding Principles for FRA's Safety Initiatives..........................................................................8
    Annual Resource Allocation Meeting..............................................................................8
        Description of the AAA Model ........................................................................................9
    Midterm Meeting of the Resource Allocation Team.........................................................9
    Clarification to Regional Staff on FRA Priorities..............................................................9
    Roles of SACP and Traditional Site-Specific Inspections ...............................................10
    Safety Assurance and Compliance Program Role ..........................................................10
    Tracking SACP Projects ..............................................................................................12
    Traditional Site-Specific Inspection Role .....................................................................12
    Verification of Compliance ...........................................................................................13
Allocation of Resources .......................................................................................................13
Inspector Priorities .............................................................................................................14
Beginning, Ending and Times of Inspections and Investigations................................................14
Advance Notice of Inspections..............................................................................................14
Signing Waivers ..................................................................................................................14
Corrective Handling With Railroad .........................................................................................15
Follow-Up Investigations .....................................................................................................15
FRA T-10 Track Geometry Car Inspections.............................................................................15
    Survey Schedule.........................................................................................................16
    Special Instructions.....................................................................................................16
    Radio Communication ..................................................................................................16
    Train Speed ...............................................................................................................16
    Safety Rules/Regulations ............................................................................................17
    Roadway Worker Protection.........................................................................................17
Supplemental Instructions for FRA OP Inspectors Assigned to the ATIP T-10 Vehicle (effective:
September 11, 1991) ...........................................................................................................17
Appendix C - FRA T-10 Operating Rules.................................................................................19
    Reporting of Accidents Involving FRA T-10 Vehicles .....................................................20
Deterrents to Inspection or Investigation Activities .................................................................21
    Refusal to Permit an Inspection or Investigation ...........................................................21
    Interference with an Inspection or Investigation ............................................................21
    Strike or Labor Dispute...............................................................................................21

Cooperation with Industry and Other Governmental Agencies ............................................................ 22
Credentials............................................................................................................................................ 22
Statements of Witness and Reports of Interview.................................................................................. 22
    Statement of Witness ...................................................................................................................... 24
    Report of Interview ......................................................................................................................... 26

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 3 of 46

# Inspection and Investigation Procedures Safety Assurance and Compliance Program: Focused Enforcement

The Safety Assurance and Compliance Program (SACP), which entered its third year in 1997, have already produced significant safety results. SACP entails both effective allocation of inspection time and resources to address safety problems at their root and effective enforcement of the safety laws to make sure those problems are being addressed. This chapter is intended to ensure that all FRA safety personnel understand and implement a consistent enforcement policy under SACP.

SACP is an outgrowth of President Clinton's directive to Federal regulatory agencies that their inspection and enforcement programs be designed to achieve results, not punishment. In the Government Performance and Results Act, Congress, too, has directed that Federal agencies establish measures of their performance and manage their programs toward achieving specific results. SACP is the best method of getting safety results because it leverages FRA's limited resources.

SACP seeks to address safety problems at the level where they originate: if they are systemic in nature, we seek a system-wide solution going to the problem's root causes. We attempt to reach solutions to system-wide problems by creating partnerships with railroads, shippers, and their employees. Investing those responsible for actually implementing a solution in the process of devising that solution is a time-honored way of increasing the chances of success. When solutions are identified, they are embodied in a SACP action plan. FRA then monitors the implementation of that action plan to ensure safety commitments are fulfilled.

Enforcement of the Federal railroad safety laws is a very important part of SACP. In fact, FRA's strategic plan states that uniform enforcement of the safety laws is FRA's primary mission. In very general terms, our enforcement must be reasonable, fair, and firm, and it should be focused on the most important safety issues we confront. Enforcement that meets this description will be a very powerful tool for motivating the industry toward FRA's goal--shared by the entire industry--of zero accidents and zero injuries.

## Summary of Enforcement Principles Under SACP

When SACP was first announced in March 1995, the greatest emphasis was placed on getting to root causes of systemic safety problems through partnership efforts. This was, and is, the program's major innovation. Because this central thrust of the program entailed a certain amount of enforcement forbearance concerning the subjects of a system audit during the period of the audit, the erroneous impression may have developed that SACP called for refraining from use of enforcement tools in nearly all cases. However, there never was any intent to eliminate or discourage use of the enforcement tools or the exercise of discretion, which is necessary for rational enforcement. In fact, SACP actually involves stronger enforcement than before because it seeks to better target our enforcement efforts toward serious safety problems.

For most of FRA's history, one of the major factors FRA and others would use to measure the success of the safety program was the quantity of enforcement activity. However, what really matters is results as measured by the level of compliance with safety laws and the frequency of accidents and injuries. Accordingly, under SACP, our major concern is with the quality and effectiveness of safety compliance efforts, including enforcement. The SACP principles of focusing on root causes and leveraging our resources to achieve results cut across the entire safety program. With limited inspection and enforcement resources, and with the knowledge that less adversarial methods are frequently effective, we must, of necessity, be selective in choosing enforcement targets. This provides guidance on how to ensure that our enforcement approach is consistent and our enforcement actions are most effective.

## Basic Principles

These are the basic principles (each of which is discussed more fully, below) of enforcement under SACP:

**Use Discretion**: Exercise enforcement discretion in accordance with the agency's longstanding criteria found in 49 CFR Part 209, Appendix A (see Chapter 4 in this manual). Where, consistent with those principles, the situation warrants use of an enforcement tool to ensure compliance and increase safety, take the enforcement action.

**Focused Enforcement:** In deciding whether enforcement action is necessary, make a special effort to focus enforcement where it will do the most good, i.e., where accident trends, inspection data, direct observation, and/or the violation's inherent seriousness indicate that enforcement action is needed to address a significant safety risk.

**System wide Audits**: In system wide audits, refrain from enforcement action concerning the subjects of the audit as long as full cooperation continues, unless a violation is extremely severe. This limited forbearance is an important way of developing a cooperative atmosphere for mutually identifying root causes of problems and achieving solutions.

**Safety Action Plan Violations:** Where a railroad or shipper has developed a Safety Action Plan as a response to a Safety Profile and a Senior Management Meeting and then committed violations of the safety laws directly related to the Safety Action Plan, strong enforcement action should be taken in every case, absent a compelling reason.

**Small Companies:** In dealing with very small railroads and shippers, abide by the dictates of President Clinton and recent small business legislation, which generally require that enforcement agencies, in deciding whether to assess penalties and determining penalty amounts, give great weight to whether violations were committed in good faith and the swiftness of remedial action. As has long been FRA's policy, we strive to assist these small businesses in their compliance efforts.

## Enforcement Discretion

FRA inspectors may detect violations of the safety laws during system audits, regular inspections, when investigating complaints, or when investigating accidents. Each inspector has discretion to determine whether a violation warrants enforcement action. If every violation led to an enforcement action, inspectors, FRA attorneys, and the regulated community would spend an inordinate amount of time dealing with--and probably litigating--these matters, regardless of their potential impact on safety. On the other hand, if inspectors lacked the discretion to take enforcement action where they thought it was necessary, their ability to affect safety-related behavior--and the agency's impact--would be greatly diminished. In deciding whether enforcement action is the best method for addressing noncompliance, FRA inspectors weigh the criteria set forth in 49 CFR Part 209, Appendix A. The inspector considers these factors:

the inherent seriousness of the violation

the kind and degree of potential safety hazard presented by the violation under the circumstances

any actual harm to persons or property already caused by the violation

the offending person's general level of compliance

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 5 of 46

the offending person's recent history of compliance with the particular rules involved, especially at the particular location involved

whether a remedy other than a civil penalty (ranging from a warning to an emergency order) is appropriate under the circumstances, and

other factors relevant in the immediate circumstances.

Having considered these factors, the inspector may exercise discretion to seek an enforcement remedy or to provide the railroad, shipper, or individual an inspection report documenting the noncompliance and discuss measures to obtain compliance. It is important for every inspector to know these criteria and consider them in making enforcement decisions.

Generally, this discretion is exercised wisely. Note that one of the factors to consider is which enforcement remedy is appropriate. Each inspector should be familiar with the full range of actions. The SACP seeks to improve the quality of these judgments on when to take enforcement action and which action to take. During development of a Safety Profile under SACP, for example, the need to engender an extremely high degree of cooperation in order to address any systemic problems is an "other factor" relevant to the circumstances and points toward refraining from enforcement action.

Similarly, a provision in a Safety Action Plan that a railroad will fix a certain system-wide problem within a defined period is an "other factor" that strongly suggests refraining from enforcement action concerning individual occurrences of that system-wide problem during the defined period so long as the railroad is making a good faith effort to fix the system-wide problem as agreed in the Safety Action Plan. However, in either example, where the first two factors listed above (the inherent seriousness of the violation and the risk it poses in the given circumstances) point very strongly toward enforcement action, these factors would outweigh the more general factor.

Where enforcement action appears necessary in the context of developing a Safety Profile or monitoring the implementation of a Safety Action Plan, the inspector must first consult the SACP Team Leader. Ordinarily, the Team Leader will defer to the judgment of the inspector on the need for enforcement action. However, the Team Leader is responsible for coordinating SACP activities and needs to ensure that FRA follows a consistent approach with respect to the particular railroad or shipper. The Team Leader's role provides him or her with a broader perspective on compliance issues across the railroad's or shipper's system. The Team Leader, after applying the discretion criteria, may conclude that the recommended action will not be taken (or conversely, could require preparation of enforcement actions that had not been recommended by an inspector).

## Focused Enforcement

Focused enforcement entails concentrating enforcement efforts primarily on the types of violations most likely to cause an actual train accident or injury. FRA's accident/injury database provides a wealth of information on what these leading causes of accidents and injuries are. The basic principle here is allocating our finite enforcement resources on those areas where improvements in compliance are most likely to produce concrete results. The principle is the same with regard to allocating inspection resources; as discussed in a separate document on inspections, we need to use available information on safety risk criteria to better guide our selection of inspection priorities.

FRA inspectors shall utilize FRA's accident, injury, and inspection data to gain better insight into the types of violations that are actually causing large numbers of accidents and injuries. While much of the information is already available to the field, FRA will distribute to the field, data summaries showing the leading causes of train accidents and injuries by safety discipline, cause code, and regulatory section. The data will be industry-wide and broken down by railroad. With this information, inspectors will be better equipped to weigh the discretion criteria concerning the inherent seriousness of violations and the level of risk posed in specific circumstances. This is not to suggest that enforcement decisions are to

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 6 of 46

become entirely driven by data. Direct observations and experience will always be necessary elements of these decisions. However, because the agency has adopted certain performance goals linked directly to reducing the rate of certain unsafe events, we need to make better use of the data we collect to help guide our achievement of those goals.

In the meantime, we encourage inspectors to make use of data already at their disposal, including accident data, inspection data, and their own experience about the most important safety hazards. Inspectors should give this information great weight and strongly consider enforcement action whenever these especially unsafe conditions occur, with a goal of maximizing the safety return on enforcement efforts. While some enforcement actions will continue to be necessary on matters that are not likely to actually cause accidents or injuries but violate rules that are important underpinnings of an effective regulatory program (e.g., reporting, record keeping and inspection requirements), those matters that are serious safety concerns are more likely to be the prime candidates for enforcement actions. Reporting, record keeping, and inspection violations become more important to the extent they are widespread and/or bear directly on compliance with substantive requirements.

Where inspectors are focusing on leading causes of accidents and injuries, their violation reports should summarize the factors underlying their decision. For example, where a track report alleges wide gage violations on a railroad that has wide gage as the leading cause of its track-caused accidents, the report should briefly explain why those violations are especially important.

Over time, this more careful focus on how enforcement discretion is exercised should reduce the number of penalty assessments that might be considered "nitpicking" by FRA's regulated community. On the other hand, as we refine the process, we may decide to adopt a "zero tolerance" (i.e., always enforce) policy for the most egregious violations. The goal is not to achieve a particular volume of enforcement on the high or low side. The goal is a compliance program in which enforcement discretion is routinely exercised in a common sense way to address important problems that more cooperative methods have not solved.

# Failure to Implement a SACP Action Plan

Railroads benefit from the enforcement restraint we show during development of system-wide Safety Profiles. However, when a railroad (or shipper) has agreed to a Safety Action Plan to address those issues and then fails to follow through on specified action items, any noncompliance that results is an especially strong candidate for enforcement action. In such situations, the railroad has demonstrated an unwillingness or inability to follow through on its safety commitments to address identified safety hazards, which would only be encouraged by FRA's further lenience. Unless there is a compelling reason to the contrary (e.g., we detected only a handful of minor violations after a dramatic systemic improvement demonstrating the railroad's full commitment), these situations should lead to enforcement actions. As discussed above, before initiating such actions, inspectors need to consult with the SACP Team Leader to ensure a coordinated FRA approach.

Any enforcement actions that do arise from such situations should be marked clearly on the transmittal sheet to the Office of Chief Counsel as "SACP Follow-up Violations." The violation report should state clearly what the railroad committed to do as an action item and how the violations demonstrate a failure to live up to that commitment. FRA attorneys will transmit such violations with an especially stern penalty demand letter requiring a response within 30 days and explaining that FRA expects either payment in full or prompt negotiations resulting in a payment of a very high proportion of the initial amount assessed.

# Small Businesses

FRA's guidance to its field inspectors has for some time emphasized the unique nature of small railroads and shippers. That guidance encourages inspectors to help these companies find ways to achieve compliance. FRA is especially careful in exercising its enforcement discretion where these smaller

entities are involved; being mindful of the disproportionate impact a civil penalty may have on a very small operation. Of course, there are situations where, in the view of the FRA inspector, a small railroad or shipper, must be fined in order to gain compliance.

On April 21, 1995, President Clinton directed Federal agencies to take special actions with regard to enforcement of regulations against small businesses. The President's memorandum of that date stated (with emphasis added):

To the extent permitted by law, each agency shall use its discretion to modify the penalties for small businesses in the following situations. Agencies shall exercise their enforcement discretion to waive the imposition of all or a portion of a penalty where the violation is corrected within a time period appropriate to the violation in question. For those violations that may take longer to correct than the period set by the agency, the agency shall use its enforcement discretion to waive up to 100 percent of the financial penalties if the amounts waived are used to bring the entity into compliance. The provisions in [this paragraph] shall apply only where there has been a good faith effort to comply with applicable regulations and the violation does not involve criminal wrongdoing or significant threat to health, safety, or the environment.

The principles of the President's memos are the policy of the FRA. FRA has discretion not to seek civil penalties or take other enforcement action when it detects noncompliance. In fact, more often than not, the FRA inspector chooses to provide his or her findings to the railroad and discuss progress toward future compliance. When we apply the enforcement discretion criteria, one "other factor" to consider is the entity's level of sophistication and resources. Where a civil penalty has been assessed, FRA has the authority to compromise the penalty for an amount equal to at least $500 per violation. With that statutory floor in mind, FRA exercises its compromise authority to waive a portion of the assessed penalty in nearly every case. How much of the initial penalty is waived depends on many factors, but certainly efforts to achieve compliance are among the most important considered.

In 1996, Congress enacted the Small Business Regulatory Enforcement Fairness Act ("SBREFA"). Among other things, SBREFA requires each Federal enforcement agency to: establish a program for responding to inquiries by small entities; establish a program for reducing or waiving civil penalties for small entities that tracks very closely with President Clinton's policy, outlined above; and prepare small entity compliance guides for any new rule that will have a significant economic impact on a substantial number of small entities. The act also establishes Small Business Regulatory Fairness Boards in each region of the Small Business Administration (SBA). These boards may hold hearings on complaints filed by small businesses concerning compliance or enforcement activities by Federal agencies, and then advise the SBA's Enforcement Ombudsman of their findings. The ombudsman will work with any agency about which complaints are received.

FRA has issues a notice in the Federal Register defining "small entities" for purposes of the railroad safety laws, explaining its program for responding to inquiries by small entities, and explaining its enforcement policy with respect to such entities. In the meantime, FRA inspectors should carry on their activities with regard to small entities as they ordinarily would. All FRA enforcement personnel should provide the most prompt and clearest answers possible to questions raised by small entities. Because the law may permit reliance by the small entity on such advice, enforcement personnel should document what they say to whom and when. If there is any question about an interpretive issue, regional managers and FRA counsel should be consulted.

While we need to be very mindful of the unique circumstances of small entities, we should not be inhibited from doing our jobs where they are concerned. Lack of size does not excuse safety violations, especially those that are serious, frequent, or committed in the absence of good faith. Where enforcement actions are necessary against small entities, be sure to document in the violation report any previous violations, attempts made to resolve our concerns short of enforcement action, contacts with the small entity on compliance issues, and any special safety hazard associated with the violations. In civil penalty actions against such entities, FRA attorneys will make extra efforts to elicit information concerning remedial actions that have been taken and give any such actions great weight in reaching a compromise.

# Integration of Safety Profiles, SACP Audits and Civil Penalty Negotiations

Safety personnel must ensure that enforcement efforts, Safety Profiles, and SACP Audits become fully coordinated and integrated. Any violations involving a failure to adhere to a SACP Action Plan deserve special handling and an especially firm negotiating posture. Civil penalty settlement conferences need to be coordinated with senior management meetings to ensure delivery of a consistent message. Because they tend to reveal any system wide compliance problems, civil penalty negotiations often involve discussion of issues similar to those that arise in development of Safety Profiles. Issues discussed in senior management meetings, as areas of FRA concern may already be the subjects of pending enforcement actions. The idea is to use the settlement conferences to highlight issues raised in the latest SACP Safety Profile or SACP Audit of the railroad (or shipper), or likely to become SACP issues if the railroad does not improve compliance. In addition, the settlement conferences provide the Office of Safety Assurance and Compliance managers an opportunity to ensure that enforcement is being focused on the most important issues and that SACP Safety Profiles are addressing important issues being presented in enforcement cases.

Achievement of this seamless integration of our civil penalty process with the SACP process will require sustained coordination and cooperation by the attorney assigned to the railroad and the SACP project manager. Both the attorney and the manager will be responsible for making clear to the railroad that civil penalty cases and the SACP audits are complementary parts of the same safety program. The likelihood of success in the cooperative safety efforts at the heart of SACP is strengthened when the consequences of failure to cooperate or to follow through on safety commitments are clear. Of course, in order to increase incentives for cooperation, specific evidence of substantial remedial action going to the root cause of a safety problem should be given great weight in settlement negotiations. This balance between firm enforcement and cooperative effort is essential to the program's success.

**Conclusion:** The Safety Assurance and Compliance Program is designed to ensure that FRA exercises its safety authority in a common sense way that focuses on results. The principles set forth provide guidance on how to exercise our enforcement authority in just such a manner. All FRA enforcement personnel must become familiar with these principles and apply them in making their daily enforcement decisions.

# Guiding Principles for FRA's Safety Initiatives

**Preamble:** The FRA partnership with rail labor, rail management, State representatives and shippers is built on cooperation and trust. This cooperative approach has already achieved significant safety results and ensured the success of FRA's Safety Assurance and Compliance Program (SACP). SACP is the best method of getting safety results because it leverages FRA's limited resources. The safety initiatives outlined below explain how to effectively allocate inspection time and resources to address safety problems at the level where they originate. The outcome will be a more accurate focus on the root causes of the safety problems. This guidance also explains the role of SACP and the traditional site-specific inspections.

## Annual Resource Allocation Meeting

The Regional Administrators, Project Safety Coordinators, and headquarters managers are responsible for the development of an annual strategic resource allocation plan.

A team composed of all Regional Administrators, Project Safety Coordinators and Office of Safety headquarters managers will meet annually in January to plan how resources will be used for the year.

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 9 of 46

The team will use the Annual Allocation Analysis (AAA) model as the starting point for targeting resources.

Data from the AAA model and other sources that highlight questionable safety performance by a railroad will be further analyzed to decide if a SACP project is appropriate or whether traditional site-specific inspection actions are needed.

## Description of the AAA Model

The exhibit data are presented by region, discipline and railroad. Railroads have been grouped into one of three classes to assist in the team analysis process. The largest class is railroads with annual employee hours worked that exceed 400,000. The middle class of railroads is less than 400,000 annual employee hours worked with total train miles times employee hours worked that exceed 100 million. The smallest class of railroads has train miles times employee hours worked that are less than 100 million.

- As to the specific risk factors in the model, units inspected are weighted using Quality Improvement Program hours (total units inspected multiplied by the average time to inspect a unit). A defect rate (defects divided by units inspected) is used instead of total defects found. With the exception of the OP discipline, the accident count column only includes accidents that were specifically caused by the discipline. The OP discipline includes all accident causes. Casualty counts only include fatalities and serious injuries (dislocation, fracture, amputation, hernia, internal injury and loss of an eye) for the discipline except for the OP casualty count, which includes all disciplines. Counts for tons and hazmat tons have been divided by one million while counts for passenger train miles, train miles and employee hours worked have been divided by one thousand. Unique risk factors for the hazmat discipline are: (1) internal audit rates which were calculated by dividing the hazmat tons by reports filed with DOT's Research and Special Programs Administration (RSPA) using calendar year data (if a railroad had not filed a report with RSPA, the number one was used to generate a rate); and (2) Regional Inspection Point counts from regional files.

## Midterm Meeting of the Resource Allocation Team

The team composed of all Regional Administrators, Project Safety Coordinators and headquarters managers will meet semiannually.

The team will review safety information to analyze whether the Agency is maximizing its resources. If the team determines that an adjustment is needed, resources will be reallocated.

## Clarification to Regional Staff on FRA Priorities

Regional Administrators are responsible for providing clarification to regional staff on FRA priorities and how resources will be allocated between SACP projects and site-specific inspections based on the annual resource allocation plan described in item one.

Regional Administrators are expected to analyze where inspectors have inspected and what was inspected to assure that we are maximizing our efforts to achieve zero safety hazards.

An inspector assigned to a SACP project will find they have less time to perform traditional site-specific inspections. Therefore, the Regional Administrators need to assure that the time available for inspections by all inspectors is reasonably focused on the critical safety hazards.

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 10 of 46

## Roles of SACP and Traditional Site-Specific Inspections

FRA will use its SACP process for system-wide improvements of safety problems and traditional site-specific inspections to target individual problems.

Traditional site-specific inspections will also be used to support SACP projects by monitoring each railroad's compliance with its Safety Action Plan.

Railroad Safety Action Plan initiatives are designed to correct systemic safety problems. Using the Safety Audit process, FRA monitors a railroad for compliance using site-specific inspections, industry listening sessions and continuous communication between the SACP team leaders for FRA, labor and railroad management.

## Safety Assurance and Compliance Program Role

SACP complements site-specific inspections with a comprehensive system-wide analysis of a railroad's systemic problems.

FRA, States, labor and railroad management work together to identify problems. The objective is to eliminate safety hazards before they become problems.

Traditional site-specific inspections are critical to the success of SACP efforts. Site- specific inspections along with a railroad's safety record verify that the SACP resolutions of systemic problems have been achieved.

Description of what happens with a systems approach to resolving safety hazards.

-       **Safety Profile:** SACP projects are initiated based on information gathered during the Safety Profile process. Rail labor and management work with FRA and States in the development of a railroad's Safety Profile. Activities include identifying a railroad's safety strengths and weaknesses by compiling a list of reportable accidents/incidents, findings from site-specific inspection data including potential violations, summaries of "listening sessions" (interviews with railroad employees and management) and other safety specific problem areas. During this process, FRA is unlikely to assess civil penalties against a railroad for problems disclosed by its management in order to facilitate the railroad's participation in assessing its own weaknesses.

-       **Senior Management Meeting:** During a Senior Management Meeting, FRA presents Safety Profile findings to railroad labor and senior railroad management.

-       **Safety Action Plan:** Railroad management prepares a draft Safety Action Plan in response to FRA's Safety Profile, which is presented during a Senior Management Meeting. FRA and railroad management, with participation from rail labor and States, negotiate the final Safety Action Plan.

    --      The final Safety Action Plan becomes an informal "contract" between railroad management, FRA, States and rail labor to remedy safety hazards. The "contract" contains long-term measures to correct concerns, interim measures to ensure safety, the designation of a responsible railroad officer and an implementation schedule.

    --      FRA notifies the designated responsible railroad officer concerning how and when the agency will verify corrective safety measures by the railroad, and makes clear that FRA inspectors will inspect to assure compliance and that FRA stands ready to take any necessary enforcement action when we have identified noncompliance with a Safety Action Plan.

- **Safety Audit Process:** The Safety Audit process is the primary means by which FRA monitors a railroad's compliance with its Safety Action Plan "contract." The goal is to quickly resolve systemic safety problems so that we can achieve zero safety hazards.

    -- FRA's SACP manager gathers information from site-specific inspections, industry listening sessions and continuous communication between the SACP team leaders for labor and rail management. The information is used to verify that remedies are occurring within a reasonable time period.

    -- FRA suspends the assessment of most civil penalties concerning matters covered by a Safety Action Plan during the first phase of a Safety Audit when the subject railroad is beginning to implement its Safety Action Plan. Except in egregious cases (see focused enforcement guidelines), safety is best served by refraining from assessing civil penalties as long as the railroad is timely in carrying out system-wide improvements agreed upon in a Safety Action Plan.

To illustrate this process, an FRA safety assessment on a northeastern railroad uncovered a number of systemic signal and grade crossing problems. The railroad agreed to develop a Safety Action Plan, which incorporated the following:

- replace signal cables showing evidence of deteriorating insulation resistance;

- test soft core iron signal relays in accordance with FRA prescribed intervals;

- install light-out protection at specific interlocks;

- replace a particular type of track relay, which is prone to manufacturing defects;

- Improve the quality of employee training and railroad instruction manuals relative to the testing and inspection of signal system;

- develop a plan to monitor and test the integrity of the transaction return bonding system; and

- improve inspection of interconnected grade crossing circuits.

To date, the railroad has corrected many of the signal and grade crossing problems ahead of schedule. If, however, violations of the Safety Action Plan were found, vigorous enforcement action would be taken promptly.

An inspector who detects a violation involving failure to implement the terms of a Safety Action Plan must contact FRA's SACP Team Leader for the project. The SACP Team Leader is then expected to contact the appropriate regional manager(s), Office of Safety headquarters and Chief Counsel, as appropriate, to decide on the appropriate course of action.

All communications between inspectors and regional offices, headquarters, or counsel about enforcement against a railroad that is subject to a SACP process must be made through or with (for example, in conference calls or meetings) the SACP Team Leader. This communication pattern is necessary for SACP Team Leaders to be both responsible and accountable for what happens during SACP processes. For this to work, it is also essential that SACP Team Leaders facilitate communication among inspectors, regional managers, headquarters, and counsel. More, and better, communication is the goal.

To achieve maximum benefit from SACP activities, FRA is quickly establishing partnership agreements between FRA, rail labor and management, States, and suppliers. These agreements operate best when flexible enough to expand beyond the specific tasks that first brought the parties together. The objective is to institutionalize the partnership process so that employees have a continuous involvement in deciding

the best operating procedures to achieve zero safety hazards. When possible, SACP activities will continue with no defined ending date providing clear safety benefits are expected from the continued partnership. FRA will work with all parties on current activities, changes to existing activities, and formulating new activities to support the partnership process.

## Tracking SACP Projects

SACP Team Leaders are assigned the responsibility of maintaining the master Senior Management Meeting file and all subsequent activities. Quantitative measures selected to highlight the reason for the SACP action will be clearly noted in the master file. Data gathered during the Safety Profile analysis will be FRA's quantitative benchmark measures. Copies of master files including quantitative measures are provided to Project Safety Coordinators who transmit documents to the Office of Safety Assurance and Compliance headquarters.

Office of Safety Assurance and Compliance headquarters contact for the field Project Safety Coordinators will maintain a central file that tracks the progress of SACP projects to determine if a SACP action has contributed to achieving zero safety hazards. SACP projects that fail to achieve the expected safety improvements require follow-up safety action. The type of action will depend on the amount of cooperation FRA receives from railroad management. If a railroad has not been cooperative, FRA needs to plan on focused enforcement actions.

## Traditional Site-Specific Inspection Role

Effective site-specific inspection preparation includes the use of FRA's accident/incident and inspection databases. Inspectors are expected to spend a high proportion of their inspection time trying to find and eliminate the types of safety problems that are actually causing large numbers of accidents and injuries.

Site-specific inspections that are focused on the more critical safety hazards are more effective in helping us achieve our safety goal of zero safety hazards.

To avoid conflicts between SACP initiatives reached during SACP Senior Management Meetings and ongoing traditional site-specific activities on the same railroad, the Office of Safety Assurance and Compliance will maintain a matrix that shows that the agreements are between FRA, States, railroad labor and railroad management with a FRA contact for each railroad agreement. The matrix will be maintained in a central network file by the Project Safety Coordinators that can be accessed by everyone in the field and headquarters.

- For example, FRA's SACP Senior Management Meeting with rail labor and XYZ railroad results in a Safety Action Plan that focuses on five systemic safety problems.

-- FRA's Safety Audit will focus on the five systemic safety issues by contacting railroad management and rail labor to get progress reports.

-- FRA and State inspectors must also conduct traditional site-specific inspections to verify compliance.

-- If each discipline has a systemic safety issue, the matrix for XYZ will show the regulation that applies to each discipline and the FRA person that the inspector should contact.

--- If an MP&E Inspector conducting a traditional site-specific inspection discovers a violation of a safety regulation listed on the matrix, the inspector must contact the Team Leader listed on the matrix for XYZ. The inspector needs to report what was found, make a recommendation, and get further guidance from the Team Leader on the appropriate action to take.

    --      Traditional site-specific inspections need to continue before, during and after negotiations with XYZ. Without continued site-specific inspections, FRA will not be able to effectively verify that the XYZ has committed to correcting the systemic problems.

Appendix C of the FRA report to Congress, Enhancing Rail Safety Now and Into the 21st Century provides detailed guidelines for routine site-specific safety inspections.

## Verification of Compliance

The achievement of SACP objectives is verified through FRA's follow-up discussions with senior railroad management, rail labor and conducting traditional site-specific inspections. The site-specific inspections will be done before, during and after a SACP agreement with railroad management and target the greatest safety hazards.

Inspectors should use site-specific accident and incident data to target particular parts of the regulations for assuring a railroad's compliance with Federal safety regulations. An inspector inspecting for compliance should be spending a greater portion of time on railroad operations that are causing the accidents and incidents.

    -      For example, OP's top accident cause as reported over a four-year period (1993- 1996) was H702 (switch improperly lined). This human factor cause accounted for 21 percent of the "Top 10" Human Factor cause codes. The second most frequently reported human factor cause code was H306 (shoving movement, absence of man on or at leading end of movement), accounting for another 19 percent of the "Top 10" human factor accidents. Of the universe of 91 human factor accident cause codes reported over the stated four-year period, 1,930 or 55 percent of these human factor accidents fell into the "Top 10" human factor accident causes. These types of statistics tell us that inspectors should be reviewing a railroad's accident and injury history to ensure that FRA is focusing its inspection activity on the safety hazards that are occurring most frequently.

# Allocation of Resources

Regional Administrators and Regional Operating Practices Specialists are responsible for coordinating Operating Practices inspection activities and assignments within the region to maximize effective utilization of our limited human resources.

The Railroad Safety Specialist will coordinate the activities of the inspectors consistent with the program objectives of the Regional Administrator. A number of factors influence the dynamics of inspection/investigative activities within the assigned territory of the inspector. Compliance on the part of railroads may be compromised for economic reasons. At times, non-compliance results from dynamic changes within the industry due to mergers, consolidation of facilities, changing operations, adoption of railroad rule changes, and associated programs of instruction. Still others result from unfamiliarity with Federal regulations and railroad rules when normal attrition of railroad employees results in loss of institutional knowledge. However, regardless of the reason, the industry's history has demonstrated that when safety requirements and programs are compromised, the negative impacts continue to increase. Hence, a constant monitoring process provides the essential information the Operating Practices Inspector, Specialist and Regional Administrator need to properly respond to the changing railroad environment.

There are a number of mechanisms on which inspector allocation is determined:

Accident/Incident Information

Complaints Received

Number of Defects or Violation Activities

Consolidation, relocations, and mergers of railroad operations

# Inspector Priorities

The allocation of resources will often deviate from the desired goal because of unforeseen events. When these events occur, Regional Administrators, Specialists and Inspectors will base human resource allocation decisions on the following priorities (listed in the order of importance):

Accident/Incident Investigations (including false proceed signal failure investigations)

Congressional Complaint Investigations

Petitions for Waiver Investigations

Compliance Audits

Regular Complaints

Special Investigations (e.g., sample car, steam locomotive, OSHA, etc.)

Automated Track Inspection Program (ATIP-T-10 Geometry Car) activities

Site-Specific (Routine) Inspections

# Beginning, Ending and Times of Inspections and Investigations

Operating Practices inspections and investigations are to be conducted during the inspector's duty hours. On certain occasions, it will be essential to our mission to conduct inspections, investigations, or surveillance activities outside of the established duty hours. When an inspector determines it is necessary to conduct his or her activities at times other than the inspector's duty hours, the inspector should notify his or her Regional Specialist in advance of planned activity. Alternative Work Schedule programs, overtime or compensatory time programs are designed to facilitate such activities, and should be utilized.

# Advance Notice of Inspections

Inspectors should not routinely provide railroads with advance notice of planned inspection activities. However, an inspector may exercise his or her discretion in determining when advance notice of inspection is necessary to ensure the availability of records, equipment, officials, or persons to be interviewed, and thereby enhance efficient utilization of resources.

# Signing Waivers

While conducting inspection/investigation activities in conjunction with FRA official business, inspectors may not sign waivers, which release railroads, companies or their representatives from responsibility for any personal injury, loss or damage to the inspector's belongings or U.S. Government property.

Inspectors may sign visitor or guest registers in order to gain entry into the premises to be inspected, provided the signature constitutes no form of release or waiver of responsibility, or limits the inspector's access to areas germane to the inspection. When an inspector is uncertain of the legal effect of signing a

2-14

visitor or guest register, the inspector will consult the Regional Specialist or his/her designee for advice prior to signing the register.

# Corrective Handling With Railroad

Upon completion of an inspection, the inspector shall confer with a railroad or company representative and advise the person of all conditions and practices disclosed by the investigation which may constitute non-compliance with Federal safety standards or railroad rules. The inspector should also indicate the applicable section or sections, which may have been violated. Appropriate copies of the completed inspection report, FRA form 6180.96, should be left with the railroad or company representative at the conclusion of the inspection or investigation, when practicable. Copies of inspection reports may be mailed or sent by facsimile in order to facilitate delivery to the appropriate railroad manager.

# Follow-Up Investigations

Often, regular inspections disclose unsatisfactory safety conditions. When such conditions jeopardize railroad employee or public safety, it is important that the condition be corrected as soon as possible. FRA shall confirm that the non-compliant condition has been corrected through follow-up investigations or inspections.

Follow-up investigations or inspections are conducted as regular inspections that also identify actions taken on prior violations or deficiencies. An important principle to a follow-up investigation or inspection is that it need not be conducted at the same railroad location or facility where the original violation or deficiency was discovered. If, through further investigation or inspection, the inspector concludes the causal factors of the non-compliance have been resolved and that corrective actions have been initiated to prevent a reoccurrence, a follow-up investigation or inspection has occurred.

In case of less egregious violations or deficiencies, the Inspector and Specialist may exercise discretion in scheduling follow-up investigations or inspections in balance with our other inspection priorities. These types of investigations or inspections should still be conducted within a reasonable time after the initial violation or deficiency was discovered.

Certain situations require mandatory follow-up investigations within 30 days from the day of discovery. These follow-up investigations are required in situations:

Where FRA has issued an emergency order based on a risk to personal or public safety;

Where an inspection determined that the railroad failed to report death, injury or occupational illness, highway-rail crossing, and/or rail equipment accidents/incidents;

Where certain occurrences have generated public concern, special interest, or have high public visibility; or

Where the railroad failed to report excess service to the FRA, as required by 49 CFR 228.19.

# FRA T-10 Track Geometry Car Inspections

FRA operates a self-propelled ATIP (Automated Track Inspection Program) T-10 Track Geometry car through its contractor, Ensco, Inc. for the purpose of inspecting track nationwide for compliance with the Track Safety Standards. Through the use of state-of-the-art electronic sensing and data processing, the T-10 car is able to collect track geometry data while traveling at speeds up to 80 mph. In the measurement process, data are displayed on oscillographs and simultaneously processed in real-time to produce printed reports for distribution to the railroads and FRA. The oscillographs visually indicate the condition of the track being surveyed and are compared to the actual track as viewed from the rear of the

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 16 of 46

survey vehicle by and FRA Track Inspector and railroad representative. Operation of the T-10 is governed by the "Operations Plan for FRA Survey Vehicle T-10," revised January 1993.

FRA OP inspectors are assigned to monitor operations of the T-10 Track Geometry inspection car in order to ensure that the car is operated in a manner that protects the safety of FRA, Ensco, and railroad employees operating the car, railroad employees and operations with which the car interfaces during its operations, and the general public. In order to accomplish this mission, FRA OP Inspectors assigned to T-10 must be fully cognizant of all operating conditions affecting T-10.

A "NO SMOKING" policy will be adhered to and enforced on T-10. This applies to all FRA employees, Ensco employees and consultants and railroad personnel. The Ensco Survey Director will encourage personnel to remain aboard during Instrument Verifications but must be aware that one or more vehicle occupants might detrain to smoke outside. All FRA and Ensco personnel should remain alert to the fact that all personnel are onboard T-10 prior to resumption of movement.

## Survey Schedule

As a general rule, the train and engine crew should be called on duty for 7:30 a.m. with normal departure time at 8 a.m. Of course, the actual on-duty time can be adjusted earlier or later to accommodate the railroad's operational and/or maintenance activity. The FRA Track Inspector and Operating Practices Inspector will consult with the railroad before the day of the T-10 movement to determine the best on-duty time. Aside from these adjustments, normally the track geometry survey should be completed at about 4:30 p.m.; post-run calibration checks will require approximately 1 hour.

## Special Instructions

Where operating rules require work and freight locomotives to be equipped with cab signal, ATC, or ATS, T-10 must be towed by an equipped locomotive. When requested by the FRA, railroads will provide at FRA cost, the following:

Locomotive power (with short nose forward) 110-psi brake pipe

Operating crews

Security for measurement cars during extended stops, overnight and weekends

Number 2-diesel fuel for diesel generators

Potable water

NOTE: Single unit vehicles of this type do not always effectively shunt track circuits.

## Radio Communication

The engineer-pilot shall have a radio with appropriate frequencies to maintain communication with the train engineer and/or railroad facilities.

## Train Speed

The maximum train speed will be set by the applicable railroad.

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 17 of 46

## Safety Rules/Regulations

The Survey Director is designated as Safety Officer for this survey and as such is responsible for ensuring all survey activities are performed in a safe manner. The Survey Director is the only person who can give permission to the engineer-pilot to move the consist. The engineer-pilot must make himself available to the Survey Director. FRA Safety Rules as they relate to the vehicles and their operation are compatible with applicable railroad rules.

## Roadway Worker Protection

When operating T-10, Ensco is a contractor to FRA, and not a contractor to a railroad. Ensco's authority to be on railroad property derives from FRA's authority under 49 U.S.C. § 20103, and Ensco is an agent of FRA for operations under the T-10 contract.

When on the individual railroads, FRA policy requires its employees (and agents) to abide by the provisions of the railroad's plan for compliance with the Roadway Worker Protection (RWP) rule. In principle, FRA should designate specific Ensco employees to work under the FRA policy and abide by the provisions of the railroad's plan in all respects other than qualification and designation by the railroad. Ensco's "railroad training" would consist of requesting and receiving appropriate job briefings from railroad personnel to determine the on-track safety procedures at any time and location.

When it is necessary for Ensco employees to stop the T-10, detrain and occupy the track structure for the purpose of performing instrument verification checks, mechanical inspections, or for servicing of the car, these employees must be in compliance with the provisions of the railroad's RWP plan. Under these conditions, for the track the T-10 is operating on, the Ensco employee(s) would be under the operating rule protections afforded to the T-10 vehicle. If the Ensco employee(s) would occupy a position within four feet of an adjacent main track, RWP protection must be established. A railroad employee can serve as a watchman for Ensco employee(s) under these conditions.

The following directive clearly establishes FRA's safety standards and the Operating Practices Inspector's authority over general operation of the car.

# Supplemental Instructions for FRA OP Inspectors Assigned to the ATIP T-10 Vehicle (effective: September 11, 1991)

The following instructions are a supplement to any applicable Federal and carrier rules, as well as to Ensco's Operation Plan. For purposes of these instructions, a main track is any track outside the confines of a yard.

1.      The control and authority for T-10 operation rests with FRA, not Ensco, with respect to the safe movement of the car. The senior on-board FRA Operating Practices Inspector/Supervisor will be the final decision-making authority on the proper course of action. Contact with the Regional Administrator or his designee will be made at the earliest practical time should an unusual or unplanned event occur which materially changes T-I0 schedule or operational capability.

2.      The OP Inspector is responsible for daily coordination with railroad train dispatchers to ensure T-10 operating instructions are understood and to resolve any questions or concerns regarding T-10 operations.

3.      T-10 operating instructions will be read to each locomotive engineer pilot by the Ensco crew chief in the presence of the FRA OP Inspector prior to T-I0 movement.

4.      The locomotive engineer pilot will be asked by the OP Inspector if he or she fully understands the instructions, and confirm that the vehicle is being operated as a train by the railroad.

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 18 of 46

5.      Prior to operation of T-10 on the main track, the OP Inspector must ascertain through the pilot the method(s) of operation in effect on the route to be traveled. Reference to applicable operating documents will be made to confirm such information as applicable.

6.      In the event reverse movements are necessary on the main track, when conditions so warrant, OP Inspectors will instruct the car operator to change ends and operate from the rear of the car. Conditions, which will require changing ends, include movement through interlockings, movements over multiple highway-rail crossings, or movements of a significant distance (2 miles or more).

7.      The OP Inspector will communicate with the locomotive engineer pilot (or the locomotive engineer and conductor when towed) and will examine pertinent qualification documents as required under 49 CFR Part 240. The pilot must be currently qualified over the routes and railroad(s) involved.

8.      Prior to operation of the vehicle on the main track, the OP Inspector will personally inspect applicable forms, bulletins, orders or clearances for accuracy and to ensure the vehicle is being operated as a train. If other FRA employees are aboard, they will inspect these documents as soon as practical. The inspectors must not request or accept copies of these authorities until they are fulfilled or annulled. FRA inspectors are assigned to T-10 to ensure compliance with Federal rules, railroad rules, and T-10 operating instructions by railroad and Ensco employees.

9.      FRA inspectors are not to be directly involved with the movement of the vehicle insofar as operating the controls, talking over the radio regarding movement authority, or adjusting/operating any vehicle survey computers or equipment. FRA OP Inspectors are to be aware of T-10 movement authorities at all times and will question the pilot if any doubt exists regarding route, signal indication, speed or other operational element. If necessary, T-10 will be stopped until the OP Inspector achieves a clear understanding of movement intent.

10.     Prior to operation of T-10 on each segment of main track, the OP Inspector will review and note the limits of each applicable movement authority, and applicable method of operation involved. When practicable, other FRA personnel on board will also review each authority.

11.     When T-10 is in motion, FRA personnel are to limit conversation with the locomotive engineer pilot and T-10 operator to matters of official business related to the movement of the car. Idle conversation or small talk while T-10 is in motion is inappropriate and distracting.

12.     All FRA employees aboard will jointly determine from appropriate persons all relevant speed restrictions, which will be encountered en route. All FRA employees aboard will assure compliance with each speed restriction. The internal communication system may be used for this purpose if appropriate.

13.     The OP Inspector will assure the locomotive engineer pilot notifies the vehicle operator of the limit of authority and authorized speeds a sufficient distance in advance of any speed or movement restrictions.

14.     T-10 may be operated within the confines of a yard provided the movement is approved by proper authority and is piloted by a railroad employee qualified on the physical characteristics.

15.     T-10 must not be operated on the main track unless a qualified locomotive engineer is piloting the movement. This requirement also applies on main track within yard limits.

16.     Train orders, DTC, TWC, MBS or other mandatory directives must be transmitted and received in compliance with 49 CFR Part 220.61. For purposes of this instruction, all references to crewmembers apply only to the locomotive engineer pilot. If the locomotive pilot cannot remain in the control cab while receiving such directives, the vehicle must be stopped.

17.     In the event the T-I0 Ensco operator is to be relieved due to hours of service constraints, the railroad locomotive engineer pilot should be utilized to continue car operation to a point of final tie-up. Should the pilot be prohibited from operating the car, the survey should be stopped at a suitable point short of scheduled tie-up or a locomotive should be requisitioned for tow-in. (This contingency is one that should be addressed at the beginning of the survey to allow for ample planning). If, in the opinion of the FRA Operating Practices Inspector, the locomotive engineer pilot is capable of continuing T-10 operation, sufficient supervised familiarization training time (45 minutes to 1 hour) for the locomotive engineer pilot should be allowed prior to Ensco operator's hours of duty expiration.

18.     If the operating authority does not include permission to operate on the main track within yard limits, FRA employees must ensure the applicable timetable or other instructions are complied with before entering such limits. This applies when necessary to operate either with or against the current of traffic. The carrier employee in charge of the main track within these limits must specifically state that authority to operate within yard limits has been granted.

19.     Ensco employees are required to comply fully with FRA Blue Signal Regulations when inspecting, repairing, servicing or testing the vehicle. Ensco employees may request that a railroad employee operate a railroad switch or derail, but the Ensco employee must apply the blue signal and locking device. Although instrument verification (IV) checks are not covered by blue signal regulations, a blue signal must be displayed on or near the control stand at a readily visible location when they are conducted if the vehicle operator is not seated at the controls.

20.     Each OP Inspector must complete and submit an FRA F6180.96 for each day assigned to the vehicle. Deficiencies identified on the F6180.96 will apply to the railroad. If more than one railroad is involved on any particular day, a separate inspection report must be completed for operations on each railroad.

# Appendix C - FRA T-10 Operating Rules

T-10 is a modified SPV 2000 rail diesel car, which measures track geometry for compliance with Federal regulations. Each railroad is governed by the following when T-10 is operated in the self-propelled mode.

1.     Each train dispatcher handling T-10 must be furnished with a copy of this Appendix.

2.     T-10 must be operated in compliance with Federal regulations and the rules and instructions of the railroad over which it is being operated.

3.     The railroad must provide a qualified engineer pilot for the vehicle. T-10 must not be operated on a main track, inside or outside yard limits, unless the qualified engineer is piloting the movement. The pilot must notify the T-10 operator of the limits of movement authority and authorized speeds a sufficient distance in advance of any movement or speed restrictions.

4.     T-10 must be operated as a train except that automatic signals must not be relied on to provide protection against following movements. Alternate methods of protection, including controlled signals where feasible, must be utilized to provide protection against following movements. When the method of operation can provide for absolute block protection against following movements, it must be provided. When the method of operation cannot provide for absolute block protection, the railroad must determine and provide the maximum level of protection available against following movements.

5.     T-10 must not be operated by lineups or other track car authorities and must be governed by signal indications in signal system territory.

6.    T-10 is prohibited from making a reverse movement, regardless of distance, unless the movement is fully protected and made in accordance with the railroad's operating rules.

7.    Traffic control machines must be operated manually for T-10 movements. Automatic clearing and automatic routing features must not be used. The control machine operator must be kept informed of the progress of T-10 from one control point to another. Where provided, electrical or mechanical blocking devices must be used on switch and signal controls.

8.    Interlocking machines must be operated manually for T-10 movements. Automatic clearing and automatic routing features must not be used. The operator of an interlocking must not change the position of any switch or indication of any signal until informed that T-10 is clear of the interlocking or a section thereof. Where provided, electrical or mechanical blocking devices must be used on switch and signal controls.

9.    T-10 must approach all interlockings prepared to stop until the route is known to be clear.

10.   If T-10 is stopped within the limits of any interlocking, the control operator or dispatcher must be notified of the stop and the precise location.

11.   T-10 should not be stopped within the limits of an automatic interlocking or a non- interlocked railroad crossing at grade. If such a stop cannot be avoided, T-10 must be fully protected against conflicting movements at once. Flag protection will be provided unless other positive methods of protection are available or relieved of this responsibility by the train dispatcher.

12.   In automatic block signal system or traffic control system territory, T-10 should not be stopped on sand. If such a stop cannot be avoided, T-10 must be moved immediately a sufficient distance to clear the sanded portion of the rails.

13.   T-10 must approach all highway grade crossings equipped with automatic protection prepared to stop until it is determined that the protection is working and continues to work as T-10 passes over the crossing. Flag protection against highway vehicles must be provided when automatic protection does not operate properly or when required by railroad rules or instructions.

14.   T-10 may be operated within the confines of a yard provided the movement is approved by proper railroad authority and is piloted by a railroad employee qualified on the physical characteristics of the yard.

15.   Except within a locomotive servicing area or car shop area, T-10 may be repositioned at any time on a track or portion of a track, which is exclusively occupied by T-10 and protected by blue signals. Within a locomotive servicing area or car shop area, T-10 may be repositioned only after the railroad employee in charge of the workers authorizes the movement. Blue signal requirements must be complied with.

16.   No more than four persons are permitted to occupy the control cab of T-10. These four persons are the vehicle operator, forward observer, engineer pilot and either the FRA Operating Practices Inspector or a railroad operating department supervisor. If the Operating Practices Inspector is not in the control cab, he/she must be stationed in the immediate vicinity of the cab, at a location from which the operation can be monitored.

## Reporting of Accidents Involving FRA T-10 Vehicles

Any accident, which involves the T-10 vehicles, the T-10 train consist, or any personal injury or death resulting from the operations of a T-10 vehicle shall be reported immediately to:

1.    The appropriate Regional Administrator and the Office of Safety Analysis.

2.      The Staff Director of the Track Division.

With information provided by regional personnel and the T-10 Program Manager, the Office of Safety Analysis will prepare and distribute a Railroad Accident Notification (FRA **Form 6180.41**) to all concerned.  The Regional Administrator will designate an inspector to investigate each accident.  This inspector will be responsible for the coordination, preparation, and timely submittal of a written report to the Washington office.  The original report will be forwarded to the Office of Safety Analysis and a complete copy to the Staff Director of the Track Division.

# Deterrents to Inspection or Investigation Activities

## Refusal to Permit an Inspection or Investigation

Under no circumstances will an inspector engage in a dispute when denied permission to conduct an inspection or investigation. When a person refuses to permit an inspection or investigation, the inspector should request an explanation for the refusal.  The inspector should leave the premises and immediately report the circumstances of the refusal to the Regional Specialist.  The Regional Specialist will notify the Regional Administrator or Deputy Regional Administrator, the Washington office, or the Office of Chief Counsel.

## Interference with an Inspection or Investigation

Where entry to railroad premises is allowed and a person interferes with or limits an important aspect of the inspection or investigation, the inspector shall exercise his or her judgment as to whether the work should be continued.  Whatever the decision, the inspector should report the circumstances to the Regional Specialist, who will notify the Regional Administrator, the Washington office, or the Office of Chief Counsel.  A written memorandum summarizing the circumstances and nature of the interference should be submitted to the Regional headquarters.

In any instance where the inspector encounters forcible resistance, or the threat thereof, in the performance of his or her duties, the inspector should immediately stop the inspection activity, withdraw from the scene and report the circumstances to the Regional Specialist and Regional Administrator, the Washington office, or the Office of Chief Counsel.

## Strike or Labor Dispute

When FRA field personnel arrive at an inspection point and find that the railroad, or other person, is involved in a labor dispute which has escalated to a work stoppage or strike, the inspector must promptly notify his or her Regional Specialist, and report the circumstances of the work stoppage.  This information will be promptly communicated to the Washington headquarters, and should include:

Location of pickets and date/time they were placed

Impact on rail commuters or passenger services

Impact on railroad operations (service shutdowns or curtailment, etc.)

Shipper/receiver disruptions

Reported interference with railroad operations or vandalism

Impact or potential impact on public safety

FRA personnel whose official duties require them to cross picket lines must use good judgment. Safety must be our first priority and it is not expected or authorized for FRA personnel to take any action, which could cause them reasonable fear for their own personal safety. Under most circumstances, an inspector should display their credentials to those in charge of the picket lines and explain that they are entering the property to conduct Federal railroad safety compliance activity. The inspector should make every reasonable effort to accomplish their official duties without exposing themselves to unreasonable risk. Remember that these are often emotional situations and you should do all you can, not to exacerbate the situation, express any personal opinions, or engage in any confrontation. Promptly report any problems in this area to your Regional Specialist or Deputy/Regional Administrator.

## Cooperation with Industry and Other Governmental Agencies

Inspectors shall assist other governmental agencies, public representatives, and industry representatives when directed by the Regional Specialist. Inspectors must also provide certain information to other governmental agencies and state and local representatives (see Chapter 6, Accident Investigations).

## Credentials

Any officer, employee, or agent of the Department of Transportation is required to display proper credentials upon request. Consequently, it is essential that when conducting an inspection or investigation the inspector shall possess his or her credentials. Inspectors shall offer their credentials for identification when asked.

## Statements of Witness and Reports of Interview

Standard verbiage FRA Statements of Witness and Reports of Interview should not be confused. Each has a specific purpose and usefulness in reporting information as part of our inspection, investigation and enforcement activities. A Statement of Witness is considered to be an evidence document, while a Report of Interview provides a means to record and report information provided by an individual for our use.

A Statement of Witness is <u>required</u> if an employee's statement provides essential evidence supporting a violation action. On the other hand, a Report of Interview which includes an admission against interest (a manager or supervisor admits ordering a crew to violate a regulation), or which merely provides additional information, may be included in a violation report. Two factors must be considered when deciding whether a Statement of Witness is necessary, or if a Report of interview is acceptable. Occasionally, these two factors overlap, but each must always be taken into account:

The need to protect the identity of a complainant (whistle blower); and,

The need to provide sufficient evidence to prove an alleged violation.

Section 5(b) of the former Rail Safety Improvement Act of 1988 requires us to protect the identity of a person who provides information used to prosecute a railroad or person (whistle blower protection). FRA policy defines a "whistle blower" as a person who comes to FRA with information about an alleged violation by a railroad or person. This need not involve a formal written complaint, but can also include an informal contact in the field. Not all persons who provide us with information are considered whistle blowers, however. For instance, an employee, supervisor, manager or officer of a railroad carrier who provides information in response to questioning by an FRA inspector during an accident investigation is not a whistle blower for the purposes of Section 5(b). Therefore, we are not required by law to protect the identity of that individual (however, it is certainly permissible to do so if whistle blower protection is requested).

If a union representative files a complaint with FRA on behalf of an employee, the employee is the actual complainant (entitled to protection), as it is his or her personal knowledge upon which the complaint is

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 23 of 46

based and the union representative is acting on his or her behalf. If the union representative files a complaint without the knowledge or consent of the employee, the employee is still the party with personal knowledge, and is entitled to protection.

Signed Statements of Witness used to support a violation report are provided to railroads, individuals, or persons as part of the supporting documentation for the violation report, during the claims collection process. If an employee is unwilling to provide a signed Statement of Witness, a Report of Interview or an unsigned Statement of Witness may be used to supplement other documentation or add information for Chief Counsel's Office in prosecuting the railroad, but must not be attached to the railroad's copy of the violation report or otherwise provided to the railroad.

If an employee is unwilling to sign a Statement of Witness, and a violation action cannot be supported by other documentation or the inspector's direct observations, a civil penalty action violation is not appropriate and FRA will decline prosecution.

FRA's standard verbiage Statement of Witness form and standard Report of Interview format are provided on the next two pages for your use. When using a Statement of Witness form, the inspector (or the witness) should record the witness's statement in clear language that captures the essential elements and facts of evidence provided by the witness in the body of the statement.

Either the Statement of Witness or Report of Interview may follow a question and answer format or a narrative format, or a combination of both formats. It is frequently helpful for the inspector to develop a list of questions before commencing an interview. These questions and the responses may become the entire statement, or the basis for a further narrative discussion within the statement. Before closing the interview or statement, the inspector should always offer the person interviewed or witness an opportunity to provide additional pertinent information to the case at hand.

After the witness reads the statement and agrees that the statement is accurate, the inspector and witness should sign and date the form. Occasionally an inspector may find it necessary to obtain a Statement of Witness to support an enforcement action, but cannot be present when the individual signs the statement. An inspector should not rely on the Statement of Witness unless there is a mechanism for verifying the identity of the person providing the Statement of Witness. If the Statement of Witness cannot be signed in the presence of an FRA employee, it may be signed and properly notarized in the presence of a Notary Public, and then delivered to the inspector. A notarized statement may then be used to support the enforcement action.

**The format for a Statement of Witness is as follows:**

FEDERAL RAILROAD ADMINISTRATION

## Statement of Witness

I,_____, make the following voluntary statement to
_____, who has identified him or herself to me as a representative of the Federal
Railroad Administration (FRA). No threats or promises have been made to induce me to give this
statement. I understand that a copy of this statement will be provided to any person (whether an
individual, corporation, or other entity) whose violation of the Federal railroad safety laws may be proven,
in whole or in part, by this statement, and/or to that person's counsel, when and if enforcement action is
taken based in whole or in part on this statement. I further understand that such enforcement may
include: a demand for a civil penalty for a violation of the railroad safety laws; the issuance of an
emergency safety order; the initiation of a compliance order proceeding; the seeking of an injunction; or
the initiation of a disqualification proceeding to remove an individual who is unfit to perform safety-
sensitive service in the rail industry from such service for a specified period of time. If it subsequently
becomes necessary for FRA to support its enforcement action in an administrative hearing or in court, I
will testify to the facts set forth below in that hearing or lawsuit.

I understand that 49 U.S.C. §20109 (formerly section 212 of the Federal Railroad Safety Act of 1970)
makes it illegal for a railroad carrier to discharge or in any manner discriminate against any employee
because that employee (1) filed a complaint or brought or caused to be brought a proceeding related to
the enforcement of the Federal railroad safety laws, or (2) testified, or will testify, in that proceeding. I
also understand that any dispute, grievance, or claim that may arise under §20109 will be resolved under
the procedures of the Railway Labor Act.

[INSERT THE STATEMENT OF WITNESS HERE]

I have read the statement above, and it is all true and correct to the best of my knowledge and belief.

Date:_____

_____
(Witness signature)

Signed in the presence of

_____
(Name)

_____
(Title)

2-24

**The following is an example of a Statement of Witness:**

## FEDERAL RAILROAD ADMINISTRATION

### Statement of Witness

I, _____Dolores Doright_____, make the following voluntary statement to _Geraldo Gomez_____, who has identified him/herself to me as a representative of the Federal Railroad Administration (FRA). No threats or promises have been made to induce me to give this statement. I understand that a copy of this statement will be provided to any person (whether an individual, corporation, or other entity) whose violation of the Federal railroad safety laws may be proven, in whole or in part, by this statement, or to that person's counsel, or to both, when and if enforcement action is taken based in whole or in part on this statement. I further understand that such enforcement actions may include: the demand for a civil penalty for a violation of the railroad safety laws; the issuance of a warning letter; the issuance of an emergency safety order; the initiation of a compliance order proceeding; the seeking of an injunction; or the initiation of a disqualification proceeding to remove an individual who is unfit to perform safety-sensitive service in the railroad industry from such service for a specified period of time. If it subsequently becomes necessary for FRA to support its enforcement action in an administrative hearing or in court, I will testify to the facts set forth below in that hearing or lawsuit.

I understand that 49 U.S.C. § 20109 (formerly section 212 of the Federal Railroad Safety Act of 1970) makes it illegal for a railroad carrier engaged in interstate or foreign commerce to discharge or in any way discriminate against an employee because that employee (1) filed a complaint or brought or caused to be brought a proceeding related to the enforcement of the Federal railroad safety laws, or (2) testified, or will testify, in that proceeding. I also understand that any dispute, grievance, or claim that may arise under section 20109 will be resolved under the procedures of the Railway Labor Act.

I am employed by the Bigosh Central Railroad as a Locomotive Engineer headquartered at Bigosh, Washington. I was originally certified as a locomotive engineer in December 1993, completed re-certification requirements and was issued a new locomotive engineer certificate in November 1996.

On November 20, 1996, while I was being recertified, the Designated Supervisor of Locomotive Engineers, Charles Lindberg, boarded my locomotive while I was in the process of conducting a train air brake test before departing Bigosh yard. He talked to me about the trip I was about to make. When we were ready to depart, he announced that I had just completed my surprise efficiency test for the year and my proficiency check ride for recertification purposes. Then he got off my locomotive and I departed the terminal. He did not ride with me on any part of this trip. I didn't see Mr. Lindberg for the rest of the day, but I did receive my new certificate a few days later. The certificate had entries on it showing that he conducted a train ride proficiency test and a surprise efficiency test on November 20, 1996.

I have read the statement above, and it is all true and correct to the best of my knowledge and belief.

Date: June 20, 1997_____        _____Dolores Doright_____
                                                                    (Witness signature)

Signed in the presence of        _____Tom Franklin_____
                                                                                    (Name)
                                                          _____FRA OP Inspector_____
                                                                                    (Title)

**The following is the format for a Report of Interview:**


## Report of Interview

PERSON INTERVIEWED:

DATE OF INTERVIEW:

PLACE OF INTERVIEW:

INTERVIEW CONDUCTED BY:

OTHERS PRESENT:

Mr./Ms. _____ was interviewed regarding _____(incident)_____, and provided, in substance, the following information:

    (Record substance of the interview)

Chapter 3

# Table of Contents

Table of Contents...................................................................................................................... 1
Conducting Operating Practices Inspections Focused Inspections................................. 2
Railroad Operating Rules (49 CFR Part 217)................................................................. 2
Operational Tests and Inspections .................................................................................. 3
 Program Audit................................................................................................................ 3
Use of Radar Guns by Inspectors.................................................................................... 5
Onboard Train Inspections............................................................................................... 7
 Authority of FRA Inspectors to Conduct Onboard Train Inspections....................... 7
 Avoid Disruption of Operations................................................................................... 7
 Advance Notice of Onboard Train Inspections and Signing Waivers of Liability.... 7
  Safety Equipment......................................................................................................... 8
  Calling Signals............................................................................................................. 8
  Preparation For Onboard Train Inspections............................................................... 8
  During the Onboard Train Inspection ........................................................................ 9
  Train Ride Check List................................................................................................ 10
  Follow-up After Onboard Train Inspection ............................................................. 10
Train Dispatching Office Assessment .......................................................................... 11
 Work Plan ..................................................................................................................... 11
  Resource Material ...................................................................................................... 11
Train Dispatcher Compliance Review Format ............................................................. 12
 Staffing.......................................................................................................................... 13
 Workload and Stress .................................................................................................... 13
 Corporate Organization................................................................................................ 14
 Software ........................................................................................................................ 14
 Signal and Train Control............................................................................................. 15
 Communications ........................................................................................................... 16
 Training.......................................................................................................................... 16
 Operational (Efficiency) Testing ................................................................................ 16
 Records Inspection........................................................................................................ 17
 Emergency Response .................................................................................................... 18
 Desk Review ................................................................................................................. 18
  Tape Monitoring Approach........................................................................................ 18
  At the Desk Approach................................................................................................ 19
 Rules and Methods of Operation ................................................................................ 19
 Concerns of Employees ............................................................................................... 19

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 28 of 46

# Conducting Operating Practices Inspections Focused Inspections

Situations, which could result in a death, serious injury, or substantial property damage, take precedence over all other inspector duties. An inspector has the responsibility to ensure that unsafe conditions receive prompt corrective action.

Inspectors must have a thorough knowledge of railroad operations in their assigned territory. This knowledge is acquired by studying each railroad's operating rules, timetables, special instructions, general orders, etc. Inspectors must become familiar with railroad operations at all rail yards, terminals, train dispatchers' offices, interlocking towers, locomotive and car department facilities, and hump yard towers within their assigned territory.

In-depth accident analyses are conducted to determine if any laws, rules, or orders within FRA's jurisdiction have been violated and what remedial action should be taken. In addition, inspectors must study accident trends in the inspection territory, especially those attributed to human factors and other operating practices. Information is available for each railroad in the inspector's territory and proves helpful in outlining inspection plans and setting safety priorities. Site-specific inspections should be performed on the basis of each inspector's knowledge of enforcement areas requiring more attention to ensure safety. An inspector's knowledge of each railroad within the inspection territory should determine the types of inspections, which must be performed. For example, if a recent human factors-caused accident was related to improper use of radio communications, concentrated inspections of the railroad's radio operating rules should be conducted.

# Railroad Operating Rules (49 CFR Part 217)

Within their assigned territory, each inspector must conduct periodic inspections and observations to determine the degree of compliance with sections 217.7, 217.9, and 217.11, concerning railroad pertaining rules. Inspections or reviews of each railroad's operational testing program and inspection program must be conducted to determine employee compliance with railroad operating rules. Inspections must also include each railroad's program of employee instruction on operating rules and the adequacy of the recordkeeping required for both programs.

Inspectors must determine the location within their assigned territory where railroad files and records are maintained and review the records to determine adequacy and compliance.

The inspector must not actively conduct or participate in railroad testing procedures. The inspector may evaluate the adequacy or effectiveness of an operating rules instruction program by attending an instruction program. Inspection activities must never pre-empt or interfere with a railroad's operational prerogatives.

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 29 of 46

An audit plan for performing efficiency tests (records and field tests) follows:

# Operational Tests and Inspections

## Program Audit

**49 CFR 217.9 Railroad Program of Operational Tests and Inspections:** It is the responsibility of the railroad to determine if employees are complying with the rules through appropriate surveillance and performance tests. The OP Inspector monitors the railroad's efforts by inspecting pertinent records and may, on occasion, accompany railroad managers when efficiency tests are conducted.

One duty of the OP Inspector is the observation of railroad managers who conduct tests. This is not to form a basis for employee disciplinary action or to criticize the railroad's manager for deficiencies in the program, but to impartially and objectively assess the railroad's efforts to develop and maintain a suitable safety program.

**Recordkeeping:** Each railroad is required to conduct operational tests and inspections of its employees to determine the extent of compliance with its Code of Operating Rules, Timetables, and Timetable Special Instructions in accordance with a written program, which is retained at its System Headquarters and the Division Headquarters for the railroad division where the tests are conducted.

**Team Leader/Inspector in Charge of Audit:** The following guidelines should be followed to conduct a Team Inspection audit of a railroad's Program of Operational Tests and Inspections (OPTI) on the railroad to which you and your team have been assigned.

Contact a senior railroad division manager for the railroad division to which you have been assigned at least two weeks in advance of the inspection activity and request the following:

1.      Request a copy of the railroad's OPTI Program.

2.      Request a copy of the railroad's guidelines or standing instructions for conducting operational tests by its managers or officers. Identify the monthly number of tests per manager or officer, frequency and distribution of test times required by the railroad's program.

3.      Request the railroad or division furnish a list of all officers or managers who are required to conduct operational tests, their titles, and where they are headquartered.

4.      Request the railroad furnish a copy of a printout of all operational tests conducted for the time period to be inspected. The record should be available on the date selected for the team's inspection.

5.      Arrange for a location for conducting the team's records inspection.

6.      Request a designated officer or manager who can answer questions regarding the railroad's program or recordkeeping system.

**Inspectors Assigned to Team:** Upon arrival at the assigned railroad division for the operational testing audit, the inspector in charge should have all the records and programs, which are required to conduct an audit of the railroad's program available. Each inspector should review the railroad's program and requirements for the railroad's officers or managers to conduct tests, and the number of tests required by each testing officer or manager. Inspect each manager or officer's records of operational tests for the time period identified to determine if testing was conducted in accordance with the railroad's written program. Ideally, this inspection activity should cover a one-year period to determine if each officer or manager conducted the required number of tests each month as required by the railroad's program. If the

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 30 of 46

number of tests required was not achieved by each individual officer or manager, or he or she failed to comply with railroad requirements, such failure should be recorded as a deficiency. Count and evaluate the tests reported by each officer or manager. One testing session conducted by an officer or manager may result in numerous different tests reported on the same crew; this should not be counted as individual tests in order to "pump up" the recorded tests. Try to identify valid tests conducted in the field as opposed to tests which may have been conducted "at the desk" in the manager's office. The following may help identify valid tests, and tests which were fabricated in order to meet a monthly quota:

1.       Total number of tests-be alert for outrageous numbers reported by an officer or manager.

2.       Look for a pattern where tests are regularly conducted at the same location.

3.       Elapsed time between tests conducted on the same calendar date (inspectors have found tests recorded by a testing manager a few minutes apart - at locations 80 or 90 miles distant from each other).

4.       Same crew tested day after day, especially at the same location each time a test is performed.

5.       All tests are conducted within yard limits, all tests reported are signal tests, all tests are observations, all tests are set up tests, numerous tests are reported at the same location.

6.       Be alert for two officers who can be identified as testing together on the same date and location, when both officers claim credit for conducting the same tests on the same crew members.

7.       Try to determine if the tests conducted appear to be meaningful, or appear to be "filling in blanks."

8.       Identify and inspect tests reported by Designated Supervisor of Locomotive Engineers (DSLE) or road foremen of engines. The inspection should try to identify if they are reporting set-up tests, observation tests, or those conducted during onboard train inspections or qualifying trips with locomotive engineers. When a DSLE is riding with a train crew, he or she should not count tests as unannounced or record a broad variety of tests inappropriate for the activity.

9.       Note whether any tests reported by field officers or managers in the field were conducted on train dispatchers. Train dispatchers are frequently excluded from testing because they are managers, or to avoid interference with railroad operations. Report a deficiency, if records indicate train dispatchers have been excluded from the testing program.

10.     Check for operational tests conducted by chief train dispatchers, assistant chief dispatchers, or managers in charge of dispatching operations. If the train dispatching office is located outside the division where you are working, obtain a copy or record of any operational tests reported on this division by dispatching center managers or supervisors.

11.     Qualifying engineers under 49 CFR Part 240.303© - Check operational testing program records for tests conducted by managers or officers in order to comply with regulatory requirements for one unannounced test each calendar year. This program shall:

        A.      Test engineer compliance with one or more provisions of the railroad's operating rules that requires a response to signals that display less than a "clear" aspect.

        B.      Evaluate tests recorded to see if they are properly categorized as set-up tests. Observation tests and set-up tests are not the same. A set-up test should establish a restrictive condition, which would not otherwise exist if it were not for the test. Otherwise, tests should be categorized as observation tests.

12.     Railroads that operate jointly with another railroad on their own trackage should actively conduct tests on the other railroad's train crews, and conduct joint test sessions with managers of the

other railroad. Inspect for tests conducted by the host railroad on the other railroads' trains, including Amtrak operations. Determine if the host railroad is properly reporting test results; particularly test failures, to the other railroad.

**Field Inspections:** At the conclusion of the records inspection, a field inspection of the performance of operational tests is required to determine if testing is conducted in accordance with the railroad's written program. If you have found a pattern of questionable tests by individual managers or officers, ask to accompany the individual(s) identified during a testing session. Observe the methods used when the officer or manager sets up tests, how skilled he or she is when using track shunts, what testing equipment he or she has, and how the equipment was used. If the officer is conducting signal tests, note whether or not a qualified signal maintainer is involved when conducting tests at interlockings or when tests involve disabling a component of the signal system or its appliances. Each inspector should arrange to observe testing sessions or trips with a division officer whose test records he inspected. The number and types of tests to be conducted, or period of time spent in the field, should be determined in consultation with the team leader and should be representative of each testing officer's typical testing session.

**Conclusion of Inspection:** Inspectors should communicate with the team leader daily, utilizing their laptop computers where appropriate, so that at the end of the inspection activity, each inspector can furnish the team leader their findings, to be incorporated into a final report for the railroad or division. Inspectors should also prepare inspection reports daily, recording their inspection activity findings and deficiencies, if any, for delivery to the railroad and to the team leader. Team leaders will prepare a final report for submission to the Regional office, to include a summary of the team's activities, and any appropriate recommendations to be presented to the railroad at a closeout meeting conducted at the conclusion of the inspection activity.

# Use of Radar Guns by Inspectors

FRA and State inspectors historically have had access to radar guns, Operating Practices Inspectors have routinely employed the units to monitor train speed for purposes of evaluating compliance with FRA safety standards such as those found in Part 218 (Yard Limit Rule). As the result of heightened concern about compliance with limitations on train speed attributable to enforcement of the locomotive engineer certification program, FRA can anticipate that challenges to FRA speed data predicated on use of radar guns will occur. Moreover, there is reason to think that these challenges will be made in a formal adversarial setting such as in front of an administrative law judge or a Federal court. Such challenges could easily come either in the context of a decertification appeal or as part of a disqualification proceeding. It is important that FRA ensure that inspectors' use of radar guns will withstand such a legal challenge. To accomplish this, the Office of Chief Counsel recommends adherence to the following practices:

1.      Selection of Radar Guns:

FRA's choice of units should be limited to those identified on the consumer products list (CPL) issued by the International Association of Chiefs of Police (IACP).

2.      Calibration Procedures:

Radar guns need to be calibrated on both a periodic and on a daily basis.

        a.      Periodic Testing:

        All radar units should be submitted to appropriate laboratories for recertification testing every two years, or after the unit has been opened for repair. Tuning forks should be certified as accurate each year. One option would be to access the IACP's service for such periodic tests. This service entails payment of a minimum fee. Details can be obtained by calling the IACP at 703-

836-6767. Another option may be to have a cooperative state policy agency do the testing if it is equipped to do that for its own units. A written record of all laboratory service and repairs should be maintained at the regional office.

b.      Daily Testing:

All safety inspectors must strictly adhere to manufacturer procedures for on-site calibration checks of these radar units. At a minimum, the procedures for actual day-to-day use of these guns should include a calibration check of the radar unit utilizing two tuning forks or a tuning fork and the unit's internal calibration methods. On-site calibration checks both before and after use of the unit are strongly recommended. Inspectors should keep a written record of this testing.

3.      Training for Inspectors:

All inspectors need to be given appropriate classroom training regarding the use and limitations of radar speed measurement and the mechanics of using a radar gun. The National Highway Traffic Safety Administration (NTSA) has a suggested course for Basic Training in RADAR Speed Measurement that can be adapted for FRA use. It is strongly recommended that any FRA course include supervised field performance tests, allowing inspectors an opportunity to demonstrate their competence with the radar unit prior to using it for enforcement purposes.

An audit plan follows for the conduct of onboard train inspections:

# Onboard Train Inspections

## Authority of FRA Inspectors to Conduct Onboard Train Inspections

49 U.S.C. § 20101 (formerly the Federal Railroad Safety Act of 1970, hereinafter "the Law").... gives the Secretary of Transportation the authority to prescribe regulations for and to conduct evaluation of all areas of railroad safety. To carry out these broad duties, the Secretary's employees are given the power by 49 U.S.C. § 20107 of the Law to enter upon, inspect and examine rail equipment, rolling stock and operations. FRA believes, in this context, train-riding inspections should be conducted in a manner, which will not be disruptive to the operations to be observed. FRA does not intend to interfere with those operations.

The primary purpose of an FRA inspector's onboard train inspection is to evaluate compliance with Federal safety standards and railroad operating rules by railroad employees. Although 49 CFR Part 217 does not provide the ability to file a violation report for failure to comply with railroad operating rules, a non-compliance may be reported to the railroad as a deficiency under 49 CFR Part 217 and the applicable railroad rule. FRA's authority to conduct inspections is not limited to detection of violations. Rather, as discussed above, that authority extends to evaluation of all areas of railroad safety, and is especially broad with regard to those aspects which FRA finds to be "in need of prompt attention," 49 U.S.C. § 20104.

## Avoid Disruption of Operations

Railroads have expressed concern that FRA inspectors may distract train and engine crews by riding trains. FRA does not intend for its inspectors to offer criticisms or advice on the crew's handling of the train or compliance with operating rules. As for conversations or inquiries during the inspection, FRA inspectors experienced in railroad operations refrain from saying or doing anything, which might distract the crew from their duties. Railroad supervisory personnel frequently ride trains for inspection and observation purposes, without a detrimental effect on crew performance.

If a crewmember violates (or is about to violate) a Federal regulation, it is the inspector's responsibility to inform the crewmember of the requirements of the Federal regulation. In essence, this is a verbal warning possibly leading up to individual liability if not acknowledged by the crewmember.

## Advance Notice of Onboard Train Inspections and Signing Waivers of Liability

Railroads, in the past, have asked FRA inspectors to sign Waivers of Liability or provide advance notice of their intention to inspect prior to conducting onboard train inspections. FRA cannot condone the setting of any preconditions to its entry onto a railroad's property for official purposes. Therefore, FRA is not legally compelled to waive liability or provide advance notice of inspections made for official purposes. FRA inspectors may give the railroad notice of their intention to ride trains in the majority of cases. However, a situation may arise in which FRA decides that an unannounced inspection is necessary to determine the degree of compliance with the railroad's operating rules or with Federal regulations. FRA would vigorously oppose any railroad's attempt to prohibit its inspectors from riding a train on such an occasion.

In most cases, an inspector will give the railroad advance notice of their intention to ride a train. Some railroads have a policy that a railroad manager accompanies an inspector during an onboard train inspection. FRA does not take exception to this as long as the absence of a railroad manager does not interfere with an inspector's intention to ride a train.

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 34 of 46

**Safety Equipment**

Inspectors who perform an onboard train inspection shall be equipped with all safety equipment required by the railroad for train crews. This is to include safety glasses with side shields and lace up boots where required. Inspectors also should have the applicable rule book(s) and timetable/special instructions in their possession for reference during the onboard train inspection. Determining what safety equipment is required should be part of the inspector's preparation for the train ride.

**Calling Signals**

Inspectors are reminded that their role is that of an observer and that they should not participate in activities construed to be duties of crewmembers, i.e., operating locomotive, operating switches or calling signals. If an inspector is questioned about not participating in such activities, he or she shall explain the purpose of the inspection is to monitor compliance, not participate as a member of the crew subject to railroad rule requirements.

**Preparation For Onboard Train Inspections**

Inspectors should:

Determine what safety equipment is required by the railroad for its crewmembers and make sure they have the required equipment.

Determine which train they will ride. In making this determination, the inspector may elect to ride a specific type of train, or may leave it open to chance, depending on his or her objectives. The inspector may want to obtain a lineup and/or have a discussion with a railroad manager to find out what trains usually run during the period of time you wish to ride a train, or contact a chief train dispatcher for the expected arrival/departure times of through trains. This is also a good way to provide the railroad with informal notice of your intention to ride a train.

Read and be familiar with all General Orders, Notices, and Special Instructions that pertain to the territory over which the train ride will take them.

Read and be familiar with the railroad's operating rules, timetable, and railroad safety rules. The inspector should have a copy of these publications with them while performing the onboard train inspection. If the crew will operate over a foreign railroad, obtain a copy of that timetable also. The operating rules should also specify what materials the crew is required to have in their possession during operation of the train.

Ensure the operating rules contain the minimum operating rules, including the required provisions, for blue signal protection (including provisions for utility employees where applicable), yard limit rule (if railroad has yard limits), flag protection rule (if operating methods are such they continue to have a requirement for flag protection), radio rules (if railroad uses radios), and an alcohol/drug prohibition rule.

Introduce yourself to the train crewmembers, upon their arrival. Identify yourself with either your credentials or with a business card.

Check the mandatory directives [i.e., Train Orders/Track Warrants, Track Bulletins (all forms)] issued to the train crew, for accuracy. Per Part 220, Railroad Communication, make sure the conductor and engineer each have a written copy and that the mandatory directives are read and understood by other members of the crew (mandated for all mandatory directives issued over the radio). NOTE: Even if the conductor and engineer are both in the lead locomotive, they each need their own copy of the orders.

It is a good idea for the inspector to request a copy of the mandatory directives also. However, there is no Federal requirement that the railroad provide you with a copy. If you do not have a copy of the mandatory directives, copy them down on a sheet of paper or on the Train Ride Checklist form.

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 35 of 46

Check the train consist list for proper train makeup, per any railroad or timetable special instructions. NOTE: There are no Federal regulations governing train makeup, except for train placement of certain hazardous materials cars.

Check the train profile (if applicable). Typically, a train profile portrays the location of cars requiring special handling and a visual profile of car tonnage; and the actual weight of each car in the train along with tons per operative brake, specific order of cars entrained, train length, and the location of hazmat cars. If a railroad utilizes a train profile graph, contrast it with the train consist list (and if time permits, with the actual observed cars in the train) to determine the relative accuracy of the train profile.

Check the crew's paperwork for proper HAZMAT placement, and proper shipping papers for cars containing HAZMAT. While Hazardous Materials Inspectors are responsible for Parts 100-179, OP Inspectors should be familiar with those parts pertaining to car placarding, shipping papers, and car placement.

Check crewmembers for possession of required operating rulebooks, safety rules, air brake and train handling rules, and current applicable timetables for their territory (some may operate over joint trackage rights territory).

If the crewmembers are required to know the latest General Order or have the General Orders in their possession, or know the Safety Rule of the Day, check for compliance with these railroad requirements.

Inspect locomotive engineer's certificate for compliance with Federal regulations. Make sure the engineer is qualified on the territory to be operated over. If the engineer does not have his certificate with him, have the engineer talk to a railroad officer and get a replacement (temporary) certificate.

Check for compliance with the alcohol/drug prohibition rule. If an inspector observes that one of the crewmembers is potentially impaired or impaired by alcohol or drugs, take the other crewmember (or railroad manager) aside, and advise him of your specific, objective observations. An acceptable statement would be, "I smell alcohol on the engineer's breath." An unacceptable statement would be, "I think the engineer's drunk." If an inspector is already onboard the train, he should ask the crewmember to make an observation and ask him to use the radio to request the appearance of a railroad manager on the train (prior to departure).

**During the Onboard Train Inspection**

Inspectors should:

Observe all air brake tests performed on the train, if possible. Stay on the locomotive and observe the engineer's compliance with the air brake rules. If the air brake test was conducted by the mechanical department prior to the crew's arrival, check the form provided to the engineer. Make an inspection of any blue signal protection provided by workers, during required train air brake test.

Check daily locomotive inspection records for compliance.

Make observations to determine compliance with 218.37 (flag protection), check for required flagging supplies (torpedoes, fusees, and red flag and/or white light). The Federal regulation does not specify an amount of flagging supplies. The specified requirements are found in the railroad's operating rules.

Observe crew for rules compliance of all railroad operating and safety rules, and Federal laws and regulations, including use of required personal safety equipment.

Make observations to determine compliance with 218.35 -Yard Limit Rule. While riding the train, observe the physical location of yard limit signs and determine if these locations are the same as those outlined in the timetable, special instructions, or other publications.

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 36 of 46

Make a Rear End Marking Device inspection for the train you are on and also on other trains while en route, as applicable (hours of darkness). Check for other markers on train if required by railroad operating rule, i.e., red flag during daylight hours.

Inspect for a properly working radio, and monitor radio use for compliance with Part 220 and the railroad's radio rules. Inform the crew that you will be monitoring radio communications for purposes of radio rules compliance. Ensure that an employee operating the controls of moving equipment does not receive and copy mandatory directives over the radio.

Inspect locomotive safety devices for evidence of tampering, e.g., micro switches on alerter wiring; flagstick holding deadman pedal depressed; pencil holding deadman pedal depressed on electric control cab units; string attached between windshield wiper handle and alerter toggle switch. NOTE: Although not a stated "safety device," the inspector should observe the independent brake handle for blocks and coins used to hold the handle in the depressed or "dumped" position. This is not an acceptable practice and is prohibited by most railroads in their air brake and train handling rules.

Be familiar with the event recorder requirements on locomotives required to be equipped (229.135) (even though the MP&E discipline has the primary responsibility for this regulation).
Make observations whether a crewmember makes the required speed indicator test as soon as possible after departure by means of speed test sections or equivalent procedures.

Be familiar with the two-way end-of-train telemetry device requirements on certain trains and ensure the required tests are performed (even though the MP&E discipline was the primary responsibility for this regulation). If anyone other than a crewmember performs these tests, the engineer has to be informed that the test (both front and rear device) was successfully performed. This can be either written or verbal. This could also be relayed by a third party who knows that the test was successfully performed.

**Train Ride Check List**

The enclosed Train Ride Check List, or similar checklist may be used during train riding activities. The information contained on the form can be a useful tool in completing the inspection report at the end of each train ride or crew change. With each crew change, or State line crossed, the inspector is required to generate a separate inspection report, and the Train Ride Check List, contains essential information to include on the inspection report.

**Follow-up After Onboard Train Inspection**

An inspection report should be completed for each onboard train inspection. If a deficiency is noted for railroad operating rules, or safety rules, or if a violation of Federal regulations or laws is to be filed, these findings should be communicated to a railroad manager as soon as possible. Appropriate copies of the completed inspection report, FRA Form 6180.96, should be left with a railroad official at the conclusion of the inspection, when practicable. Copies of inspection reports may be mailed or sent by facsimile delivery to the appropriate railroad official

NOTE: Should such violation or deficiency be of a nature that requires prompt corrective action for compliance (e.g., engineer with a non-complying engineer's certificate, train with inoperative two-way end of train device, or missing rear end marking device), inspector should take appropriate action to notify the train crew, a railroad officer or manager, or train dispatcher when non-compliance is discovered during the inspection.

(Insert train-riding checklist)

A work plan follows for conducting assessments at a train dispatcher's office:

# Train Dispatching Office Assessment

### Work Plan

**Scope:** Although every effort has been made to provide guidelines and instructions which are clear enough to promote uniformity, understanding and consistent application of the regulations, it must be recognized that each Operating Practices Inspector must exercise a high degree of independent judgment in individual situations. Therefore, prior to conducting an audit/inspection, the inspector should contact the local labor representative (if applicable; some dispatcher staffs are non-union) and determine if there are any problems associated with the dispatching office.

**Resource Material**

When performing a train dispatcher assessment the following documents are available as a resource in determining what areas of concern and deficiencies were found on the nations railroads during these earlier assessments. All of the documents were products of the Office of Safety Assurance and Compliance.

•       National Train Dispatcher Safety Assessment 1987-1988: February 1990

•       Train Dispatcher Training Standards Inquiry - Report to Congress: May 1990

•       Train Dispatchers Follow-Up Report - Specific Railroad Findings: September 1994

•       Train Dispatchers Follow-Up Review - Report to Congress: January 1995

**Examine the following:**

•       Staffing (insufficient staffing may effect workload stress and fatigue).

•       Communication devices and procedures.

•       Training, duration, content and methodology for both new-hire and continuing education.

•       Determine workload, including: total track miles handled, train density on territory, number of mandatory directives issued and administrative duties.

•       Examine operational testing records (testing should be conducted even if the office is non- union) and determine if the tests relate to dispatcher functions and are of substantive nature. Tests should be placed on a matrix to determine that they are performed around the clock, throughout the month and over the spectrum of dispatcher duties. Determine if the dispatcher is notified of results of operational tests and if discipline policies are appropriate. It is the railroad's responsibility to ensure that employees are complying with the rules through appropriate surveillance and performance tests.

•       Hours of service records should be inspected for recordkeeping requirements, and to ascertain compliance with 49 U.S.C. § 21105.

Software content should be investigated to ensure that the software does not create any problems that impede safety. Software implementation procedures should be examined to determine that the

procedures do not pose additional threats to safety.  Determine if the software is checked prior to being placed into actual service.

# Train Dispatcher Compliance Review Format

Each team leader should perform an FRA team briefing prior to beginning the compliance review.  At this meeting the team leader will inform team members of the objectives of the review and give working group assignments.  The team leader will also cover protocols and working expectations at this meeting, e.g., all problems to be addressed with the railroad will be funneled through the team leader.  This organizational meeting is essential to achieve a professional and efficient team compliance review.

The team leader should have already arranged a " brief- in" meeting with railroad and labor groups.  The purpose of the brief-in meetings is to inform our partners of the objectives of the compliance review. Additionally, this is the format for achieving cooperation and identifying concerns that may be relative to the review.

Team leaders will be responsible for submitting detailed narrative reports, inspection reports, and computer files to the Audit Project Manager no later than 10 days after completion of the field activities. Team leaders will make specific reporting assignments, including time frame expectations.

Team assignments will vary to meet the needs of the specific review, but listed below are teams to which an inspector might be assigned:

Desk Reviews

Records Inspections

Emergency Response

Work Load and Stress

Signal and Train Control

Training (New-Hire and Continuing Education)

Operational (Efficiency) Testing

Staffing

Software

Communications

Rules Compliance

Corporate Organization (Culture)

Concerns of Employees (Focus Groups)

After an assignment has been completed, team members should report to the team leader for a new working group assignment.

The following are guidelines an inspector should consider in completing working group assignments.  As with all inspections performed in OP, the investigation may involve future follow-up investigations.

3-12

## Staffing

Conduct an evaluation of staffing practices. This will include consideration of any (railroad) audit procedures in place to periodically review the current workload and implement changes where necessary. Specific staffing determinations should include but are not limited to the following:

1.    Evaluate the railroad-staffing model. Determine if the staffing allocations appear to be adequate by considering each extra-board area of responsibility for:

    a.    Projected vacation schedules (raw numbers)

    b.    Off assignment, or other predictable staffing considerations

    c.    The number of extra dispatchers available to cover assignments

    d.    The number of districts extra-board dispatchers is able to protect, and which districts they are qualified on

    e.    Extra-board staffing sufficient to protect unforeseen vacancies

        Determine if the railroad is meeting its staffing model, and what actions it is taking to ensure that they will continue to meet staffing allocations. Good indicators that the staffing model may be deficient are heavy over-time, job consolidations, working districts dispatchers are minimally qualified on, violations of the hours of service laws, and extensive rest-day work by the dispatching staff.

2.    Has the railroad increased or decreased staffing levels? If so, how much and what criteria was used to determine the change?

3.    Has the dispatching center management developed databases to assist them in decision making processes and do they include all information necessary for decision making? Is the information readily retrievable and formatted into quality reports?

## Workload and Stress

1.    Evaluate the dispatcher positions to determine the workload by considering among other things:

    a.    The number of mandatory directives issued on a shift (i.e., Track warrants, DTC authorities, Track and Time Permits, etc.)

    b.    The number of control points under the dispatcher's command

    c.    The number of interlockings under the dispatcher's command

    d.    Administrative and miscellaneous duties required

    e.    The number of miles and trains under the dispatcher's command

    f.    The types of operating authorities on the district

    g.    The adequacy and configuration of the communications systems

    h.    The ease of dispatcher interface with computer software or other operating systems employed by the dispatcher.

2.     Evaluate the amount and reason for extensive overtime and determine if overtime, combining positions, dispatchers' working districts they are minimally qualified on, violations of the hours of service laws, and extensive rest day work by the dispatching staff are impacting workload and stress factors.

3.     Are track maintenance authorities (i.e., Track Bulletin Form B) scheduled ahead of time or are first trick dispatchers required to communicate with each MOW employee requesting authority and then required to react to each instantly?  If the railroad contends they are pre-scheduled, obtain documentation.

4.     Determine if dispatching center management has the authority and capability to evaluate workloads of dispatchers and reassign administrative duties to staff support personnel (either assistant chief dispatchers or clerical employees).  Also, determine if they have the authority to recommend that functions currently handled by dispatching center personnel be transferred to other departments.  Examples of this could include initial computer input of train number, train crewmembers, consists, locomotives, on-duty times, off-duty times, etc.  Obtain documentation regarding evaluation.

5.     Who is involved in the decision making process regarding the sizes of dispatching districts?  Is there an on-going evaluation process, and if so, who is involved?  What procedures would be necessary to amend initial staffing plans?

6.     Obtain copies of computer generated reports which assess dispatcher time and motion.

7.     Are extraneous duties adequately delegated to support employees such as assistant chief dispatchers and clerical staff?

Many of the tasks outlined above can best be accomplished by coordinating with the desk review team or the staffing team.

## Corporate Organization

1.     Develop information concerning changes in the organizational structure.  Include any dispatcher position consolidations.  Identify the relationship between the dispatcher's office and the system and operating divisions.  Determine if the dispatching center has a system level officer reporting directly to the Vice President Operations with responsibility for review and development of train dispatching functions.  Obtain all organizational structure charts related to the dispatching center.

2.     Are there formal meetings, safety committees, or safety suggestion formats to discuss safety and environmental problems?  If so, are formal reports prepared and forwarded to senior level officers, and are results of the railroad's response returned to the concerned individual?

## Software

1.     Evaluate software used at the dispatching center to determine:

       a.     Are there any locations where software functions, or oversights generate safety concerns?

       b.     How is blocking accomplished, and does the blocking affect field signals?

       c.     How does the software affect safety in areas of adjoining dispatcher districts?

       d.     How often is the software upgraded?

     e.     Is new or altered software run on an inactive position to check for accurate function before it is put on-line?

     f.     Evaluate the ease with which the dispatchers interface with the software.

2.     Is the software designed to relieve the dispatcher from manually verifying qualifications of employees operating on the main track? If so, does this include foreign-line employees? If not, how does the railroad determine qualifications of these employees?

3.     Can the computer track times of incoming and outgoing communications initiated, answered, and terminated?

4.     Does the computer track the times that all computer assisted dispatcher inputs are initiated by the dispatchers.

## Signal and Train Control

Where the objectives of the review require, Signal and Train Control Inspectors will be included on the review team. This work group is helpful in evaluating data and voice communication systems used by the operating department, establishing the relationship between the dispatcher operating system (usually the computer) and the signal system, and answering signal related questions generated in the partnership meetings. This will include computer assisted dispatching, radio communication, printers and other devices used for transmissions of safety sensitive information. Items to be evaluated include, but are not limited to:

     a.     Is a complete diagnostic program built into the computer? If so, what are the capabilities? Is the diagnostics check strictly for computer hardware, or does it include data input cross checks?

     b.     Has the railroad corrected any program flaws identified during previous audits?

     c.     Examine computer back-up systems and operating practices plans in place to address the contingency of computer failure or power outage.

     d.     Examine the computer assisted dispatching system to determine if areas of overlap, or "dual control" exist among dispatching districts. If they do exist, what procedures are in place to ensure the safety of on-track equipment?

     e.     Examine the use of electronic "blocking devices" and the effect of the system in practice. Because computer assisted dispatching systems display an office indication instead of the actual track circuit indication of the older technology applications, a thorough evaluation of the modes used for electrical transmission, interface, and data communication will be necessary. This will include the capabilities, if any, of the system to re-transmit data at pre-established intervals.

     f.     Software must be evaluated for all control systems including but not limited to track car movements, Track Warrant Control, Train Control Systems, and Direct Train Control Determine if conflict-checking capabilities are complete.

     g.     Determine what happens in double track ABS territory when movements are made against the current of traffic. Does the computer color code the train and/or on-track equipment movements? How is protection established?

     h.     Determine if there is a problem with the computer-assisted system, the code generator, or the communication system generating un-requested (by the dispatcher) signal or switch codes.

3-15

i.      Determine the process for transmittal of mandatory directives.  Evaluate the capability of the system, including printers and facsimile machines to provide a 100 percent secure data transfer.

## Communications

In conjunction with the desk audit team, this team will also evaluate the radio and telephone communication systems to determine if the capabilities and actual performance of the system is adequate.  The desk audit team will notify the data communication team of any functional problems observed during monitoring of the shift dispatcher positions.  The primary concerns will be:

a.      Locations severity and safety impact of dead spots.

b.      Locations where radio congestion impacts safety.

c.      Dedicated emergency lines and procedures.

d.      Back-up systems to deploy in case of failure.

e.      Noise levels and the quality of transmissions.

## Training

Currently, the dispatching force nationwide is experiencing a great amount of turnover.  With this turnover, and with the current technology explosion, it has become increasingly important for FRA to monitor and make suggestions in the areas of training and recurrence training of dispatchers.  The training team should evaluate at a minimum:

a.      The program the railroad has in place for the training of non-railroad experienced new-hire dispatchers, railroad experienced new-hire dispatchers and dispatchers that have experience on other railroads.

b.      The program the railroad has for providing training on new equipment, software changes, and changes in operating systems.

c.      The training provided dispatchers to facilitate continuing education.

d.      The training and qualification requirements for extra-board dispatchers, including district familiarization.

e.      The training plan in effect to familiarize dispatchers with the physical characteristics of the territories, including road trips and/or video road trips.

f.      Determine class duration and frequency by which dispatchers are trained and tested on operating rules and evaluate the process. (including content)

g.      Evaluate the training given to dispatchers on Federal regulations.
        Evaluations of the dispatcher efficiency test records, accident records and desk audits are helpful in evaluating the effectiveness of the training systems.

## Operational (Efficiency) Testing

Evaluate the entire operational testing program as it relates to train dispatchers.  Review the format of data to determine if it is adequate for proper management of the program.  Determine if the program

3-16

meets the requirements set forth in 49 CFR Part 217. Evaluation of the program should include but is not limited to the following:

   a.   Obtain copies of any computer generated reports provided to railroad management on a periodic basis. Review the reports to determine if the format provides management with a good overview of the program as well as the existence and extent of problem areas.

   b.   Determine if the dispatcher or dispatching center management is made aware of operational testing done on dispatchers by field officers.

   c.   Determine if the program provides for testing and inspection under the various operating conditions of the railroad. This will probably require detailed analysis, or matrixing of the data to determine that tests are done around the clock and throughout the month.

   d.   Evaluate the quality of the tests by noting what rules are tested. Look for patterns in each supervisor's tests to ensure that tests are for various rules and that the tests are meaningful in content.

## Records Inspection

This team is responsible for reviewing compliance with 49 CFR Part 228 as it applies to train dispatchers. An inspector may copy, or request that the railroad furnish a copy of the electronic hours of service records. Under no circumstances should an inspector remove original records from the railroads property. Records to be inspected should include, but may not be limited to:

   a.   Excess service reports (F6180.3)

   b.   Train Dispatcher's Record of Train Movements

   c.   Train Dispatcher's Hours of Duty Records. Pay particular attention to ensure time spent performing random toxicological tests, railroad interviews, and mandatory rules classes is included as on-duty time in the records. Additionally, extra dispatchers' Hours of Duty Records require more attention. (Be careful to note that Hours of Duty in a dispatcher's office requiring only one shift is limited to 12 hours instead of the traditional 9 hours.)

   d.   Unusual occurrence reports. A good technique is to compare accident/incident and trouble log notes to the unusual occurrences section to assure events are being correctly entered.

   e.   Maintenance trouble logs or reports including computer, signal and communication failure reports and corrective actions taken

   f.   Mandatory directive authority records

   g.   Blue signal protection records for remotely controlled switches;

   h.   Injury/illness records for the dispatching center;

   i.   Hazardous materials incident reporting procedures and records;

   j.   Interoffice bulletins and notices. Evaluate to determine if the process complies with railroad operating rules and instructions.

This team will conduct the excess service evaluation first and report their findings to the team leader for further analysis.

## Emergency Response

This team will review railroad accident/incident emergency response procedures including intra-office emergencies, with emphasis on passenger operations and hazardous materials. Evaluate the program to determine that a system is in place that will provide adequate response to emergencies by reviewing the following:

a.  Does the railroad have a system that provides field personnel the ability to gain immediate response from the dispatcher or other central figure (i.e., a dedicated hot line)?

b.  Does the railroad have an emergency plan in place that outlines what the dispatchers' steps are for handling various types of emergency?

c.  Does the dispatcher have at hand an up-to-date list of names and telephone numbers of persons and emergency response agencies that will be asked to respond?

## Desk Review

There are two ways to accomplish this task. Both have value depending on the focus of the review. One method is to carefully review selected segments of the voice recordings from the dispatcher position. The other method is to monitor a dispatcher actually performing duties. The inspector should have knowledge of the rules and the method of operation on the territory being monitored. Information formulated by this work group will determine compliance with rules and Federal regulations and will interface to work done by most of the other teams. Dispatchers are often questioned regarding training, communication problems, software problems, operational testing, etc. to determine if the programs are effective at the dispatcher level. Inspectors should accomplish tasks on this team by:

**Tape Monitoring Approach**

a.  Have the railroad prepare segments of voice tape for the positions you are to monitor. The inspector should select the actual times and positions of interest to prevent the railroad from influencing the review.

b.  Obtain copies of mandatory directives issued during the time that corresponds to the voice tape segment. The inspector should monitor the dispatcher's transmission of the mandatory directives, and the read-back from the copying employee to assure they are correct.

c.  The inspector then listens to the voice tape, taking care to produce inspection reports on Federal regulations and rules compliance. Additionally the inspector should be monitoring for efficiency of the operating systems and other safety sensitive problems.

d.  In some cases, an inspector can monitor live dispatcher transactions from a remote location. This can be used as an alternative to sitting with a dispatcher and has the advantage of not disturbing the dispatcher while performing the inspections.

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 45 of 46

**At the Desk Approach**

Note: When conducting a desk monitoring session, it is imperative that the inspector be as unobtrusive as possible. Be sure not to ask the dispatcher questions when it will interrupt the job process.

a.  Obtain necessary documentation and equipment (i.e., rules, timetables, headphones, etc.) prior to entering the dispatcher's workspace.

b.  On entering the dispatcher's space, if possible, introduce yourself and give the dispatcher an idea of what you are doing. Be sure to tell the dispatcher you will be monitoring radio procedures.

c.  The inspector then listens to the dispatcher, taking care to produce inspection reports on Federal regulations and rules compliance. Additionally the inspector should be monitoring for efficiency of the operating systems and other safety sensitive problems.

d.  The inspector should evaluate the working systems to determine if improvements that affect safety can be made.

e.  When an opportunity arises, ask the dispatcher for locations on the district where there are radio overlaps, radio congestion, signal problems, or other safety related problems. If conditions allow, ask the dispatcher how he was trained, about continuing education, road trips, rules training and operational testing.

## Rules and Methods of Operation

This team should develop a short report to introduce the specific railroad operating procedures, types of mandatory directives and rules that the railroad uses to establish on-track authority.

## Concerns of Employees

It is the responsibility of the team leader to accurately identify and assign the specific concerns that are brought to FRA by all entities involved. The team leader shall respond to each concern investigated and determine the validation of the concerns. Valid concerns will be incorporated into the report and resolution will be sought.

As the review continues, it will be the responsibility of the team leader to compile the information from the working groups and develop details to appraise the railroad of the preliminary findings. Depending on the team leader, and arrangements with the railroad, briefing meetings will be held on a regular (preferably daily) basis. Working group leaders and inspectors (sometimes) will be asked to attend the briefing meetings.

Whenever a regular inspection indicates a violation of Federal regulation or laws, the inspector should investigate the circumstances and brief the team leader. The inspector, team leader, audit project coordinator, and regional supervision will develop a consensus on appropriate enforcement actions.

A closeout meeting should be held with railroad management at the conclusion of the inspection or audit. Any deficiencies of railroad operating rules, Federal regulation or law, should be immediately discussed with railroad management for corrective action.

A copy of the concerns and deficiencies should be submitted to the appropriate Regional Specialist for follow-up action(s).

Case 5:03-cv-04110-DEO   Document 54-3   Filed 07/01/05   Page 46 of 46