Chapter 4

# Table of Contents

Table of Contents....................................................................................................................................1
Enforcement Actions...............................................................................................................................2
Determining When and What Enforcement Action is Necessary............................................................2
    The Inherent Seriousness of the Condition or Action........................................................................2
    The Kind and Degree of Potential Safety Hazard the Condition or Action Poses in Light of the
    Immediate Factual Situation...............................................................................................................3
    Any Actual Harm to Persons or Property Already Caused by the Condition or Action......................3
    The Offending Person's General Level of Current Compliance as Revealed by the Inspection as a
    Whole..................................................................................................................................................4
    The Person's Recent History of Compliance with the Relevant Set of Regulations, Especially at the
    Specific Location or Division of the Railroad Involved........................................................................4
        Compliance Orders.......................................................................................................................6
        Court Injunctions..........................................................................................................................6
        Emergency Orders.......................................................................................................................6
        Individual Liability Action..............................................................................................................7
    Such Other Factors as the Immediate Circumstances Make Relevant...............................................7
    Determining the Existence of a Violation............................................................................................8
        Basic Elements.............................................................................................................................8
        49 CFR Part 217 - Railroad Operating Rules..............................................................................8
Enforcement Actions Against Individuals................................................................................................9
    Statutory Authority..............................................................................................................................9
    "Willful" Violations..............................................................................................................................9
    Who May Be Held Liable....................................................................................................................9
When to Pursue an Individual Liability Action.......................................................................................10
    Inspector Investigation and Recommendation..................................................................................10
    FRA Discretion..................................................................................................................................10
    Personal Liability...............................................................................................................................10
    Level of Individual Liability to Recommend.......................................................................................11
Decision to Issue a Regional Warning Letter........................................................................................11
Decision to Recommend a Formal (Chief Counsel) Warning Letter or Assessment of a Civil Penalty......12
Decision to Recommend Disqualification..............................................................................................12
    Standard for Disqualification.............................................................................................................13
    Disqualification From Safety-Sensitive Service Applies To...............................................................13
Guide to Preparation of Violation Reports Against Individuals..............................................................14
    Factual Details...................................................................................................................................14
    Severity of the Violation(s)................................................................................................................14
    Culpability of the Individual...............................................................................................................14
        Knowledge of the Facts..............................................................................................................14
        Knowledge of the Law.................................................................................................................14
        Compliance History.....................................................................................................................14
        Mitigating Circumstances (if any)...............................................................................................15
        Recommendation........................................................................................................................15
Privacy Act Restrictions........................................................................................................................15
Notice to Individual of Alleged Violation................................................................................................16
Example: Individual Liability Civil Penalty Case....................................................................................19
    Example - Penalty Demand Letter.....................................................................................................19
    Example - Civil Penalty Violation Report...........................................................................................21
    Example - Chief Counsel Warning Letter..........................................................................................25

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 1 of 41

# Enforcement Actions

# Determining When and What Enforcement Action is Necessary

FRA is not compelled to initiate formal enforcement action each time it discovers a deviation from the Federal railroad safety laws and regulations. FRA may exercise its prosecutorial discretion. It can select which cases to pursue based on its limited resources and on what it believes to be the best method of promoting compliance. Moreover, when FRA decides that enforcement action is called for, it has a range of enforcement tools (discussed below) and has the authority to choose those best suited to the circumstances. One of these tools (emergency order authority) can be used to address an immediate hazard even if no existing law has been violated.

The existence of this wide enforcement discretion concerning when and what enforcement action is necessary calls for general guidelines to ensure effectiveness, fairness, and an acceptable level of consistency in the exercise of that discretion. The purpose of the guidelines is not to dictate absolutely identical treatment of similar situations. That would be an unrealistic ideal based on the false assumption that each of the many variables going into an enforcement decision could objectively and accurately be quantified. Instead, the purpose of these guidelines is to control the necessarily subjective elements of this process as much as is feasible by requiring that those making enforcement decisions weigh the same factors and make full use of objective information bearing on those factors. In this way, the appropriate enforcement tool is applied, responsible discretionary judgments are made, and an acceptable level of consistency in similar situations is achieved.

FRA's Statement of Agency Policy Concerning Enforcement of the Federal Railroad Safety Laws (49 CFR Part 209, Appendix A) stresses that discretion is exercised at the field and regional levels; although inspectors make initial determinations on the need for enforcement action, regional personnel play an active role in reviewing those determinations with an eye toward effectiveness and consistency. Moreover, Regional Specialists play a primary role in ensuring that field inspectors have the data necessary to make enforcement decisions. The Specialists, for example, periodically analyze the relevant data on accidents, incidents, and inspections to detect patterns or problem areas at the regional, railroad, or offeror level. This information is to be used not only in deciding where to inspect, but is also used in deciding when and what enforcement action is necessary. Office of Safety Assurance and Compliance headquarters personnel are, of course, responsible for spotting national trends in the data that require enforcement action, and for providing guidance to the regional and field staffs on difficult enforcement policy issues.

FRA's policy statement sets forth seven factors to be considered in making enforcement decisions. The following discussion is intended to describe the thought process that should go into weighing each factor. The discussion applies to all FRA disciplines and, therefore, uses examples from all disciplines.

## The Inherent Seriousness of the Condition or Action

In the abstract (i.e., when the immediate circumstances are not considered), every violation is no more or less severe than another. However, the consequences resulting from a non-compliant condition may vary considerably. For example, a hazardous materials shipping paper that is incomplete but still contains enough information to enable the material to be identified is less serious than a shipping paper that does not permit such identification to be made. Four hours of excess service is more serious than ten minutes of such service. Extremely wide gage is more serious than gage barely in excess of the limit. A freight car wheel that is loose on the axle is more serious than a wheel with a small crack.

These distinctions based on inherent severity are to some extent reflected in FRA's schedules of civil penalties. A good source of relevant information is the national data on accidents, incidents, and hazardous material releases; viewed over time (e.g., the most recent two or three years), these databases provide useful insight into what are the most dangerous violations. But the use of hard data in considering this factor has its limitations. Accident/incident data may reveal little or nothing about a violation that is obviously serious (e.g., several hours of excess service where no emergency existed or an inaccurate shipping paper that could interfere greatly with emergency response).

This factor is very hard to apply between disciplines because the Inspectors and Specialists are not cross-trained in the various disciplines. Thus, inherent seriousness will usually be considered as a relative matter within each discipline. This is where regional and headquarters Specialists can play a significant role in explaining the relative severity of the various violations. Special care should be taken to keep the Inspectors aware of any specific types of violations that are causing an increasing proportion of accidents so that the Inspector can focus on those violations as possible enforcement action.

Moreover, a relatively non-serious violation is not automatically excluded from candidacy for enforcement. If that were true, whole portions of the law would never be enforced, and that is not acceptable. Only when all of the criteria have been considered can a decision be made. Nevertheless, consideration of the inherent seriousness of a violation is a good place to begin. If the other factors do not point toward enforcement action, a relatively non-serious violation is a poor candidate for enforcement action as it is likely to produce little safety benefit in return for the FRA resources expended on enforcement.

## The Kind and Degree of Potential Safety Hazard the Condition or Action Poses in Light of the Immediate Factual Situation

While the first factor focuses on seriousness in the abstract, this factor focuses on the potential for injury or property damage posed by the violation in the context of its actual facts. For example, the seriousness of a track defect is probably increased over what it would be in the abstract if it occurs on a relatively high-speed line with heavy hazardous materials or passenger traffic. Likewise, a hazardous material violation (e.g., failure to secure all openings of a tank car) may be exacerbated by the nature of the material and is certainly of greater consequence if it caused a leak of the material.

On the other hand, a broken freight car wheel is inherently serious but may not pose a significant hazard if found on an inbound inspection to a major repair point where FRA is confident repairs will be made and necessary precautions will be taken in the meantime. Similarly, an hours of service violation for two hours of excess service that consisted of commingled service (e.g., a mandatory rules class) that came after all covered service and was followed by an adequate off-duty period poses little or no hazard to safety. By contrast, if the commingled service preceded the covered service, resulting in two hours of covered service beyond the twelve-hour on-duty limit, there would be a significant safety hazard.

But this factor cannot be viewed in isolation. If it were, record keeping and reporting violations, for example, might never result in enforcement action because the safety hazard they pose is usually so remote. Yet we know that compliance with record keeping rules is vital to FRA's ability to enforce many of its other rules and that accurate reporting is vital to the integrity of our data. Therefore, a conclusion that little or no actual hazard was caused by a violation does not automatically rule out the need for enforcement action.

## Any Actual Harm to Persons or Property Already Caused by the Condition or Action

The ultimate goal of our regulatory and enforcement programs is to prevent death or injury to persons or damage to property caused by unsafe behavior. Where a violation of the Federal railroad safety laws or regulations has actually caused or contributed to the severity of such actual harm, there is every reason to take enforcement action.

Case 5:03-cv-04110-DEO    Document 54-4    Filed 07/01/05    Page 3 of 41

Such violations should be submitted to the Office of Chief Counsel with a recommendation for Top Priority review. A cover memorandum explaining the basis for such review must be included. The violation report itself must explain the causal link between the violation and the harm. The violation need not have been the sole or primary cause, and need not have been a cause at all if it contributed to the severity of the harm. It will not suffice to say that a violation and some actual harm coincided (e.g., a shipping paper violation is discovered on a train involved in a fatal accident, but the violation played no apparent role in the accident's cause or severity). If no relationship between the violation and the harm can be shown, the violation may still be a strong candidate for enforcement, but not based on consideration of this factor. A violation report in such a case must also explain the extent of the harm. For example, rather than simply stating that two persons were injured by the violation, the report should discuss the nature and extent of the injuries. These cases are inherently strong candidates for extraordinary penalties and the report should provide information necessary to support such a claim.

## The Offending Person's General Level of Current Compliance as Revealed by the Inspection as a Whole

Most FRA inspections or investigations entail observation of more than one event or piece of equipment. This enables the inspector to draw a conclusion about the railroad or offeror's general level of compliance at the current time. At one end of the spectrum, this factor could lead the inspector to conclude that a violation is merely an aberration and enforcement action is not needed to encourage compliance. At the other end of the spectrum, violations may be so common that enforcement action--perhaps even an extraordinary remedy such as an emergency order if the violations are serious enough--is obviously in order.

Ordinarily, of course, the facts will be somewhere in between, requiring the inspector to balance this factor against the seriousness of the violations and other factors. For example, an equipment inspector might inspect one hundred cars in one day and find very few defective conditions. From that, the inspector might conclude that the company's current compliance efforts are generally good and decide that enforcement action is unnecessary or that it is necessary only on the most serious violations found. On the other hand, the inspection might reveal a multitude of violations that, even though not serious in relative terms, indicate a very poor compliance program on the part of the company. This could lead the inspector to recommend enforcement action on some or all of the violations discovered.

## The Person's Recent History of Compliance with the Relevant Set of Regulations, Especially at the Specific Location or Division of the Railroad Involved

A company's (or individual's) historical record of compliance is an important factor to be weighed. This is an important area where Office of Safety Assurance and Compliance headquarters and the Regional Specialists will help the inspectors sift through the data for important indicators. The inspectors, of course, form their own impressions about companies and specific locations based on experience, but national and regional analyses of the data help the inspector determine problem areas. Moreover, resource limitations prevent inspectors from getting to all locations as frequently as would be preferable, and, therefore, inspectors may often encounter certain companies only rarely. The inspector who is forearmed with national and/or regional data on that company may be better able to focus the inspection and more or less inclined to take enforcement action depending on the broader picture of compliance.

This factor is aimed primarily at either spotting patterns of noncompliance that might not be apparent from a single, isolated inspection or patterns of good compliance that might temper an inspector's reaction to an otherwise unsatisfactory inspection. Although the consideration of this factor should be based on the available data, there is no rigid prescription for which data to include. Generally, the older the information the less useful it is (noncompliance four years before the inspection is not very meaningful), and the more specific the information, the more useful it is (e.g., a clustering of violations of a particular regulation over

4-4

time may indicate the need to come down hard on any such violations currently discovered, especially if serious).

Focusing the review of the historical data on the particular facility presently involved often makes sense. If one facility or division manages to achieve a very high level of compliance as compared to the rest of the company or the industry generally, that argues for encouraging such efforts by restricting enforcement actions to the most serious matters. Of course, if one facility is clearly out of line in terms of historical and current compliance, that argues for taking enforcement action on even less serious violations in order to increase the deterrent effect. Spotting broader trends in the data (e.g., a particular railroad's frequent noncompliance with the hazardous materials placement regulations) that may have a systemic cause is the job of the regional and headquarters Specialists. Together, they can devise enforcement strategies (e.g., a recommendation to the Office of Chief Counsel that an action for an injunction against such violations be undertaken) that are responsive to patterns of violations that are apparent from analysis of the overall data.

Which Enforcement Remedy is Most Appropriate Under the Circumstances? FRA has more than two options (civil penalty against the company or a warning) available when it detects noncompliance. Civil penalties and/or disqualification actions against individuals are one option. Emergency orders, compliance orders, and injunctions are other possibilities. In several areas, the inspector may issue a special notice for repairs immediately removing the equipment or track from service. See 49 CFR Part 216. It may be that a combination of these options (e.g., a special notice and a civil penalty) would be the best way to ensure safety and deter noncompliance.

The inspector--with guidance on the difficult cases from regional and headquarters staff--needs to weigh all of the factors to determine the appropriate course of action. In deciding whether action more severe than the implicit warning conveyed by an inspection report is necessary, one consideration is that choosing to recommend a formal enforcement action entails a considerable investment of time to prepare the violation report and obtain necessary supporting documents. Time spent preparing violations reports is time not spent inspecting, so it makes sense in terms of time allocation for the inspector to choose carefully for enforcement action those violations that--due to seriousness, frequency, and/or other reasons--are most in need of being deterred.

Where the inspector has decided that merely reporting his/her findings to the company or individual and discussing the need to improve compliance is unlikely to have a sufficient deterrent effect under the circumstances, the inspector will decide which enforcement tool is most appropriate. If the violation creates an immediate hazard of death or serious injury and the inspector is not confident of immediate corrective action, consideration should be given to a special notice for repairs and/or an emergency order. In the case of a situation that may well call for an emergency order, immediate consultation with the Regional Administrator is essential. Remember that emergency orders can be used even if the unsafe condition does not violate existing law if FRA can make a rational case that the conditions or practices create a hazard of death or injury.

If the violation presents a very serious risk of death or injury but the risk is not so imminent as to warrant emergency action, or the violation actually caused significant harm (death, injury, or substantial hazardous material release), consideration should be given to a civil penalty case with a Top Priority recommendation. When submitted to the Office of Chief Counsel, such a report must include a cover memorandum from the region explaining the basis for the Top Priority recommendation so that FRA attorneys can quickly determine whether this is in fact a violation that should be handled immediately ahead of others that were submitted before it. Such violations are also strong candidates for extraordinary penalties (i.e., penalties above the ordinary scheduled amount). If such a penalty is recommended, the report must indicate the basis for that recommendation. Except in the hours of service and hazardous materials areas, a penalty of up to $20,000 per violation is possible where a grossly negligent violation, or pattern of repeated violations, has created an imminent hazard of death or injury to persons, or has caused death or injury. If a penalty above $10,000 per violation is recommended, the report must include a cover memorandum from the region explaining that recommendation. Extraordinary

penalties should never be recommended without providing the necessary support for the recommendation, as this will only delay transmittal of the penalty demand letter.

If the situation is one that does not rise to the level of an emergency but the sheer volume of violations or their recurring nature suggests that a measure other than a civil penalty might be necessary to obtain corrective action on a specific problem, consideration should be given to recommending a compliance order or injunction.

## Compliance Orders

If a violation is one that does not rise to the level of an emergency, but the sheer volume of violations or their recurring nature suggests that a measure other than a civil penalty might be necessary to obtain corrective action on a specific problem, consideration should be given to recommending a compliance order or injunction.

49 U.S.C. Section 20111(b) gives FRA the authority to issue an order directing compliance with a railroad safety regulation or order issued under the Federal railroad safety laws. A compliance order is a tool that the FRA seldom requires and is made at the level of the Director of the Office of Safety Assurance and Compliance along with FRA's Office of Chief Counsel.

Keep in mind that a compliance order entails the possibility of an administrative hearing before the order would even be issued, so it is not a tool designed for extremely quick action. It is most likely to be useful only on the most clear-cut and repetitious violations where FRA has sought reasonable and well-defined remedial action from the offender but has been met with resistance. In such situations a compliance order proceeding may provide the extra leverage FRA needs but not result in cumbersome litigation.

FRA may issue a compliance order when it thinks a railroad is engaging in conduct or a pattern of conduct involving a violation(s) of the Federal railroad safety laws and may amend its notice of investigation before the entry of a final compliance order. If an amendment includes any new fact or seeks new or additional corrective action, the railroad is given an opportunity to respond. The issuance of a compliance order does not prevent FRA from using the other enforcement tools at its disposal to address compliance problems on a railroad, whether it is against the railroad or any individuals involved with compliance problems. Nor does it prevent any other agency of the United States Government from bringing legal action based on the facts referred to herein.

## Court Injunctions

Injunctions are court orders prohibiting violations that add the weight of the court's contempt powers to further FRA's compliance efforts. However, to obtain such an injunction FRA will first persuade the Department of Justice of the need for such extraordinary relief and, assuming that Department is willing to file suit, we will then be able to persuade the court that it should issue an injunction. This tool is most likely to be used where civil penalties alone have been ineffective in lessening the frequency of a particular type of violation, the violation is serious, and the company is unusually obstinate in its safety behavior.

## Emergency Orders

If a violation creates an immediate hazard of death or serious injury and the inspector is not confident of immediate corrective action, consideration should be given to an emergency order. In the case of a situation that may well call for an emergency order, immediate consultation with the Regional Administrator is essential. Remember that emergency orders can be used even if the unsafe condition

does not violate existing law if FRA can make a rational case that the conditions or practices create a hazard of death or injury.

FRA's emergency order authority derives from 49 U.S.C. § 20104. If FRA determines, through testing, inspection, investigation, or research, that an unsafe condition or practice creates an emergency situation involving a hazard of death or injury to persons, FRA may immediately issue an order imposing such restrictions or prohibitions as may be necessary to bring about the abatement of such emergency situation. Procedures for issuance of such orders are found in 49 CFR **Part 209.**

There is a right to a trial-type hearing after issuance.

An employee exposed to "imminent physical injury" because of FRA's "failure, without any reasonable basis," to issue an order may bring suit to compel issuance of an emergency order.

## Individual Liability Action

Individual liability action is a tool that should be considered in any situation where deterring a particular individual's noncompliance is what is most needed. This tool is especially useful where the violation arose from the individual's own choice. Where the violation is more attributable to corporate policy or failure by the company to properly train or supervise the individual, the company is usually the better target (unless the policy or failure can be traced directly to a specific individual). The inspector need not choose between individual liability and corporate liability. In some situations, enforcement action against both will be warranted.

# Such Other Factors as the Immediate Circumstances Make Relevant

The foregoing list is not all-inclusive; specific situations may involve specific facts that do not fall under any of those headings but need to be figured into the decision of whether to take enforcement action. Perhaps the most common of these additional factors is the violator's culpability, i.e., the relative degree of blameworthiness. Most of these laws provide for strict liability, i.e., if the violation occurred, the offender may be penalized whether its actions were purposeful or accidental. In some areas, however, FRA will prove a certain level of knowledge in order to assess a penalty: In hazardous materials cases, FRA will show the violative acts were committed "knowingly." In civil penalty cases against individuals, FRA will show that the violation was committed "willfully." In track cases, FRA will show that the violator knew or had notice of the non-complying conditions.

Even where the law does not require that FRA show the offender's mental state, culpability is a factor that should be considered in deciding whether to take enforcement action. For example, the violation may have been the result of good faith understanding of the relevant law, which often happens when a regulation is brand new or inherently ambiguous. Unless the violation is very serious, enforcement action would ordinarily not be appropriate where there is solid evidence that such a good faith mistake was in fact the cause. Such good faith mistakes, which imply an honest attempt to know and obey the law, should not be confused with simple ignorance of the law resulting from a failure to attempt to know it.

Culpability is also very low where the violation is discovered on the property of one company that has not had a reasonable opportunity to correct it but the violation was clearly more attributable to another company. For example, this may be true with regard to an equipment defect where the receiving railroad has hauled the car only a short distance from interchange to a major repair point and FRA is confident-- based on its experience at that location--that the violation would have been caught and corrected by the receiving railroad even had FRA not been present. There, the better candidate for enforcement action would be the delivering railroad if the evidence indicated that the defect was present when that railroad delivered the car. Likewise, where a placarded tank car is found on railroad property with loose fittings that could not be observed from the ground and with no evidence of a leak, the culpable party is nearly always the car's offeror. It is the offeror that has the primary responsibility to ensure that all closures on a

car are secured in such a manner as to remain secured under conditions normally incident to transportation. To get at the root cause of the problem, the violation should be taken against the offeror (unless there is some evidence of vandalism or extremely rough handling since the car left the offeror). While very low culpability might tip the inspector's discretion toward not taking enforcement action, very high culpability might have the opposite effect. For example, a clearly willful violation may warrant enforcement action even if isolated or not especially serious. Blatant disregard for the law even on relatively lesser matters may indicate an overall poor attitude toward compliance that could carry over to very serious matters. Where a violation is willful, FRA's penalty schedules provide for higher than normal penalties. If a willful penalty is recommended, the violation report must explain the basis for concluding that willfulness (as defined in 49 CFR **Part 209**, Appendix A) was present. Willful penalties should not be recommended without support, as this will only slow the processing of the violation report.

Inspectors and regional personnel are not expected to spend hours deliberating about every possible enforcement action. Instead, these guidelines are intended to provide a framework that enforcement personnel will incorporate into their entire approach to enforcement so that these factors are weighed quickly and effortlessly in most situations. Of course, the time spent weighing these factors should correspond to the seriousness of the situation. Application of these factors should produce positive results: (1) enforcement should be more effective because inspectors should be better able to recommend the enforcement action appropriate to the circumstances; (2) enforcement should be more fair because enforcement decisions will not be made on the basis of inappropriate factors; and (3) enforcement should be more consistent because it will be to some extent guided by empirical compliance data and by the application of criteria that should limit the arbitrariness of necessarily subjective judgments.

# Determining the Existence of a Violation

## Basic Elements

The regulations require that certain elements be present for a violation to exist, i.e., a railroad or its employees being subject to the regulations must commit an act that does not comply with the regulations. For a civil penalty to be assessed, the act must have been committed "knowingly" (i.e., with actual knowledge of the facts or with presumed knowledge of the facts that would have been obtained had the railroad or its employee exercised reasonable care under the circumstances). The regulations contain "triggering events;" actions taken by a railroad or its employees which may be held responsible for its compliance or noncompliance with the regulations. For example:

## 49 CFR Part 217 - Railroad Operating Rules

Through the requirements of this part, the FRA learns the condition of operating rules and practices with respect to trains and rolling equipment in the railroad industry, and each railroad is required to instruct its employees in operating practices. A railroad is in violation when it:

fails to file and/or retain a copy of rules or amendments required by 49 CFR **Part 218.7**- Operating Rules Filing and Recordkeeping;

fails to conduct operational tests and inspections to determine the extent of compliance with its code of operating rules, timetables, and timetable special instructions in accordance with a program retained per 49 CFR Part 217.9;

fails to periodically instruct that employee on the meaning and application of the railroad's operating rules in accordance with a program retained per 49 CFR Part 217.11;

fails to promote and require compliance with its operating rules in the spirit intended by the regulation. Clearly when compliance effectiveness erodes, the accident/incident risk and rate increase. Given this circumstance, examination has found that, in these cases, the intent and requirements of the regulation have been compromised.

In the past, determining the existence of a violation of Federal railroad safety regulations, the facts were developed to evidence that the railroad compromised the intent and requirements of regulation...Hence a violation. Today, railroad safety regulations hold the employee and/or the railroad accountable when there is evidence to support that FRA should do so (Reference 49 CFR Part 219 - Control of Alcohol and Drug Use; 49 CFR Part 209 - Railroad Safety Enforcement Procedures; Disqualification Proceedings; 49 CFR Part 240 - Qualification and Certification of Locomotive Engineers).

# Enforcement Actions Against Individuals

## Statutory Authority

The Laws formerly known as The Rail Safety Improvement Act of 1988 (RSIA), (Pub. L. No. 100-342), among other things, amended the rail safety statutes to authorize the FRA to assess penalties against individuals who willfully violate the statutes or regulations promulgated there under (published December 29, 1988-Vol. 53, Fed. Reg. 52,918). The RSIA also authorized FRA to disqualify from safety-sensitive service, individuals whose violation of the safety laws has shown them to be unfit for such service.

## "Willful" Violations

Individual civil penalty actions will be commenced only where the offending conduct is willful. Willful conduct includes behavior that evidences reckless disregard of the requirements of the law or regulation, even if it cannot be shown that the violation was deliberate. However, where the individual has been directly ordered by a supervisor to violate, the conduct will ordinarily not be regarded as willful. If an individual was ordered to do something by a supervisor and you can prove it - go after the supervisor, not the subordinate. If you cannot prove it, but have reason to believe it is true, it is probably better not to pursue individual liability.

FRA has stated, at 49 CFR Part 209, Appendix A: Thus, FRA will consider a "willful" violation to be one that is an intentional, voluntary act committed either with knowledge of the relevant law or reckless disregard for whether the act violated the requirements of the law. Accordingly, neither a showing of evil purpose (as is sometimes required in certain criminal cases) nor actual knowledge of the law is necessary to prove a willful violation, but a level of culpability higher than negligence must be shown. A willful violation entails knowledge of the facts constituting the violation, but actual, subjective knowledge need not be shown. It will suffice to show objectively what the alleged violator must have known of the facts based on reasonable inferences drawn from the reasonable circumstances.

## Who May Be Held Liable

For purposes of enforcing the Federal railroad safety laws, any person (including but not limited to a railroad; any manager, supervisor, official, or other employee or agent of a railroad; any owner, manufacturer, lessor, or lessee of railroad equipment, track, or facilities; any employee of such owner, manufacturer, lessor, lessee, or independent contractor) who violates any requirement or causes the violation of a requirement may be subject to FRA's enforcement activity. However, the inspector must consult with the relevant applicability section of the violated regulation.

Also, in enforcing the Federal hours of service laws, it should be noted that although the penalty provision states that any person violating the provisions is liable for a civil penalty, and indicates that "an act by an individual that causes a railroad carrier to be in violation is a violation," the substantive provisions relating

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 9 of 41

to signal employees only impose restrictions upon railroad carriers who require or permit railroad carrier employees to perform signalmen duties.  See 40 U.S.C. Sections 21303, 21101(4), and 21104.  Congress did not extend those restrictions to independent contractors, and the behavior of an independent contractor is only regulated if it causes a railroad carrier to violate the Federal hours of service laws.

# When to Pursue an Individual Liability Action

## Inspector Investigation and Recommendation

An inspector will determine from the totality of the facts and circumstances whether actual knowledge or reckless disregard for the regulations is present.  The more clear-cut example occurs when the act in violation was committed by or at the direction of the individual following a specific warning from an FRA inspector to that individual that such an act would be a violation of Federal law.  However, that is not the only possible situation, which establishes individual liability.  The inspector will investigate to gather all relevant information, determine from that information if the necessary standard may be proven, and provide guidance as to the appropriate use of particular sanctions on a case-specific basis.

-        Ensure that you have sufficient evidence to support all necessary elements.

-        Remember that waiving formal investigation by the railroad is not an admission of guilt.  Do not rely on that waiver to prove your case (but do include it in your report).  If a formal investigation is held, FRA is entitled to a transcript of the proceedings and documentation of the outcome.  These transcripts sometimes contain important information and/or admissions.

-        When interviewing, do not actively deny that individual liability is being considered.  If you are asked, state that it is a possibility (there is no need to state against whom).  If someone refuses to speak to you and their information is important enough, FRA can subpoena them.

## FRA Discretion

Individual liability is an important tool, but should be used appropriately and where it will achieve the desired result.  Overuse and/or use in questionable or weak cases will damage FRA's credibility and the effectiveness of the enforcement tool.  Individual liability is a tool that should be considered in any situation where deterring a particular individual's noncompliance is what is most needed.  This tool is especially useful where the violation arose from the individual's own choice.  Remember that we have discretion - never think you must pursue an individual liability action.  We have the discretion to pursue enforcement action against the railroad, the individual, or both.  The decision depends on the culpability of the respective parties.  For example, if the individual is solely responsible and acting outside corporate policy or guidance, pursue the individual, not the railroad.  However, if the violation results from exercise of corporate policy or failure by the railroad to properly train or supervise the individual, the railroad is usually the better objective (unless the policy or failure can be tracked directly to a specific individual).  If there is tacit acceptance of a practice by the railroad - you may want to go after both, depending on the circumstances.

## Personal Liability

Do not be afraid to use your discretion to recommend individual liability when warranted, but be aware of the possibility of an action for personal liability.  Be extremely careful about threatening someone with an individual liability action.  Be absolutely sure it would be a provable and worthy case and do it in the context that "if this practice continues, I might have to recommend to my supervisor that individual liability be considered."  Impersonalize the "target," suggesting that there is a process, which includes more people than just you.  Never put yourself in the position of essentially threatening someone's job.

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 10 of 41

## Level of Individual Liability to Recommend

There are four levels of individual liability.  They are:

-        Regional Warning Letter

-        Formal (Chief Counsel) Warning Letter

-        Civil Monetary Penalty

-        Disqualification From Safety-Sensitive Service

The following should be taken into consideration when determining what level of individual liability to recommend:

-        How serious is the offense?

-        Is there danger of an accident, injury, or death?

-        What is the compliance history of the individual (both with the railroad and with FRA)?

-        What level of action is necessary to achieve the desired result?

-        What was the railroad's response to the offense?

-        Is this person a bad actor or was this a one-time offense?

-        Are there other mitigating and/or aggravating factors to consider?

# Decision to Issue a Regional Warning Letter

Usually, warning letters will be employed for a first offense where there is doubt as to the offending employee's knowledge of the law or where the offense is not highly serious and a warning is deemed adequate to prevent a recurrence.

When an inspector determines that an individual should be issued a regional level warning for a violation, the inspector shall orally advise the individual of the facts, including the fact that the inspector intends to recommend that a written warning notice be issued to the individual.  This will ensure that the individual immediately knows that he has performed an unlawful act and should not do so again.  The inspector shall carefully note the circumstances, including the time of the violation, and the time the individual was so notified.

As soon as practicable, the inspector will contact his or her Regional Specialist, who will arrange a conference call with the Regional Administrator or a regional staff member delegated by the Regional Administrator.  If the Specialist is not available, the inspector shall directly contact the Regional Administrator.

Once it is established that the facts support at least the issuance of a regional level warning against the individual, the inspector will submit a completed F6180.80 to the Regional Administrator, making sure to check Item 4, "NO" to indicate that no formal enforcement action will be recommended.  The Regional Administrator will then co-sign the form and mail the original to the individual by registered mail.

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 11 of 41

Further, the Regional Administrator will insert the region's sequential calendar year report number (e.g., 3-97-1) in the space provided in the upper right corner on the copies only and will mail the appropriate copy to RRS-1 in an individual envelope with "F6180.80" marked on the outside, mail the "Employer" copy to the individual's employer, and retain the appropriate copy in the secure regional file.

Note: If it is subsequently determined that no violation occurred, the inspector will contact the individual and discuss the circumstances that led to the verbal warning and explain why the warning was not valid.

## Decision to Recommend a Formal (Chief Counsel) Warning Letter or Assessment of a Civil Penalty

When an inspector or Regional Administrator determines that an individual should be issued a warning letter from the Office of Chief Counsel or assessed a penalty, the inspector shall orally advise the individual of the circumstances surrounding the violation, including the fact that the inspector intends to recommend formal enforcement action against the individual. This will ensure that the individual immediately knows that he/she has performed an unlawful act. The inspector shall carefully note the circumstances, including the time of the violation and the time the individual was notified.

As soon as practicable, the inspector shall contact his/her Regional Specialist, who will arrange a conference call with the Regional Administrator or delegated regional staff member. If the Specialist is not available, the inspector shall directly contact the Regional Administrator.

The Regional Administrator will contact the Director of Safety Assurance and Compliance and the Assistant Chief Counsel for Safety and advise them of the circumstances. When headquarters concurs in the need and basis for formal enforcement action, the inspector will submit a completed F6180.80 (checking Item 4, "YES") and a narrative memorandum detailing the facts to the Regional Administrator, which should show as its subject: "Violation Report Concerning (individual's name) With a Recommendation for (Formal Warning Letter or Civil Penalty)." The memorandum must specifically address each element necessary to make a case against an individual in the format prescribed in this manual. The Regional Administrator will co-sign the F6180.80 and mail the original to the individual by registered mail. The Regional Administrator will insert the region's sequential calendar year number in the space provided in the upper right corner on the copies.

The appropriate copy of the F6180.80 and the original and one copy of the memo and any attachments shall be forwarded to the Assistant Chief Counsel for Safety, RCC-10, for further action. (Do not use violation report transmittal Form F6180.72 for this transmission or include these documents in any envelope with unrelated violation reports against railroads). The appropriate copy of the F6180.80 and a copy of the memo shall be forwarded to RRS-I in an individual envelope with "F6180.80" marked on the outside, and the appropriate copy shall be retained in the secure regional file. The "Employer" copy will be mailed to the individual's employer.

Civil monetary penalties will be recommended for repeat offenses involving the same regulation or a closely related regulation and for particularly serious initial offenses (e.g., where the individual orders use of a piece of defective equipment after an FRA inspector issues a special notice for repairs).

## Decision to Recommend Disqualification

Disqualification is an option only where FRA can prove the individual's unfitness for safety-sensitive service. Although many, if not most, disqualification actions will involve willful behavior, willfulness is not a prerequisite to such an action. Moreover, willfulness alone will not suffice to prove unfitness.

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 12 of 41

Disqualification will be recommended where the individual has engaged in repeated violations of FRA regulations, or has committed a particularly serious violation, showing that the individual is unfit to continue the discharge of safety-sensitive functions. The following are examples of conduct that may warrant initiation of a disqualification proceeding:

When there is a pattern of conduct involving repeated orders to subordinates to violate railroad safety laws or regulations. Two incidents may be adequate to support action where FRA provided warning after the first incident, depending upon the severity of the conduct.

When there is on-duty use of alcohol or drugs resulting in loss of life or serious injury to other persons.

## Standard for Disqualification

Violations of the Federal railroad safety laws that show the person to be unfit for safety-sensitive service.

Disqualification is not available for hazardous material or substantive Federal hours of service violations. Violations need not be proven to be willful, but they usually will be.

Remember that you need not recommend permanent disqualification. You may recommend any time period that you feel is adequate to achieve the desired result. When deciding on a time period, remember that the case will probably be negotiated, and that the time length may be one item up for negotiation. If you strongly believe that a certain time period is the absolute minimum necessary, say so in your violation report.

Do not assume that just because the railroad has suspended or fired someone we need not disqualify the individual. If the person is really a threat, we want him off all railroads.

Even though our actions are separate and apart from the railroad's, their action should be taken into account. Inadequate action by the railroad strengthens the reasons for disqualification. On the other hand, strong action by the railroad might lead you to consider alternatives to disqualification, particularly if the employee has a clean disciplinary history, was guilty of a one-time offense, etc.

Sometimes a technical defect in the disciplinary proceedings will lead to reinstatement, even if the employee is clearly guilty.

We can attach conditions to reinstatement, e.g., in alcohol and drug violations we can require the employee to be certified clean before he or she can return to safety-sensitive service.

## Disqualification From Safety-Sensitive Service Applies To

employees covered under the Federal hours of service laws

employees or agents who:

-        inspect, install, repair, or maintain track and roadbed

-        inspect, repair or maintain, locomotives, passenger cars and freight cars

-        conduct FRA-required training and testing of employees

-        managers, supervisors, or agents if they either perform safety-sensitive functions, supervise or direct the performance of safety-sensitive functions, or are in a position to direct the commission of violations of any of the railroad safety regulations.

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 13 of 41

# Guide to Preparation of Violation Reports Against Individuals

In any violation report recommending assessment of a civil penalty, issuance of a warning letter, or initiation of a disqualification proceeding against an individual, the FRA inspector must address the following subjects under separate headings:

## Factual Details

All factual details of the violation(s) must be explained, with specific references to sources of proof if other than the inspector's own observations. Where a violation report form exists for the subject (e.g., a safety appliance) it should not be submitted but should serve as a guide to the facts that must be explained.

## Severity of the Violation(s)

The memo should describe in detail any harm (e.g., derailment, personal injury) that resulted from the violation or was seriously threatened by the violation. Any aggravation of the offense caused by the degree of the violation should be discussed here. For example, if the violation concerned a wide gauge, the report should discuss how the actual width, combined with factors such as train speed, created a greater risk than a lesser offense would have.

## Culpability of the Individual

Keep in mind that a civil penalty may be assessed against an individual only for a willful violation. However, an individual may be subject to disqualification even where the violation was not willful. For a disqualification, however, a lack of fitness for safety-sensitive functions must be shown. The section should address four factors:

### Knowledge of the Facts

The memo should explain whether the individual, without regard to each alleged violation, actually knew or had a duty to know of each fact constituting the violation. If actual knowledge (e.g., of a broken handhold) is alleged, explain what supports that allegation (e.g., a crewman's conversation with a yardmaster in which the crewman pointed out the defect). We do not need an admission of knowledge (although that would help), but do need information from which the reasonable inference is that the individual knew of the facts. If failure to meet a duty to know the facts is alleged, explain the basis for concluding that person had the duty and failed to meet it (e.g., an employee was assigned to inspect the train for safety appliance defects, walked only one side of the train, and did not find the obviously broken handhold on the other side).

### Knowledge of the Law

This section should explain what the individual knew of the particular law allegedly violated: Had it been discussed with FRA before the incident? Had the person been trained on the particular law or corresponding railroad rules? Is the requirement of the law so fundamental to safe railroading (e. g., the prohibition against tampering with an automatic train control device) that any violation of the law should be seen as reckless disregard of the law?

### Compliance History

This section should address any previous enforcement action against or warnings (even informal) given to the individual concerning compliance with the particular requirement(s) now violated or other safety laws, and any railroad disciplinary record about compliance with safety requirements.

## Mitigating Circumstances (if any)

In some situations certain factors will be present that tend to lessen the severity of the violation or the culpability of the individual (e.g., the requirement was new and the individual had not been fully trained on it: a medical emergency prompted a break down of normal procedures, such as radio communications). These factors should be addressed in fairness to the individual.

## Recommendation

This section will briefly state the inspector's recommendation whether a warning letter, civil penalty, or disqualification action is appropriate.

Note: The inspector should keep in mind that he or she may be called on to testify under oath concerning each allegation in it, either before an administrative hearing officer or in Federal district court. As with any violation report, great care must be taken to prove all assertions, but this is especially true where, as here, the individual's livelihood is at stake. (Requirements for testifying are found in 49 CFR Part 209.)

# Privacy Act Restrictions

The Privacy Act makes individuals, including FRA employees, personally liable for unauthorized release of information from any "system of records" about individuals maintained by the Federal government. FRA has two systems of records (one kept by the Office of Safety Assurance and Compliance, the other kept by the Office of Chief Counsel) concerning noncompliance with the railroad safety laws by individuals. Included in those systems of records are (i) information contained in a Form 6180.80 notice concerning the individual to whom the notice is addressed or (ii) any other information contained in a "system of records" concerning the individual's noncompliance, such as a computer or paper file on a particular violation by an individual for which the individual is being investigated, warned, or cited for penalty as an individual.

Agencies are, however, permitted to make certain disclosures from their Privacy Act systems of records when necessary to further certain "regular uses" if a notice proposing such regular uses has been published in the Federal Register and a comment period has run. FRA has established the following regular uses for information contained in the Office of Safety Assurance and Compliance Individual Enforcement Case System:

To review these records to determine whether cases should be forwarded to the Office of Chief Counsel for prosecution.

To otherwise review these records to accomplish the mission of the Office of Safety Assurance and Compliance.

To disclose pertinent information in these records to any source from which additional information is requested in the course of conducting an investigation to the extent necessary to identify the purposes of the request and to identify the information requested.

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 15 of 41

To provide notice of the investigation and its outcome to the individual's employing railroad or offeror or another railroad related to the case through joint facilities or trackage rights in order to give those entities information they may need to assist in preventing a recurrence of noncompliance.

To provide information concerning enforcement actions for violations of safety statutes and regulations to government agencies and the regulated industry in order to provide them with information necessary to carry out their responsibilities.

To provide information concerning enforcement actions for violations of safety statues and regulations to the public in order to increase the deterrent effect of the actions and keep the public informed about how the laws are being enforced.

55 Fed. Reg. 17,851 (April 27, 1990).

These "regular uses" provide regional personnel and field inspectors sufficient flexibility to accomplish their mission without running afoul of the Privacy Act. For example, the third use clearly permits inspectors to disclose information about individuals to any source of pertinent information to the extent necessary to identify the purpose of the information request and identify the information requested. Ordinarily, only the fact that an investigation is being conducted and the name of the individual should be provided to the person from whom you are requesting information. The fourth regular use is what permits the regional office to send a copy of the F6180.80 notice to the individual's employing railroad or offeror.

However, in order to ensure that the regular uses are not misapplied or applied inconsistently, disclosure of information on individuals to those outside FRA other than the types of disclosure discussed in the preceding paragraph may not be made without prior approval from Office of Safety Assurance and Compliance headquarters, which will consult with the Office of Chief Counsel on the propriety of any such disclosure. Moreover, certain rules on storage of records on individuals must be observed in order to comply with the Privacy Act.

Accordingly, inspectors are not to maintain file copies of records about noncompliance of an individual after they have forwarded a notice concerning that individual to the region; instead, inspectors will submit their file to the region. Regional Administrators will establish a secure file for all such records and will ensure that, except as discussed above, no information contained in this file is released without the authorization of Office of Safety Assurance and Compliance headquarters. Information submitted by the individual will be placed in that file along with the other pertinent records. The files will be stored in file cabinets that will be locked after working hours. Automated files will be password-protected and will be retrievable only by direct terminal access with the selection of the data elements determined by the authorized user. Manual (paper) records will be retained for a period of three years. Automated (computer) records will be maintained for five years. (Consult the Office of Chief Counsel prior to disposing of any records that may still be subject to an enforcement action.) Disposal will be by shredding, except that certain automated records will be retained indefinitely to provide complete compliance histories.

To avoid problems in this area, regional and field personnel should follow this general rule: except for sending the individual's employer its copy of the F6180.80 notice, do not disclose records about individuals to, or discuss information in those records with anyone outside the agency except as is necessary to complete the investigation and any resulting enforcement action or as specifically authorized by Office of Safety Assurance and Compliance headquarters.

# Notice to Individual of Alleged Violation

Form FRA F6180.80 is used by Office of Safety Assurance and Compliance technical staff to provide notice to individuals regarding violations of Federal railroad safety laws or regulations. The form is designed to serve one of two purposes, depending on the choice made at the regional level concerning

the need for formal enforcement action. First, it provides a timely written notice to an individual of the FRA regional decision that he or she has violated a Federal railroad safety law or regulation, and that the individual should consider the notice warning that any violations in the future could lead to a civil penalty. However, further action will not be taken for this specific violation. Secondly, where a regional warning letter is deemed insufficient, it provides a timely written notice to an individual of FRA's decision that he or she has violated a Federal law or regulation, and that formal further enforcement action WILL be taken for this specific violation.

Issuance of this form does not require headquarters approval unless there is doubt about the proper individual to be charged, that is, it is not intended that such a notice be issued to an individual whose violation was compelled by a superior. If the inspector has properly determined that a railroad or contractor employee has committed a violation but that employee asserts (or facts otherwise suggest) that a violation resulted from compliance with orders from a superior, that employee must be given an opportunity to provide evidence to support such an assertion. If such evidence is provided by the individual or otherwise uncovered, the inspector must properly determine culpability. Such an investigation must be conducted very carefully to ensure that blame is properly determined. It will usually be necessary to consult Office of Safety Assurance and Compliance headquarters staff and the Office of Chief Counsel for guidance before beginning an investigation.

**The following instructions shall be strictly followed when issuing a Form FRA F6180.80:**

1.     Subject: Enter Operating Practices

2.     Violation of 49 CFR: Enter the applicable part, rule, and subrule.

3.     F6180.80 RPT. Type & No.: Enter the applicable inspection report type and inspector's sequential calendar year number, as submitted to the railroad to document the inspection or investigation during which the violation was established. Any violation by an individual is also a violation by the employing railroad, which may be the subject of a separate enforcement action. This corporate noncompliance needs to be properly recorded. Accordingly, inspectors are required to complete an inspection report (e.g., Form FRA F6180.96) concerning the noncompliance and submit a copy to the railroad involved. This report will include the notation of fact that a specific individual violated a Federal law or regulation. This notation does not raise Privacy Act concerns because it is not a part of or taken from a system of records concerning individuals and does not indicate what action, if any, will be taken against the individual.

4.     Violation Recommended: If a regional level warning is recommended, type an "X" in the "No" box. If a Chief Counsel warning letter or civil penalty is recommended, type an "X" in the "Yes" box.

5.     Name: Enter the last name, first name, and middle initial of the individual. The inspector will request proof of the individual's identity, such as a state driving license.

6.     Address: Enter the individual's street number, street name, apartment number, box number, or any other valid mailing address information.

7.     Social Security Number: Enter the individual's social security number. As indicated in the Privacy Act notice, disclosure of the social security number by the individual is voluntary. The individual is required to provide all information except that disclosure of the social security number by the individual is voluntary. If the individual refuses to provide any of the requested information including the social security number, the inspector will secure the information from the individual's employer. If the employer is not cooperative, the inspector will contact the Office of Chief Counsel through the Regional Administrator for guidance.

8.     Date of Birth: Enter the individual's date of birth, using two digits each for the month, day, and year. For example, September 13, 1960, would be entered as 09/13/60.

4-17

9.       Job Title of Individual:  Enter the individual's job title.

10.      Time and Date of Violation:  Enter the time the violation occurred, including a.m. or p.m.  Enter the date the violation occurred using two digits each for the month, day, and year as in Item 8.

11.      Individual Notified:  Enter the time and date the individual was orally advised by the inspector of the facts, including the fact that the inspector intended to recommend that a formal notice be issued to the individual.  Use the format specified in Item 10 for these entries.

12.      Location of Violation:  Enter the city or county, and state where the violation occurred.  Enter the city or county, and state GSA location codes.

13.      Operating RR Code:  Enter the alpha code of the railroad that is responsible for the operation at the location where the violation occurred.

14.      Operating Division Code:  Enter the railroad division code of the railroad that is responsible for the operation at the location where the violation occurred.

15.      Employing RR Code:  Enter the alpha code of the railroad that employs the individual.  If the individual is employed by a contractor, enter "N/A" and give the employer's name first in Item 17.

16.      Employing DIV Code:  Enter the division code of the employing railroad where the individual's regular reporting location is located.  If a railroad is not the employer, enter "N/A."

17.      Summary of Violation:  Enter a brief summary of the circumstances of the violation.  This summary must contain the facts and why it is a violation.  If more space is needed, attach a typed continuation sheet.  If a continuation sheet is attached, the inspector will note this fact in this section.  This section should not be the detailed discussion of facts, culpability, and compliance history required on a violation report.  The purpose is merely to summarize what the individual did.  As is always true in any inspection report or violation report, the name of any complainant - or even the fact that a related complaint exists - should not be mentioned.

The remainder of the form is self-explanatory.  If two inspectors observed or determined the violation, both must sign the Form FRA F6180.80.  The regional office will enter the date the report is prepared and mailed before mailing the form to the individual.

Insert F6180.80 (completed)

# Example:  Individual Liability Civil Penalty Case

## Example - Penalty Demand Letter

In reply, refer to:  FRA Indpen 96-1 (HS)

Mr. Russell Williams

5146 Jones Circle

Yeehah, Texas  94585

Dear Mr. Williams:

Individuals who willfully violate the Federal railroad safety regulations or statutes are liable for civil penalties of up to $20,000 per violation.  This is to inform you that a civil penalty in the following amount is claimed against you for violation of the railroad safety statute or regulations specified below:

Total Civil Penalties: $4,000

Total No. of Violations: 1

Statute/Regulations: 49 U.S.C. Section 21103 - Limitations on Duty Hours of Train Employees; 49 U.S.C. Section 21303 - Chapter 211 Violations; and 49 U.S.C. Section 21304 - Willfulness Requirement for Penalties Against Individuals

Settlement Authority and Standards: 49 U.S.C. Section 21301; 31 U.S.C. Sections 3701-3719; 49 CFR 89; 49 CFR Parts 101-105

Specifically, we allege that you committed a willful violation under 49 U.S.C. Sections 21303, 21304, on April 7, 1995, by requiring, through your subordinates, Conductor Gerald Man to report immediately for duty at Sacramento, California, for the purpose of a drug screening and medical evaluation, knowing that materially disrupting his rest period when ordering Conductor Man back to duty for this purpose and requiring him to remain on duty for a period in excess of the maximum permissible number of hours would constitute a violation of the Federal Hours of Service laws as set forth in 49 U.S.C. Section 21103.  At the very least, you acted with reckless disregard for whether you were causing a violation of those laws.

The enclosed violation report provides the details on which this allegation is based. You may wish to obtain the services of an attorney or other representative, although you are not required to do so.

You may proceed in one of two ways.  First, you may submit information in writing that you believe will explain, excuse, disprove, or in any way mitigate the alleged violation, or you may request an informal conference to discuss such information.  If you prefer, the conference may occur via telephone rather than in person.  Written materials filed in this proceeding should be addressed to the Assistant Chief Counsel for Safety, Office of Chief Counsel, (RCC-10), Federal Railroad Administration, 400 Seventh Street, SW, Washington, D.C. 20590.

We encourage you to avail yourself of this opportunity to discuss the allegation with us informally through the mail, over the telephone, or in person.  FRA is authorized to compromise this initial penalty assessment for an amount less than that shown above, and the information you submit may provide the basis for compromise of this initial penalty assessment.  If we do reach an agreement on compromise of this assessment, the case will be concluded by execution of an Agreement of Settlement showing the compromised penalty amount and the date it is due.  Payment of a claim under an Agreement of Settlement would bar FRA from seeking a penalty for the specific violation alleged here and does not

constitute an admission that any violation has occurred, but would not preclude FRA's use of the evidence in this case in any subsequent litigation with you (e.g., to support FRA's assertions concerning your compliance history in a subsequent case based on new allegations on which settlement could not be reached). If you disprove the allegation, we will send you a letter terminating the case.

Second, you may (a) execute the enclosed Agreement of Settlement and return it and a photocopy of your check to this Office, at the following address: Office of Chief Counsel, RCC-10, Federal Railroad Administration, 400 Seventh Street, SW, Washington, D.C. 20590 and (b) remit the penalty amount by check or money order payable to the Federal Railroad Administration to the Accounting Operations Division, RAD-41, Federal Railroad Administration, 400 Seventh Street, SW, Washington, D.C. 20590. If you choose this option, please alert this office by calling us before transmitting payment.

If we have not received a reply within 60 days of the date of this letter, we will send you a letter notifying you of our intent to refer this matter to the Attorney General with a request to bring suit in the appropriate United States District Court to collect the full amount claimed herein. Or, if you do respond within 60 days but we are unable to reach a settlement of this matter, we will send such a letter notifying you of our intent to refer this matter for suit.

Please contact attorney Winsome of this office at (202) 555-1212, if you need additional information.

                                              Sincerely yours,

                                              Assistant Chief Counsel for Safety

Enclosures
(l) Copy of Violation Report
(2) Agreement of Settlement
(3) Copies of 49 U.S.C. Sections 21103, 21303, and 21304

## Example - Civil Penalty Violation Report

Date:           May 21, 1995

To:             James T. Schultz

                Regional Administrator

From:           Operating Practices Inspector

Subject:        Violation Report Concerning Russell Williams With a Recommendation for a Formal
                Warning Letter and Penalty Assessment.

Factual Details

On April 6, 1995, Conductor Mo went on duty at 1912 for Yachechak Train 11 at Klamath Falls, Oregon,
after receiving a statutory off-duty period in excess of 8 hours. Conductor Mo completed the trip aboard
Train 11 to Sacramento, CA., went off duty at 0535 April 7, 1995, and went home with a total of 10 hours
23 minutes on duty. At about 0730 April 7 1, Road Foreman Danny Bow contacted Conductor Mo via
telephone at his residence, for the purpose of ascertaining the extent of Conductor Mo's injury and the
circumstances surrounding the accident.

At 0850 Trainmaster Po, acting on direct orders from Superintendent Russell Williams and immediate
Supervisor Jay Sorah made a second telephone call to Conductor Mo (at home) and ordered him to
report immediately for duty at Sacramento for the purpose of a drug screening and medical evaluation.
Conductor Mo was subsequently released from duty at 1230 April 7. Conductor Mo's 2 rest period was
disturbed at about 0730 when Trainmaster Po made the first of two telephone calls to Conductor Mo at
his residence, for the purpose of making inquiries regarding the accident and injury. This telephone call,
wherein a company officer interviewed a subordinate primarily for the purpose of gathering business-
related information, constitutes "a material disruption of the employees off-duty period," as described in
FRA Associate Administrator for Safety Bruce Fine's Memo of February 22, 19963, addressing Safety
Advisory (SA 96-01), Operating Practices Technical Bulletin OP-96-01. At this point, Conductor Mo's
entire rest period of 1 hour 55 minutes reverts to commingled service in continuous time since the initial
on duty time of 1912, for a total of 12 hours and 15 minutes on duty, violating the statutory limit of 12
hours continuous service. A second rest period began for Conductor Mo at about 0740 when the first call
concluded.

When Trainmaster Po telephoned Conductor Mo the second time at 0850, he again engaged Conductor
Mo in a conversation regarding the accident, materially disturbing Conductor Mo's rest, and ultimately
ordering him to report for duty. The second off-duty period of 1 hour and 10 minutes also reverts to
commingled service. Having not received a minimum interim period of release of at least 4 hours,
Conductor Mo's continuous on duty time is calculated from the beginning of his tour of duty, which started
at 1912 of the previous day, for a total of 13 hours and 45 minutes. Mo remained on duty throughout the
duration of the drug screening and medical examination, until finally being released at 1230, for a total
continuous time on duty of 17 hours 18 minutes.

Severity of the Violation

The Hours of Service violation was a direct result of Conductor Mo's submission of an accident/injury
report. Conductor Mo sustained an injury to his right knee on a previous tour of duty (April 6, 1995, Train
14 en route to Klamath Falls), but did not formally report the injury until the morning of April 7, 1995, when
he left an accident/injury report in Trainmaster Po's Sacramento office. When railroad managers became
aware of the submission of this report, the decision was made to embark upon an immediate course of
action, which resulted in the hours of service violation. As the senior manager involved, Mr. Williams

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 21 of 41

consulted with his subordinates (James Co and John Be) and was provided information regarding the situation as follows:

According to Trainmaster Po's witness statement, he knew that Conductor Mo was at home on a legal rest period, when it started, and of his previous hours on duty. Trainmaster Po advised Mr. Williams of those facts. Conductor Po stated that he was familiar with the hours of service laws, and realized that disturbing Conductor Mo's rest would constitute a violation of the Act. Mr. Williams, however, insisted that Trainmaster Po comply with his instruction, and contact Conductor Mo immediately. Trainmaster Po then called his immediate supervisor James Co, to advise him of the situation. According to his witness statement4, James Co conferred with Mr. Williams, who confirmed the information received from Trainmaster Po. James Co stated that in his discussion with Mr. Williams, it was understood that requiring Conductor Mo to report for a medical exam and drug screening would violate the hours of service laws, but that the decision was based on concern for the employee's well-being and possible need for medical attention which outweighed the requirements of the laws.

James Co then instructed Trainmaster Po to contact Conductor Mo and advise him, per regional policy, that reporting his injury would result in a disciplinary hearing predicated on the rule violations involved. Trainmaster Po contacted Conductor Mo at home, via telephone. According to Conductor Mo's witness statement, Trainmaster Po told him that, "Mr. Williams had instructed him (Po) to call and tell me that if I reported the injury, I would be removed from service pending a disciplinary investigation, but if I didn't submit the report then everything would be okay." Conductor Mo stated he told Trainmaster Po he was injured and would seek treatment later in the day when he was rested. Trainmaster Po then ordered Conductor Mo to report for duty immediately.

The course of action undertaken by Mr. Williams suggests that he questioned the validity of Conductor Mo's claim based on his injury history. In the Report of Interview 5, Mr. Williams stated that the reason he insisted on the medical evaluation and drug screening was because Conductor Mo had incurred questionable on-duty injuries in the past, and one in particular, where he stumbled in a hole near the walkway and could not later identify that hole.

Mr. Williams stated that his primary concern was to ascertain the extent and nature of Conductor Mo's injury incurred while on-duty, and that considerations regarding the Hours of Service were secondary to that. When Trainmaster Po informed Mr. Williams of Conductor Mo's recent injury report, Mr. Williams instructed Trainmaster Po to order Conductor Mo to immediately report for duty for the purpose of:

a. Providing a urine sample for drug screening based on the violation of operating rule(s) C. - "Employees will promptly report illness or injury to themselves to their supervisor," and 5306 - "Failure to maintain a firm footing, a secure handhold and a braced position" and,

b. Submitting to a medical evaluation to determine the exact nature and extent of his injury, and to receive any treatment necessary.

The severity of the violation is aggravated by the admission of witnesses that knowledge of the violation of the Laws was discussed prior to the commission of the violation. It is not reasonable to believe that a genuine concern for the employees' well being was the primary motivating factor behind the contact which resulted in the violation. Conductor Mo's witness statement illustrates that his primary concern (after arriving in Sacramento and going off-duty) was to get rested, after which he intended to seek medical attention.

The same option was available to the railroad, and after discovering that there was not an immediate medical need, they could have informed Conductor Mo to report for the medical evaluation and drug screening after receiving a statutory off-duty period. Based on statements from witnesses, it would appear that this employee was encouraged to withdraw a legitimate report of injury by means of intimidation which included threats of discipline, removal from service, disturbing his legal rest period, and submitting to a company mandated drug screening and medical examination. When Conductor Mo refused to withdraw his injury report, the means used to threaten became a punitive consequence of his

injury report submission. Further evidence of aggravating factors are supported by two witness statements from Yachechak employees who cite separate incidents where similar means of intimidation were employed by Williams regarding the submission of employee injury reports. These statements7 document a pattern, wherein a deliberate campaign of intimidation was employed to discourage the reporting of on-duty employee injuries by Yachechak management. In the case of Conductor Mo, the means of intimidation included a knowing and willful violation of the Laws.

If legitimate employee injuries are not reported, the integrity of the FRA database is compromised. Information used to assess trends and/or to develop recommendations to the railroads is skewed as a consequence. Railroad safety could be negatively impacted on a large scale.

Culpability of the Individual

Knowledge of the Facts:

As stated in his witness statement, Trainmaster Po advised Mr. Williams of the time when Conductor Mo went off duty (0535) and of the total time Conductor Mo had previously been on duty (10 hours 23 minutes). James Co also stated in his witness statement that in his discussion with Mr. Williams, "It was understood that the hours of service would be violated." A certain amount of knowledge of train schedules, running times, arrival and departure times for scheduled trains, is common and expected for any Superintendent. In the Report of Interview document, Mr. Williams admitted that he knew the scheduled running time of Train 11, and that he made the decision to call Conductor Mo in for the medical examination and drug screen. Mr. Williams acknowledged that at the time the decision was made, the issue of Conductor Mo's hours on duty was discussed, but that his overriding concern was to obtain a prompt medical evaluation and drug screening on Conductor Mo. Mr. Williams also mentioned in the interview, that Conductor Mo had "given him trouble before" by submitting injury reports which were, in his opinion, questionable in nature. The conclusion can be made that Mr. Williams had indisputable knowledge of the hours of service law and how it applied to that situation, but made a conscious decision to violate the provisions of the law.

Knowledge of the Law:

Knowledge of the hours of service law is a fundamental requirement for most railroad employees. It is required by the General Code of Operating Rule 1.17, which states, "employees must be familiar and comply with the requirements of the Federal hours of service law." Knowledge of the hours of service law is common, and is referred to on a daily basis, by those classes of employees who fall within its scope such as signalmen, engineers and trainmen. Having been formerly employed in covered service as a trainman, the Superintendent, and now holding the position of Director of Yachechak's California Corridor, Mr. Williams' knowledge of the law is inferred. During the interview, Mr. Williams questioned whether it was legal to violate the law for the purpose of obtaining emergency medical attention for an employee. Mr. Williams was informed that a bona-fide medical need would obviously mitigate any enforcement action if a violation such as he described did in fact occur.

It is particularly disturbing to note that during the course of the interview, it was stated explicitly to Mr. Williams that his actions (with regard to the Conductor Mo incident) were a violation of the law. Mr. Williams acknowledged that he had broken the law, but said that he would take the same action if presented with a similar situation.

Compliance History:

I am not aware of any previous enforcement actions against or warnings given to Mr. Williams concerning compliance with the particular requirement(s) of the hours of service laws or other railroad safety laws or regulations.

Mitigating Factors:

The employee involved in the violation, Conductor Mo, had earned a reputation as "accident prone." In discussions I had with railroad claims representatives, skepticism was expressed concerning the validity of injuries, which this employee claimed to have incurred while on duty.

Mr. Williams' frustration with this individual may have manifested itself in the course of action he chose on the morning of April 7, 1995, which resulted in the violation.

Recommendation:

Certainly the severity of this violation, committed with willful and knowing intent, warrants a high level of formal enforcement action. When this violation is viewed from the perspective that it resulted from the efforts of a senior railroad manager's actions in an attempt to discourage the reporting of an on-duty injury, it assumes ominous proportions. In this case, the requirements of the hours of service laws were set aside, and consciously disregarded by senior railroad managers, bent on intimidating and making examples of employees who are injured on the job. The actions of the Yachechak managers, as documented in this case compel the conveyance of a loud and clear message. Although the violation is somewhat mitigated by circumstances and a clear compliance history, it is my recommendation that a Formal Warning Letter be issued by Chief Counsel, and monetary penalties be assessed to Russell W. Williams.

# Example - Chief Counsel Warning Letter

February 13, 1992

FRA Ind Warn 9 2 –1

Dear Mr. Williams:

Since enactment of the Rail Safety Improvement Act of 1988, individuals who willfully violate the Federal railroad safety regulations or statutes administered by the Federal Railroad Administration are liable for civil penalties of up to $20,000 per violation. In addition, individuals who commit a violation or violations demonstrating their unfitness for safety-sensitive service in the railroad industry are subject to temporary or permanent disqualification from such service.

Information developed during an FRA investigation supports the conclusion that you violated one or more of the railroad safety laws. Specifically, it is alleged that on October 2, 1990, while assigned as the locomotive engineer to operate Soo Line Railroad Company's Train 6037 East (also designated "Train 227," consisting of two locomotives and 101 cars) between Ottumwa, Iowa (milepost 302.8) and Nahant, Iowa (milepost 195.7), you willfully reported for covered service and/or went on duty and/or remained on duty in covered service, while having .04 percent or more alcohol in your blood, in violation of FRA regulations at 49 CFR Part 219.101(a)(2)(i) and (ii) (copy enclosed). I have enclosed copies of the relevant regulatory provisions and FRA's violation report that provides the details on which this allegation is based.

FRA also concludes that the willful violation cited above was a possible contributing factor to the impact accident at Muscatine, Iowa on October 2, 1990, in which Train SOO 6037 East (with the front brakeman who was not a qualified engineer) at the controls of the locomotive, collided with the designated "Train 343" within SOO yard Limits at Muscatine and caused two locomotives and the four head cars to derail on Train SOO 6037 East and seven cars to derail on Train SOO 440 East. Property damages resulting directly from this accident totaled $446,038: $38,300 for track and $407,738 for equipment. Furthermore, the accident caused a minor personal injury to the front brakeman of SOO 6037 East.

You received training in the Consolidated Code of Operating Rules (CCOR) while employed as a brakeman, fireman, and engineer on the Chicago, Milwaukee, St. Paul & Pacific Railroad (MILW). The MILW was purchased by the Soo Line Railroad Company (SOO) on February 12, 1985. The SOO adopted the General Code of Operating Rules (GCOR) for the entire railroad on October 28, 1965. You participated in bi-annual rules training classes and examinations on the GCOR from 1965 through 1985. Further, after the adoption of the GCOR, you participated in rules training classes and examinations on the new rules in 1986, 1988, and 1990.

General Rule G of the GCOR, which parallels the requirements of 49 CFR Part 219.101, provides that the use of alcoholic beverages, intoxicants, drugs, narcotics, marijuana, or controlled substances by an employee subject to duty, when on duty, or on company property is prohibited. Rule G further states that an employee must not report for duty, be on company property under the influence of, use while on duty, or have in his possession while on company property, any drug, alcoholic beverage, intoxicant, narcotic, marijuana, medication, or other substance, including those prescribed by a doctor, that would in any way adversely affect his alertness, coordination, reaction, response, or safety.

Toxicological testing of your blood alcohol following the October 2, 1990, accident yielded results in excess of .04 percent of alcohol in your blood. Because you had attended the railroad's rules examination earlier in 1990, prior to the accident, you therefore knew or recklessly disregarded the existence and applicability of Rule G and the corresponding Federal regulation.

In the exercise of our enforcement discretion, we have decided not to initiate an enforcement action against you based on this alleged violation. However, we will very likely take such action in the future if

we are reliably informed that you have willfully violated the railroad safety laws and/or committed a violation that indicates your lack of fitness for safety-sensitive service. We will retain information concerning this violation in our files for reference in the event of any future noncompliance on your part, and may use the information to demonstrate your compliance history in any future proceeding based on a subsequent allegation.

Please note that no action is being taken against you based on the allegations stated in this letter and its enclosures. However, if you believe that these allegations are untrue, or if there were anything you would like us to know concerning this matter, please respond in writing to me at the Safety Law Division (RCC-10) at the above address. Your reply will be included in our file on this matter.

We hope that our decision not to act on the allegations against you in this instance will instill in you a desire to learn and comply with the railroad safety laws pertinent to your position. Your cooperation is essential in protecting employees and the public from the potential perils incident to railroad operations not in compliance with those laws.

If you ever have questions in the future about the laws pertaining to railroad safety, please immediately contact the FRA office closest to you. The address is 519 Federal Building, 210 Walnut Street, Des Moines, Iowa 50309-2108. Copies of the relevant regulations, officially printed in Parts 209-236 of Title 49 of the Code of Federal Regulations, should also be available from the Soo Line Railroad Company.

Very truly yours,

Assistant Chief Counsel
for Safety

Chapter 7

# Table of Contents

Table of Contents ........................................................................................................................... 1
Complaint Investigations ................................................................................................................ 2
   Receipt of Complaints ................................................................................................................. 2
   Complaint Letter Received in Region ......................................................................................... 2
   Complaint Letter Received in Headquarters ............................................................................... 3
   Complaint Letter Received in Other Region ............................................................................... 3
   Telephone or Verbal Complaints ................................................................................................ 3
      Handling of Complaints Concerning Intimidation and Harassment of the Railroad Accident Reporting
      Rule ........................................................................................................................................ 3
      Handling of Complaints Concerning Decertification Cases Under Investigation by the LERB ........... 3
      Handling of Complaints Concerning Occupational Safety and Health (OS & H) Issues ...................... 4
      Follow-up Complaints ............................................................................................................. 4
      Duplicate Complaint Handling ................................................................................................. 4
      Congressional Complaints Received in Headquarters ................................................................ 4
      Congressional Correspondence Addressed to Regional Offices .................................................. 4
      Inside Addresses/Congressional Salutations – in Washington ................................................... 5
      Inside Addresses/Congressional Salutations – away from Washington ....................................... 5
      Sample Letter ........................................................................................................................ 6
      Controlled Complaints ............................................................................................................ 6
      Headquarters Involvement ...................................................................................................... 6
      Regional Complaint Numbers ................................................................................................. 6
      Listing of Type Codes and Descriptions .................................................................................. 7
Complaint Investigations - General Procedures ............................................................................. 8
   Confidentiality ............................................................................................................................ 8
   Divulging Information .................................................................................................................. 8
   Conducting Interviews ................................................................................................................ 8
   Documentation ........................................................................................................................... 9
   On-Site Inspection ..................................................................................................................... 9
   Determining Merits ..................................................................................................................... 9
   Thoroughness in Investigating ................................................................................................. 10
   Completion of Complaint Investigation Report ......................................................................... 10
   Memoranda of Complaint Investigation ................................................................................... 10

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 27 of 41

Chapter 7

# Complaint Investigations

FRA receives inquires and complaints covering a wide range of issues from a variety of sources from within the rail industry as well as from the general public. The major source of inquiries and/or complaints originates from the employees of individual railroad companies, or from their labor representatives. These inquiries or complaints are received either in the form of a written letter, telephonically, or verbally in the presence of the FRA representative. The issues involved may concern both areas for which FRA has statutory or regulatory enforcement authority, or for which this agency does not have any enforcement authority. The following guidance is provided to allow the agency to properly respond to inquiries and complaints received.

When receiving inquiries or complaints for which we do not have regulations, it is still the responsibility of FRA to actively progress those issues that may have an impact upon railroad safety. These should be progressed either through the Complaint Procedure, or through the SACP process if one is currently in effect on that railroad.

For those areas that do not impact railroad safety, we should assist the person to the extent possible by providing information concerning the proper governmental agency (if any) or other entities that would have jurisdiction over the non-railroad safety related issue.

## Receipt of Complaints

Each region is responsible for handling complaints from start to finish: logging-in, assigning numbers, acknowledging, investigating, closing out, and keeping the file. Headquarters will serve as a technical resource for interpretations and will stand by to assist as appropriate.

## Complaint Letter Received in Region

When a complaint is received in the region, it will be generally processed and handled as follows:

1.    Complaint will be categorized and logged in and a number assigned (e.g., an hours of service complaint is received in Region 8: H97-MRL-80001). The related information is also entered in the complaint database (FACTS) and continues active until closed out.

2.    An acknowledgment letter should be promptly forwarded to the complainant over signature of regional administrator. (An example of an acknowledgment letter is shown in this chapter.)

3.    The complaint will be assigned to an inspector for investigation.

4.    After the investigation has been completed, a closeout letter will be prepared to the complainant over the signature of the Regional Administrator. (An example of a closeout letter is shown in this chapter.)

5.    The file will be maintained in the region. There is no need to forward anything to headquarters unless the Regional Administrator or Specialist believes the issue is one that headquarters staff needs to be aware (e.g., something appropriate for a technical bulletin, something germane to a rulemaking or special study such as train makeup, etc.).

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 28 of 41

6.      If a complaint letter is received by an inspector in a field office, he/she must forward it to the
        regional office for handling.

## Complaint Letter Received in Headquarters

When a complaint letter is received in headquarters, it will be faxed/forwarded to the appropriate region
for handling as noted above.  For alleged violations involving more than one region (such as a train crew
going on duty in one region and exceeding its statutory hours of duty limitations in another region) the
complaint will be assigned to the region where the alleged violation (excess service) occurred.

## Complaint Letter Received in Other Region

When a complaint letter is received in a region other than the one in which the incident occurred, the
letter will be faxed/forwarded to the appropriate region for handling as noted above.

## Telephone or Verbal Complaints

Complainants who bring their complaint to the attention of an inspector are to be encouraged to submit it
in writing to the Regional Administrator.  If, given the circumstances, it is in your best judgment to accept
the oral complaint, do so; never refuse.  As per existing policy, if a telephone complaint is received within
the applicable region, it will be investigated during an inspector's next visit to the area (unless a critical rail
safety issue is apparent).   When telephone complaints are received in headquarters, a message will be
taken and then forwarded to the affected region for handling as noted above.

## Handling of Complaints Concerning Intimidation and Harassment of the Railroad Accident Reporting Rule

Telephone or verbal inquiries concerning alleged intimidation and harassment of the Railroad Accident
Reporting regulation should be handled by encouraging the complainant to first seek remedy provided for
within the railroad's internal control plan.  If the complainant insists on an FRA investigation, the
complainant should be encouraged to submit it in writing to the Regional Administrator.

## Handling of Complaints Concerning Decertification Cases Under Investigation by the LERB

The Operating Practices Specialist should screen requests for complaint investigations involving engineer
certification/decertification cases that have been sent (or have the potential to be sent) to the Locomotive
Engineer Review Board (LERB).  The proper course of action is to file a petition with FRA, requesting the
LERB to review the railroad's decertification decision.  The petition requirements are outlined under
Section 240.403.

If such a complaint involves additional allegations of noncompliance with other Federal safety regulations,
the OP Specialist should separate the decertification issues from engineer certification/revocation issues
so the issues regarding other regulations can be investigated.

## Handling of Complaints Concerning Occupational Safety and Health (OS & H) Issues

When complaints concerning OS & H issues for which FRA does not currently have regulations are received at the regional level, the investigation should not commence until headquarters is contacted for guidance. This is important for three reasons:

1.     Based on the nature of the complaint, a predetermined procedural process may have to be implemented in headquarters that involves a review of the complaint by the legal staff.

2.     This review by legal may result in the forwarding of the complaint to OSHA for handling or a recommendation for a joint or parallel investigation by OSHA and FRA personnel. The review and recommendation from legal will generally be made within 5 working days. Headquarters will then provide notification to the appropriate region on the disposition of the complaint.

3.     Committing FRA personnel to investigate a complaint that may ultimately be forwarded to OSHA for handling is a waste of resources and time.

## Follow-up Complaints

If a follow-up letter is received expressing dissatisfaction with a field investigation finding, the affected region, in conjunction with headquarters staff, will handle follow-up action and response.

## Duplicate Complaint Handling

Occasionally complainants forward similar or identical compliant letters to multiple agency representatives. Inspectors and Specialists should regularly discuss complaint investigation status, especially when an inspector has been assigned several complaints at one time to avoid duplication of effort. Multiple identical complaints should be handled as a single investigation.

## Congressional Complaints Received in Headquarters

For congressional correspondence received in headquarters requiring field investigation, the letter will be acknowledged by the headquarters staff, then a copy of the file faxed to the appropriate Regional Administrator and handled as follows:

1.     The matter will be afforded priority over other complaints.

2.     At the conclusion of the investigation, the Regional Administrator will forward the file, along with a draft closeout letter to the respective Staff Director involved. The letter will be finalized in headquarters and mailed with a copy returned to the Regional Administrator's file.

## Congressional Correspondence Addressed to Regional Offices

This is to establish uniform procedures for the handling of congressional mail addressed to regional offices.

1.     Within 2 days of receipt, the Regional Administrator is to write and transmit an interim response following the format in the attached sample letter.

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 30 of 41

2.   The Regional Administrator should then initiate an investigation and request a complaint number from the Office of Safety Assurance and Compliance in Washington.

3.   On the date that the interim letter is signed, the Regional Administrator is to send a copy of the congressional letter and the interim reply to the Executive Secretariat (ROA-20), via overnight mail, for assignment of a correspondence control number.

4.   The Executive Secretariat will assign a control number and forward the correspondence package to the Office of Safety Assurance and Compliance for appropriate assignment in headquarters. A copy of the control number cover sheet will be sent to the Regional Administrator.

5.   When the investigation is complete, the file will be transmitted to Washington. Headquarters will prepare the closeout letter for the Administrator or by the signature of the Associate Administrator for Safety. Headquarters will send the Regional Administrator a copy of the closeout letter.

## Inside Addresses/Congressional Salutations – in Washington

The Honorable Trent Lott                    The Honorable John B. Smith

United States Senate                        U.S. House of Representatives

Washington, D.C.  20510                     Washington, D.C.  20515

Dear Senator Lott:                          Dear Congressman Smith:

The Honorable Mary C. Jones

U.S. House of Representatives

Washington, D.C.  20515

Dear Congresswoman Jones:


## Inside Addresses/Congressional Salutations – away from Washington

The Honorable Trent Lott                    The Honorable John B. Smith

United States Senator                       Member, U.S. House of Representatives

3100 South Pascagoula Street                123 Main Street

Pascagoula, Missouri  39501                 Pittsburgh, Pennsylvania  12345

Dear Senator Lott:                          Dear Congressman Smith:

## Sample Letter

The Honorable Mary C. Jones

Member, U.S. House of Representatives

123 High Street

Richmond, Virginia 23456

Dear Congresswoman Jones:

Thank you for your (Month and Day) letter on behalf of (Person's name and title if appropriate) of (Name of City/Town, State). (Mr., Mrs., or Ms.) (Last name only) is concerned about _____.

The Federal Railroad Administration (FRA) enforces regulations covering railroad operating practices, including those covering [Fill in pertinent issue]. I have assigned regional inspection personnel to investigate (Mr., Mrs., or Ms.) (Last name only) 's concerns. When the investigation is complete, the FRA's Washington, Headquarters office will provide you with a final report.

I appreciate your interest in this matter.

Sincerely,

Regional Administrator

## Controlled Complaints

All complaints assigned "control numbers" will be handled as noted above (i.e., "congressionals received in headquarters").

## Headquarters Involvement

Headquarters staff will serve as a resource for regional staff. Each specialist should contact his or her headquarters counterpart when interpretive issues arise. However, all inquiries for formal written interpretations will continue to be handled by headquarters staff.

## Regional Complaint Numbers

Complaints are numbered on a sequential basis per calendar year, assigned by type and railroad. In keeping with this approach, each region will be assigned a unique series of 5-digit numbers as follows:

| Region | Number Series |
|--------|---------------|
| 1 | 10000-19999 |
| 2 | 20000-29999 |

| Region | Number Series |
|--------|---------------|
| 3 | 30000-39999 |
| 4 | 40000-49999 |
| 5 | 50000-59999 |
| 6 | 60000-69999 |
| 7 | 70000-79999 |
| 8 | 80000-89999 |

## Listing of Type Codes and Descriptions

| Type Code | Subject |
|-----------|---------|
| A | Alcohol and Drug |
| AI | Accident/Incident Report |
| B | Bridge |
| BS | Blue Signal Protection |
| C | Communication |
| D | Dormitory |
| EQ | Employee Qualification |
| EF | Employee Fatigue |
| ET | End of Train Device |
| G | Safety Glazing Standards |
| H | Hours of Service (HS) |
| HD | HS Deadhead Transportation |
| HA | HS Alcohol and Drug Testing |
| K | Equipment |
| L | Locomotive and Train (include noise) |
| M | OSHA Mining |
| N | Signal |
| O | OSHA |

| | |
|---|---|
| P | Personal Injury |
| PB | Power Brakes and Drawbars |
| R | Operating Rules |
| RM | Rear End Marker |
| RX | Grade Crossing |
| S | Safety Appliances |
| TM | Train Make Up |
| T | Track |
| U | Unclassified |
| Z | Hazardous Materials |

# Complaint Investigations - General Procedures

Generally, complaints are filed by employees, labor organizations, and the general public.

## Confidentiality

The inspector assigned to a complaint investigation normally knows the identity of the complainant and has the names of potentially helpful contacts. An inspector must not, under any circumstances, reveal the identity of a complainant to anyone outside of FRA, unless the complainant authorizes such disclosure in writing (by signing a Statement of Witness document), the disclosure is to the Department of Justice in the course of related litigation, or such disclosure is required by a court of competent jurisdiction (as determined by consultation with counsel for FRA). See Section 5 of the Rail Safety Improvement Act of 1988, 45 U.S.C. Section 441(f).

This same confidentiality protection afforded to a complainant extends to other involved train crewmembers.

## Divulging Information

An inspector assigned to investigate an Operating Practices complaint must determine the facts of the case, report the findings, and provide an analysis. When possible, this is done without revealing to any person that a complaint is or was under investigation.

## Conducting Interviews

When beginning an investigation of an Operating Practices complaint, the inspector should first interview the complainant, if known, to obtain detailed information about the circumstances involved in the complaint. The inspector should then interview any person who has information pertaining to the complaint. An example of a Report of Interview is included in this chapter.

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 34 of 41

Interviews should be conducted in private when possible. The inspector must include a comprehensive report of every interview conducted when the investigation report is submitted. The inspector may also submit a written statement signed by the complainant. Such signed statement will be necessary if a violation report is being submitted and the violation cannot be proven from the inspector's firsthand knowledge. In this event, the statement must be on FRA's Statement of Witness form, which indicates that the complainant has authorized the use of the statement in an enforcement proceeding and will testify if necessary.

## Documentation

The inspector should first become familiar with the case and then examine pertinent records or other documents maintained by the railroad, to determine if they support the allegations made by the complainant. The inspector should use good judgment when contacting employees during the course of the investigation. Unless authorized, the inspector must not give any information, records, data, etc., about the complaint to anyone outside of FRA.

Any items obtained during a complaint investigation should be marked to identify where each was obtained and who has the original documents. Photos obtained during a complaint investigation should be posted on a sheet of paper with a brief description of the photo and its significance. In the report, this page should be indexed to the complaint number.

## On-Site Inspection

When a complaint involves Operating Practices issues at a particular place or location, the inspector should visit the scene to observe or determine exactly what took place there with respect to matters referred to in the complaint (as applicable).

## Determining Merits

After conducting appropriate interviews and examining pertinent records, the inspector should be able to determine whether the complaint is bona fide. If the investigation of a complaint reveals a violation of the Federal regulations, the inspector is required to exercise good judgment in determining the best method for obtaining compliance in accordance with the guidelines discussed in Chapter 4 (Determining When and What Enforcement Action is Necessary), that is:

the inherent seriousness of the condition or action;

the kind and degree of potential safety hazard the condition or action poses in light of the immediate factual situation;

any actual harm to persons or property already caused by the condition or action;

the offending person's general level of current compliance as revealed by the inspection as a whole;

the person's recent history of compliance with the relevant set of regulations, especially at the specific location or division of the railroad involved.

The inspector may handle the situation directly with appropriate representatives of the railroad and if approved, submit a violation report for prosecution. In either case, the violation must be brought to the attention of the appropriate person for corrective action without identifying the complainant(s), except

where the complainant has signed a witness statement authorizing the use of his/her statement in an enforcement proceeding.

If corrective action is going to be handled directly with the railroad representative(s), the inspector should do this promptly and describe in the investigation report what corrective action was taken by that representative. If the person does not agree to take the required corrective action, the inspector should submit a violation report. If a violation report is submitted, the inspector must document it in accordance with instructions provided in Chapter 5.

## Thoroughness in Investigating

All inspectors are reminded of their grave responsibilities in thoroughly investigating complaints the first time. Job pressures and commitments must not interfere with the investigation even if it is thought that the investigation is taking an inordinate amount of time.

## Completion of Complaint Investigation Report

After receipt of a complaint investigation assignment, the inspector must complete the investigation within the generally assigned completion period: 30 days for Congressional complaints and 60 days for all others.

After completing an investigation, the inspector should promptly submit a comprehensive report of the investigation, carefully review the report to ensure its completeness and appropriateness and then forward the report to his/her Specialist. The Specialist is responsible for the accuracy, completeness, timeliness, and appropriateness of a complaint investigation report.

If in the course of the complaint investigation, the inspector determines that non-compliance with a Federal safety law or regulation, or with a railroad operating or safety rule has occurred, a completed copy of the inspector's Inspection Report (Form F6180.96), documenting the violation or deficiency must be submitted with the completed complaint investigation report.

The violation report, if any, and/or physical evidence which supports the findings, should be prepared and forwarded as directed in Chapter 5.

## Memoranda of Complaint Investigation

Complaint investigations will be completed by an inspector and reported on a memorandum format with the complaint number in the upper right-hand corner.

**Complaint Closeout Letter:** The Regional Specialist will complete a complaint closeout letter, which will indicate whether a violation was recommended or the corrective action taken, as applicable. The complaint closeout letter will be signed by the Regional Administrator.

The office of Chief Counsel has recommended the following verbiage be used in customer correspondence relating to penalties.

Our findings have been forwarded to the Office of Chief Counsel with a recommendation for the assessment of civil penalties.

**The following are examples of a Complaint Investigation Memorandum, Report of Interview, Regional Complaint Closeout Letter, and Regional Complaint Acknowledgment Letter:**

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 36 of 41

**Memorandum**

U.S. Department
of Transportation
Federal Railroad
Administration

---

**Date:**      March 26, 1997                        **Reply to Attn. of:** H97-BN-80021

**Subject:**   Complaint Investigation
               Burlington Northern Santa Fe Railway (BNSF)

**From:**      Deborah Spurgeon, OP Inspector

**To:**        Dick Clairmont, Regional Administrator, Region 8
               Vancouver, Washington

The Complaint: A letter dated February 27, 1997, was received from Mr. Thomas Pendleton, Local Chairman 1637, United Transportation Union (UTU). In his letter, Mr. Pendleton alleges that on January 27, 1997, crewmembers of BNSF Train 01-664-26 were required by BNSF's train dispatcher to violate the hours of service laws. This alleged violation occurred on BNSF's Oregon Division, Wishram Subdivision, at Milepost 225, near Finley, Washington.

They stated that on January 26, 1997, they were called on duty in Vancouver, Washington, at 1550 hours, on Train 01-664-26. The train departed Vancouver at 1830 hours and proceeded eastbound to Milepost 195, arriving at 0005 hours, January 27, 1997. They stated that locomotive BN 2822 ran out of fuel at that point. They also stated they were able to depart this location and they proceeded east to Milepost 225. At Milepost 225, another locomotive in the engine consist, BN 3552, also ran out of fuel and the leading locomotive, BN 2179 would not load. They stated that the train could no longer proceed.

The train dispatcher was notified of the situation at 0215 hours. The train dispatcher advised the engineer that eastbound Train BN 8150, a following train, would shove Train 01-664-26 in the clear at the next siding. The engineer stated he then called the terminal manager at Pasco, Washington (his point of final release) to seek an alternative solution to his dilemma. The engineer said the manager could not offer any assistance. At 0200, BNSF's train dispatcher communicated, via radio, that they were advised to violate.

The Investigation: On March 6, 1997, the engineer and conductor were contacted concerning this matter. Based on the investigation, Federal Railroad Administration concluded that the train crew violated the Hours of Service Laws (HSL) in order to complete its assignment. At 0350 hours, January 27, 1997, the crew expired on their hours of service. Train BN 8150 East arrived and shoved Train 01-664-26 to Hover, Washington, siding. Train 01-664-26 arrived at Hover Siding at 0420 hours, and the crew secured the train at 0440 hours, and was released from duty. The crew was then transported to Pasco, their point of final release.

Conclusion: The conductor and engineer of BNSF Train 01-664-26 were required to violate the (HSL), as instructed by BNSF's train dispatcher on January 27, 1997. This excess service was reported by the railroad on the Hours of Service Report-Railroads (FRA Form F6180.3).

Contact: Mr. Pendleton, Local Chairman 1637, UTU, was contacted and advised of our findings on March 20, 1997. Mr. Pendleton stated he was pleased with the results of our investigation.

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 37 of 41

Action Taken:  The region's findings have been forwarded to the Office of Chief Counsel with a recommendation for the assessment of civil penalties.

Attachments can include one or more of the following:

1.      Copy of complainant's letter

2.      Copy of Reports of Interview of conductor and engineer of Train 01-664-26

3.      Copy of BNSF hours of duty record for conductor and engineer of Train 01-664-26

4.      Copy of Hours of Service Report-Railroads (FRA Form F6180.3)

5.      Copy of BNSF Delay Report for Train 01-664-26

6.      Copy of "Inspection Report"

**The following is an example of a complaint investigation Report of Interview:**

Report of Interview

| | |
|---|---|
| Person Interviewed: | Fred Brown<br>Manager of Operating Practices<br>Parkville and Eastern Railroad Company (PERC)<br>2801 Rosecrans Drive<br>Kansas City, Missouri 64117 |
| Date of Interview: | Tuesday, April 5, 1997 |
| Place of Interview: | By telephone to Mr. Brown's office from the FRA office in<br>Des Moines, Iowa |
| Interview Conducted by: | John P. Jones<br>Operating Practices Inspector<br>Des Moines, Iowa |
| Others Present: | None |

Mr. Brown was contacted by telephone this date to develop his knowledge concerning the case of Mr. Curtis Richards, (former Parkville and Eastern Railroad Company Locomotive Engineer), who alleged he had been intimidated, harassed, and ultimately discharged from the railroad as a result of an on-duty personal injury he had sustained on December 20, 1993.

Mr. Brown stated that as he recalled this case, Mr. Richards had been discharged from the railroad for his failure to comply with written instructions.  He said that if he recalled correctly, Mr. Richards had failed to provide former Kansas City Terminal Superintendent Mr. Russell Wade with information from his doctor that would allow him to stay off work.  Mr. Brown said that Mr. Richards has a litigation case against the company; an FELA case due to an on-duty injury, and that it is expected this case would go to trial before the end of the year.

When asked if Mr. Richards had been discharged for his failure to attend a rules class, Mr. Brown emphatically indicated that he did not say that.  I pointed out to Mr. Brown that correspondence in my possession indicated Mr. Richards was accorded a formal investigation for his failure to show up at a rules class.  Mr. Brown said his discharge had nothing to do with his failure to attend a rules class.  He said that Mr. Richards had been notified to attend a rules class in advance of his returning to work.  He said that Mr. Richards had asked him for a rule book, which indicated to Mr. Brown that Mr. Richards was

7-12

going to attend a rules class. He said that Mr. Richards did not attend a rules class, and that Mr. Brown did not communicate with him anymore.

Mr. Brown said that Mr. Richards was a former Clarinda and College Springs Railroad Company engineer, having hired out in July 1978. Mr. Brown said that the computer screen that he was referencing indicates that he became a fireman in October 1978. As such, Mr. Brown said that Mr. Richards would come under the Brotherhood of Locomotive Engineer collective bargaining agreement with the former Clarinda and College Springs Railroad. He said that his recollection of the terms of that agreement is that when engineers are off injured, they are to periodically provide the Company with medical advise from their treating physician.

Mr. Brown said Mr. Richards was accessed a Level 2 under PERC's "Discipline Policy" on April 19, 1996, for violation of Rule 1.13 (failure to comply with instructions) of the General Code of Operating Rules, and, that this current violation plus his current discipline status resulted in a Level 3 under the "progressive discipline table." Then, on May 17, 1996, Mr. Richards was again assessed a Level 2 for violation of Rule 1.13 (failure to comply with instructions) of the General Code of Operating Rules, and that this current violation plus his current discipline status resulted in a Level 5 (permanent dismissal) under the "progressive discipline table."

**The following is a sample regional complaint closeout letter:**

June 18, 1997                                                    E97-BE-50231

Mr. Marvin B. Jones, Jr.
Legislative Representative
United Transportation Union
1612 University Avenue
Dallas, Texas 73162

Dear Mr. Jones:

This is in further reference to your March 12, 1997, letter addressed to Director, Office of Safety Assurance and Compliance in Washington, D.C., regarding the operations of a plant railroad at the American Petroleum and Refining Company (APRCO) refinery, which involved operation of the plant railroad's crews and equipment on trackage owned by the Bartlesville and Eastern Railroad Company (BE) in Fruitland, Texas.

The Federal Railroad Administration (FRA) has completed its investigation of the allegations contained in your letter. Our investigation found the allegations to be essentially correct. APRCO has contracted with XYZ Switching Services to operate a plant railroad switch engine within its plant. Because the lead track from the BE main track into the plant did not have the capacity to hold more than nine cars clear of the main track, BE crews were required to leave deliveries of 20 or more cars per day on the BE main track and plant lead track. The plant railroad and the BE allowed the plant railroad crew to enter and operate on BE main track to pull the cars into the plant. Furthermore, we found that the plant railroad crew is not qualified on the operating rules of the host railroad, and the plant railroad engineer is not certified by the BE railroad.

Both the plant railroad and BE managers were advised by FRA that even this limited intrusion into BE main track was not consistent with FRA safety standards, and that the plant railroad would either have to come into compliance with all crew qualification requirements and locomotive safety standards or stop the practice of entering BE main track. The two railroads elected to stop the practice of pulling deliveries into the plant from BE's main track, and to arrange some other method of interchange. The plant railroad manager indicated that he intends to qualify the plant railroad crew on BE rules and certify the locomotive engineer to operate on BE trackage in order to be in compliance if business necessitates the crew's operation on BE trackage in the future.

We will continue to monitor the plant railroad's operations for compliance. Please advise this office if you have any further information about this subject. Thank you for your continued interest in rail safety.

                                        Sincerely,


                                        Regional Administrator

Case 5:03-cv-04110-DEO   Document 54-4   Filed 07/01/05   Page 40 of 41

**The following is a sample regional complaint acknowledgment letter:**

April 4, 1997                                        E97-BE-50231

Mr. Marvin B. Jones, Jr.
Legislative Representative
United Transportation Union
1612 University Avenue
Dallas, Texas 73162

Dear Mr. Jones:

This acknowledges receipt of your March 12, 1997, letter addressed to Director, Office of Safety
Assurance and Compliance in Washington, D.C., regarding the operations of a plant railroad at the
American Smelting and Refining Company (ASARCO) refinery, which may involve operation of the plant
railroad's crews and equipment on trackage owned by the Bartlesville and Eastern Railroad Company
(BE) in Fruitland, Texas.

The Federal Railroad Administration will investigate the allegations contained in your letter, and you will
be advised of the results of our investigation.  Please refer to the file number above on any future
correspondence regarding this matter.

Thank you for your interest in this matter.

                                        Sincerely,


                                        Regional Administrator