IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| Thomas Bauer, et. al., | ) | No. C03-4110 MWB |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| Burlington Northern | ) | PLAINTIFFS' COMMENTS AND |
| Santa Fe Railroad Company, | ) | ADDITIONAL BRIEFING |
| Defendant. | ) | |

Table of Contents:

I.      The factual basis of this case is true, substantial, and provable.
        A.      Live testimony.
        B.      Documentary evidence
II.     New Developments Since the Case Was Filed.
III.    The role of (or lack of) the Federal Railway Administration in this case.
        A.      Scope of this question.
        B.      FRA will not agree to intervene.
        C.      FRA is resisting being named as a party.
        D.      FRA is resisting subpoenaing its current supervisory employees.
        E.      FRA will resist any testimony of its ex-supervisory employees.
        F.      Conclusion One:  No one from the FRA will "... back up the statements and
                promises set out in his letter of August 22, 2004".
        G.      Conclusion Two: The BNSF-FRA letter should not be used by the Court as
                support for dismissal under FRCP Rule 12(b)(l) without giving greater weight to
                the Plaintiffs' reply email dated 9/1/04.
        H.      Conclusion Three: The Court should extend to Plaintiff more time to attempt to
                get or compel cooperation from the FRA.
IV.     Discussion of prior efforts to force the FRA to do its duty.
V.      Discussion of prior effort by Plaintiffs to negotiate with BNSF.
VI.     BNSF's argument conclusively proves that Plaintiffs are entitled to a declaratory
        judgment permitting political strikes and that the court, after allowing supplementation
        of the record, should   reconsider its prior tentative ruling.
VII.    Initial comments on BNSF's jurisdiction arguments related to Count One.
VIII.   There Are No Legal Barriers to The Issuance of Declaratory Judgment Here.
IX.     Comments on Sereda v. BNSF, (Order of 3/17/05) (S. D. Iowa).
X.      Short Notes on Public Policy: Iowa Has An Extensive Policy and Statutory Structure on
        Rail Safety

Plaintiffs submit the following comments and additional briefing:

1

I. The factual Basis of this Case is True, Substantial, and Provable.  The factual core of the Complaint and its amendments is that the BNSF and its handmaiden, the FRA, are ordering and condoning management practices which violate FRA safety standards and industry practices.

A. Live Testimony.  Current and former BNSF workers from the Sioux City area and other locations are ready to be put under oath to testify.  Former FRA officials under oath will provide testimonial support if the FRA will stop blocking their testimony.

B.  Documentary Evidence.  Documentary evidence supports the Plaintiffs allegations that conditions on the BNSF are dangerous and steadily getting worse:

• BNSF self-reported an increase of train accidents of 20% in 2002-04, 2004 being the most recent year of complete FRA statistics (http://fra.dot.gov/officeofsafety/).

• The BNSF's self-reported total of "human factors" accidents continues to dangerously escalate: 120% more in 2004 than in 1996 (http://fra.dot.gov/officeofsafety/), a figure dramatically tied the statistical umbilical of incipient disaster of too few employee hours worked as demonstrated by the Plaintiffs graphs used in the prior hearing.  (Exhibit 2)

• State and FRA inspections found that BNSF operating practices in Iowa were deficient 47% of the time in 1994.  FRA Inspection Summary, BNSF, Iowa Only.  (Exhibit 3) (http://fra.dot.gov/officeofsafety/).

In 2004, after this suit was filed, FRA's Chief Safety Administrator, George Gavalla, was forced out by FRA for trying to do his job (Gavalla subsequently filing and settled a whistle-blower suit). (Exhibit 4)  Stimulated by the New York Times which has been hammering the FRA for its persistent failure to investigate rail safety problems and to enforce the existing laws. (Exhibit 4)  The Inspector-General of the Department of Transportation, Kenneth Meade, investigated Gavalla's whistle-blower complaints.  Given the institutional understatement, it is

2

remarkable that Meade reported on December 10, 2004 that:

- "substantial safety and inspection issues exist for the four major freight railroads;

- that these are "significant safety problems";

- that these are "long-standing systemic problems" that are not being resolved by the FRA policy; and

- that FRA reliance on the 'SAG-P', the official government "partnership" with the rail carriers rather than engaging in traditional governmental enforcement, is not solving but contributing to these problems.   (Exhibit 10), Mead Memorandum at pps. 3, 5,-6, 13-15.

The FRA admitted that major railroads seriously under-report accidents and injuries in May, 2003:

> "FRA has become increasingly aware that many railroad employees fail to disclose their injuries to the railroad or fail to accept reportable treatment from a physician because they wish to avoid potential harassment from management or possible discipline that is sometimes associated with the reporting of such injuries. FRA is also aware that in some instances supervisory personnel and mid-level managers are urged to engage in practices which may undermine or circumvent the reporting of injuries and illnesses."   (Exhibit 5), FRA Guide for Preparing Accident/injury Reports, May 1, 2003 (ch. 1., p. 8).

While the under-reporting problem has been endemic, its long range effect is critical. Consider that the validity of all planning for the movement of high level nuclear waste rests on the accuracy of the self-reporting railroads of their  accident  rates.   (Exhibit 7), Identification  of Factors  for  Selecting Modes and Routes for Shipping High Level Nuclear Waste and Spent Nuclear Fuel, U.S. Dept. of Transportation, April, 1998 (pps. x, 7-7 to 7-9); Resource Handbook on DOE Transportation Risk Assessment, U.S. Dept. of Energy, July, 2002 (pps. x and 54) (Exhibits 6, 7, 8). It is this lack of statistical understanding which leads nonchalant regulators to assume that the FRA will do its job throughout these special programs. Puncturing these

3

assumptions, the Association of State Rail Safety Program Managers contrasts the finding by the DOE that "that the current regulatory structure is sufficient to provide for the safety of the shipments" with the fact that "the current regulatory framework consists of <u>minimum</u> federal standards, that "there are not enough federal inspectors to adequately police major shipping campaigns", and that "sixteen of the forty-eight contiguous states have no rail safety regulatory capability." ASRSPM concludes that DOE's OCRWM "...exhibits a lack of understanding of the role of states in the national rail safety regulatory program." (Exhibit 6), Comments of Association of State Rail Safety Program Managers to DOE, 1997.

II.  New Developments Since the Case Was Filed.

In addition to this lawsuit, pressure on the FRA and the rail carriers has been building due to (1) the news media focus on claims of widespread FRA ineffectiveness, which in part blamed political cronyism and major rails carriers offering lucrative futures to FRA safety administrators (the latest is New York Times editorial yesterday, (Exhibit 9) ; (2) another series of preventable lethal rail accidents occurred; (3) the release of the DOT-Meade investigatory report concerning the issues raised by the Gavalla whistle-blower case; (4) counsel for Plaintiffs used the DOE's Technical Review Board hearings to educate regulators and the public attention about the danger of the BNSF's single key 'system' which operates all of the more than 125,000 main line switches including those in dark main lines; and (5) the Washington, D.C rail hazmat case in which the federal court found rail safety issues totally deficient and sustained the D.C. ordinance banning its movement through the District of Columbia.

In response, DOT Secretary Mineta announced a new National Rail Safety Plan on May 26, 2005, much of which is directed toward switch safety in dark territory on main lines. (Exhibit 11), <u>BNSF Today</u>, May 26, 2005.    See also, a summary of similar concerns including

4

the need to monitor close-calls' for the first time. (Exhibit 12), <u>FRA Action Plan for Addressing Critical Railroad Safety Issues</u>. DOT-FRA May 16, 2005.

In additional response, on January 10, 2005, FRA announced urgent recommendations to major railroads that they change their switch procedures on main lines, (Exhibit 13), FRA Notice of Safety Advisory 2005- 01; Position of Switches in Non-Signaled Territory. BNSF finally announced compliance with these urgent recommendations in late May, 2005.

III.   <u>The Role of (or lack of) the Federal Railway Administration in this Case.</u>

A.   <u>Scope of the Question.</u>

The Court inquired whether the Federal Railway Administration ("FRA") would agree to intervene (June 6th Order at 60) and whether FRA's Chief Counsel could be subpoenaed so that the Court could "determine if he is ready to back up the statements  and promises set out in Ms letter of August 22, 2004." (Order at 62).

B.   <u>FRA will not agree to intervene.</u>

Harry Zanville went to Washington, D.C. last week and met with Michael Haley, Assistant to Chief Counsel Lindsay, and Joel Caplan, FRA Staff Trial Attorney. Haley stated that the FRA would not agree to intervene in this case.

C.   <u>FRA resists being named as a party and., in that regard., threatened Plaintiffs' counsel.</u>

Haley stated that the FRA would resist being brought into the case and threatened Plaintiffs' counsel that the FRA would use the power of the United States government to seek Rule 11 sanctions if they attempted to bring FRA into the case.

D.   <u>FRA will resist any subpoena of its  current supervisory employees.</u>

Haley stated that no FRA employees will testify in this case even if subpoenaed. He

stated that even if Plaintiffs use the <u>Touhy</u> regulations., FRA will not allow FRA employees will testify in this case. Haley's blanket refusal includes Chief Counsel Lindsay and is a refusal unconnected to Lindsay's health. After BNSF's attorney Munro indicated to the Court that Lindsay might be too ill to testify, FRA Staff Trial Attorney Caplan on the telephone to Zanville on Wednesday stated that Lindsay's previous health related problems would not prevent him from providing testimony to the Court.

     E.   <u>FRA will resist any testimony of its ex-supervisory employees.</u>

Plaintiffs informed FRA that the last two former FRA Chief Safety Administrators and one FRA staff counsel were among those intended as witnesses in this case, but Haley stated and Caplan repeated on Wednesday that even if Plaintiffs use the <u>Touhy</u> regulations., FRA will not allow ex-FRA employees to testify in this case unless they were being called to testify to tilings like fishing in Montana.

     F.   <u>Conclusion One: No One from the FRA Including Chief Counsel Lindsay Will "... back up the statements and promises set out in his letter of August 22, 2004" Under Oath and Before the Court.</u>

     In the comfort of Ms own office, Haley freely admitted to Zanville that the Lindsay letter, signed by Haley, was not solely intended to address Plaintiffs' counsel with its views but rather was <u>intended</u> to be given to third parties. Yet, despite knowing the request of the Court, not only do Lindsay and Haley refuse to appear before it, the FRA will not allow anyone to appear before the Court.

     G.   <u>Conclusion Two: The BNSF-FRA Letter Should Not be Used by the Court As Support for Dismissal Under FRCP Rule 12(b)(l) Without Giving Greater Weight to the Plaintiffs' Reply email dated 9/1/04.</u> (Exhibit 1) See also Affidavit of Lineweber, (Exhibit 16).

BNSF, knowing that the unsworn and disputed FRA letter could not be evidence, nevertheless submitted it to the Court with the expectation that the letter would provide a testimonial sufficient for the Court to have confidence that the FRA was doing an excellent job and that the Plaintiffs complaints were completely baseless. Plaintiffs allegations that the FRA is not performing its statutory duty remain unaffected for FRCP Rule 12(b)(1) purposes by the BNSF-FRA letter which remains unsworn and unsubstantiated. If the BNSF-FRA letter has any evidentiary value, it demonstrates the lock-step manner in which the two entities, the regulator and the regulated, work together. Plaintiffs' counsel replied to the FRA immediately and its contents are, under the circumstances, more credible than those of the FRA and should be given greater weight than the FRA letter.

II. Conclusion Three: The Court Should Allow Additional Time for the Plaintiffs to Attempt to Get or Compel Appearance from the FRA.

The FRA simply cannot opt out of being involved, at lease as a witness, in this case. As Plaintiffs predicted, FRA is attempting to hide behind the regulations it drafted for itself to be able to hide behind. Plaintiffs are prepared to use its time and meager resources to continue to try to reason with the FRA and, as necessary, seek appropriate orders to compel the FRA to cooperate. This is important for several reasons.

First, the FRA cannot be allowed to tout its performance despite not performing   its duty   to   the   public,   and   then   hide behind its Touhy regulations so that the truth will never see the light of day. Plaintiffs9 counsel did remind FRA Counsel Haley and Caplan that the principles of 5 U.S.C. 301, n. 1 and United States ex rel Touhy v. Ragen, 340 U.S. 462 (1951) are not intended to permit the United States to hide behind these "house-keeping rules" but that these rules are supposed to permit reasonable means of obtaining important government

7

information. See, e.g., <u>Robbins, v. Wilkie</u>, 289 F.2f 1307 (D. Wyoming 2003)(BLM employees must reasonably cooperate and not use their discretion and procedural rules to block discovery of the truth).

Second, the only way the FRA can avoid being subject, inter alia, to a mandamus action, is for it to state under oath specifically how it intends to address the real safety issues raised by the Plaintiffs. Plaintiffs understand that a federal court, under appropriate circumstances, has relied on FRA's promise to perform its statutory duty. Totally unlike the circumstances in the case at bar, in <u>United Transportation Union v. Slater</u>, 149 F.3d 851 (8* Cir. 1998), where the FRA was a party (therefore subject to contempt and perjury), the Court found it could rely on a representation made by the FRA made in its Brief:

> "We note, however, that the FRA has made the following representations to this court: Of course, FRA will not permit [Norfolk] to provide the Moberly facility as sleeping quarters for covered employees if it is not in compliance with the [HSA]. If [Norfolk] completes the renovation and the facility is still not in compliance, then FRA will take whatever action is necessary to ensure compliance. The agency will protect the health and safety of the railroad workers to the full extent of the law. Brief for Respondent at 35." Id. at footnote. 6.

<u>IV. Discussion of prior efforts to force the FRA to do its duty</u>.

The repeated failure of the FRA to perform its duty to the public has been subject of prior litigation in a variety of forums.

Sometimes, the federal courts get to the factual bottom of the problem and seek a means to solve the immediate safety issue presented. For example, in <u>United Transportation Union v. Slater</u>, *supra*, the Eighth Circuit held that the UTU was correct that the rail carriers action and the FRA's inaction violated "the spirit" of the safety laws, but permitted the FRA to clean up the mess upon a specific representation that it would do so. After getting down to the bottom of the issues, in <u>United Transportation Union v. Lewis</u>, 699 F.2d 1109 (11th Cir. 1983), the Court

8

dismissed the claim but defined a route by which relief could be found:

> "UTU could have proceeded under section 64a directly against the Secretary. If a violation has occurred, the Secretary can be compelled to inform the U.S. attorney. If the Secretary finds no violation and refuses to lodge with the U.S. attorney complainant's information supporting an alleged violation, the Secretary's decision to withhold administrative action could be reviewed under the Administrative Procedure Act n11 (APA) as administrative action wrongfully withheld.

In other cases, the federal courts have decided that the problem of getting the FRA to do its job is essentially a political issue. In a 2-1 decision in RLEA v. Pole, 760 F.2d 1021 (9th Cir. 1985), it was held that a railroad labor organization and a railroad employee lacked standing to obtain declaratory judgment and injunction requiring DOT and FRA to enforce railroad statutes mandating assessment of penalties against railroads for safety violations under 49 U.S.C.S. §§ 26(d), (h), even though the statutes require a penalty each time an inspector finds a violation.

The majority wrote:

> "The deployment of inspectors is essentially an executive branch matter. The trial court properly perceived that this litigation is an attempt by an interest group to win in the courts a political argument that it appears to have lost in its dealings with the executive branch." (emphasis added)

Yet, in an important and relevant dissent:, Circuit Judge Schroeder wrote that

> "But agencies may not violate congressional directives with impunity. See Chaney, 105 S. Ct. at 1656-57 & n. 4, Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, *** (1970); Kunaknana v. Clark, 742 F.2d 1145, 1148 (9th Cir. 1984); Carpet, Linoleum and Resilient Tile Layers v. Brown, 656 F.2d 564, 568-69 (10th Cir. 1981); District 2, Marine Engineers Beneficial Association v. Adams, 447 F. Supp. 72, 74-75 (N.D. Ohio 1977); see also Adams v. Richardson, ***, 480 F.2d 1159 (D.C. Cir. 1973) (en bane). The plaintiffs assert that the Secretary, by directing inspectors not to assess penalties when they find statutory violations, is violating the express terms of the statutes. See 45 U.S.C. §§ 6, 13, 34, 438; 49 U.S.C. §§ 26(h), 1809. In my opinion, the majority has dealt too hastily with this claim which the district court also failed to consider. As the Supreme Court recognized in Chaney, when an agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities it has ceased acting within

9

an area committed to its discretion. <u>Chaney</u>, 105 S. Ct. at 1657 n.4 (quoting <u>Adams v. Richardson</u>, 480 F.2d at 1162). I would remand for consideration of the plaintiffs' claim that the Secretary's policy violates her statutory duties."

In <u>Adams v. Richardson</u>, *supra*, the Court made it clear that the deference provided to agencies "did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers."

V.  Discussion detailing Plaintiffs efforts to negotiate with BNSF.

    While Plaintiff normally would not recite efforts to settle matters between the parties, the Court observed in its prior tentative ruling that it did not find any indication that the Plaintiffs tried to negotiate with BNSF before filing suit or the holding of subsequent proceedings.

    Plaintiffs used every level available to try to resolve these issues. They tried before and after suit was filed. These efforts consisted of meetings, conference calls, and e-mails. Every one of these direct efforts were initiated by Plaintiffs and their counsel — and all were rebuffed. BNSF refuses to negotiate with Plaintiffs. It was bitterly ironic that BNSF appeared to suggest to the Court that Plaintiffs's counsel unfairly failed communicate about this case with BNSF. Since BNSF will not agree to anything with Plaintiffs, Plaintiffs have seen no need to contact BNSF. In contrast, every procedural request made to date by BNSF prior to the last hearing lias been agreed to by Plaintiffs counsel and that will continue to be the position of Plaintiffs with regard to procedural issues.

VI.  BNSF's Argument Conclusively Proves that Plaintiffs are Entitled to a Declaratory Judgment Permitting Political Strikes and that the Court, after allowing Supplementation of the Record, should Reconsider its Prior Tentative Ruling.

    BNSF explained the core of the FRA rail safety enforcement program:

        "FRA has chosen to base its investigation and enforcement decisions - the

10

"Safety Assurance and Compliance Program" - on a cooperative approach that relies on inspector discretion, targeted enforcement, system-wide audits, and railroad self-reporting.. ***. Plaintiffs may prefer a different approach, but there is no legal foundation for second-guessing the FRA on this score." BNSF Brief at p. 15.

BNSF's position is, in effect, that:

- it does not matter if the official FRA-BNSF partnership of SAC-P is completely ineffective;
- it does not matter that FRA does not participate in all SAC-P meetings;
- it does not matter that railroad self-reporting is historically, persistently, and intentionally inaccurate and amounts to gross underreporting;
- it does not matter that FRA directs federal money to BNSF and other freight railroads to enhance safety without having accurate reporting of accidents and injuries; and
- it does not matter that the federal courts have no jurisdiction or power to do any tiling about it because these are political decisions, not judicial issues.

The candor of BNSF is more than refreshing: it is an admission that the law permits no redress for anything that the FRA does or does not do. However, consider the impact of this admission.

If it is true that there is nothing a court can do about this situation, it is a political issue.

There is precedent not cited by BNSF for this proposition. In RLE A v. Dole, *supra*, even though the Plaintiffs proved that DOT and FRA violated the statutory requirement of 49 U.S.C.S. §§ 26(d), (h), the majority held that it could not require the FRA to perform its statutory duty because:

> "The deployment of inspectors is essentially an executive branch matter. The trial court properly perceived that this litigation is an attempt by an interest group to win in the courts a political argument that it appears to have lost in its dealings with the executive branch." (emphasis added).

Plaintiffs have already extensively briefed the salient point that BNSF refused to negotiated any and all safety issues with its employees. See also, Aff. __ (Linewebber). If asked, the BNSF will admit to the Court that it would never agree to bargain over safety issues if a Section 6 notice was served on it by a rail brotherhood on safety issues ('major dispute') nor

11

would it allow a safety issue to be decided in the context of an Investigation or NRAB proceeding ('minor dispute'). Since a safety issue cannot be major or minor, it is not covered by the anti-strike provisions of the Railway Labor Act. TMs is precisely what and why Count Three of Plaintiffs First Amended Complaint address concerning the right to political strikes.

In <u>Burlington Northern & Santa Fe Railway Co. v. Brotherhood of Locomotive Engineers</u>, 367 F.3d 675(7 th Cir. 2004), the BNSF, represented by Mr. Munro, appealed the refusal of a district court to issue a permanent injunction against a rail union to prevent it from striking. The appellate court found that its judicial power did not permit it to enter a permanent injunction where the rail union was acting "outside the scope of the activities previously enjoined by the district court.". <u>Id</u>. BNSF absurdly asserted that the BLE's efforts to lobby the FRA, state and municipal bodies, to engage in informational picketing, to negatively characterizing the arbitration award on its website, to encouragement of documentation of remote control-related accidents and injuries, and published an article in a trade journal communicated the BLE's belief that remote control would continue to be controversial despite the SBA's award was evidence of intent to engage in economic self-help. The appellate court found that

> "BLE's post-arbitration actions demonstrate that the BLE has abandoned hope of a contractual remedy, and has adopted a new strategy for protecting the jobs of its membership: the reduction or elimination of remote control at the regulatory level. The RLA injunction power does not extend to mere "labor strife" about industry practice. <u>Id</u>. at 680.

The Court's initial ruling on political strikes assumed that, because the BNSF would he compelled to negotiate with the Plaintiffs over safety issues, those processes needed to be exhausted before the Court would decide that a political strike was not illegal but rather protected conduct. Now that it is clear that BNSF will not negotiate over safety issues and that

12

this dispute cannot be characterized as either major nor minor, its initial ruling needs to be reconsidered. For purposes of the RLA Count, Plaintiffs will agree with BNSF that this is a political issue because it clearly results in the right to engage in a RLA protected political strike.

Knowing that the issue will be appealed to the Eighth Circuit, especially since this is an Osborn-controlled FRCP Rule 12(b)(l) situation, it is important that the facts be developed sufficiently to permit jurisdiction to be properly considered. Therefore, the court should allow supplementation of the record for this purpose.

VII.   Initial comments on BNSF's jurisdiction arguments related to Count One.

The Court understandably wishes to question FRA on the sincerity of its' position. The law does not allow Defendant BNSF (or potential defendant FRA) to avoid fact-finding, with declaratory judgment by insisting an appealing agin to FRA, or FRA's letter. Where there is an established policy/practice the Federal Court has jurisdiction to act where that policy continues and will create further identical confrontations.

Plaintiffs will submit testimony that FRA representatives have consistently refused to take action, or even investigate, when employees report they were ordered to violate safety requirements, or that safety regulations are being violated. Plaintiffs will present testimony that these refusals came from investigators and inspectors, on up to regional directors of FRA enforcement. These refusals are uniform and consistent, and have been for several years. Plaintiffs will present testimony that BNSF officials have refused to take action on the same complaints as countless occasions, and have condoned such offenses repeatedly.

As the D.C. Circuit stated in Montgomery Envi Coalition v EPA, 646 F.2d 568k, 580 (D.C. Cir. 1980)  "This categorical legal stance amounts to a "continuing and brooding presence, cast(ing) what may well be a substantial adverse effect on the interests of the

13

petitioning parties." See Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122, 94 S. Ct. 1694, 1698, 40 L. Ed. 2d 1 (1974).

The 7th Circuit stated similarly, in USA v. Fitzgerald, 747 F.2d 1118, 1119 (7th Cir. 1984): "That the right would be subjected to future violations was not a matter of speculation or conjecture but of reasonable expectation because of the existence of a statute or course of conduct of sufficient permanence to amount to the "brooding presence" described in Super Tire." In our case, it is the same, the joint FRA/BNSF policies are long-standing and will continue, Plaintiffs contend these acts are illegal, and subject to declaratory judgment.

VIII.    There Are No Legal Barriers to The Issuance of Declaratory Judgment Here.

BNSF asserts the FRA has absolutely total and exclusive control over all issues pertaining to the rail safety laws, and that no Court can have jurisdiction for any purpose.   This is simply not the case

A.  FRA Safety Regulations Can Be, and Frequently Are Interpreted and Applied by Courts and Juries Both State and Federal

Defendant argues repeatedly here that the FRA has exclusive jurisdiction to interpret, apply and enforce rail safety regulations adopted by the Secretary of Transportation.

In fact, the statute (49 U.S.C. § 20111) grants the   Secretary exclusive authority for three specific things and no more.   Under Section 20111 (a), titled "Exclusive Authority" these are: (1) to impose and compromise civil penalties for regulation violations; (2) to request an injunction for violation of a rail safety regulation or (3) to recommend enforcement by the attorney general.

Under 20111(b) the Secretary "may" issue an order directing compliance with this part or a rail safety regulation.   The secretary may also direct that a person be disqualified as unfit for

14

safety- sensitive functions 49 U.S.C §201111(c)

However, sections (b) (c) and (d) are <u>not</u> listed under the exclusive authorities of the secretary.

Contrary to BNSF's broad assertions, FRA regulations are interpreted and applied by many courts and juries for many purposes. This occurs in railroad crossing cases;[1] FELA injury cases[2], contract and indemnity cases[3] and many others.

The BNSF itself has not hesitated to go to Court over issues involving FRSA safety compliance. Indeed, Defense Counsel has mentioned that BNSF had successfully obtained an order against unions (alleging excessive compliance with FRA regulations was a "slowdown" under RLA). This was a short Transcript of Argument in the case of BNSF v. UTU & BLE, 4:98- CV-9744. (N.D.Texas) in December, 1998. It was dismissed by agreement a month later. (Although all the events and persons involved were in Minnesota, the case was filed in Ft. Worth, BNSF headquarters.)

Obviously, in that instance, BNSF did not bother to have the particular safety rule compliance and interpretation of regulatory matters investigated and either charged or waived by FRA. BNSF asked the Federal Court to evaluate whether the rule compliance in that case was or was not actually required by FRA regulations, and whether the rule compliance was motivated by improper or illegal goals.

---

[1] See, e.g., Stone v. CSX, 37 F. Supp. 2d789 (S.D.W. Va. 1999); Zook v. N & W Ry. Co., 642 N.E. 2d 1348 (111. App. 1994); Stanton v. National R. Passenger Corp., 849 F. Supp. 1524,1528 (N.D. Ala. 1994)

[2] See e.g., Engvall v. Soo Line R. Co. 632 N.W. 2d 560 (Minn. 2001)

[3] See e.g., Engvall, supra.

Thus it is clear in that instance, BNSF felt the system was simply not working, that is was being abused by the union, and resorted to the Court.

Likewise here, these Plaintiffs contend the system is not working, that it is being abused by BNSF, and they resort to the Courts for protection. BNSF touts 49 U.S.C. Section 20114, but that deals only with criminal contempt, subpoenas for witnesses, and review of final agency action. None of these apply here. To offer 20114 (c) (review of agency) begs the question, for BNSF assumes such review is the sole forum for any of these issues. That is not true: as noted, the regulations are interpreted in hundreds of civil cases, and the statute itself contemplates interpretation and enforcement in various forms and forums: 49 U.S.C. 20104(c) (civil actions in emergencies); §20112 (direct attorney general action without agency action) , and §20113 (state enforcement by a state rail authority — such as IDOT).

Further, unlike many other agencies, FRA has no specific declaratory powers or procedures in its enabling legislation or rules. (See, 49 U.S.C. §20103 and 49 C.F.R. §20111). By Contrast, IRS has specific declaratory powers (26 U.S.C. §301, 7477-1) and is exempt from the Federal Declaratory Judgment Act. The Maritime Administration has specific Declaratory authority in its' Rules of Procedure (46 C.F.R. §201.74); as does the NLRB (29 C.F.R. Pt. 102.106) and Department of Energy (18 C.F.R. PL 375.308).

Within DOT, the absence of declaratory delegation to FRA stands in contrast to the specific delegations of declaratory powers with the Surface Transportation Board. See, e.g., 49 C.F.R. 1002.2; 1000.7; 1105.6; 1105.8.

In this Declaratory action, FRSA preemption (49 U.S.C. §20106) has no application. That only apphes where a court seeks to enforce other or more stringent regulations and there are no fact issues as to the railroad having fully complied with the Federal regulations, (assuming

16

both cover the same subject matter.),   This is well established; Stone v. CSX Transportation, 37 F.Supp. 2d 789 (S.D.W.Va. 1999); Zook N & W R.R. 642 N.E. 2d 1348 (111. App. 1994). Here, Plaintiffs seek only to have the regulations interpreted and (depending on interpretation) enforced. There is no preemption, nor any statutory conflict between the Federal Declaratory Judgment Act and FRSA.

One of the FRCP Rule 12(b)(l) facts to be developed in this case is the extent to which the FRA has deputized the BNSF to serve as its official agent and partner in rail safety matters. To the extent that this deputization has occurred, BNSF must perform those tasks or it violates the federally guaranteed rail safety rights of the Plaintiffs.

Plaintiffs have alleged that BNSF has been clothed with delegated authority of the federal government (whether lawful or unlawful at this point remains to be discovered and decided) but *inter alia*, BNSF has abused this authority by among other things deciding not to keep proper records and by carrying hazardous materials unsafely.   *Inter alia*, the legal consequences of this behavior implicate federal common law of labor per <u>Lincoln Mills</u> and implicate rights related to life, liberty, and property guaranteed them under the U.S. Constitution's Fifth Amendment. Of course, this process necessarily involves the RLA right to political strike as well.

Despite BNSF's assertion, there are sufficient federal claims which accompany the declaratory judgment request in this case that the <u>Osborn</u>-mandated Rule 12(b)(l) evidentiary proceeding is within the purview of the Court's authority.

IX.     Comments on Sereda v. BNSF, (Order of 3/17/05)  (S. D. Iowa)

There are a great many errors in reasoning and research, in this opinion, but we will limit comments to brief notes on the major items. The Southern District's opinion rests on a single main premise: that 49 U.S.C. §20109 preempts all state law whistleblower claims, including

17

Iowa's. This in turn rests on the FRSA preemption provision, §20106. (Order at 17) The reality

is: §20106 does not even apply to 20109, and §20109 is controlled by its' own specific

preemption clause. (This court discovered and pursued this aspect)

It is astonishing these two points are first noticed now, (and this is no great credit to prior

courts or advocates including the undersigned). It is a classic illustration of the saying that the

simplest and most obvious things can often be the easiest to miss.

A. The Plain Language of §20106 Limits Its' Application to Regulations Adopted By the

Secretary Which Excludes §20109 from Its' Reach

The Southern District purports to follow Rayner v. Smirl 873 F.2d 60 (4th Cir. 1989),

(Order at 7, 16) Rayner held that because 20109 (then 45 U.S.C. 441) appeared in the FRSA, it

must be controlled by the preemption

provision, §20106. (Rayner, at 65 to 67) But the Southern District recognized the fatal error of

that premise (Order at 7, note 2) namely, the plain language of §20106 limits its' application

specifically to regulations and orders enacted by the Secretary of DOT which cover the subject

matter of the state "law, regulation or order". (49 U.S.C. §20106) The Supreme Court has

recognized this in its' primary pronouncement on FRSA preemption; that by its' plain terms

§20106 applies to "any regulation adopted by the Secretary." CSX v. Easterwood, 507 U.S. 658,

663 (1993). As the 8th Circuit recently affirmed in Chapman v. Lab One, 390 F.3d 620 (8th Cir.

2004) "Preemption begins when the Secretary adopts a regulation."

Certainly no regulations have or ever will be issued under Sec. 20109, because the FRA

has absolutely no jurisdiction or authority to enforce or even investigate claims under §20109.

There is no doubt that both BNSF and FRA will admit this.

B. The Text of Section 20109 Incorporates the RLA's Preemption Standard., Which

<u>Excludes Private Enforcement of the Rights Created By §20109; But Does Not Preempt Related</u>

<u>Private Rights Created By Laws Other than §20109.</u>

The Southern District then abandoned §20106 and looked to the RLA preemption clause incorporated into §20109(c).

Like the RLA preemption clause which it incorporates, "Section §20109 states: (c) Dispute resolution. A dispute, grievance, or claim arising under this section is subject to resolution under Section 3 of the Railway Labor Act (45 U.S.C. 153)

> This language obviously establishes that an employee attempting to enforce rights created by §20109 must do that under §3 of the RLA, (just as it does regarding CBA enforcement under RLA). But the Southern District somehow extracted from this quoted language a far wider conclusion, holding it was intended that §20109 preempt all state employment law of any kind, whenever it may have anything to do with rail safety reporting and retaliation, regardless of what law created the rights. That court provides no explanation as to why the same language would have such a different and wider meaning.

§20109's key phrase "arising under", is obviously adopted from the law it is assigned to for enforcement, namely the RLA, Section 153. The RLA uses "growing out of and "arising under" interchangeably to describe the set of all conflicts "subject to" resolution under the mandatory arbitration of §153 . 45 U.S.C. §l53(i)(m) and 45 U.S.C. §152(first). We must assume Congress had in mind, when adopting the RLA preemption standard for Section 441 (now 20109), that it intended the same meaning and preemptive effect (no more or less) as that language has in 4,5 U.S.C. §151-153. RLA preemption limits were definitively set in <u>Hawaiian Airlines v. Norris</u>, 512 U.S. 246 (1994), which held that the language of RLA §153 compelled arbitration <u>only as to any claim for which the CBA was the only source of the rights claimed.</u> <u>Norris</u>, infra, at 258, As to all claimed legal rights which arise independent of the CBA, there

19

was no preemption. Norris, infra at 262-265. This was so because in such a situation[4], the claim could not be said to "grow out of" or "arise under" the CBA, even if the same facts might also state a claim or part of a claim under a CBA, so long as the other rights "arise independent of the CBA. Norris, at 262. Thus, in like fashion, the term "arising under" Section 20109 would mean just that: a claim which exists solely by virtue of the rights created in §20109. It would not preempt a claim based on the same facts arising under some other set of rights created by a legislature or a court. (See, Norris supra at 264) See also, Affidavit of Fitzgerald (Exhibit 15).

### X. Short Notes on Public Policy: Iowa Has An Extensive Policy and Statutory Structure on Rail Safety

This Court stated, in dicta, that it felt Iowa had no real public interest here. This issue had not been raised by Defendant BNSF; hence it was not briefed by Plaintiffs. We comment briefly.

For nearly one-hundred years, the State of Iowa has had laws in place providing a powerful tort remedy to any citizen or employee harmed by negligence or mismanagement of a railroad corporation, prohibiting any contract to restrict such liability and providing strict liability for safety violations. Iowa Code § 327 D 186. Some earlier versions of Iowa railroad statutes pre-dated the first Federal railroad safety laws by over 40 years. (Legislative Notes to §327).

The Iowa Department of Transportation (IDOT) is currently given jurisdiction and general supervision of all railroads in the state. See Iowa Code § 327C.2 (2003) The State of Iowa Transportation Department has a duty to order such changes as are necessary when, in its'

---

[4] Situation such as Norris himself, a mechanic, who sued under Hawaiian whistleblower law based on his dismissal for refusing to violate federal safety regulations. Norris CBA actually contained a provision (unlike those here) which provided an employee could not be disciplined for refusing to perform work which violated heath or safety laws! (Norris at 250)

judgment, any railroad fails to operate its business in a manner safe for the public. Id. The Iowa department may conduct spot checks for hazardous cargo (Iowa Code § 327 D. 192); has a right and duty to inspect railroads for safety defects and issue a notice to repair, where needed (Iowa Code 327 C.4), and has many specific safety provisions. (§ 327 D.16; 327 G.7; 327 C.21)

Iowa requires safe track and equipment, and Section 327 C.4 provides:

"The department shall inspect the condition of each railroad's rail track, and may inspect the condition of each railroad's rail facilities, equipment, rolling stock, operations, and pertinent records at reasonable times and in a reasonable manner to insure proper operations. Employees of the department shall have proper identification which shall be displayed upon request. If found unsafe, the department shall immediately notify the railroad corporation whose duty it is to put the same in repair, which shall be done by it within such time as the department shall fix. If any corporation fails to perform this duty the department may forbid and prevent it from running trains over the defective portion while unsafe or may regulate the speed and operation of trains moving over the defective portion of the railroad."

Iowa has adopted and incorporated Federal regulations into its' own regulations. All these laws are administered by IDOT's Office of Rail Transportation located in Ames, Iowa, which has inspectors and participates with FRA & NTSB in monitoring compliance and investigating accidents.

While we understand the Iowa Court is unlikely to recognize the wide range of harassment herein under the public policy tort, we do earnestly claim that Iowa has significant public policies involved. If employees are intimidated from reporting violations and ordered to commit violations, Iowa's rail agency cannot possibly carry out the Iowa laws and policy underlying them. Certainly the three retaliatory terminations herein, coupled with the pattern of retaliation, would greatly undermine IDOT's ability to carry out its' statutory duties.

List of Exhibits Bauer vs: BNSF:

1.      Zanville response to Lindsey FRA

2.      Total train accidents caused by Human Factors

3.      Iowa regions defect ratios

4.      U.S. Rail Audit New York Times

5.      FRA Guide for Preparing Accident/Incident Reports

6.      Comments of the Association of State and Rail Programs

7.      Radio Active Waste

8.      DOE Resource Handbook

9.      New York Times Washington's Deadly Bridge

10.     Inspector General Letter of Review of FRA coziness

11.     Secretary Mineta National Rail Safety Plan

12.     FRA Action Plan critical safety issues

13.     FRA Position of Switches in Dark Territory

14.     BNSF General Order 12 - Inhalation Hazard Handling

15.     Affidavit of John Fitzgerald

16.     Declaration of Ray L. Lineweber

##

Dated: 7/6/05

/s/ Charles A. Collins #0017954
411 Main Street, Suite 410
St. Paul, MN 55102
651-255-1125 phone 651-255-1153 fax

/s/ Harry Zanville
500 West Harbor Drive, #1213
San Diego, CA 92101
619-231-1781 phone

/s/ Scott H. Peters, #PO0004327
OF PETERS LAW FIRM, P.C.
233 Pearl Street, P.O. Box 1078
Council Bluffs, IA 51502-1078
712-328-3157 phone 712-328-9092 fax

23