

U.S. Department
of Transportation

**Federal Railroad
Administration**

1120 Vermont Avenue, NW
Washington, DC 20590

August 12, 2005

Harry Zanville, Esq.
500 West Harbor Drive, Ste. 1213
San Diego, California 92101

Re: FRA FOIA File No. 05-381

Dear Mr. Zanville:

This letter responds to your July 18, 2005 letter providing further elaboration to your FOIA request and responding to my July 18th letter. Although your letter fails to re-fashion your request for documents in accordance with the FOIA requirements, FRA will search for and attempt to identify existing agency records that respond to the discrete requests you have advanced. Accordingly, we have below or will following a search indicate whether we have documents responsive to items 1-1.5, 2-2.5, 3.5-3.8, 4-4.4, 5-5.6, 6-6.4, and 8-8.5 of your July 13, 2005 request. If no documents are identified, we will specify the extent of our search in accordance with our standard practice. On the basis of the information included in your July 18th letter, we assume that you are no longer requesting a records search for items 3-3.4 and 7-7.2 of your original letter.

Our interim response to your request is as follows:

Request 1-1.5 - Notwithstanding the ambiguous nature of these requests, FRA has no responsive documents. The agency has no regulations requiring railroads to self-report safety-sensitive violations committed by railroad management. See, e.g., 49 C.F.R. §§ 209.301 and 303 (purpose, scope, and coverage of disqualification procedures).

Request 2-2.4 - Notwithstanding the ambiguous nature of this request, FRA has no documents responsive to this request. Our records indicate that the agency has not prosecuted an individual liability action, including a disqualification action, against any Burlington Northern Santa Fe (BNSF) management official. We have searched our individual liability case files in order to reach this determination.

Request 2.5 - FRA's computer database of violation reports is not set up to track the employment level of an individual that may have contributed to a violation of Federal railroad safety laws or regulations and as a result, it would be too burdensome for the agency to review each individual violation report issued against BNSF (over an unspecified period but presumably June 1, 1995 to

June 30, 2005 to the extent records remain in FRA's files) to determine whether the violation was somehow traceable to the conduct of a management employee. See AFGE v. U.S. Department of Commerce, 907 F.2d 203, 209 (D.C. Cir. 1990), O'Harvey v. OWCP, NO. 95-0187, slip op. at 3 (E.D. 'WA December 29, 1997), aff'd sub nom. O'Harvey v. Comp. Programs Workers, 188 F.3d 514 (9th Cir. 1999). Counsel in our Chief Counsel's office generally familiar with our enforcement actions involving BNSF were able to recall two violation reports related to violations of 49 C.F.R. §225.33(a) in connection with accident/incident reporting. It is unclear if this is the type of information you were seeking, but they are enclosed nonetheless. The names and related personal information of individuals (dates of birth, social security numbers, etc.) and 7 pages of employee medical records have been redacted from these records in accordance with FOIA exemptions 6 and 7(C).

Request 3.5 - Notwithstanding the ambiguous nature of this request, FRA will diligently search for any documents responsive to your request, focusing on documents filed by BNSF pursuant to 49 C.F.R. Part 225. Our efforts will depend on the extent to which the database is set up to track information on this basis.

Request 3.6 - Notwithstanding the ambiguous nature of your request, FRA will diligently search for any documents responsive to your request, focusing on documents filed by BNSF pursuant to 49 C.F.R. Part 225. Again, our efforts will be dependent upon the extent to which the database is set up to track information on this basis.

Request 3.7 - Notwithstanding the ambiguous nature of this request, FRA will diligently search for any documents responsive to your request, focusing on reports issued by FRA pursuant to accident investigations conducted as authorized by 49 U.S.C. § 20902. This will require us to review all FRA reports or summaries of BNSF accidents for the period 1/1/95-6/30/05.

Request 3.8 - See response to item 2.5; FRA's databases are not set up to track this type of information and attempting to review each individual violation report to determine if it was based upon a FRA finding or report that BNSF management was at fault in any accidents or incidents would be burdensome (see earlier citations).

Request 4.1 - Notwithstanding the ambiguous nature of this request, FRA will diligently search for any documents responsive to your request, focusing on written requests to FRA for information or FRA employees to serve as witnesses for use by a rail brotherhood or individual worker in connection with a BNSF Investigation.

Request 4.2 - FRA will diligently search for any documents responsive to your request, focusing on written FRA responses to requests to the FRA from a rail brotherhood or individual worker.

Request 4.3 - FRA will diligently search for any documents responsive to your request, focusing on written requests from BNSF for the assistance you identify.

Request 4.4 - FRA will diligently search for any documents responsive to your request, focusing on written FRA responses to any such BNSF requests.

Request 5.1/5.2/5.3 - FRA's files do not contain any documents delegating the FRA's statutory or regulatory authority to BNSF.

5.4 - FRA will diligently search for any documents responsive to your request, focusing on written BNSF waiver petitions and FRA responses. You have not indicated a time period with respect to this item. We will focus on January 1, 1995 to June 30, 2005, to be consistent with most of your other inquiries. If you intend a different time period, please let us know.

5.5 - The agency does not have an informal waiver process so the agency's files do not contain any documents reflecting informal waivers of rules or regulations extended by the FRA or DOT to BNSF. See 49 C.F.R. Part 211, Subpart C, for regulations governing petitions for waiver of FRA's safety laws.

5.6 - FRA will diligently search for any documents responsive to your request, focusing on written notices to rail brotherhoods of all FRA approvals of BNSF waiver requests. See also 49 C.F.R. §§ 211.41 and 211.43 with respect to publication of Federal Register notices with respect to waiver petitions.

Request 6.1-6.4 - FRA cannot respond to this request on the grounds that it calls for the agency to answer questions and not produce documents, and is ambiguous in nature. Please restyle this query for discrete documents within the agency's control, custody, or possession. See Krohn v. DOJ, 628 F.2d 195, 198 (D.C. Cir. 1980); DiViaio v. Kelley, 571 F.2d 538, 542 (10th Cir. 1978); and Hudgins v. IRS, 620 F.Supp. 19, 20-21 (D.D.C. 1985).

Request 8.1 - FRA cannot respond to this request on the grounds that it calls for the agency to answer questions and not produce documents, and is ambiguous in nature. FRA could search our correspondence databases for all letters and other correspondence received from BNSF and AAR, however, the databases are not set up to identify BNSF or AAR lobbyists. Please identify how you would like us to proceed with this inquiry if you wish to pursue it further.

Request 8.2 - FRA has various correspondence control databases that track correspondence directed to the FRA Administrator, the Associate Administrator for Safety, the Chief Counsel, etc. The databases do not track correspondence related to lobbyists.

Request 8.3 - Under the Standards of Ethical Conduct for Employees of the Executive Branch, 5 C.F.R. § 2635, Subpart B, employees are generally prohibited from soliciting or accepting any gift from a prohibited source given because of the employee position unless the item is excluded from the definition of a gift or falls within one of the exceptions set forth in Subpart B of the Standards. Any gift accepted by the Government under specific statutory authority, including, travel, subsistence, and related expenses accepted by FRA under the authority of 31 U.S.C. § 1353 in connection with an employee's attendance at a meeting or similar function relating to his or her official duties which takes place away from his or her duty station would be in accordance with implementing regulations at 41 C.F.R. part 304-1. These files are maintained in the offices of the ethics officials of the FRA. We will conduct a search of the agency's files for responsive records with respect to items received from BNSF or Association of American Railroads (AAR) officials from January 1, 1995 to June 30, 2005.

An gift of $20 or less (noncash or investment interests) is deemed to be an exception to the general prohibition on gift acceptance. An employee may accept unsolicited gifts having an aggregate market value of $20 or less per source per occasion, provided that the aggregate market value of the individual gifts received from any one person shall not exceed $50 in a calender year. The FRA does not maintain information regarding these gifts.

When an employee is assigned to participate as a speaker or panel participant or to present information on behalf of the Agency at a conference or similar event, the Agency may accept the offer of free attendance on the day of his or her presentation, when offered by the sponsor, if his or her attendance is viewed as a customary and necessary part of his or her performance. Additionally, an employee may accept an unsolicited gift of free attendance at a widely attended gathering when there has been a determination by the Agency ethics official that his or her attendance is in the interest of the Agency because it will further Agency programs. We will conduct a search for responsive records with respect to items received from BNSF or AAR officials from January 1, 1995 to June 30, 2005.

Request 8.4 - The agency's files do not contain records stating the number of ex-FRA employees who have, from January 1, 1995 to June 30, 2005, gone to work for AAR, NCCC, or any railroad after their departure from the FRA. This information is not maintained by the agency.

Request 8.5: - The agency's files do not contain records stating the number of ex-FRA employees who have, from January 1, 1995 to June 30, 2005, gone to work for AAR, NCCC, or any railroad after their departure from the FRA who had been solicited, directly or indirectly, for their positions by AAR, NCCC or any railroad or their lobbyists or other agents. This information is not maintained by the agency.

Given the breadth and nature of the requests and FRA's "first-in, first-out" policy, see 49 C.F.R. § 7.31(a), the agency will conduct a search and produce responsive documents for the remaining open items as discussed above, as expeditiously as possible. Furthermore, your July 18th letter does not support your earlier request for expedited treatment or a fee waiver (the requirements for which were described in my earlier letter and in 49 C.F.R. Part 7) and thus both requests are denied. Finally, we will conduct a search for two hours and produce up to 100 pages of documents without cost, and then search and produce records that amount to $100 in fees per your willingness to incur such costs. We will contact you should the agency incur additional fees to complete its search. We will provide you with a complete written response and responsive documents at the conclusion of our search.

Sincerely,

William R. Fashouer
Assistant Chief Counsel

Enclosure

OPERATING
PRACTICES
(OP)

U. S. Department of Transportation

Federal Railroad Administration

Date: *March 31, 2000*

Subject: Transmittal of Violation Report

From: Director of Railroad Safety—Region    4

To: Assistant Chief Counsel
for Safety

1.  Top Priority (X)    X    State Report (X) _____    Individual Viol _____

2.  Violation Type (AR, AD, HS, HSR, RSP, ROP, ROR, REM)    AR

3.  Inspector    R. G. Knicker    ID No.    48900

4.  Violation Report No.    RGK-158

5.  Railroad    Burlington Northern Santa Fe Railway    Code    BNSF

6.  Choose Only

_____ (X) All Violations Are Neither Intentional Nor Hazardous

_____ (X) All Violations Are Intentional

_____ (X) All Violations Are Hazardous (RSP ONLY)

   X   (X) Maximum Penalty Requested For All Violations

7.  49 C. F. R. Section(s) Violated (Do Not Complete if HS Violation):

| Part | | | Section | | | Subsection(s) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 2 | 5 | 0 | 3 | 3 | a | 2 | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

8.  Assessment of    One    Day(s) For Each Violation

9.  REM Only: Sec. 221.13(a), REM--    Sec. 221.16--

_____ (X) Not Present    _____ (X) Failure to Obtain

_____ (X) Present/Inoperative    Protection

_____ (X) Improperly Located    _____ (X) Improper Protection

10. HS Only:  Number of Violations Covered by this Report    _____

11. AD Only:  Number of Employees to whom this Report Pertains    _____

12. Location of Violation(s):  State    WI    GSA Code    55

City/County    SUPERIOR    GSA Code    4730

13. Date of First Violation:  Year/Month/Day    11 / 15 / 99

14. Complaint File Number    HI99-BNSF-40092

15. Witness Statement   (X)    X

16. Specialist Concurrence    *JM*    (Initials)

17. Related Violation Report(s) _____

18. Enforcement Previously Declined   (X) _____

19. Date Received by RCC: Year/Month/Day    ___ / ___ / ___

*R.G. KNICKER*
*6180.96 No 28*
*BNSF. MINNES*

## VIOLATION OF
## OPERATING PRACTICES REGULATIONS

U. S. Department of Transportation

Federal Railroad Administration

OMB Approval
2130-0509

| 1. SUBJECT Railroad Accidents/Incidents — Intimidation/Harassment | 2. VIOLATION OF 49 CFR: PART RULE SUBRULES 2 |2 |5 |3 |3 | (a) (2) | 3. RPT. NO. RGK-158 | 4. F6180.65 RPT. 28 |
|---|---|---|---|

| 5. RAILROAD INT: B N S F Burlington Northern Santa Fe Railway | 6. NAME OF INSPECTOR(S) R. G. Knicker | ID NO. 4 8 9 0 0 |
|---|---|---|

| 7. LOCATION CITY: Superior | GSA CODES 4 7 3 0 | 8. DATE OF VIOLATION MONTH DAY YEAR | 9. TIME OF VIOLATION |
|---|---|---|---|
| STATE: WI | 5 5 | 1 1 1 1 5 9 9 | 12:30 a.m. |

| 10. OPERATION/FACILITY Yard Office | 11. DIVISION Minnesota | 12. TRACK N/A |
|---|---|---|
| | 13. LOCOMOTIVE INITIALS AND NUMBERS N/A | 14. TRAIN DESIGNATION N/A |

**15. VIOLATION DESCRIPTION**
BNSF Manager took actions and made remarks to an injured employee to intimidate the employee to not report the injury.

**16. DETAILS OF VIOLATION**

A switch foreman injured his right hand and little finger while opening the door of a locomotive. He went to the trainmaster to tell the trainmaster about the injury. The trainmaster then told the switch foreman that if the employee was hurt there would be eight hours of paperwork for the trainmaster, and three hours in a conference call with his superiors. He said that he would have to call in another trainmaster to help him with his other paperwork. The trainmaster put the General Code of Operating Rules (GCOR) book on the desk and stated that there is probably a rules violation involved, and there might be a disciplinary hearing. In addition, the trainmaster stated that there would have to be a re-enactment of the injury. The trainmaster concluded his comments with the statement, "Either you told me, or you didn't."

The switch foreman was indeed intimidated by the above remarks. He feared his "job was on the line." He also stated that he was "feeling really scared; I asked for a Union Representative." The switch foreman persisted and completed the injury report. He did not desire to go to the doctor, and the injury was not reportable to FRA.

Attachments:

Injury report (2 pages)
Written Statement of Witness from the switch foreman
Inspection Report Number 28 of Inspector Knicker dated March 24, 2000

| 17. DATE REPORT PREPARED March 24, 2000 | 18. SIGNATURE OF INSPECTOR(S) | 19. CARRIER NOTIFICATION TIME: 11:15 a.m.. NAME: TITLE: Divn Supt DATE: March 24, 2000 |
|---|---|---|

te: Monday, 29 November 1999 1:50pm CT
): L7300419
om: SAFEMS
bj:ct: BNSF PERSONAL INJURY REPORT

:P::T SENT TO: LP300418
---------------------------------------------------------------
```
              BURLINGTON NORTHERN SANTA FE RAILWAY
                    ALTERNATE TO FRA F6130.98
            PERSONAL INJURY REPORT TO EMPLOYEE ON DUTY
                    FRA STATUS: NON-REPORTABLE               ACIP0821
                                        1999-11-17-13.26.17.194102
```
▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀ UPDATE WIRE ▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀

```
ACCIDENT ID :    MN-1199-010       DATE : 11/15/1999    TIME: 0030    RJS
RUTH TYPE   :    9N2010            JT FAC: NO
DEPARTMENT:      NL OPERATIONS NORTH
RESP LVL 1/2:    MN MINNESOTA DIVISION
SUPV NOTIFIED:                                          PHONE:
RATE/TIME NOTIFIED:                11/15/1999            0230
DATE ENTERED :   11/17/99          FRA REP:              MED RVW COMP:
                                   388882027             7153990722
```
▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀▀

```
INJURED EMPLOYEE/                          EMPL ID#:
PERSON                                     SEX: MALE
                                           AGE:
            SWITCH FOREMAN                 LGTH SRV:
            HDQ:     SUPERIOR         WI    HIRE DATE:
            ON DUTY:   DATE: 11/14/1999    TIME: 2330
                                           TRAIN ID: Y-SUP212-1-15

ACCIDENT/INJURY   SUPERIOR           WI
INFO.             DOUGLAS COUNTY                ON CO PROP: YES
                  LINE SEG   : 0509             MILE POST: 006.0

                  TEMP        : 033            LIGHT: DARK
                  WEATHER     : CLEAR
                  PHYSICAL ACT: OPENING
                  LOCATION (1):YARD
                  LOCATION (2):LOCOMOTIVE(S) - STANDING
                  LOCATION (3):IN CAB OR ON WALKWAYS OF LOCOMOTIVE
                  EVENT       :DEFECTIVE-MALFUNCTIONING EQUIPMENT
                  CAUSE       :EQUIPMENT (DEFECTIVE)
                  TOOLS, ETC  :DOOR
                  EXPOSED HAZ :NO
                  LOST CONSCIOUS:NO

                  INJ/ILL                        BODY PART
                  BRUISE/CONTUSION               FINGER - LEFT
```

```
WHAT WAS PERSON    SWITCH FO          PULLED OPEN THE LOCOMOTIVE DOOR
DOING?             TO CAB ON LOCOMOTIVE BNSF 6116 AND PINCHED THE LITTLE
                   FINGER ON HIS RIGHT HAND BETWEEN THE DOOR HANDLE AND
                   THE HANDRAIL.

INCIDENT CAUSE     EMPLOYEE PINCHED THE LITTLE FINGER ON HIS RIGHT HAND.
ACCIDENT OCCUR?

ADDITIONAL INFO    11/17/99: PER MHS CHANGE PERSON CODE TO "U".WM
```

11-29-99 UPDATED TO "A" PERSON.(MRB)

MEDICAL ATTENTION PHYSICIAN:

    HOSPITAL:

    DIAGNOSIS: NONE
    TREATMENT: NONE
    NO TREATMENT

WAS EMPLOYEE TERMINATED/TRANSFERRED DUE TO SEVERITY OF THIS INJURY? NO

EMPLOYEE STATUS
    LOST DAYS: 0               RESTRICTED DAYS: 0
    DID PERSON DIE? : NO

ROOT CAUSE :
  DOOR STOP NOT OF ADEQUATE THICKNESS TO PROVIDE NEEDED
  CLEARANCE BETWEEN DOOR HANDLE AND HANDRAIL.

CONSEQUENCE:
  ZERO CLEARANCE BETWEEN DOOR HANDLE AND HANDRAIL.

CORRECTIVE ACTION:
  WILL INSTALL DOOR STOP OF ADEQUATE THICKNESS AND
  DIMENSIONS TO ELMINATE PINCH POINT ON LOCOMOTIVE
  BNSF 6116.

  WILL INSPECT ALL LOCOMOTIVES IN THE SUPERIOR TERMINAL
  TO ELIMINATE PINCH POINTS.

  WILL SAFELY BRIEF ALL CREWS TO LOOK FOR CLOSE CLEARANCE
  PINCH POINTS WHEN OPENING AND/OR CLOSING DOORS.

IT IS THE POLICY OF THE BNSF THAT EACH EMPLOYEE WILL BE PROVIDED THE
OPPORTUNITY TO REVIEW AND/OR OBTAIN COPY OF
ALTERNATE FRA FORM F6180.98 UPON REQUEST.

IF ANY OF THE ABOVE INFORMATION CHANGES, THE ACCIDENT REPORTING CENTER
IN FT. WORTH MUST BE NOTIFIED.

SIGNED:                                    PREP BY:

LAST CHANGED:

# FEDERAL RAILROAD ADMINISTRATION

## STATEMENT OF WITNESS

I, _____ ake the following
voluntary statement to *RAYMOND G. KNICKER* , who has
identified him/herself to me as a representative of the Federal Railroad
Administration (FRA).  No threats or promises have been made to induce me to
give this statement.  I understand that a copy of this statement will be provided to
any person (whether an individual, corporation, or other entity) whose violation
of the Federal railroad safety laws may be proven, in whole or in part, by this
statement, or to that person's counsel, or to both, when and if enforcement action
is taken based in whole or in part on this statement.  I further understand that such
enforcement actions may include:  the demand for a civil penalty for a violation
of the railroad safety laws; the issuance of a warning letter; the issuance of an
emergency safety order; the initiation of a compliance order proceeding; the
seeking of an injunction; or the initiation of a disqualification proceeding to
remove an individual who is unfit to perform safety-sensitive service in the
railroad industry from such service for a specified period of time.  If it
subsequently becomes necessary for FRA to support its enforcement action in an
administrative hearing or in court, I will testify to the facts set forth below in that
hearing or lawsuit.

I understand that 49 U.S.C. § 20109 (formerly section 212 of the Federal
Railroad Safety Act of 1970) makes it illegal for a railroad carrier engaged in
interstate or foreign commerce to discharge or in any way discriminate against an
employee because that employee (1) filed a complaint or caused to be
brought a proceeding related to the enforcement of the Federal railroad safety
laws, or (2) testified, or will testify, in that proceeding.  I also understand that any
dispute, grievance, or claim that may arise under section 20109 will be resolved
under the procedures of the Railway Labor Act.

ON November 15- 1999 I was working
in The Superior Yard Job # 311-5 — I
was Going to go Into the Cab of the
Engine through the Engineers door As I opened the
door of BNSF 6116 the Handle was in direct
Path of the Handle therefore Pinching

**STATEMENT OF ⌐**     —

My Baby Finger Between Handle and Hand Rail. My first Reaction was it Hurt real Bad. Engineer Made Sure it was okay — By the time 30-45 minutes we got Back to the Yard I tried to tie Some hand Brakes on our Drag of Cars realizing that My finger was hurt worse than ~~before~~. Intially thought! — We went in for lunch Right Away I went into tell Train master _____ — My first thought would Be to let him know how I did it and that it is going to happen Again Due to the Pinch Point — he listened and said okay! ~~He told me go to go have lunch~~ ~~I~~ Explained it hurt

Continued on Page 3

**STATEMENT OF** ___

When I tied the Brake down And
I wasn't Really Sure how it would feel
in the Morning! we talked About Sprained
Ankles And Muscles And Such, he Asked the
Severity I Said I'm Not Sure how
Serious it is it hurts to tie hand BearKes
though he told Me Go Ahead And have lunch!

About 5-10 minutes later he Came downstairs
And Asked Me to go upstairs — When we got
upstairs he ___ went into A
Explanation of if I was hurt there would
Be Paperwork to fill out, Re-Enactment, Conference
Calls, Possible investigation — I Started to feel
Uncomfortable — I wanted to let him Know
My finger was hurt But wasn't Sure where
this was going — My Biggest fear At this time

Continued on Page 4

**STATEMENT (**

WAS if My Job was on the line —
All I wanted was to let Know
I Pinched my finger! At About this
time teammate Said Something
Like It's Either You Told me About the
Accident or You didn't" Then the Started
to Repeat There would Be 6 hours of
Paperwork — Conference Calls with the division
heads to figure out what happen and why it happen
Paper work to fill out I'd have to Call in Frank Tano
to help with my other Paperwork — He Reached
down and Grabbed the Color Book Put it
On the Desk Put his hand on it said also and
Said There is probally A Rule Violation in here
And There Might Be and Investigation — And
We would have to do An Reenactment

Continued on Page 5

of the Accident. At this time I
was feeling Real Scard I Asked for
Union Representation And wanted the Paperwork to Begin!
Said okay I'll Start the Paperwork You.
Can have Representation after the Reenactment. I went
through the Reenactment unrepresented And · · When he
Saw the Door Handle Hit the Hand Rail He Said it
was A design flaw Bad design And there Shouldn't Be
an investigation — at which time the Roundhouse did their
inspection to pull the Engine out of Service to fix
the Handle.

I have read the statement above, and it is all true and correct to the best of my knowledge and
belief.

Date: 03/06 / 00

Signed in the presence of Raymond G. Knicker, inspector, Federal Railroad Administration.

# INSPECTION REPORT

DEPARTMENT OF TRANSPORTATION
FEDERAL RAILROAD ADMINISTRATION (FRA)

PAGE 1
OMB Approval No: 2130-8549

| Inspector's Name<br>KNICKER, RAYMOND G. | | | Inspector's Signature | Inspector's ID No<br>48900 | Report No.<br>28 | Date<br>03/24/2000 | | Violation Recommended<br>[X] Yes [ ] No |
|---|---|---|---|---|---|---|---|---|
| Railroad/Company Name & Address<br>BURLINGTON NORTHERN AND SANTA FE R<br>80 44TH AVE NE<br><br>MINNEAPOLIS, MN, 55421- | | | R/C<br>R | Division<br>MINNES | | RR/Co Representative (Receipt Acknowledged)<br>Name √ | | |
| | | | KR/Co<br>Code | Sub-Division<br>N/A | | Title<br>Signature | DIVISION SUPT | |
| | | | BNSF | | | | | |
| From:<br>City SUPERIOR | | | Codes<br>4730 | Destination City & County | | | | |
| State WI | | | 55 | City | | Codes | Mile Post: From | To |
| County DOUGLAS | | | C031 | County | | Inspection Post:<br>OFFICE | | |
| Activity<br>Code: 225R | | | | | | | | |
| Units: 1 | | | | | | | | |

| Item | Route/Mile Post | Equipment/Tracks | Type/E-md | 49 CFR/USC | Defect Code | Subrom | Speed | Class | Train P/Site | SNFR * | # of Occ. ** | Activity Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | 225 | 0033 | A2 | | | | N | 1 | 225R |

Description
INVESTIGATED PERSONAL INJURY CASE MN-1199-010. SUPERVISOR TOOK ACTIONS AND MADE REMARKS TO INTIMIDATE EMPLOYEE TO NOT REPORT HIS INJURY.

| Written Notification to<br>FRA of Remedial Action is: | Required [X] | Optional [ ] | Railroad<br>Action Code | | Date(m/d/y) | | Comments on back? (y/n) |
|---|---|---|---|---|---|---|---|

*< END OF REPORT >*

| Source Code R | File Number HIBNSF40092 | ID & Report Number of Accompanying Inspector |
|---|---|---|
| FORM FRA F6180.96(Revised 4/98) | *SNFR - Special Notice for Repairs | **FRA COPY** | ** # of Occ. - Number of Occurrences |

# REPORT OF INTERVIEW
## HI99-BNSF-40092

**Person Interviewed:**

Switch Foreman
Burlington Northern Santa Fe Railway (BNSF)


**Date of Interview:**       December 7, 1999

**Location of Interview:**   Telephone

**Interviewed by:**          R. G. Knicker
                             OP Inspector

**Others Present:**          None


On November 15, 19          injured his right hand and little finger while opening the door
on locomotive BNSF 6116. He later told the trainmaster he wanted to "make him aware of it."
Later the trainmaster called him to the office. The trainmaster told him that he couldn't just
"make him aware of an injury," that if he was injured, he would have to make out a report. The
trainmaster then added that he (the trainmaster) would then have to do six hours of paperwork
and spend three hours on conference calls. So the trainmaster told him "either you told me, or
you didn't."          responded that he wanted to report the injury.

          stated that the trainmaster became mad at that point. The trainmaster told him that
there might be an investigation, and that there would have to be a re-enactment of the injury.
          then requested that his union representative also attend the re-enactment, and the
trainmaster denied that request. At the re-enactment, the trainmaster observed that a piece on
the door stop was worn, and took the locomotive out of service. The trainmaster then told
          that there would not be an investigation because the door was defective.

          did not desire to go to the doctor, and his finger was sore, but OK the next day.
          felt that the comments and demeanor of the trainmaster was an effort on the part of the
trainmaster to dissuade him from reporting the injury.

#

# REPORT OF INTERVIEW
## HI99-BNSF-40092

**Person Interviewed:**

Trainmaster
Burlington Northern Santa Fe Railway (BNSF)

**Date of Interview:** December 8, 1999

**Location of Interview:** BNSF 28th Street Yard

**Interviewed by:** R. G. Knicker
OP Inspector

**Others Present:** None

_____ recalled that at about 12:30 a.m. on November 15, 1999 _____ came to his office and he "wanted to make him aware" the he _____ had hurt his finger opening a locomotive door. _____ alle _____ to his office later and told him that there was no such thing as "making him aware" of an injury, that if _____ was indeed injured, reports would have to be made. He then told _____ that if the injury was reported that h _____ would have to do eight hours of paperwork and spend three hours on conference calls. In addition they would have to re-enact the injury. He also told _____ that it was possible that there would be an investigation.

After _____ stated to him that he wanted to report the injury, they went out and did the re-enactment of the injury _____ saw that the door to the locomotive door was broken, and took the locomotive out of service. He stated that _____ did not desire to go to the doctor.

I then asked _____ why his version of the conversation could differ so much from _____ version. _____ responded that he had 30 years on the railroad as a manager, and that he had seen all methods of handling personal injuries. He said that he always went along with the current program. He would never place his career in jeopardy by trying to dissuade an employee from reporting an injury. If _____ took some of his remarks the wrong way, that was because of the historical labor/management perspective on injuries. He felt that the labor people aren't aware, nor do they care of the follow-up that managers such as himself had to do following an injury report. _____ maintained that he didn't say or do anything to dissuade _____ from reporting his injury.

\#



**VIOLATION OF**
**OPERATING PRACTICES REGULATIONS**

U. S. Department of Transportation
Federal Railroad Administration

OMB Approval
2130-0509

| 1. SUBJECT | 2. VIOLATION OF 49 CFR: | 3. RPT. NO. | 4. F6180.98 RPT. |
|---|---|---|---|
| INTERNAL CONTROL PLANS (Harassment and Intimidation) | PART RULE SUBRULES<br>2 2 5 3 3 a (1) | 300 | SJD93 |

| 5. RAILROAD INT: B N S F | 6. NAME OF INSPECTOR(S) | ID NO. 2 4 5 4 1 |
|---|---|---|
| BURLINGTON NORTHERN SANTA FE RAILWAY | S. J. DRASSLER | |

| 7. LOCATION CITY: GALESBURG | GSA CODES 3 2 6 0 | 8. DATE OF VIOLATION | | | 9. TIME OF VIOLATION |
|---|---|---|---|---|---|
| STATE: IL | 1 7 | MONTH 0 8 | DAY 1 2 | YEAR 0 2 | N/A |

| 10. OPERATION/FACILITY | 11. DIVISION | 12. TRACK |
|---|---|---|
| OCCUPATIONAL MEDICINE-OSF ST. MARY MEDICAL CENTER, GALESBURG, IL | CHICAGO | N/A |
| | 13. LOCOMOTIVE INITIALS AND NUMBERS N/A | 14. TRAIN DESIGNATION N/A |

**15. VIOLATION DESCRIPTION**

RAILROAD SUPERVISOR INTERFERED WITH THE MEDICAL TREATMENT OF AN INJURED EMPLOYEE.

**16. DETAILS OF VIOLATION**

On August 7, 2002, Burlington Northern Santa Fe Railway (BNSF) conductor        was operating eastbound freight train symbol NRMCXL0-13A near Halpin, IA, at about 10:38 p.m., when he suffered an injury to his neck when the lead locomotive he was riding on (BN 8251) traveled over a rough section of track on Main Track No. 2 that caused the locomotive to dip and sway in an extreme manner. Conductor        body was moved violently up, down and sideways; he struck his head on the side window of the locomotive. Upon arriving at his home terminal, Galesburg, IL, he telephoned a supervisor at 4 a.m., August 8, Road Foreman of Engines        to notify him that he had hurt his neck while on the train. The supervisor was not in and        left a voice mail message.        has supervisory responsibilities on the Nebraska Division-Ottumwa Subdivision, where        was working when injure        later filled out an injury report at        office. On August 12, after taking using two "personal days,"        was again "marked-up" for work when he decided he was still having too much pain in his neck and shoulder area to go back to work. He telephoned        to inform him of this and that he wanted to see a doctor.        went to an occupational clinic recommended by the railroad at St. Mary's Hospital in Galesburg. He was examined by Doctor        iagnose.        as having cervical strain. According to        informed him he was prescribing two prescription medications, an anti-inflammatory and a pain reliever. Following the doctor's initial exam,        was then sent down to the x-ray department for an MRI exam. Upon returning to the clinic office from the x-ray departmen        . was met by supervisor        who aske        if he had received any prescription medication.        told        that the doctor told him he would be receiving two prescriptions.        told        to wait and then went to see the doctor. He then left the clinic. When        saw the doctor before being discharged from the clinic, the doctor presented him with only one medication, over-the-counter Naproxen, 200 mg., and not two prescription medications, as he initially had told        he was going to issue.        questioned the doctor about the medication provided. The doctor remarked that the supervisor said that he'd have too much federal paperwork to do if prescription medications were issued. The doctor told        to take the Naproxen as directed (a double dose) and it would do the same thing for him as the prescription pain killer medicine and anti-inflammatory medicine. According to        , he later had a reaction to the Naproxen, causing his blood pressure to skyrocket, causing him to seek treatment at a nearby emergency room.
continued on a continuation page.

| 17. DATE REPORT PREPARED | 18. SIGNATURE OF INSPECTOR(S) | 19. CARRIER NOTIFICATION |
|---|---|---|
| December 9, 2002 | S. J. Drassler *SJ Drassler* | TIME: 1 p.m.<br>NAME:<br>TITLE: Division Manager<br>December 9, 2002 |

49 CFR Part 225 states:

*Internal Control Plans.*

225.33(a)
*(a) Each railroad shall adopt and comply with a written Internal Control Plan that shall be maintained at the office where the railroad's reporting officer conducts his or her official business. Each railroad shall amend its Internal Control Plan, as necessary, to reflect any significant changes to the railroad's internal reporting procedures. The Internal Control Plan shall be designed to maintain absolute accuracy and shall include, at a minimum, each of the following components:*
225.33(a)(1)
*(1) A policy statement declaring the railroad's commitment to complete and accurate reporting of all accidents, incidents, injuries, and occupational illnesses arising from the operation of the railroad, to full compliance with the letter and spirit of FRA's accident reporting regulations, and to the principle, in absolute terms, that harassment or intimidation of any person that is calculated to discourage or prevent such person from receiving proper medical treatment or from reporting such accident, incident, injury or illness will not be permitted or tolerated and will result in some stated disciplinary action against any employee, supervisor, manager, or officer of the railroad committing such harassment or intimidation.*

was contacted. He admitted to asking the doctor if there was any over-the-counter medication that          could be given, because he thought that the prescription medication would cause          o lose time away from work and that ₁          had earlier told him he wanted to keep working. He said he thought he was doin₁          favor by asking the doctor to prescribe OTC medication.          stated that he always looked out for the best interests of his employees and was not trying to prevent the injury from being FRA reportabl          said that he always thought that the more powerful prescription drug side effects would keep an employee from performing his work and that over-the-counter medications could do the same job and an employee could still keep working.

has since been diagnosed by a neurologist as having a herniated disk in his neck and advised not to ride on a vibrating train locomotiv          has not worked since this incident.

The railroad failed to report this injury to the FRA, as required. As of the date of this report, it has not been reported to FRA. Violation is recommended for failure to report, one count.

A violation is also recommended for failing to adhere to the railroad's Internal Control Plan and the prohibition against harassment and intimidation, one count.

#

# ATTACHMENTS

Form FRA F6180.96 SJD #93

Employee Witness Statement,

Report of Interview

Report of Intervie

BNSF Crew Management "Call Sheet," August 7, 2002

BNSF "Train Activity Report," August 7, 2002

BNSF "Employee Personal Injury/Occupational Illness Report," dated August 8, 2002

BNSF "Non-Reportable Injury Follow-Up Instructions," dated August 8, 2002

OSF Occupational Health Network, Occupational Medicine, Galesburg, Work Status Report, dated August 12, 2002

Letter from BNSF headquarters fro⌐                    ⌐ce-President Safety, Rules and Technical Training, dated August 1, 1997, describing a letter issued by BNSF Senior Vice-President and Chief Operations Officer, Matt Rose, concerning BNSF policy on injury/illness reporting

Letter and statement from BNSF headquarters from Mr. Matt Rose, Senior Vice-President and Chief Operations Officer, dated August 1, 1997, prohibiting harassment, intimidation and discrimination regarding those employees injured on the railroad.

BNSF statement (mentioned above) on EEO/Employee Relations/Injury Reporting Complaint Resolution/Mediation Procedure

#

ꞏ 6ꞏ8ꞏ67
SJ0800

# FEDERAL RAILROAD ADMINISTRATION

## STATEMENT OF WITNESS

I, _____ make the following voluntary statement to Stephen J. Drassler, who has identified him/herself to me as a representative of the Federal Railroad Administration (FRA), Operating Practices Inspector. No threats or promises have been made to induce me to give this statement. I understand that a copy of this statement will be provided to any person (whether an individual, corporation, or other entity) whose violation of the Federal railroad safety laws may be proven, in whole or in part, by this statement, or to that person's counsel, or to both, when and if enforcement action is taken based in whole or in part on this statement. I further understand that such enforcement actions may include: the demand for a civil penalty for a violation of the railroad safety laws; the issuance of a warning letter; the issuance of an emergency safety order; the initiation of a compliance order proceeding; the seeking of an injunction; or the initiation of a disqualification proceeding to remove an individual who is unfit to perform safety-sensitive service in the railroad industry from such service for a specified period of time. If it subsequently becomes necessary for FRA to support its enforcement action in an administrative hearing or in court, I will testify to the facts set forth below in that hearing or lawsuit.

I understand that 49 U.S.C. § 20109 (formerly section 212 of the Federal Railroad Safety Act of 1970) makes it illegal for a railroad carrier engaged in interstate or foreign commerce to discharge or in any way discriminate against an employee because that employee (1) filed a complaint or brought or caused to be brought a proceeding related to the enforcement of the Federal railroad safety laws, or (2) testified, or will testify, in that proceeding. I also understand that any dispute, grievance, or claim that may arise under section 20109 will be resolved under the procedures of the Railway Labor Act.

I am employed by the Burlington Northern Santa Fe Railway (BNSF) as a freight conductor and have been so employed for thirty years, and had worked for the BNSF predecessor, the Chicago, Burlington and Quincy Railroad (the "Q"), for four years. I reside at _____

On August 7, 2002, I went on duty at Creston, IA, as conductor on freight train C-NRMCXLO-13A, with engineer _____ We went on duty at 2015 hours after having been off duty for nine hours five minutes. We departed Creston at 2030 hours with Galesburg, IL, as our intended destination. The train had lead locomotive number BN 8251 and BN 9611, 110 loaded coal hopper cars, 15,764 tons and was 5,839 feet in length. The rear end telemetry device was the BN 16531 and the last car initial was the GEAX 990556. The maximum allowed speed for this train was 55 mph.

While operating eastward and passing through the Halpin, IA, area at about 2238 hours, the train passed over a rough section of track on main track no. 2. I was seated in the conductor's seat on the north side of the engine when we hit the bump. The engine dipped and swayed in an extreme manner. My body was moved violently down and sideways and I felt a popping in my neck. I instantly felt sick, nauseous. I was thrown against the side window. My left shoulder

struck the window. I also felt my head hit the window. I yelled to the engineer about my neck being hurt. He said nothing. I called the train dispatcher at about 2242 hours to clear our track warrant and told him to get the track inspected at Halpin crossover because it was really rough. I didn't think I was injured enough to report it at the time to the dispatcher. I did tell him I was thrown against the window and they needed to get the track looked at. I cannot remember what the train dispatcher told me. Later on, I saw the crew of the train behind me and they said the dispatcher called them on the radio and told them to reduce speed to 25 mph through Halpin area. We then continued on from Halpin on a new track warrant. The rest of the trip was uneventful. We arrived at Galesburg at 0315 hours August, 8, 2002, and went off duty at 0400 hours at the YD crew office at the diesel shop. I called                            the road foreman of engines (RFE) who is responsible for the west end, and left him a voice mail about what happened and that I thought I hurt my neck. I told him I thought I was ok, and was going to go home and go to bed. I went home and went to bed at about 0500. I slept until I woke up later that morning or early afternoon. I felt tight through my neck when I got up. I went about normal activities that afternoon at home.

On the evening of August 8, 2002, while at home, I received a telephone call from RFE                  whereby he asked me to come out to his office at the yard to talk to him. I was off-duty at this time. I drove out to RFI            office at the diesel shop and met with him and explained to him what had happened. He had me fill out an injury report and sign it. He asked me how I was doing. I told him I thought I was ok. I felt filling out the form was the right thing to do to protect myself. He also had me fill out a form concerning what to do for non-reportable injuries, what to do if one does seek medical treatment, if unable to perform duties, what to do if one experiences complications from the injury, all requiring notification of the supervisor.

I was due to go to work and called .                        and told him I was hurting and wanted to take personal days to take a trip off. He said he'd authorize personal days to take a trip off, which I did. I wasn't any better by the morning of the August 12. On that morning I called RFE             and told him I couldn't take it any more (the neck pain, shoulder pain, overall not feeling well), I needed to see a doctor. He said he'd call me right back (which he did not do). The person who called me back was             He said he was with a private firm that was hired by the railroad and had set me up an appointment to see a doctor at OSF Occupational Medicine-Galesburg on August 12, that same day and I was to meet Rι              here. I said "no." He said, "what do you mean, no?" I said,            is there, I will leave." He said, "Ok, go ahead and go, he won't be there." So I went.

I drove myself out to the OSF office and checked in at the desk. I didn't know the place was an occupational therapy type place. I just thought I was going to see a doctor at the hospital; this OSF Occupational Medicine is in the St. Mary's Hospital building. The staff took me back to a room and saw one gentleman who interviewed me. He said he worked for the OSF staff and quizzed me about what happened and told me about what they'd probably do. The doctor came in shortly after and asked me what had happened. He explained what it could be, maybe a disk

2

problem, etc. I asked him "what do I do?" He said, "no golf." Then the doctor asked if I'd be more comfortable if an MRI was done and I said yes. The doctor said there would be about a 45 minute wait for the MRI to be done. I had not received an official diagnosis at that time, the doctor saying maybe I strained something.

I went to the lobby and ran into _____ _____ He said he'd done some research on my Lyme disease and what symptoms it can cause. He'd already known I'd been off in 1998 with Lyme disease, as did most of the railroad. I didn't know what that was all about. We made some small talk, he went out to his vehicle a couple of times while I was waiting.

So, I had the MRI. About an hour later, they took me back to the doctor's office, Dr. _____ the doctor I had just previously seen. He came in and explained to me what he thought was going on. He had a spine skeleton and showed me what was going on. He said I had a little arthritis in my neck and it would go away in four to six weeks. He said he was going to give me two prescriptions, a muscle relaxer and an anti-inflammatory. He said you can go to the waiting room and I'll get the prescriptions for you. So, I went to the waiting room. I was surprised to see _____ sitting there, waiting on me. The first thing he said was, "Did they give you any prescriptions?" I said, "yes, two." He said, "Wait here." He then went back to see the doctor. About ten minutes later, he left. We didn't converse any when he left; I did see him go by.

One of the nurses called me back to the nurses station a_____ _____ walked out of his office and came up to me at the nurses station. He had a box in his hand and said, "This is for you." I said, "What about my two prescriptions?" And he said, "Unfortunately, your boss said he'd have too much federal paperwork if I gave you the prescriptions; you can take these and they'll do the same thing." There were four nurses standing around overhearing this conversation. I quizzed him in front of them and his face turned red. I said "What happened to my prescriptions? You mean my boss is dictating my medicine?" He didn't comment on my question. I knew things weren't going anywhere, so I picked up the box and looked at it. It said to take one tablet every twelve hours. It was Naproxen, 200mg. The doctor stated "You're a big guy, you take four." I knew I didn't have any options so I took it and I left.

I tried to take just two tablets of the Naproxen for pain at first, on August 12 and early August 13, but it didn't help. At 1900 hours on the August 13, I took four tablets for the pain, as _____ had said to do. At 0300 hours on August 14, I received a telephone call to go to work for 0430 hours a conductor job on an empty train going back west to Creston. I had been sleeping when the telephone rang. Upon awakening, I felt this weird feeling all over, in my feet, in my fingers, a tingling sensation. I also felt real hot. So, I left for work, and as I started driving into town I felt that the feeling was doing away and maybe my blood pressure was high. I decided to get it checked at the Cottage Hospital, I drive by it on the way to work. I stopped by the emergency room, told them about my problem. The paramedic said, "You look real white, pale." He checked my blood pressure and it was almost 200 over 100, in that range. He asked me if I was taking any medications and I told him only the over-the-counter Naproxen, that I take no

3

other medications. The paramedic commented that it was a good thing that I got called to work and awakened from sleep because with blood pressure that high during a sleep mode, I could perhaps have had a stroke. He said that the four tablets of Naproxen was a high dosage. He sat me down and had me drink to small pitchers of water to flush my system. After about 30 minutes, he again took my blood pressure and it had fallen to 190 over 100. He said it was coming down. He said to continue drinking water to flush my system, which I did. I reported for work and made the trip to Creston and back to Galesburg.

Upon returning to Galesburg, I saw another doctor, my own doctor                 in Galesburg. I calle         to tell him I was going to see a doctor.           sked why. I told him I was sick and wanted to see another doctor. He asked who I was going to see and I told him I wouldn't tell him. He asked why not and I told him that he had stopped me from getting my prescriptions the first time and I wasn't going to let it happen again. He stated that "I would never cancel an employee's prescriptions; all I did was ask the doctor if there was anything you could receive that was over-the-counter that would have the same effect as the prescription medication." I don't remember what else we said, other than stating that I was going to see a doctor. I then went to s.             That doctor gave me a shot to reduce inflammation in my shoulder/neck area. She also gave me a prescription for an anti-inflammatory and also a pain pill, both prescription medication. I later on went to a neurologist doctor in St. Louis, .            who diagnosed my neck pain being caused by a herniated disk in my neck. He gave me a second MRI and said I was getting worse. He said there is no way I can ride on a train because the vibration will cause more problems in my neck.

I am currently off work indefinitely since August 15, 2002, the last trip that I made. I am off as injured.

#

I have read the statement above, and it is all true and correct to the best of my knowledge and belief.

Date: 11/13/02     Signed: _____

Signed in the presence of *Stephen J Drasler*
(Name)
*Operating Practices Inspector*
(Title)
Federal Railroad Administration.

4

Case 5:03-cv-04110-DEO   Document 83-7   Filed 10/19/05   Page 23 of 39

# REPORT OF INTERVIEW

## 021106-002979

**PERSON INTERVIEWED:** ~~ ~~ BNSF Road Foreman of Engines

**DATE OF INTERVIEW:** Friday, November 15, 2002, 3:40 p.m.

**PLACE OF INTERVIEW:** Telephonic Tel. No

**INTERVIEW CONDUCTED BY:** S. J. Drassler, FRA Operating Practices Inspector

**OTHERS PRESENT:** None

was interviewed regarding allegations made by Burlington Northern Santa Fe Railway (BNSF) conducto. 'h. interfered with medical treatment provided to . _ by a health care professional on August 12, 2002, following a work-related injury.

The following statements and/or comments are provided as part of this investigation and although not verbatim, accurately and fully reflect the statements of the participant.

.e is employed by the Burlington Northern Santa Fe Railway Company as a road foreman of engines (RFE) and has been employed in that capacity for over 10 years. Mr. territorial responsibilities extend west of Galesburg, Illinois, on the Nebraska Division Ottumwa Subdivision to Creston, Iowa.

'. said that came in to his office in Galesburg to report a personal injury that occurred due to rough track on the Ottumwa Subdivision. He said that cold him that he did not have a personal physician and wanted to see a doctor because he was having a lot of pain in his neck and shoulder. _ recommended that he go to a clinic used by the railroad at St. Mary's hospital. _ asked if could accompany ∵ to the clinic anc agreed.

'. said that ∴ had expressed a desire to continue working, if he could. At the clini . said he waited in the waiting room/lobby area while was seen by a doctor When . came out from seeing the doctor, . ∴ told him that they doctor was sending him down for a MRI test. asked ‾ if he could speak to the doctor while he was down getting the MRI done anc agreed.

_ said that he spoke with Doctor He said the doctor mentioned that he was going to issue a prescription medication to ! _ said the he told the doctor that wished to continue working. He told the doctor about FRA reporting requirements and that issuance of a prescription medication would make the injury reportable to the government. He asked if there was any over-the-counter medication that he could issue that would have the same

F6180.67 5J0.300

effect as a prescription medication, but would still allow          to continue working. He said
the doctor said there was such a medication and that he would issue that one instead of the
prescription medication. After the conversation,          _          left the clinic.

I.              said that after          went to see the doctor          _     made one or two trips
and then marked off as injured and said that due to the nature of medications given to him by another
doctor, he wasn't supposed to work.                    said that he did not know prior to that call that
          had seen another doctor, or tha               had another doctor. He thought
was without a personal physician, but apparently was not.

          said that he thought what he did was right.               wanted to continue working
and                    felt that prescription medications would force          to miss work.
          said that he felt he was doing          a favor by asking the doctor to substitute an
over-the-counter medication for the prescription medication.          said the report ability
of the injury was not a concern to him, if the employee was injured, he was injured, and he always
tried to put the employee's best interest first. Had he known that he was creating such a controversy
by merely explaining to the doctor about a prescription medication causing an injury to become
reportable and also asking him if there was an over-the-counter medication that could accomplish the
same thing, he would never have taken such a course of action.

The interview was concluded at this point.

#

2

SEP. 27. 2004 10:37AM   MIKE SCHUSTER SAFETY   NO. 8132   P. 9

# REPORT OF INTERVIEW

## 021106-002979

| | |
|---|---|
| **PERSON INTERVIEWED:** | Dr. |
| **DATE OF INTERVIEW:** | November 18, 2002 |
| **PLACE OF INTERVIEW:** | Telephonic |
| **INTERVIEW CONDUCTED BY:** | S. J. Drassler, FRA Operating Practices Inspector |
| **OTHERS PRESENT:** | None |

Doctor                was interviewed regarding an alleged on-the-job injury suffered by Burlington Northern Santa Fe (BNSF) Railway employee              . examined the employee on August 12, 2002, and provided the subsequent diagnosis and treatment provided to                provided, in substance, the following information:

        . is employed by the OSF Occupational Medical Clinic, OSF St. Mary Medical Center, Galesburg, IL. He has worked there for about five years.

He said that he is familiar with the fact that industries are obligated to report employee job-related injuries to the government. He indicated he was aware of the fact that issuance of prescription medication can trigger reportability of an injury.           s stated that he, and other doctors, strive to prescribe OTC medications, when possible, that still help the employee but also help to keep the reportable injuries down. He stated that the medications are the same and he had no problems prescribing the OTC medications. He also stated that the BNSF Railway is only one of many employers who bring employees to the clinic for job-related injuries.

        examined the medical chart on file for BNSF employee              He said he was brought into the clinic on August 12 and was accompanied by a supervisor, a                        He said that the supervisor waited in the waiting room while .            was examined. He stated that he and           'ater had a discussion about the injury, but the supervisor did not interfere with the examination (he was not present) nor did he influence the doctor as to treatment.        . was sent down to the x-ray department for an MRI image of his neck, which was negative, except for some minor, early, arthritis.      ' said he diagnosed Mr.           as having suffered "cervical strain" and that he expected him to be feeling better in a couple of weeks and prescribed him a pain reliever/anti-inflammatory medication. He said that          informed him that he was not taking any medications at the time        .' said he initially prescribed over-the-counter (OTC) Ibuprofen for            pain and inflammation.        . indicated to him that the Ibuprofen caused side-effects and asked for something else.        . took that under consideration and prescribed Naprosyn, 220mg, a standard size dosage. The doctor stated the medication was to be taken "as-needed." He said           was released with no restrictions.        , st            was comfortable with being released to go

F6180.67 SJ0300

back to work.        _        was to call the clinic in one week to arrange coming in for a follow-up exam, but        ι never called or came in.        said that if ̄ ̄        had come in a second time, he probably would have prescribed Celebrex, a prescription drug for arthritis and recommended physical therapy via "home traction," a very common treatment for neck pain. This is is standard treatment for such pain        .        was very surprised to learn tha.        was not working and was still having problems with his neck three months later. He said he hasn't seen ̄        ˙ since the August 12 examination, nor ha        been back to the clinic.

        stated that the railroad supervisor did not influence or interfere with his decision to prescribe the OTC pain reliever.

I thanked the doctor for his time and concluded the interview.

#

2



# EMPLOYEE PERSONAL INJURY/OCCUPATIONAL ILLNESS REPORT

F 6180.67 STO

Each employee incurring an injury or occupational illness on duty and/or on property must fill out this report and provide it to their supervisor. A copy should be retained for your file.

| NAME OF INJURED PERSON | AGE | DATE OF BIRTH | SENIORITY DATE | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|
| | | | | |

| | MILE POST (IF APPLICABLE) | STATION NO. (IF APPLICABLE) | DATE OF INJURY | TIME |
|---|---|---|---|---|
| ALBIA IOWA | 309.89 | HALPIN | 8-7-02 | 2313 - Reported to Dispatcher. Could Not Get Dispatcher Earlier. 2233 By HALPIN □ AM ☒ PM |

**TEMPERATURE** 68

**VISIBILITY** (Check correct response): □ DAWN □ DUSK □ DAY ☒ DARK

**WEATHER** (Check correct response): ☒ CLEAR □ RAIN □ SLEET □ CLOUDY □ FOG □ SNOW

IF THIS IS AN OCCUPATIONAL ILLNESS RATHER THAN AN ACUTE INJURY, WHEN DID YOU FIRST NOTICE SYMPTOMS?
No ILLNESS. INJURED ShoulDer + Neck

WHEN WERE YOU FIRST TREATED OR DIAGNOSED?
No TREATMENT AS of this Date.

DESCRIBE INJURIES OR OCCUPATIONAL ILLNESS:
INJURED SHoulDer + NECK

DESCRIBE FULLY HOW INJURY OR OCCUPATIONAL ILLNESS OCCURRED:
ENGINE DIPPED + SWAYED BAD THROWING my leFt SHoulDer AND HEAD AGAINST WINDOW. HEARD Neck SNAP MAKEING ME SICK AT Stomach.

WAS THE ACCIDENT CAUSED BY THE CONDUCT OF ANOTHER PERSON? □ Yes ☒ No
IF YES, PLEASE DESCRIBE:

COULD YOU, BY MORE CARE ON YOUR PART, HAVE PREVENTED YOUR INJURY? □ Yes ☒ No
IF YES, HOW?

WAS THERE ANYTHING WRONG WITH THE EQUIPMENT, WORK PROCEDURES, OR WORK AREA WHICH LED TO THIS ACCIDENT/INJURY? ☒ Yes □ No
IF YES, PLEASE DESCRIBE: BAD TRACK

TYPE OF MEDICAL ATTENTION ADMINISTERED (PRESCRIPTION, BRACE, SPLINT, ETC):
NoNE AS OF 8-7-02

NAME OF ATTENDING PHYSICIAN: NONE
ADDRESS:

NAME OF ATTENDING FACILITY: NoNE
ADDRESS:

IF INJURY OCCURRED WHILE WORKING WITH ON TRACK EQUIPMENT, LIST INITIALS AND NUMBERS:
No

IMPORTANT: LIST ALL PERSONS WHO WITNESSED THE INJURY OR THAT CAN GIVE ANY INFORMATION ABOUT IT:

| NAME | OCCUPATION | ADDRESS (Show Street and City) |
|---|---|---|
| | ENGINEER | |

Signed:

Date: 8-8-02

PLEASE ANSWER ALL QUESTIONS (USE REVERSE SIDE IF NECESSARY)

IAF51662 2-98

SEP. 27. 2004 10:38AM   MIKE SCHUSTER SAFETY   NO. 8132   P. 12

**From:**
**Sent:** Thursday, August 22, 2002 1:35 PM
**To:**
**Cc:**
**Subject:**

**Importance:** High

Here is the information I have been able to put together so far regarding this case: On 08-07-02, Conduct_____ radioed the dispatcher that their locomotive, BNSF 8251, had bottomed out while going over the crossovers at Halpin, IA, MP 309.8 of the Ottumwa Subdivision. He told the dispatcher that he had hit his head and that they needed to have the track checked out at that location. Nothing more was said. Upon his arrival in Galesburg, he lef ¯ _____ Road Foreman of Engines, a message about what had happened and that he had hit his neck and left shoulder on the window of the locomotive. He further stated that while his neck was a little stiff, he had taken some aspirin and was doing fine. As soon as _____ received the message, he attempted to contac____ He called ¯ _____ esidence and was told by his wife that he wasn't home. He also tri____ cell phone but without success. Finally that evening, August 8th, at around 7:30 PM - 8:00 PM, he made contact with _____ who had taken his wife out to dinner. He advise____ that as soon as he was done with dinner, he needed to come in and fill out the injury paperwork which he did. While completing the paperwo____ again said he was doing fine and did not need to go to the doctor. Since the____ requested to go to the doctor and was taken to a clinic in Galesburg. The doctor at the clinic could find nothing wrong with _____ and they even did an MRI with negative results. He was advised to take over the counter aspirin if needed and to go back to work. We have since learned that ¯ _____ las gone to see his personal physician, was given a sample drug to take and then went back and asked for a prescription for that drug but we don't know the reason for that visit or the prescription as he refuses to allow us to contact his personal physician. He has not signed a medical release and told _____ not to attempt to contact his doctor. He has taken 3 personal days off and again we don't know the reason for that. On August 20th, he notifie____ _____ that the medication he was on was making him drowsy and "weird" and he wante____ to put in writing that he had to work which of course he wouldn't do. _____ did tell him to get a note from his doctor stating whether or not he could work. _____ tol____ that his doctor was sending him a note stating he could not work because of the medication he was taking, again nothing to tell us what the medication was for or what _____ problem was. As of August 22, 2002, we have not received that note but have not allow____ to work.

Meanwhile, an investigation has been conducted into this alleged incident which revealed the following. Four engineers, 2 prior _____ train and 2 after, were interviewed about the track condition at the location and none of them took exception to it. They did state that it wasn't as smooth as other locations but nothing that would toss a person around. Amtrak was also contacted and their crews took no exception to the track condition at that location. Roadmaster _____ went to the location and took measurements and found that the track was within FRA specifications. I have the report from the Roadmaster and would be glad to forward that to you if you need it. The locomotive involved in this incident was captured and inspected at Alliance. The inspection was of the seat and the suspension and no exception was taken. Additionally, the manufacturer also inspected the suspension of the locomotive and took no exception.

_____ was observed on Sunday, August 11th, by a BNSF clerk demonstrating what appeared to be a golf swing to an engineer. The clerk stated tha____ _____ was using both arms to demonstrate and did not appear to be having any problems with his arm or neck. We have taken the clerk's statement and will also contact the engineer. _____ nd his wife were seen out in public by _____ the evening of August 19th and stated he didn't seem to be having any problems. We have been told that _____ has been playing golf on the days that he has been off and this info_____ _____ on to_____

understanding that Claims is doing surveillance on ____ and that they have some good video but the problem is no one knows what his restrictions are as we have no medical. We have also been advised that ____ was wearing some type of neck brace prior to his alleged injury of August 7, 2002. In addition, we have been informed th. ____ is good friends with, and has coffee on a regular basis with ____ (IL-102001-008) who alleged a similar incident in October of last year and received a settlement from Claims in the amount of $93,000.00 (this amount is common knowledge in the Galesburg area) ____ retired several months after his incident.

While I realize this case is listed as non-reportable, I am writing you to inform you of the facts that we have developed regarding this alleged incident. I feel that once we have all the information we will be able to pursue ____ for falsifying an injury but some of those facts might also cause someone to believe the case should be reportable. Also, we are not counting any lost days or ____ as we don't have any medical information that would justify his being off.

Please call me if you have any questions regarding this case.


*Manager of Safety*
*Nebraska Division*

\c-rrua\).vc\



**BNSF**

A. V. WETSCH
Superintendent of Operations

The Burlington Northern
and Santa Fe Railway Company

201 N. 7th Street
Lincoln, Nebraska 68508

Phone: 402-458-7634
Fax: 402-458-7503

# INTER – OFFICE MEMO

Date:        September 6, 2002

To:                       · Mgr. Of Safety

From:      Rick Wetsch

RE:

I received an anonymous telephone call in my office on Friday, August 9th, from a Galesburg employee who stated that Mr.                had been doing neck exercises with a stretch type machine prior to his injury on August 7th of 2002.

The anonymous caller stated that              had problems with his neck and back prior to this injury and did not feel the BNSF should be paying for this man's injury.



# BRASHER LAW FIRM, L.C.

WILLIAM A. BRASHER •
THOMAS J. PREBIL •
RICHARD F. NASH •
PAUL R. FERBER
PATRICIA D. BRASHER
JOHN H. MARSHALL •
PAUL E. LITTLETON
CYNTHIA A. MASTERSON ▪

SUITE 2300
ONE METROPOLITAN SQUARE
211 NORTH BROADWAY
SAINT LOUIS, MISSOURI 63102
TELEPHONE (314) 621-7700
FAX (314) 621-1088
FAX (314) 768-7010
FIRM E-MAIL: brasher@brasherlaw.com
SENDER E-MAIL: tprebil@brasherlaw.com

THOMAS P. McDERMOTT
TOM L. BELL •
JAMES A. BAX •
RALPH G. GODSY, JR. •
LINDA R. SELF •
ZORA MANJENCICH
ERIC J. SCHWALB ••

*LICENSED IN MISSOURI AND ILLINOIS
**LICENSED IN ILLINOIS AND WASH. D.C

OF COUNSEL
RICHARD L. DALY

## PLEASE DELIVER IMMEDIATELY!!!

## TELECOPIER TRANSMITTAL COVER SHEET

**TO:**       **Mike Hartung-Schuster**

**FAX NO:**    **817-352-7631**

**FROM:**     **Thomas J. Prebil**

**DATE:**     **May 25, 2004**

**RE:**              **v. BNSF**

## TOTAL NUMBER OF PAGES INCLUDING COVER SHEET: 8

If facsimile transmission is incomplete,
please call Tanya at (314) 621-7700

**MESSAGE:**

Jerry Dillingham requested I forward this statement to you.  Please call if you have any questions.

**IMPORTANT:**  This message is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the United States Postal Service.  Thank you.

08/07/02

RE: Statement by Gary Harter taken on 09/16/02

This is .                    interviewing          on the 16ᵗʰ of September 2002. The time is
now approximately 2 p.m.  I'm speaking from phone number          What is your
number there

A.

Q.  And is that your home phone?

A.  Yea.

Q.  This interview concerns an injury, which occurred at or near Albia on August the 7ᵗʰ, 2002
    involving                              is this telephone recording being made with
    your full knowledge and consent?

A.  Sure, yea.

Q.  Would you please state your full name and spell your last for me?

A.

Q.  And what is your home address with zip code?

A.

Q.  Your date of birth?

A

Q.  And you're speaking from your home phone number?

A.  Yes.

Q.  What is your social security number?

A.

Q.  By whom are you employed?

A.  Burlington Northern Santa Fe Railway.

Q.  And what is your occupation?

A.  I'm a locomotive engineer.

Q.  And how long have you worked for the railroad?

1

A.  6- years.

Q.  And what is your marital status?

A.

Q.  Uh, on August the 7th, of 2002 um, were you indeed working with

A.  Yes.

Q.  And was this trip from Creston?

A.  From Creston on a loaded coal train that's correct.

Q.  Would that have been uh, CNRNC hmm, something, LO13, if you remember?

A.  I do not remember the train's number.

Q.  Okay, do you remember the locomotive?

A.  It was a SD70 Mack and that's all I remember.

Q.  Okay, um, did you ride over with uh,              from Galesburg to Creston?

A.  Yes.

Q.  You were on the same crew?

A.  Yes.

Q.  Do you remember what kind of train that was?

A.  Uh, I don't, no I can't honestly answer that no.

Q.  Okay, and did you have any difficulties on that trip from Galesburg to Creston?

A.  No not that I recall.

Q.  Okay, how long did you lay over there in Creston if you remember?

A.  Oh, I would have to get my paper. It was in the neighborhood of 8-10 hours.

Q.  And then you just turn around and come back?

A.  That's correct.

Q.  So with a full coal train you don't go all the way to Galesburg, is that correct?

A.  It depends on the train symbol. Some of them we trade crews at Burlington.

2

Q. And on this particular train on August the 7th, how far did you come?

A. We went to Galesburg.

Q. Okay, and during that trip was there an incident in which _____ uh, complained of any injury?

A. Yes.

Q. Where was that?

A. It was exactly at control point Halpin, absolute signal at Halpin.

Q. The absolute signal at Halpin. Okay, and what happened?

A. Uh, as we were going over the crossing there's um, we weren't crossing over but there were lines for normal movement. And his side of the locomotive bottomed out. Um, I don't know if it actually bottomed out or not it's hard to tell when your dealing with that many tons. Um, the SD70 Mack's are known to ride hard. Some of them their shocks are worn out and I've reported them in the past. But um, this particular spot the locomotive did take a severe bounce. And uh _____ asked me if I hard a snap or a pop and I said no I did not and he said his neck popped. And he was sitting um, as I recall with his left elbow on the armrest and as the locomotive bottomed or dropped due to what I don't know, the track conditions I have no idea. I'm not a trackman; I'm a locomotive engineer. But uh, it forced his shoulder up and his head down therefore consequently causing a um, a neck popping. And he experienced nauseous and um, he took a couple of I don't know what kind of pain relief and uh, after awhile he said the nausea had went away and he then he reported the incident to the locomotive or the uh, Ottumwa subdivision dispatcher.

Q. At the uh, time in which I _____ felt his problem did you experience any rough handling of the locomotive?

A. Not any rougher then any other bad spot on the rail.

Q. Okay, and if you could, can you define bad spot?

A. Uh, anywhere for the normal flow of movement is interrupted due to the track conditions that is not in my definition normal. Uh, low spot, a uh, a kink in the rail, uh, like I say I'm not a trackman I don't know. But I do know when the normal flow of the train is interrupted.

Q. Okay, and so this spot was as far as it effective you was it normal or abnormal?

A. Well it was, it's not normal uh, I don't know the correct word. The normal flow for better term, of the locomotive of a train was disrupted due to the low spot in the track.

Q. Okay, and that was on the crossover?

A. Yes it would be the west crossover at Halpin.

Q. Okay,

3

A. It was exactly where it happened.

Q. And um, are there other

A. Main track 2.

Q. Main track 2?

A. That's correct.

Q. Um, are there other crossover locations where that occurs?

A. It has been in the past but the trackman eventually and I'm not saying quickly but they do eventually get to them and fix them. And they put slow orders on them. This particular night there was not a slow order on that, on that piece of track.

Q. Okay, um, have you heard that while you were on that locomotive on that train any other reports from other trains ahead of you?

A. No.

Q. Did you hear any subsequent reports of trains behind you?

A. No.



Q. Uh, had you, did you have an occasion to go over that location on your uh, next round trip?

A. Yes.

Q. And what was the condition?

A. Uh, I can't accurately answer that because there had been a 25mph slow order placed on that piece of track.

Q. There has been?

A. Yes.

Q. And how many days later was that?

A. I would venture to say 3.

Q. Okay, so maybe the 10th?

A. Yea, there about uh, I'm not real sure.

Q. Okay, that's fine. Um, was this particular locomotive one of the roughriders?

A. No we hadn't uh, like I said before in my statement that some of the, I don't remember what the locomotive number was. Some of the 94's, 95's and 96's that have not been rebuilt yet,

4

right now we are in the process of rebuilding 94's and they're fine pieces of equipment. They are excellent locomotives.

Q. After being rebuilt?

A. After being rebuilt. Before being rebuilt some of these locomotives tend to get a galloping on you, on rough rail. And when I say galloping it will bounce on a low spot on the track and uh, it's just like being in an old Cadillac with worn out shock absorbers. It will bottom out.

Q. Okay,

A. And when this happens it's my obligation to report this to Ft. Worth mechanical. And I did not do it on this particular locomotive because I did not notice any roughness.

Q. Okay, well I think if my paperwork is correct the lead locomotive there was a, BN8251 and a BN9611 but it looks like the 8251 was in the lead?

A. Well if it was an 80 it was a what number?

Q. 8251?

A. That would not be an SD70. That would (I can't hear this answer.)

Q. It says here I don't know how, I have a copy of your delay report and it says identification number or identification engine initial and number. Then it says other engines in consist.

A. Okay, well in the first place if it was an 8200 series it would be an BNSF and all of the SD70's from 96 on up would be BNSF.

Q. Yea well let me see if

A. I know my job.

Q. Well you know it better then I, I'll tell you that. That's why I talk to guys like you. Um, well those were the 2 locomotives and regardless of which one was in the lead you wouldn't report?

A. No.

Q. Um, have you work with                    /efore that round trip?

A. Not over the road. I had worked with him year's back in the yard.

Q. Okay, had you ever um, hello. Turns tape off. This i.            ˉontinuing the interview of uʰ            on the 16ᵗʰ of September 2002 and the time is now 2:15 p.m. And I accidentally bumped the telephone and it cut us off didn't

A. Yes it did.

Q. Uh, what was the span of time between the time it got cut off and I called you back?

5

A. 15 seconds.

Q. Okay, and so we've not had any other conversation outside the tape recording is that correct?

A. No.

Q. Okay, that is correct?

A. That is correct.

Q. Okay, um, my question was if you ever known ___ have neck or back problems before?

A. No I haven't because I only kn_ in passing; I don't know him personally.

Q. Okay, did he experience or complain at all on your trip over to Creston about any problems?

A. Not neck or back problems no.

Q. Okay, any other problems?

A. Uh, I was aware of a problem he had with Lyme disease.

Q. Oh he actually did have lyme?

A. Yea he had uh; he was bitten by a deer tick. I had discussed that in the past with him. I'm an outdoorsman and I was curious of the symptoms and uh, what the problems were that he experienced with that.

Q. Yea well that's curious. I've heard about Lyme disease but never really talked to anybody that ever had it.

A. Yea.

Q. Um, so these 9600's that you were talking about and 9700's uh, are they, were they like that from the very first time we got them new?

A. No the Ottumwa subdivision in my opinion the track especially main track 2 has a lot of hard use with a lot of heavy trains. We're talking trains in excess of 16,000 tons, 6300 feet long continuous pounded and the weather conditions it tends to deteriorate the track faster then it seems that a lot of people can keep up with it. And uh, over the years of hard use uh, since these locomotives have been moved it seems like the system the springs and the shocks have worn down. Because due to the sheer weight of the locomotives themselves and the deteriorating track conditions. In my opinion.

Q. Okay, let me ask you this. How long have you been working on that Ottumwa Sub?

A. Uh, ever since I've hired out I was pretty much stayed out there luckily. That's my subdivision of choice to work.

Q. Okay, why is that?

6

A. Um, it's just the lay over's in-between trains, the time off and plus it's just fun. I take a lot of pride in my train handling and my locomotive handling skills and it's a challenge every time you run a coal load out there.

Q. Okay, and over that period what was it, 6 or 7 years?

A. 6.

Q. 6 has the um, maintenance of the tracks stayed about the same?

A. No there's been time uh, in wet springs where they just worsen.

Q. Okay.

A. Uh, we've had wash outs and stuff like that you know, that's acts of GOD which we don't have any control over.

Q. But as far as quality of ride, speaking average at an average across those 6-years has it stayed pretty much the same?

A. It picks and uh, but uh, yea it has.

Q. Okay, um, I think that ends any questions that I have for you.

A. Okay.

Q. Are there any details or facts that I've not asked you about that you would like to add to your recorded statement?

A. Oh, no not that I can think of off hand. I've answered everything to the best of my knowledge and my ability and honestly so.

Q. Okay, that's my next question. Are the remarks you made in this telephone recording your true version to the best of your knowledge?

A. 100% yes.

Q. And has this telephone recording been made with your full knowledge and consent?

A. Yes it has.

Q. Oka         ay is September the 16th, 2002 and the time is now approximately 2:20 p.m. That concludes the recorded interview.

A. Okay.