MEMORANDUM:

TO: RAY LINEWEBER, UNITED TRANSPORTATION UNION;
CHARLES COLLINS, ESQ.; HARRY ZANVILLE, ESQ.,

FROM: PAUL F. BYRNES

DATE: JANUARY 9, 2006

RE.: FRA "RESPONSE" TO ALLEGATIONS OF BNSF'S WILLFUL VIOLATIONS OF FEDERAL RAILROAD SAFETY STATUTES AND REGULATIONS IN AND AROUND SIOUX CITY, IOWA

I have been asked to review the on-going controversy at issue in the instant case and provide a memorandum detailing my thoughts and impressions. In doing so, I must first make clear that I do not now work for the Federal Railroad Administration ("FRA") nor do I speak for or on behalf of the FRA. The following comments are based upon the generalized knowledge and expertise acquired during the years I was with FRA's Office of Chief Counsel and my thirty-five years of involvement with the railroad industry including twenty years spent working as a locomotive engineer.

**OVERVIEW:**

I believe that all allegations of violations of federal railroad safety standards must be taken seriously and looked into by the FRA regional headquarters for the region where the alleged violations took place, particularly when:

1. the charges are conveyed directly to the region by the very employee(s) that claim to have witnessed the misconduct;
2. the charges involve claims that safety-critical federal regulations and/or railroad rules were violated;
3. the charges are made by a number of different employees; all involving the same or common nucleus of operative facts, e.g., same railroad official(s) involved, similar circumstances in each case.
4. the charges include claims that railroad supervisors are knowingly ordering their subordinates to violate federal railroad safety statutes and regulations.

**WHAT I BELIEVE AN APPROPRIATE RESPONSE BY FRA REGION SIX WOULD HAVE BEEN:**

**Background.**

Under the FRA enforcement scheme, the eight regions are given a great deal of autonomy. Along with this decentralized division of authority, comes the responsibility on the part of each FRA region to promptly and thoroughly investigate all allegations of railroad employer/railroad employee misconduct in its jurisdiction, particularly if the level and diversity of allegations indicates that a systemic problem may exist.

**Logistics.**

I believe that once a region receives a number of complaints alleging unsafe conditions and/or violations of federal railroad safety statutes and regulations at a particular location or in a particular area, the Regional Administrator ("R.A.") should immediately form a task force to investigate those claims (this may be especially important if the claim(s) involve allegations that unsafe conditions and violations have occurred as the result of willful misconduct by one or more of the railroad's supervisors). This task force should be headed by a person from the region with sufficient authority to coordinate all aspects and resolve all issues that arise, e.g., one of the Deputy Regional Administrators ("D.R.A."), and be comprised of specialists and inspectors from each of the affected safety disciplines. If the region believes it necessary to do so, the Office of Safety and/or the Office of Chief Counsel should also be consulted for advice on how to proceed. The "foot soldiers" of the task force should be those inspectors most familiar with the location(s) of the alleged misconduct and safety concerns (hopefully some of those inspectors will have developed a rapport with the railroad employees in the affected areas and will be able to contact those employees *ex parte* in order to get a clearer picture of what is allegedly taking place in those areas before actually going out on site).

**The Investigation.**

The actual investigation by the Region should be both covert and overt. It should include:

1. direct surreptitious observation (surveillance) of railroad operations in the area (particularly helpful if the complaints and allegations involve a "pinpoint" location such as a terminal like Sioux City where activity is confined to a

relatively small area and easily observed) with simultaneous monitoring of road and yard radio traffic at that location;

2. unannounced (surprise) inspections of the location(s) where the complaints are centered, where railroad records should be reviewed, interviews taken of supervisors and employees, facilities and rolling equipment inspected; locomotive event recorders downloaded and reviewed, with all exceptions and violations noted and written up for handling pursuant to FRA enforcement policy;
3. inspection and review of all pertinent railroad reports and other documents: including but not limited to those showing the number of trains arriving and departing the terminal during a specific period of time; the average dwell time for freight cars in the terminal; the average train velocity for traffic departing/arriving; the number of bad order cars set out each day (to be compared with the number of bad orders found by the FRA inspectors during their unannounced inspection of the terminal); the number of locomotives receiving daily inspections and the number of non-complying conditions found during those daily inspections (to be compared with the number found by the FRA during its unannounced inspection); and the number of personal injuries occurring at that location (both FRA accountable and FRA reportable);
4. inspection and review of additional documents to include Hours of Service logs; minutes of any "safety committees" that meet at that location; written safety-related complaints made to railroad supervisors at that location; current timetables and timetable special instructions; and all notices, bulletins, and messages posted by the railroad;
5. meetings with railroad management and the rail-labor organizations (separately, with anonymity promised to all attendees) at which each party is provided opportunity to tell its "side of the story."

**Follow-up to the Investigation.**

As soon as possible after completing the actual investigation, the task force should reconvene at the regional headquarters to report to the R.A. and D.R.A. about the findings of the investigation: including the number and type of exceptions noted and

violations taken; the results of record inspections and document reviews; the results of meetings with railroad supervisors and meetings with rail-labor; and the overall impressions formed during the investigation.

**Action taken following Investigation.**

Once the investigation is completed and the region has reviewed all the findings thereof (and if appropriate, consulted with FRA headquarters), there are a number of courses of action possible.

1. If a thorough investigation conducted in good-faith finds that the complaints and allegations are without merit, all parties should be notified of that fact. Particular attention should be paid to the complaining parties, with representatives from the region personally explaining to those parties in detail why FRA believes no further action is warranted.

2. If the investigation find a reasonable number of exceptions and violations but no evidence of systemic problems and/or willful violations on the part of railroad supervisors, that should also be explained, with the exceptions and violations handled through normal channels.

3. If the investigation finds evidence of systemic enforcement and compliance problems (including a failure by the railroad to encourage and enforce compliance with railroad operating rules), then the region needs to notify all parties of that fact, and forcefully pursue enforcement of all regulations violated. The region should increase the frequency and intensity of its monitoring of railroad activities at that location; publicly announcing its intention to do so to all parties involved.

4. If the investigation finds evidence of a deliberate railroad policy of compelling or encouraging non-compliance with federal railroad safety regulations (e.g., railroad supervisors ordering subordinates to violate federal railroad safety statutes and regulations), then the region must act quickly and decisively to resolve that situation. Appropriate action (depending upon the nature and frequency of the violations) would range from a regional warning letter to significant fines and/or disqualification from holding safety-sensitive positions in the railroad industry. In any event, the FRA must make clear to all parties

involved as forcefully as possible that such conduct is not and will not be tolerated.

**ADDITIONAL COMMENTS:**

I believe that for FRA to claim that it had no jurisdiction to investigate the complaints it received re. BNSF conduct in and around Sioux City because those complaints involved the collective bargaining agreement ("CBA") is absurd. Employee claims that railroad supervisors are ordering train crews to violate federal railroad safety standards are not "minor disputes," i.e., do not raise issues that require interpreting the CBA. As clearly set forth in Appendix A to 49 CFR Part 209, a railroad supervisor who orders a subordinate to violate a federal railroad safety statute or regulation commits a willful violation that subjects the supervisor to a civil penalty (individual liability or I.L.) ranging from a warning letter to permanent disqualification from holding any safety-sensitive railroad position. In addition, 49 U.S.C. § 20109(a)-(b) prohibit the railroads from discriminating against or discharging any railroad employee who engages in protected activity such as filing safety-related complaints concerning violations of the federal railroad safety statutes and regulations or refusing work if it presents imminent danger of serious injury or death. Clearly, resolving these issues—some of which have arisen in the instant controversy—does not require interpretation of the collective bargaining agreement.

Furthermore, (as explained in the Office of Safety Operating Practices Compliance Manual: chapter 4, pgs 8-9) FRA considers a railroad that fails to promote and enforce compliance with its operating rules to be in non-compliance with 49 CFR §§ 217.9, 217.11. A railroad supervisor who is ordering his subordinates to violate railroad operating and/or safety rules cannot be promoting and enforcing compliance with the railroad's operating/safety rules. This is yet another reason why Region Six should have (was required to) investigated the complaints it received re. BNSF Sioux City operations.

**QUESTIONS ABOUT WHY THE FRA OFFICE OF CHIEF COUNSEL HAS TAKEN OVER AND THE OFFICE OF SAFETY HAS NOT BEEN INVOLVED AT ALL IN FRA'S RESPONSE TO THE UTU CHARGES RE. BNSF SIOUX CITY VIOLATIONS:**

One of the most puzzling (and troubling) aspects of the current controversy has been the complete absence of input by the Office of Safety until recently. As explained in 49 CFR Part 209, Appendix A, the Office of Safety is charged with monitoring the general system of transportation railroads for compliance with all applicable railroad safety statutes and regulations and investigating allegations of railroad non-compliance with said statutes and regulations. The Office of Chief Counsel's role at this stage of the process is nominally advisory, with the Office Chief Counsel taking over the regulatory enforcement process only after the Office of Safety's regional offices have transmitted violations to it for review and enforcement.

Given the normal division of authority at FRA, I believe that the Office of Safety should have been in charge of FRA's response following the November Judicial Hearing in Sioux City—or at least played a major part in the process. Instead, the Office of Safety was a complete non-factor in the process until recently, i.e., not only was the Office of Chief Counsel the principal FRA respondent, it was the only FRA respondent. Although I understand that Office of Safety has finally responded to the on-going controversy, its only response to date was *de minimis* at best: limited to an acknowledgment by the Deputy Associate Administrator for Safety of Mr. Lineweber's repeated attempts to establish a dialogue with the Office of Safety. Furthermore, it is my understanding that even following the testimony brought forth at the recent evidentiary hearing, Region Six has not further investigated the original allegations nor has it communicated with any of the parties involved, i.e., all of FRA's "substantive" actions to date have been through and by the Office of Chief Counsel. Given the fact that the Office of Chief Counsel consists of a group of career attorneys (none of whom have ever actually worked on a railroad) and given that the Office of Chief Counsel has lost a significant number of its experienced enforcement attorneys in the past few years, it is hard to see how the Office of Chief Counsel can judge the merits of the complaints and allegations made in this case

and how it can judge the efficacy of BNSF's responses (if any) to said complaints and allegations.

**FRA'S "LISTENING POST" PROPOSAL:**

I understand that in early December, FRA's Office of Chief Counsel proposed holding a "listening post" at which time the Plaintiffs in the instant action would be asked to provide details of <u>recent</u> "noncomplying [*sic*] conditions or deficiencies," with discussions of "collective bargaining issues" to be minimized. I further understand that BNSF "senior operations officials" were invited and had indicated their intention of attending the listening post.

I believe that this "listening post" proposal is highly problematic for the following reasons:

1. by its terms and conditions, it would be limited to "recent" noncomplying deficiencies detailed at the terminal. There is apparently nothing in this proposal for discussions of the previous allegations of misconduct that form the predicate for the instant action.
2. by its terms and conditions, any discussion of what FRA contends to be "collective bargaining issues" is to be "minimize[d]." If FRA has already stated that many if not all of the previous complaints made by the Plaintiffs raise collective bargaining issues that FRA has no jurisdiction to investigate, this position makes one question the usefulness of any such "listening" post since FRA has already made clear its position on these allegations.
3. I understand that the proposal for said "listening post" was made by one of the attorneys from the Office of Chief Counsel. Unless the listening post was to be under the auspices of the Office of Safety and attended by the Deputy Associate Administrator for Safety and senior FRA representatives from Region Six, I would again question the usefulness of such a session.
4. to be truly useful, I believe that attendance at any such meeting should have been limited to representatives of FRA and the Plaintiffs in the instant case. Given that the factors that gave rise to the present litigation include the belief on the part of the Plaintiffs that BNSF supervisors have discriminated against them for attempting to

comply with the federal railroad safety regulations and BNSF operating rules and for making complaints to the company hotline and to FRA, the presence of BNSF "senior operations officials" at such a meeting would almost certainly be highly intimidating; leading to less than candid discussions about the "noncomplying conditions and deficiencies" at the Sioux City terminal that FRA's Office of Chief Counsel claims to now be so interested in hearing about.

5. I understand that to date FRA has failed to follow-up on any of the issues that may have been revealed by the testimony at the recent (November 9-10, 2005) evidentiary hearings. If FRA has indeed failed to investigate any of these issues, what assurances are there that the agency would be any more aggressive in investigating any allegations of "recent noncomplying conditions or deficiencies."

6. I believe that the purpose of a listening post is to serve as a forum for FRA to receive input about working conditions and potential problems in the work environment; **not** as a substitute for agency action[1] after it has received complaints and other evidence of "noncomplying conditions or deficiencies"—and particularly so when a representative of FRA has been present in the courtroom when sworn testimony was adduced detailing the "noncomplying conditions or deficiencies."  As such, I believe that the time for a "listening post" has long since past—as has the time for a"serious" response on the part of the FRA.

Submitted January 9, 2006.

---

[1] see pages 2-6 *supra* for comments on what I believe appropriate agency action would have been.