December 23, 2005

Ms. Jo Strang
Associate Administrator for Safety
Federal Railroad Administration
1120 Vermont Avenue, NW
Washington, **D.C.** 20590

**Re: Bauer et. al. vs: BNSF Railway Company**

Dear Madam Associate Administrator:

Thank you for the response to my email message in which I attached the letter as dated December 20, 2005, from Donald J. Munro, counsel to Defendant BNSF, to Plaintiffs' counsel, Messrs. Charles A. Collins and Harry Zanville, regarding the above-referenced case.

I know you are anxious to provide BNSF officers and the FRA Regional Administrator (RA), among others with an opportunity to be heard in Sioux City, during January 2006. Although I believe your offer is well-intentioned, I am concerned about such a "listening session" for a number of reasons.

First of all, I must point out there are two distinct and separate matters in controversy here:

1. **The Litigation of <u>Bauer, et. al. vs BNSF</u> which alleges, among other things, harassment and intimidation of railroad employees by Mr. Michael G. Heyns, a BNSF Officer, who remains a trainmster in Sioux City, Iowa, supervising railroad operations in and around the Sioux City Area.**

2. **The self-incriminating testimony by Mr. Heyns during the evidentiary hearing held by The Honorable Judge Donald O.Brien on November 9th and 10th in Sioux City, Iowa.**

I believe these matters need to be outlined in dept, since you may not be aware of the underlying issues.

# I. LITIGATION AGAINST BNSF.

The first issue is the litigation against BNSF by the employees. You may have not been provided an overview of why that issue was brought before the Court. Therefore, I am providing a concise summation of the history of the litigation with the hearing transcript attached for a more detailed review of such litigation.

I first became aware of the Sioux City situation, in July 2001, while on the UTU Regional Meeting circuit with BNSF Senior Manager David Dealy, and an FRA assignee. We had explained to UTU members the reason for the Safety Assurance and Compliance Program (SACP), how it was re-created by FRA after the preliminary investigation of a series of devastating train accidents on BNSF. The subsequent investigation revealed serious shortcoming on the part of BNSF management and supervisory personnel. I believed, by working together, in partnership with BNSF and the FRA, we had been able to re-engineer safety on the BNSF. Based on the initial successes, we had additional plans. We also had reason to believe a partnership approach involving railroad management, rail labor, and the FRA, then under the leadership of the Honorable FRA Administrator Jolene Molitoris, would make the railroad industry a safer and more productive mode of transportation – for the benefit of all.

Unfortunately, <u>after,</u> I made my presentation, extolling the virtues of partnerships with our new friends (FRA and BNSF), and the meeting had closed, reality set in. Two BNSF employees from Sioux City approached me and asked me if I knew about what happened to Jim Linneman (a BNSF conductor working in and out of Sioux City). I knew Mr. Linneman from when I was in train service with BNSF, and I remember and was expecting to hear he had been injured or was ill. Instead, what I heard about was how he had been mistreated by BNSF Trainmaster Mike Heyns, apparently in retaliation for Mr. Linneman's insistence on complying with FRA regulations and BNSF operating and safety rules.

-2-

The two BNSF whistleblowers also informed me that Mr. Heyns' mistreatment and abuse was not restricted to Mr. Linneman. <u>Anyone who failed to kowtow to Mr. Heyns, was subject to his wrath.</u> They further informed me there were a number of other BNSF employees in Sioux City who had the "audacity" to insist upon complying with the rules and regulations and experienced Mr. Heyns' anger as a result thereof.

After listening to what the two gentlemen from Sioux City had to say, I apologized to them. I then spoke with the UTU representative from Lincoln, Nebraska, who reached accord with BNSF officers to save Mr. Linneman from possible permanent termination. After hearing the facts, again, surrounding the matter at hand, I telephoned Mr. Linneman. Mr. Linneman provided me with a straightforward account of the events that had led to a confrontation with Mr. Heyns. It must be known this account comported with what I had been told by the two BNSF employees and the UTU representative. At the end of our conversation, I asked Mr. Linneman if he wanted me to try to make right the wrong I believed had been heaped on him for simply wanting to follow the rules and regulations and he requested that I do so.

My first step was to insure the railcars Mr. Linneman had switched out of his train in Ferry (a siding close to Sioux City) in the incident that precipitated a confrontation with Mr. Heyns were, in fact, in non-compliance with the CFR (i.e. had federal defects). My review of the applicable BNSF records confirmed Mr. Linneman had acted appropriately at the time.

I the contacted Mr. Heyns' supervisor and requested a meeting which took palace approximately one month later, in Sioux City. I was unsure as to what to expect, since I had been informed by BNSF employees who have worked under Mr. Heyns' supervision he can be very pleasant one moment and erupt into a rage the next. Unfortunately, I can now attest to Mr. Heyns' volatile temperament, firsthand. When I met with Mr. Heyns and his supervisor, the meeting went quite well until I asked Mr. Heyns for suggestions on how to bridge the gap between Mr. Linneman and him so they could work together. In response he angrily asked "what do you think I am on Prozac," to which I replied "only you can answer that question." The supervisor then intervened, but the collegial atmosphere had been shattered by Mr. Heyns outburst and the meeting ended shortly thereafter with nothing having been accomplished.  -3-

Following my meeting with Mr. Heyns, I telephoned Mr. Mark Kotter, a BNSF Officer who reports directly to Senior Vice President Dave Dealy, my SACP "partner". Mr. Kotter really didn't review the facts, prior to denying my request that Mr. Heyns conduct be reviewed. He did make it a point to inform me BNSF could not have employees delaying trains.

Following my conversation with Mr. Kotter, I made several efforts to discuss the situation with Mr. Dealy, directly requesting that he look into the matter, firsthand. He too, expressed concern about the amount of time it took Mr. Linneman to conduct inspections of his trains, leading me to believe Mr. Dealy's only concern was getting the trains out of Sioux City, or wherever a crew was dispatched to operate one.

I know you are familiar with the requirements that trains departing the initial terminals be given a proper initial terminal air brake test and pre-departure inspection.

**As I recall during the Rail Safety Advisory Committee (RSAC) Power Brake efforts, you participated in a "working group" which completed an inspection and formalized it with a video of a brake test on Norfolk Southern. I believe the report to the full RSAC confirmed an Appendix D inspection would take a train service person a minimum of 45 seconds to one minute to inspect each side of a rail car. It also must be noted the time to inspect did not take into account such factors as bad footing, and inclement weather, nor were the delay(s) which occur when bad order (defective) railcars were found, considered.**

Mr. Linnemans delay report is within the "norm".

Mr. Dealy's refusal to review the true facts in the Heyns' matter is particularly troubling since it occurred at the time rail labor was having second thoughts about the whole SACP process. Those reservations were heightened by a perception that BNSF and the FRA were acting in concert under the auspices of the SACP to advance the interests of BNSF.

-4-

A few months later, I decided to stop attending SACP due primarily to the continued unsafe actions of BNSF management and supervisory personnel enhanced by the unjustifiable harassment and intimidation of BNSF employees who were and are attempting to perform their duties in the safest manner possible.  **I only took this aforementioned unprecedented action after I had sounded the warning bell to FRA and our union through numerous letters, meetings, and telephone calls.  The material provided for the meetings with FRA, letters, and other exhibits will be provided at your request, should you wish to review those in order to best understand why I cannot in good faith agree at this time to a "listening session" in Sioux City.**

I am also compelled to bring FRA's consistent refusal to review my concerns to your attention.  I had hoped FRA would take a leadership role in resolving these concerns, particularly since BNSF's non-compliance with the FRA railroad safety standards was an issue.  Even though I spoke with the FRA/BNSF SACP facilitators, called the FRA Region Six Headquarters in Kansas City several times, called and wrote to the FRA Office of Safety in Washington, no assistance was provided. FRA's only response was that all the issues raised by BNSF's conduct in Sioux City, Iowa, involved the collective bargaining agreement, and FRA had no jurisdiction over such issues.

BNSF failed to review the on-going harassment and intimidation of its employees at the Sioux City terminal, coupled with the FRA's refusal to investigate allegations of BNSF's non-compliance with the FRA railroad safety standards and its own operating and safety rules, the employees were forced to preserve their rights.  **The employees who filed causes of action in the above-captioned matter did so, believing they had no recourse other than to pursue legal action through the Federal Courts.**

**These employees did not act precipitously in filing suit against BNSF. There is a long "paper trail" of complaints brought to FRA's attention by BNSF employees at Sioux City.  Of most significant interest are the statements made under oath by the Plaintiffs who testified at the November 2005 hearing held by Judge O'Brien, in Sioux City.**

-5-

**Those employee-plaintiffs testified as to how FRA representatives repeatedly informed them FRA could not do anything and did in fact do nothing in response to the employee-plaintiffs complaints. As I recounted above, FRA told me essentially the same thing, and I hope you understand I don't need to participate in a "listening post" to hear more of the same.**

<u>I must also advise you the BNSF employees who had the courage (and faith in FRA) to speak up are now fearful of retaliation from the BNSF and will most likely refuse to show up and expose themselves to more management retaliation simply to get a second "dose" of "FRA can't do anything," and/or "these are all collective bargaining issues."</u>

### II. MR HEYNS" TESTIMONY

With regards to issue number two, I believe as each day goes by your agency is making more of a target of itself. I don't want to compare it (FRA) to FEMA, but the "storm" of FRA inaction continues unabated at Sioux City. Safety principles are being washed away and the conditions continue to deteriorate. Most importantly, those at BNSF and the FRA who are in a position to resolve the problems at Sioux City refuse to even admit problems exist, even when it is substantiated by sworn testimony, as that provided by Mr. Heyns.

Again, an FRA listening session a this juncture would only raise more alarms, in the minds of the BNSF employees who work in Sioux City, or perhaps set off more sirens is the more appropriate cliché'. That is assuming the affected employees could be convinced to attend. At this point it is impossible to convince the BNSF employees at Sioux City (and likely other locations on the BNSF system) that FRA will do anything about complaints without prodding from other parties.

Clearly, if BNSF and FRA have not heard enough to raise significant concerns about the safety of the BNSF operations and management practices by now, only the Congress or the Courts will be able to provide assistance to the BNSF employees and Plaintiffs.

-6-

Any reasonable person, whether he or she represents the FRA. BNSF, the United States District Court for the Northern District of Iowa, or the United States Congress should be able to comprehend more taxpayer monies, in the form of a "listening session" would not be a wise expenditure. Their clearly is sufficient evidence as has been adduced to make a compelling argument that Mr. Heyns has repeatedly committed acts of a serious enough nature to permanently disqualify him from performing safety sensitive duties. Unfortunately, FRA remains unwilling to take any action against him.

It is my profound hope that, after reading this letter, and the attached transcript you will commit the FRA to timely and forceful corrective actions with regards to Mr. Heyns qualifications to perform safety sensitive duties as set forth in 49 CFR Part 209, subpart D and Appendix A. I have chosen not to make a formal request that FRA issue Mr. Heyns a Notice of Proposed Disqualification pursuant to 49 CFR 209.305 since there are multiple certified complaints on file with FRA, in Kansas City, since September 2005, and the only response I have is the certified return card, verifying my letters were delivered to FRA.

In closing, please note I am providing you with verified copies of the transcripts from the July hearing and the November hearing in Sioux City. If there are reporting requirements FRA must comply with, after receiving at no cost something of significant cost to produce, please let me know so I can provide the cost of the same for you to report to the appropriate authorities.

Thanks for your attention to this most urgent and serious matter.

Respectfully,


Ray L. Lineweber

Attachments: Lineweber to Dealy Memorandum, & Linneman Delay Report
              July 6, 2005 Sioux City Hearing  Bauer et. al. vs: BNSF
              November 9& 10 Sioux City Hearing